49
United States Courts
Southern District of Texas
FILED
JUN 04 2002
Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JEFFERSON-PILOT LIFE INS. CO. §
§
V. §
§ CASE NO. B-01-142
§
SORT-RITE INTERNATIONAL, §
ET AL. §

# MOTION FOR SUMMARY JUDGMENT FILED BY PINO, METZGER, AND FINCH AGAINST SORT-RITE INTERNATIONAL, INC.

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW LETICIA PINO, DEBRA FINCH, and KATHERINE METZGER, and file this their Motion for Summary Judgment against SORT-RITE INTERNATIONAL, INC.

## STATUS OF THE CASE

I.

In August 2001 JEFFERSON PILOT LIFE INSURANCE COMPANY filed this interpleader action, and tendered into the Registry of the Court the sum of $1,500,000, which represented the proceeds of a life insurance policy on the life of

Shirley Metzger, who died on March 23, 2001. The policy was structured so that it contained a $500,000 portion and a $1,000,000 portion. The following individuals and entities filed claims which asserted an interest in the proceeds:

1. Movants herein claim 100% of the proceeds.

2. SORT-RITE INTERNATIONAL, INC. claims the $1,000,000 portion, and additionally claims, against Movants herein, a right to reimbursement for premiums, interest, and attorneys' fees.

3. COASTAL BANC (formerly San Benito State Bank and Trust) claimed an interest based on debts owed by Shirley Metzger and SORT-RITE INTERNATIONAL, INC.

4. EXPORT-IMPORT BANK OF THE UNITED STATES claimed an interest based on a debt to SORT-RITE INTERNATIONAL, INC.

II.

On March 1, 2002 this case was mediated, and Movants herein settled with COASTAL BANC and EXPORT-IMPORT BANK OF THE UNITED STATES in the collective amount of $150,000. Motions to distribute funds held in the Registry of the Court and sever these two claimants from the case were filed by COASTAL BANC on behalf of both banks. The Order to distribute funds was recently signed by the Court.

III.

The claimants who remain after the mediation settlement are Movants herein and SORT-RITE INTERNATIONAL, INC. Movants herein claim 100% of the remaining proceeds, based upon the beneficiary designation change form executed

in 1995, and upon proceedings which occurred in two Chapter 11 bankruptcies filed by SORT-RITE INTERNATIONAL, INC., the first filed in May 1992, Case No. 92-21053-B 11, and the second filed in April 2000, Case No. 00-21094-B 11. A plan of reorganization was confirmed in each of these two bankruptcies.

## SUMMARY OF ARGUMENTS

IV.

SORT-RITE INTERNATIONAL, INC. relinquished all interest in the subject life insurance proceeds, to the extent it had an interest, during proceedings relating to the confirmation of its plan of reorganization in Bankruptcy Case 00-21094-B-11, the second of such proceedings filed by SORT-RITE. Its original rights to the $1,000,000 portion of the proceeds were incidental to a lending transaction which required the debtor-corporation to assign to the bank its interest in a life insurance policy on the life of its chief executive until the debt was paid. The bank's assignment was not preserved as a lien in the first bankruptcy's plan of reorganization, which was confirmed in 1994 (Bankruptcy Case 92-21053-B-11). In 1995 Shirley Metzger, as President of SORT-RITE, cancelled all previous beneficiary designations, which eliminated SORT-RITE's rights to the policy.

V.

In recognition of the fact that it had no interest in the life insurance policy, SORT-RITE did not list the policy as an asset in the second bankruptcy proceeding

filed in April 2000. With the confirmation of the second plan of reorganization, the old shareholders were stripped of all interest in Debtor, and new shares of stock were issued to a third party, who represented to the bankruptcy court through sworn testimony at the confirmation hearing, that SORT-RITE was rejecting the life insurance contract, thereby terminating its interest in the policy, to the extent that it had one. This testimony was consistent with the language of the confirmed plan of reorganization, which rejected the life insurance policy as an executory contract, recognizing that it had no positive value to the company. The rejection of the contract in bankruptcy eliminated SORT-RITE's obligation to pay for a policy for which it would never receive benefit. After the plan was confirmed, SORT-RITE paid no further premiums on the policy. SORT-RITE is judicially estopped to now assert an interest in the policy, and, additionally, it has no insurable interest in the life of Shirley Metzger. The beneficiary designation change, recorded by Jefferson Pilot Life Insurance Company in September 1995, cancelled any interest SORT-RITE had.

## FACTS RELEVANT TO SUMMARY JUDGMENT

### A. Company History.

**VI.**

Sort-Rite International, Inc. manufactures and sells to an international market stainless steel shrimp-sorting equipment for commercial shrimpers and

shrimp-processing plants. This company was, for fifty years, a family-owned and operated business. For at least twenty-five years, until shortly before her death, Shirley Metzger was the company's President and primary salesperson, and owned 85% of the company's outstanding stock, with 10% owned by Movant DEBRA FINCH and her minor daughter, and the remaining 5% owned by Movant KATHERINE METZGER. Movants FINCH and METZGER are the daughters of Shirley Metzger, Deceased.

**B. Facts Relating to Purchase of the Policy and First Bankruptcy Filing.**

VII.

In 1987 Shirley Metzger purchased from Jefferson Pilot Life Insurance Company the life insurance policy #JP4038973 which is at issue in this case. A copy of the policy, with endorsement, is attached hereto as Exhibit 'B.' This policy was purchased to fulfill a requirement imposed by Export-Import Bank of the United States (hereinafter Exim Bank) as a condition for guaranteeing a SORT-RITE loan from Coastal Banc. Exim Bank required that SORT-RITE assign to it its interest in the proceeds until the debt was repaid.

VIII.

The policy provided for death benefits in the amount of $1,500,000, and through what was characterized as a "split-dollar" endorsement, the benefits were broken into two portions, one for $1,000,000 and the second for $500,000. The

Employer (SORT-RITE) had the right to the $1,000,000 portion, along with the right to assign that portion, which it assigned to Exim Bank. It also had the right to designate a beneficiary of its portion of the policy. The "Co-Owner" (Shirley Metzger) had the same rights with respect to the $500,000 portion of the policy. The Employer was to pay the premiums on the policy and the Co-Owner was to reimburse the Employer for the "cost of insurance" of the Co-Owner's portion of the policy.

IX.

In 1992 SORT-RITE defaulted on the Coastal Banc – Exim Bank loan and in May 1992 it filed the first of its two Chapter 11 bankruptcies. The plan of reorganization for that bankruptcy was confirmed on March 14, 1994. The plan provided that Exim Bank was to be paid 100% of its claim, which would remain secured by inventory and equipment. SORT-RITE's collateral assignment in the life insurance policy was not preserved in the confirmed plan.

X.

On August 16, 1995 Shirley Metzger, in her capacity as President of Sort-Rite International, filed with Jefferson Pilot a "Change of Beneficiary" form, which states, in its first paragraph, "All previous beneficiary designations and optional methods of settlement selected under the above numbered policy are hereby cancelled, and the proceeds of said policy upon the death of the insured are to be

paid to: Leticia Elizalde De Pino – friend of the insured." Shirley Metzger's daughters are listed as contingent beneficiaries.

**C. Shirley Metzger's Health Issues.**

XI.

For at least the last twenty years of her life, Shirley Metzger had suffered from numerous maladies and painful conditions which were medically treated with addictive prescriptive drugs. By 1998, at age 60, although still able to effect sales for the company, she was in a much debilitated state, suffering from the effects of unsuccessful pelvic surgery, migraine headaches, back spasms, ulcers, and chronic depression. She took between 6 and 8 prescriptive medications daily, no fewer than five of which were 'pain killers' and anti-depressants of such a character as to be regulated by the federal government as Control II or Schedule IV substances. These included Vicodin, Clorazepate, Butalbital, and Celexa. Each is habit-forming, and each carries, as a side effect, a decrease in mental and physical capabilities.

C. **Year 2000 Chapter 11 Bankruptcy Proceeding.**

XII.

In April 2000, SORT-RITE filed its second Chapter 11 bankruptcy reorganization. Three months later, in July 2000, Debtor SORT-RITE received permission from the bankruptcy court to employ a company, Engineered Thermo

Systems, to manage and handle the day-to-day operations of the company. Shirley Metzger's declining health was the reason cited in the application for the need for this employment.

XIII.

The plan of reorganization provided that the existing shareholders were to receive nothing under the plan, and their shares of stock were to be cancelled, with new shares to be issued in the name of a successful bidder, which term was so defined in the plan as to prohibit existing shareholders from participation in the bidding process. Engineered Thermo Systems, Inc., which had operated the company for the previous nine months, was the successful bidder, at a price of $10,000. Its participation in the bidding process was made possible because the plan, through it defined terms, specifically excluded Engineered Thermo Systems, Inc. from the definition of an "insider."

XIV.

Shirley Metzger was in South America on company business when the hearing was held in early December 2000 on the plan of reorganization and the disclosure statement. Nor was she in attendance for the January 10, 2001 hearing on the confirmation of the plan, the Court being advised by Debtor's attorney that her health did not permit her attendance.

D. **Representations at the January 10, 2001 Confirmation Hearing.**

XV.

Engineered Thermo Systems' President, William Capt, testified at the hearing with regard to the company's plan of reorganization. It was his testimony that there was no written employment contract with Shirley Metzger, only a verbal agreement that she could work for Sort-Rite for one year at a salary of $2,000 per week drawn against commissions she earned (Exhibit 'A' attached hereto, Transcript of hearing, page 50-51). He did not agree, as part of Shirley Metzger's compensation, to continue to pay for the life insurance on her life. Further, Mr. Capt did not agree that she was essential to the company, but that she had "a lot of knowledge of the industry, very valuable." (Exhibit 'A,' Transcript of hearing, page 49). Specific questions were asked at that hearing about any post-confirmation benefits to Shirley Metzger. Mr. Walsh, the attorney for creditor FCLT, asked:

> The only thing I want to make sure of, and if that representation can be made to us that 2,000 a week is it, there's no stock incentives, ***there's no life insurance***, there's no car payments, there's nothing else, it's just $2,000 a week, then we've got no question about absolute priority issues.

(Exhibit 'A,' Transcript of hearing, page 91) [Emphasis added]. After discussion on other matters, the court returned to this issue, stating as follows, with responses of attorneys:

> THE COURT: All right. Moving on. FCLT. Is there any stock or bank-end deals with Ms. Metzger in this corporation?

> MR. MACKEY [Debtor's attorney]: No, there—well, there are not that I have been told about and I have requested specifically that I be told everything about whatever their deal is during the time of this plan.
>
> THE COURT: So, it's you understanding and you'll stipulate on the record as attorney for this, the reorganized debtor or the debtor who is seeking reorganization at least, that the reorganized debtor has no contract nor does the party buying this have any contract other than the one that was described by the witness on the stand. Is that correct?
>
> MR. MACKEY: Well, that's correct, but the reason that I hesitate as the lawyer, Judge, is that there is an insurance, life insurance policy that when XM Bank was in the case as a secured creditor went to XM Bank as a beneficiary.[1] That has to be reversed out and how they're going to do that, I don't know. But it is an insurance policy on –
>
> THE COURT: Is it a whole-life policy?
>
> MR. MACKEY: Yes, on Ms. Metzger. But I don't think there's hardly any value left to it but there may be.

(Exhibit 'A,' Transcript of hearing, page 104). Also attending the confirmation hearing was a Miami, Florida attorney, Mark London, who separately represented Engineered Thermo Systems, Inc. Upon direct questioning from the Court, he confirmed what had been stated earlier by Mr. Mackey:

> THE COURT: But in the second year she only gets what she sells.
> MR. LONDON: Correct. That is correct, that is what I understand.
> THE COURT: Okay. But there are no stock options, no, none of that other stuff?
> MR. LONDON: Nothing. No, Your Honor.

(Exhibit 'A,' Transcript of hearing, page 106).

---

[1] The life insurance policy was originally taken out in 1987 in conjunction with and as a requirement imposed by Export-Import Bank of the United States incidental to a Sort-Rite loan which it guaranteed. It had failed to perfect its security interest, had filed no proof of claim in the second bankruptcy, and its claim had been completely discharged in the second bankruptcy. There were no other Sort-Rite creditors who had an interest in the life insurance policy.

E.    **Rejection of the Insurance Policy in the Plan of Reorganization.**

XVI.

In its Second Amended Disclosure Statement, filed on December 7, 2000, which was the one upon which the Bankruptcy Court confirmed SORT-RITE's Plan of Reorganization, Debtor SORT-RITE rejected all executory contracts, in language quoted below:

[From Paragraph H(5), page 16, Second Amended Disclosure Statement]

> At this time, the Debtor intends to reject all employment agreements, management agreements or stock options provided to any employee in connection with an employment agreement or other agreement which was entered into or existed prior to Filing, including any related employment and severance practices and policies, compensation and benefit plans, policies and programs of the Debtor applicable to its officers and employees pre-petition employment agreement, ***including insurance plans, health care plans, severance benefit plans, disability and other insurance plans***, but excluding retiree benefits defined in 11 U.S.C. 1114.

[Emphasis added].  The Second Amended Plan of Reorganization, which was the plan confirmed by the Bankruptcy Court, contains the same language, recited below:

ARTICLE IX  [page 19]

EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1   Executory Contracts and Unexpired Leases

> B.         Debtor rejects, as of the Effective Date, any and all employee-related agreements and policies, including any employment agreement, management agreement or stock option provided to any employee in connection with an employment agreement or other agreement which existed prior to Filing,

> including but not limited to any and all related employment and severance practices and policies, ***and all related compensation and benefit plans, policies and programs of the Debtor applicable to its officers and employees, including insurance plans, health care plans, severance benefit plans, disability and other insurance plans provided thereunder***.

[Emphasis added].

Following the Court's decision to confirm the plan, Sort-Rite discontinued any further payments of premiums of the insurance policy. Instead, when the premium notices were received from Jefferson Pilot, the corporate management directed the office workers to route the notices to Shirley Metzger for payment. Ten weeks after the date of the Confirmation Hearing, Shirley Metzger died. Sort-Rite now, through this proceeding, seeks $1,000,000 of the policy.

## ARGUMENTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### A. SORT-RITE is Judicially Estopped to Assert an Interest in the Policy Proceeds.

XVII.

The doctrine of judicial estoppel "bars a party who has successfully maintained a position in a prior judicial proceeding from later adopting an inconsistent position, unless he can show the prior statement was made inadvertently due to mistake, fraud, or duress." *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 396 (Tex.App.—Houston [14th Dist.] 1997, *writ. dism'd by agreement*); *Long v. Knox,* 155 Tex. 581, 291 S.W.2d 292 (1956).

XVIII.

Judicial estoppel may be triggered by a party taking a misleading position in a legal proceeding, such as a debtor omitting to disclose an asset in bankruptcy. *Stewart v. Hardie,* 978 S.W.2d 203, 208 (Tex.App.—Ft. Worth 1998, *pet. denied*).

XIX.

Under federal law, the inconsistency sought to be judicially estopped need not arise from a sworn statement; judicial estoppel requires only that a party take an affirmative position which it successfully maintained in an earlier proceeding and which is contrary to the position the party seeks to invoke. *In Re Phillips,* 124 B.R. 712, 720 (Bankr. W.D.Tex. 1991). "The policies underlying the doctrine include preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." *United States v. McCaskey,* 9 F.3d 368, 378 (5th Cir. 1993). The courts will not allow a debtor to obtain relief from the Bankruptcy Court by representing that a claim does not exist and then subsequently assert that claim for his own benefit in a separate proceeding. *Matter of Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir.), *cert. denied*, 528 U.S. 1117 (1999).

1. **Judicial Estoppel Triggered by Statements to Bankruptcy Court.**

XX.

In the instant case Judge Richard Schmidt questioned William Capt, the President of Engineered Thermo Systems, Inc., who was the successful bidder who would receive all shares of stock in SORT-RITE INTERNATIONAL if the plan was confirmed. Certain creditors' attorneys, including Scott Walsh, counsel for FCLT (quoted elsewhere in this motion) had raised questions regarding benefits to be received by former shareholders, which benefits could render the plan in violation of the absolute priority rule. President Capt denied that such benefits would be continued, Debtor's attorney, Ken Mackey, advised the court that the policy was no longer needed since Export-Import Bank's claim had been discharged, and stated that the policy would have to be "reversed" out. Judge Schmidt additionally questioned Mark London, an attorney present at the confirmation hearing from Miami, Florida representing Engineered Thermo Systems, who confirmed that the Debtor would not provide life insurance benefits to Shirley Metzger after the confirmation of the plan.

XXI.

Despite these representations, when Shirley Metzger died on March 23, 2001, SORT-RITE chose to assert the opposite position in this proceeding. This is

the very type of manipulation of the judicial system which the doctrine of judicial estoppel was intended to prohibit.

XXII.

Statements made by an attorney during the prior proceeding can be considered in determining judicial estoppel; although the attorney's statements are not evidence, they establish the client's legal position. *Goldman v. White Rose Distributing Co.*, 936 S.W.2d 393, 397 (Tex.App.—Fort Worth 1996). In fact, courts routinely rely on counsel's statements during oral argument and rely on these representations when deciding cases. See *United States v. Lopez,* 514 U.S. 549, n. 4 (1995).

XXIII.

In the case at bar, the following facts are critical and dispositive of this issue:

1. Debtor's attorney, the President and representative for Engineered Thermo Systems, Inc. and its own counsel in attendance from Florida each advised the Bankruptcy Court that the life insurance policy was not a part of the plan to be confirmed.

2. The confirmed plan and its companion disclosure statement each specifically rejected the subject life insurance policy as a contract to be continued if the plan was confirmed.

3. The voluntary petition filed in the Chapter 11 suit did not list the life insurance policy as an asset.

4. After the plan was confirmed, SORT-RITE did not make further payments of premiums, but instead, referred the premium notices to Shirley Metzger for payment.

XXIV.

This last fact is relevant because it demonstrates an intent consistent with the representations made to the Bankruptcy Court prior to the death of Shirley Metzger. Only after her death did SORT-RITE take an opposing position. The doctrine of judicial estoppel bars SORT-RITE's claim to any of the proceeds of the life insurance policy.

2. **Judicial Estoppel Triggered by Rejection of Executory Contracts.**

XXV.

The life insurance policy at issue in this case was an executory contract. An executory contract is a property interest in accounts or other general intangibles which represents the package of benefits accruing to the owner as a result of the contract, usually consisting primarily of the right to receive payment. *Revisiting Rejection: Secured Part Interests in Leases and Executory Contracts,* 103 Dickinson Law Review 498 (1999). These property interests immediately become part of the bankrupt estate under section 541. The thrust of section 365 after the commencement of the case is to determine whether the provisions of the contract will again become enforceable against the Debtor or become permanently unenforceable, through the operation of Debtor's election to assume or reject. *NLRB v. Bildisco,* 465 U.S. 513, 533 (1984).

XXVI.

With respect to both of Sort-Rite's bankruptcies, all executory contracts were rejected in the plans confirmed in both Chapter 11 bankruptcies, not in just the second proceeding. In the second bankruptcy, the language of the confirmed plan of reorganization specifically addressed the life insurance benefits to company executives in its rejection of those contracts. Shirley Metzger's life insurance policy was the only one of these contracts which SORT-RITE had.

XXVII.

The effect of the rejection of an executory contract is the termination of that contract with respect to the Debtor. *R & O Elevator Co. v. Harmon,* 93 BR 667, 671 (D. Minn. 1988); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.* 756 F.2d 1043, 1048 (4th Cir. 1985); *cert. denied,* 475 U.S. 1057 (1986).

XXIII.

Title 11 of the United States Code, Section 365(g)(1) provides that the rejection of an executory contract constitutes a breach of such contract. Claims for such a breach must be presented through the normal bankruptcy procedures for classifying and satisfying liabilities. *NLRB v. Bildisco*, 465 U.S. at 530, 104 S.Ct. at 1198; *Giddings Petroleum Corp. V. Peterson Food Mart, Inc.,* 859 S.W.2d 89 (Tex.App.-Austin 1993).

XXIX.

This brings up the related topic of SORT-RITE's claim for reimbursement of the "cost of insurance," characterized incorrectly as a reimbursement of premims. It is the language of the life insurance contract which gives rise to SORT-RITE's right of reimbursement. To the extent that SORT-RITE had rights to reimbursement, those rights arose during the life of the contractual arrangement between SORT-RITE and Shirley Metzger. They did not lay inchoate, and mature upon her death. Those rights to reimbursement were matters which SORT-RITE was required to handle through the bankruptcy court as a claim related to its decision to reject the life insurance contract. The bankruptcy court was in best position to evaluate that claim. The filing of such a claim would have had the additional benefit of clearly defining the termination of SORT-RITE's obligations, and would have necessarily required the involvement of Jefferson Pilot, with the end result of removing from SORT-RITE any opportunity for presence in this case as a party.

XXX.

Instead, SORT-RITE did not follow through and notify JEFFERSON PILOT LIFE INSURANCE COMPANY that it had treated the life insurance policy as a rejected executory contract. Additionally, it did not file any claim regarding its

position that it was owed reimbursement from Shirley Metzger for the "cost of insurance" of her individual portion of the policy. It cannot assert that claim in this forum, and its treatment of the life insurance policy in the bankruptcy court as a rejected executory contract is a separate and independent act which judicially estops SORT-RITE from asserting an interest in the life insurance proceeds in this suit.

XXXI.

Courts have recognized, under both the Bankruptcy Act and under the Code, that a debtor cannot pick and choose those provisions of an executory contract or lease it wishes to reject. *In Re. Mr. Gatti's, Inc.* 162 B.R. 1004, 1011 (Bankr. W.D. Tex 1994).

**PERTINENT POLICY LANGUAGE**

XXXII.

Under the terms of the policy, as issued in December 1987, Sort-Rite International, Inc. was the "employer," and Shirley Metzger was the "co-owner." Each had the right to appoint a beneficiary. The "co-owner's" beneficiary was identified as a "co-beneficiary." This right was never impaired or restricted in any way by the language of the banks' assignments.

XXXIII.

Under the terms of the policy, the co-owner was to reimburse the company for the cost of the insurance premiums. The actual language in the policy is as follows:

> Each premium on the policy shall be paid by the Employer as it becomes due. The Co-Owner agrees to pay the Employer an amount equal to the cost of the insurance provided to the Co-Owner by the policy each year. Co-Owner may make voluntary additional premium contributions to the Employer and Employer shall pay each such amount as an increased premium.

XXXIV.

Richard Kettenring, who is the Manager of Customer Service for Jefferson Pilot, was deposed regarding the payment of premiums on the policy. He testified that a total of $100,447.90 was paid by all entities, taken together, on the policy. Sort-Rite has presented checks which reflect that it paid a total of $63,965.51 of that amount. This establishes that SORT-RITE paid less than its two-thirds portion of the premiums and is entitled to no reimbursement for premiums. It has no right to interest or attorneys' fees.

The policy also contains the following provision:

> Upon the adjudication of the Employer as an insolvent or as a bankrupt, the Co-Owner may pay to the Employer an amount equal to the Net Premiums in exchange for the transfer by the Employer of all ownership rights to the Co-Owner, including the right to change the beneficiary.

XXXV.

This policy provision clearly contemplates the facts at bar, where SORT-RITE rejected the policy under the terms of its Plan of Reorganization. SORT-RITE could have asserted a claim for reimbursement through the bankruptcy proceeding, but did not. The new, reorganized SORT-RITE, with new stock issued after the confirmation of the plan, to new ownership, did not assert such position at the time these matters were discussed at the confirmation hearing. It did not file anything with the bankruptcy court regarding such payment, and has no right to make such a claim after receiving the benefits of that forum.

XXXVI.

An insurance policy purchased by bankruptcy Debtor is only an asset of the debtor's bankruptcy to the extent that it increases the debtor's worth or diminishes its liabilities. *In Re Zenith Laboratories,* 104 BR 659 (D. N.J. 1989). Property of the estate does not include any power that the debtor may exercise solely for the benefit of an entity other than the debtor. 11 USC Section 541 (b)(1). *In Re Herrell,* 210 BR 386 (N.D. Fla. 1997).

XXXVII.

Shirley Metzger died on March 23, 2001, approximately ten weeks after the confirmation hearing. No written documents were drawn up to effect the changes mandated by the plan of reorganization's provisions which rejected this executory

contract, and by the company's intent to transfer the policy to Shirley Metzger as demonstrated by the testimony of Bill Capt or the acts of management with regard to denial of premium payment.

**INSURANCE-RELATED ISSUES**

XXXVIII.

A distinction should be made between an assignment and a change of beneficiary. An assignment (1) is the transfer by one of his or her rights or interest in the property, (2) rests upon contract, and (3) generally requires the delivery of the thing assigned, the right to change the beneficiary is the power to appoint, which must be exercised in the manner specified in the contract. *Couch on Insurance,* Section 34.10; *Rountree v. Frazee,* 282 Ala. 142, 209 So.2d 424 (1968).

XXXIX.

The insured is generally unrestricted in his or her selection of the beneficiary of his or her insurance and the law will not review the propriety of this selection. *Lyle v. Bentley,* 406 F.2d 325 (5th Cir. Tex. 1969). The terms of a policy may prohibit a change of the beneficiary if the policy has been assigned. *Couch on Insurance 3d,* Section 34. With respect to the Jefferson Pilot policy at issue here, it did not. In the instant case, the policy provided that the corporation had the right to change the beneficiary designation for its portion of the policy, and Shirley Metzger, the co-owner, had the right to change the beneficiary designation of her

portion. Each of the two assignments at issue in the case provided that the assignors, which were Sort-Rite International and Shirley Metzger, respectively, retained the right to change the designation of the beneficiary, even during the time that the assignments were in force.

XL.

Five years passed after this 'change of designation of beneficiary' was filed with Jefferson Pilot, and the second bankruptcy was filed. The life insurance policy was not listed as a corporate asset. Exim Bank's debt became completely discharged, and, after the confirmation of the plan of reorganization, there was a complete change of ownership. Only representatives of the new ownership, not the old ownership, were present at the confirmation hearing. The matter of the life insurance policy was discussed at the confirmation hearing, and it is clear from the transcript that it was the intent of the parties that Sort-Rite release ownership and responsibility for the life insurance policy to Shirley Metzger.

XLI.

By confirmation of the plan of reorganization, the Court authorized the corporation to cease payments of premiums on the life insurance policy, and further authorized, by implication, a conversion of the policy to one where Sort-Rite's ownership was removed. See *Cooperativa Cafeteros De PP,* 37 BR 952 (D.C.P.R. 1984).

XLII.

Sort-Rite had taken certain steps in furtherance of this part of the Court's order when it ceased making payments and referred the premium notices to Shirley Metzger. Shirley Metzger died ten weeks after the confirmation hearing, and seven weeks after the judge's signature was placed on the order confirming the Plan of Reorganization. The fact that Sort-Rite had not followed through with the representations it made when it sought confirmation of the plan does not provide a basis for its right to the life insurance proceeds.

**THE POST-CONFIRMATION, REORGANIZED SORT-RITE HAD NO INSURABLE INTEREST IN SHIRLEY METZGER'S LIFE**

XLIII.

Once the Second Amended Plan of Reorganization was confirmed on January 10, 2001, Shirley Metzger was no longer the President of Sort-Rite International. She was not an officer of any kind. She owned no stock in the reorganized corporation. She was merely a commissioned salesperson for the company, and one without benefit of a written employment contract, who had significant chronic health problems. In fact, her status after the plan was confirmed was merely that of an independent contractor.

XLIV

The fall in status had been dramatic. Prior to the filing of the second bankruptcy, she was Sort-Rite's President and the owner of 85% of its stock. Shortly after the bankruptcy Sort-Rite sought bankruptcy court approval of a management agreement because Shirley Metzger was "suffering through an illness which prevents her from devoting her full attention to the business of the Debtor." (Exhibit , page 2). Additionally, she lost the following benefits previously enjoyed:

1. Vehicle and automobile insurance paid by the company;
2. Home security system paid by the company;
3. Medical insurance paid by the company;
4. Home connection of the corporation's "800" telephone line;
5. Life insurance policy.

XLV.

The new ownership determined that there was no further need for Sort-Rite to continue the insurance.

XLVI.

The legal consequences of these changes in Shirley Metzger's relationship with Sort-Rite was that Sort-Rite no longer had an insurable interest in her life. Consequently, it could not, under Texas law, retain an ownership interest in a life insurance policy on Shirley Metzger's life, and could be a beneficiary under a

policy on her life only if she chose to so designate the company as her beneficiary, which she did not do.

## ARGUMENTS AND AUTHORITIES RELATING TO "INSURABLE INTEREST" ISSUE

XLVII

For more than one hundred years Texas courts have recognized the requirement that persons for whom a life insurance policy was issued must have an insurable interest in the life of the person insured. See *Price v. Supreme Lodge of the Knights of Honor,* 68 Tex. 361, 4 S.W. 633 (1887); *Goldbaum v. Blum,* 79 Tex. 638, 15 S.W. 564 (1891).

As early as 1894 the Texas Supreme Court held:

> It is against the public policy of this state to allow anyone who has no insurable interest in the life insured to be the owner of a policy of insurance.

*Cheeves v. Anders,*87 Tex. 287, 28 S.W. 274, 275 (1894).

Prior to 1921, the State of Texas did not permit a corporation to be the beneficiary of a life insurance policy under any circumstances. In that year the legislature provided that to enable corporations to protect themselves in the event of the death of a valuable executive, under certain limited conditions, corporations would be considered to have an insurable interest in the lives of some, but not all, officers and stockholders. (*Emphasis added).* Act of March 12, 1921, 37th Leg., R.S. ch.

84, 1921 Tex.Gen.Laws 165 (amended 1951). Now Tex. Ins. Code art. 3.49 (Vernon 1981).

XLVIII.

By Acts of 1953, the legislature conferred an insurable interest status on anyone selected by the insured to be his or her beneficiary under a policy on his or her own life. 53rd Leg. R.S. ch. 113 p. 400. Corporations may name themselves beneficiaries of policies they buy on the lives of their important officers, directors, and stockholders, but the insurable interest does not survive the relationship which created it, and if the relationship has been terminated or the business entity no longer exists, the proceeds go to the insured's estate, not the corporation named as beneficiary. *Stillwagoner v. Travelers Ins. Co.*, 979 S.W.2d 354, at 359 (Tex.App.-Tyler 1998), *citing McBride v. Clayton,* 166 S.W.2d 125 (Tex. 1942).

XLIX.

The facts in *McBride v. Clayton,* 166 S.W.2d 125 (Tex.Com.App. 1942), were stronger than those of the instant case, and the employer in *McBride* was still found to have no insurable interest. In *McBride* the Deceased was the corporation's president at the time of his death. The corporation had surrendered its charter, and at the time of the insured's death the powers of its officers "had become restricted to those of liquidating agents." *McBride,* at 128. It is

noteworthy, however, that the corporation still had assets and was still receiving income.

L.

Nonetheless, the Decedent's family prevailed in its suit against the corporation, which was the named beneficiary of several life insurance policies on McBride's life. The Court found that the corporation had an insurable interest in the president's life at the time the policies were issued, but lost that interest prior to the president's death; therefore, the stockholders were not entitled to the proceeds.

LI.

This case is significant to the case at bar because it provides definition to the very limits of the 'insurable interest' landscape by providing circumstances wherein even one still retaining the position of president at the time of death is considered a person for whom the corporation has no insurable interest. Additionally, in this case the corporation was the named beneficiary at the time of death, whereas Sort-Rite lost that status in 1995, when Shirley Metzger replaced it with Leticia Pino.

LII.

The Court in *Stillwagoner,* quoting from *Drane v. Jefferson Standard Life Ins. Co.,* 139 Tex. 101, 161 S.W.2d 1057 (1942), presented the following language

as the most cited definition by Texas courts for an insurable interest in another's life:

> To prove an insurable interest in the life of another, the putative beneficiary must fall into one of three general classes: (1) one so closely related by blood or affinity that he wants the other to continue to live, irrespective of the monetary considerations; (2) a creditor; and (3) one having a reasonable expectation of pecuniary benefit or advantage from the continued life of another.

*Stillwagoner,* at 361. In the instant case, only the third class is applicable. It cannot be said that the new management of Sort-Rite International had any such expectation. Shirley Metzger's health was broken, and her relationship with the new management was not good (Exhibits , , and , letters from Shirley Metzger, William Capt, and Debtor's attorney). In December 2000, four months before her death, she had attended an important seafood show held annually in Brazil, only to discover upon her return that the company refused to pay for her expenses for the trip, taking the position that she was not authorized to go.

LIII.

The most succinct commentary on the low expectations which Sort-Rite's new ownership held for Shirley Metzger's future contribution to the company's future income stream was its decision in March 2001 to remove the company's international telephone lines from Shirley Metzger's home.

LIV.

Shirley Metzger's medical circumstances had required her to rely more and more on her ability to negotiate international sales by telephone from her home. The sales which she presented to the bankruptcy court in September 2000, in support of her application for approval of her salary were sales which were negotiated and closed from her home. She kept irregular hours which accommodated the Asian and Indonesian market.

LV.

This fact alone, without regard to those mentioned above, demonstrate that the new Sort-Rite ownership considered Shirley Metzger to be an employee of much less status than that required to maintain an insurable interest on her life.

LVI.

Two and one-half weeks after the event involving the telephone lines, Shirley Metzger was dead. She died while in Sort-Rite's service, in a hotel room the day she arrived to attend the Boston Seafood Show (this one and the Brazilian show mentioned above are the only two annual seafood shows of importance to this industry), and Sort-Rite refused to pay for the expenses for the body to be returned to Harlingen.

LVII.

These facts belie any position by Sort-Rite that it had "a reasonable expectation of pecuniary benefit or advantage from the continued life of Shirley Metzger," as required by Texas law to establish an insurable interest.

LVIII.

The mere existence of an employer-employee relationship is never sufficient to give the employer an insurable interest in the life of the employee. *Stillwagoner,* at 361. See also *Tamez v. Certain Underwriters at Lloyd's, London, international, Acc. Facilities, et al.*, 999 S.W.2d 12 (Tex.App.-Houston [14th Dist.] 1998) (Employer lacked insurable interest in lives of employees, and therefore could not designate itself as beneficiary and receive the proceeds).

LIX.

It is apparently Sort-Rite's position that its right to the insurance proceeds is based on the fact that after the confirmation hearing no formal documents had been executed before Shirley Metzger's death which memorialized Sort-Rite's rejection of future obligations under the insurance policy contract. Movants submit that the Second Amended Plan of Reorganization is sufficient to establish termination of these rights and obligations. The fact that Jefferson Pilot had not been notified of this by Sort-Rite does not alter the fact that the plan of reorganization contains this rejection language, nor does it alter the fact that the new ownership's president

testified at the confirmation hearing that Sort-Rite would no longer provide life insurance on the life of Shirley Metzger, and that Sort-Rite's attorneys, both Ken Mackey and Mark London, represented to the court that the policy was not being continued by the company.

LX.

Sort-Rite's position cannot prevail. In *Little v. X-Pert Corp,* 867 S.W.2d 16 (Tex. 1993) the Texas Supreme Court reversed the judgment of the court of appeals and held that the shareholder's estate was the rightful owner of the contested insurance proceeds, despite the fact that the corporation was the named beneficiary. The result in the *Little* case turned on a finding that a Buy-Sell agreement previously executed by the shareholders determined the rights of the parties to the proceeds, not the fact that the corporation was the named beneficiary. In the instant case SORT-RITE had never been a named beneficiary. It had been entitled to proceeds under the policy as the named "Employer", with the right to designate another beneficiary, which was done following the confirmation of the first plan of reorganization.

LXI.

*Little* is analogous to the facts herein, where it is the Second Amended Plan of Reorganization which creates the new rights of the parties. An incident of the

Plan is that Sort-Rite gave up all rights in the life insurance policy. The very fact that Sort-Rite brings this claim is an expression of bad faith.

Respectfully submitted,

ATTORNEYS FOR LETICIA PINO,
KATHERINE METZGER, AND
DEBRA METZGER FINCH

James DeAnda (by perm)
**JAMES DEANDA**
**SOLAR & ASSOCIATES**
2800 Post Oak Blvd., Suite 6300
Fed. ID. 15484
SBOT 05624000
Houston, Texas 77056
(713) 850-1212
Facsimile: (713) 850-1199

Constance Y. Singleton
CONSTANCE Y. SINGLETON
Fed. ID. 6567
SBOT 18435600
215 Bayland Avenue
Houston, Texas 77009
(281) 687-0100
Facsimile: (713) 802-1202

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent, via facsimile (where facsimile number is listed) and first class mail, to the following counsel of record or parties, on this the 4th day of June, 2002:

Chris Boswell
Stapleton, Curtis & Boswell, LLP
P. O. Box 2644
Harlingen, Texas 78551

Constance Y. Singleton
**CONSTANCE Y. SINGLETON**

United States Bankruptcy Court
Southern District of Texas
FILED
APR 03 2001
Michael N. Milby, Clerk of Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | BANKRUPTCY |
| | § | |
| SORT-RITE INTERNATIONAL, INC., | § | NO. 00-21094-B-11 |
| | § | |
| DEBTOR. | § | BROWNSVILLE, TEXAS |
| | § | JANUARY 10, 2001 |
| | § | 11:21 A.M. |
| .............................. | § | |

**PARTIAL TRANSCRIPT OF HEARING**
**(AFTERNOON SESSION)**

BEFORE THE HONORABLE RICHARD S. SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES FOR:

THE DEBTOR: MR. KEN E. MACKEY
ATTORNEY AT LAW
STE 2, 1800 VICTORIA ST.
LAREDO, TEXAS 78040

FCLT LOANS, LP: MR. SCOTT A. WALSH
KITTLEMAN, THOMAS, RAMIREZ
& GONZALES
4900-B N. 10TH STREET
P.O. BOX 1416
McALLEN, TEXAS 78505

(APPEARANCES CONTINUED ON PAGE 2)

THE COURT RECORDER: MS. SUNNY COLLETT

PROCEEDING RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
GARCIA SERVICES CORP., P.O. BOX 1718
ROCKPORT, TEXAS 78381, (361) 727-0983

275

FORM FED PENGAD • 1-800-631-6989

APPEARANCES FOR: (Continued)

| | |
|---|---|
| ENGINEER THERMO SYSTEMS: | MR. MARK S. LONDON<br>ATTORNEY AT LAW<br>4030-C SHERIDAN STREET<br>HOLLYWOOD, FLORIDA 33021 |
| INTERNAL REVENUE SERVICE: | MS. NANCY L. MASSO<br>ASSISTANT U.S. ATTORNEY<br>600 E. HARRISON, STE 201<br>BROWNSVILLE, TEXAS 78520 |
| TAXING AUTHORITIES: | MS. LORI GRUVER ROBERTSON<br>LINEBARGER, HEARD, GOGGAN, BLAIR GRAHAM, PENA & SAMPSON<br>1949 S. IH 35, P.O. BOX 17428<br>AUSTIN, TEXAS 78760 |
| JBS PACKING: | MR. RICHARD O. HABERMANN<br>ATTORNEY AT LAW<br>308 N. 15TH STREET<br>McALLEN, TEXAS 78501 |
| U.S. TRUSTEE'S OFFICE: | MS. BARBARA KURTZ |

FORM FED PENGAD • 1-800-631-6989

* * * * * * *

(Recess at 12:02 p.m. until 1:45 p.m.)

THE COURT: All right. Are we ready to proceed? Mr. Mackey, go ahead.

MR. MACKEY: Yes, Your Honor. The next matter that I was going to bring on at Ms. Kurtz's request is, set today is the motion for appointment of examiner that was filed by Coastal Bank. And there are two matters that are involved here. In their motion to appoint examiner Coastal Bank essentially, and I'm just going to paraphrase what I think their motion said, Mr. Rozell can also have his turn to speak, but essentially the allegations in this motion to appoint examiner are that sometime in December of 1999, in Sort-Rite's account in Chase Texas Bank there were deposits made and either, at some point the testimony has been it was by wire transfer, at other points it's been that it was by some sort of forged checks or instruments from Ritz Camera or someplace, but the gist of it is is that some kind of deposit came into Sort-Rite's operating account in December. And Sort-Rite had funds in the account at the time. The number I heard was about $95,000, but I don't know that for a fact. But then, once the monies came in, Sort-Rite wrote a check in the amount of $450,000 which was then deposited into a checking account at Coastal Bank, and the checking account at Coastal Bank was in the name of a third party named Letitia

FORM FED PENGAD • 1-800-631-6989

Pino or Pinon?

MR. SPEAKER: I'm not sure whether it's Pino or Pinon.

MR. MACKEY: Pinon or Pino, who is a resident of Ecuador and has had that account there for some time, and it's an account that Shirley Metzger, the president of Sort-Rite, has check-writing authority and things on in Coastal. And a few days -- that was on December 6th that that deposit was made at Coastal and then a few days after that, on December 8, Ms. Metzger requested wire transfers be made to certain parties that may or may not be listed here in this motion, but to certain third parties in other countries. And those wire transfers were in fact made and they were made on December 8. And then late in the day on December 8, Coastal found out for the first time that there was something wrong with the initial deposit at Chase and were given notice that the $450,000 Sort-Rite check that had been deposited into this Ecuador person's account at Coastal was not going to clear. Coastal's people then went out to try and stop the wire transfers and they were able to stop all but, as I understand the facts, all but one in the amount of $100,000, and that they were not able to get that one back nor had they been able to collect it. That's the gist -- and what they want is an examiner appointed in this case because, given those facts, the bank feels that an examiner is warranted

FORM FED PENGAD • 1-800-631-6989

because there seems to be some sort of fraudulent transaction or, based on these facts, there may have been fraudulent transfers of the debtor's funds or, based on these facts, there may have been all sorts of bad things done by Ms. Metzger. But there is no, in fact, on the face of the motion for appointment of examiner Coastal clearly points out, I believe, that there was no Sort-Rite money, that is, no funds of this debtor, that ever left Chase Bank and came to Coastal. And the deposit that was made into Coastal was returned, or that is, that check was returned, and so there was no debtor money went into Coastal. And therefore, the fact that Coastal, for whatever reason, was able to decide or determine that they were going to issue wire transfers without checking to see if they had current funds on deposit in the account they were going to transfer out of, that they were short $100,000. But that $100,000 is not Sort-Rite money, it was not ever Sort-Rite money because it didn't come from Chase in the first place, so no Sort-Rite money in this deal came into Coastal. And if there wasn't, then there was no possibility that there was a fraudulent transfer on the basis of the subsequent wire transfers because there was no debtor money to be transferred out. So if the 100,000 went out, that $100,000 was clearly Coastal Bank money and it certainly was not Sort-Rite money. And they may have other remedies but their remedy at this point, it doesn't seem to

FORM FED PENGAD • 1-800-631-6989

me, is against Sort-Rite or that there is any evidence even that would allow anyone to presume that Sort-Rite money is involved in any of this transaction. And it's on that basis, generally, that Mr. Rozell has sought his motion for appointment of examiner. In response to that motion, as the debtor's attorney, I have undertaken to take depositions of Coastal Bank as a bank and of two of Coastal Bank's employees as the employees who handled the transaction in Coastal. I've taken, I've arranged to have the deposition taken and it has been taken of Shirley Metzger. We had scheduled the deposition of Chase Bank for the 3rd, and they did not show for some reason. Either they saw some defect in the notice or they just decided not to come or maybe something, but for whatever reason, they didn't show. However, as a result of the depositions that I have taken, I took two or three and Ms. Sanders, my co-counsel, took the one of Ms. Metzger, there has not been a single bit of evidence that has come forward that has been gleaned out of those, and Mr. Rozell has been present at each and has had the opportunity to ask factual questions, that would show any involvement of Sort-Rite. In other words, there's no Sort-Rite money left Chase or came into Coastal and certainly no Sort-Rite money went out in these wire transfers because it was never there in the first place. We heard from certain employees of the bank, Coastal, the reasons why they in fact authorized the wire

FORM FED PENGAD • 1-800-631-6989

transfers, and I know that those kinds of things happen in all business organizations, but my purpose was not to find fault with Coastal's operations but to find out if there were any unidentified receivables, that is, that Sort-Rite was expecting to come in as a result of its business operations that had in fact not come into Chase but needed to be pursued and collected. I have certainly satisfied myself before I filed the schedules and statements in April for this debtor that that was not the case. I had heard about this transaction before. I would point out this transaction occurred almost a year before the bank filed its motion to appoint an examiner here, and also, that we've been in this Chapter 11 for almost eight months before the bank has decided to bring this matter up and even alert anybody to this problem. We have now got two or three other names as a result of these depositions of people that I want to depose who may be able to shed some light on the involvement of either Sort-Rite or especially on whether Sort-Rite funds were transferred in this transaction between these two banks and the subsequent wire transfers at all. So far I haven't found a dollar. I have responded to this motion to appoint examiner and have, in that response have denied the allegations, of course, but I have also sought and requested that the Court in fact recognize this motion for what it really is, and that is, it's a fishing expedition for Coastal

FORM FED PENGAD • 1-800-631-6989

Bank to try and find out what if anything they can do to try to find a way to recover this $100,000. They're the only ones that could benefit from that recovery, not this debtor. And this debtor is the corporate entity Sort-Rite. In addition, I have sought that the Court award the attorney's fees and costs that this debtor is incurring in trying to proceed with this investigation of these allegations. It was my determination and my client agreed that, based on my experience, the appointment of an examiner in this Chapter 11 case at this time would probably come to a price tag of about $50,000 if he does his job right. I felt and still do that I could do the same job of investigation, even though it's not the debtor's investigation, for about $20,000. I have additionally filed a motion for sanctions against the bank after the 21-day period to give them time to think about it and we have reached no agreements and it's not been withdrawn and that motion for sanctions is set on February 7 before this Court. And that motion for sanctions is that this motion to appoint examiner was filed without any possible facts that could show any involvement of this debtor or without a proper investigation of facts or law before filing it. And again in that motion for sanctions I am seeking, just through a different methodology, recovery of this debtor's attorney's fees and costs for doing all of the discovery that Coastal really should be the one out doing the

FORM FED PENGAD • 1-800-631-6989

discovery on it. There's no result possible out of this that I'm yet aware of that is going to help this debtor at the end of the day because I think we're going to find that, one more time, this debtor's money is not involved. There is no unidentified creditor that has a receivable owed to this debtor that I could go collect, nor has there been any fraudulent transfer of this debtor's money out of Chase or Coastal on these facts. Now, my thought today is that, of course it's Mr. Rozell's motion to appoint examiner, but my thought is that we have found and Mr. Rozell and I have agreed that we have more people that have to be deposed. We can't put an end to it if I must proceed to a conclusion of this, I call it frivolous investigation, then we have to go on and continue deposing people until we've had a fair chance to determine that in fact there's no money left on the table by this debtor through fraudulent transactions or uncollected receivables. It may be, and I have suggested this to Mr. Rozell, I don't know what his decision is as we speak, that what we do is we just don't do anything about the motion to appoint examiner but wait and hear it and the motion for sanctions on February the 7th, and that's my recommendation. But at any rate, we oppose the motion for appointment of examiner and believe that what we are doing and what we plan to do is as much or more than an examiner this Court could appoint would be inclined to do.

FORM FED PENGAD • 1-800-631-6989

MR. ROZELL: Your Honor, may I address the Court now?

THE COURT: Well, you know, I mean, how big is this case?

MR. ROZELL: What do you mean, how big is this case?

THE COURT: Well, is this one of those cases where if the U.S. Trustee wants to appoint an examiner they can do it as a matter of law?

MR. ROZELL: No.

THE COURT: Does the debtor's fixed assets exceed five, liquidated debts and everything else exceed five million?

MR. ROZELL: No, it's not one of those, Your Honor. As far as I know.

THE COURT: Okay. What is the U.S. Trustee's position?

MS. KURTZ: Your Honor, the U.S. Trustee has had long conversations with both Mr. Rozell and Mr. Mackey. The U.S. Trustee believes that the debtor is doing everything possible to investigate the possible fraudulent transfer and everything that surrounds this transaction. At this time the U.S. Trustee does not believe that it's necessary to have an additional expense to this debtor since the debtor himself has undertaken a complete and exhaustive and thorough investigation of any allegations that are being made by

FORM FED PENGAD • 1-800-631-6989

Coastal. This matter was brought to my attention through Coastal, and in a conversation that I had with Mr. Rozell I indicated to him that at first blush it seemed to me that this was Coastal's problem and not the debtor's problem and that Coastal, if it wanted the information it was seeking, could go forward on its own nickel, so to speak, and try to get to the facts. Based on the initial deposit being made to Sort-Rite in the manner of two counterfeit checks, and in fact I believe that those checks or each of them, agreed upon by Mr. Rozell and Mr. Mackey that they were counterfeit, there was no money that came into this debtor, so that any monies that Shirley Metzger might have written as Sort-Rite checks based upon this money, there was in fact nothing there, so the debtor has not lost anything through this transaction. Now, what Ms. Metzger's responsibility is and whether or not action should be pursued against her by Coastal Bank, that has to do with Coastal Bank. But the U.S. Trustee at this time does not believe that it's in the debtor's best interests or the creditors' best, unsecured creditors' --

THE COURT: Well, did the debtor sign the back of these checks, endorse these checks to Coastal Bank?

MR. ROZELL: Your Honor, there is an endorsement on the back of -- first of all, are you asking about the checks that were deposited to the debtor's account?

FORM FED ® PENGAD • 1-800-631-6989

THE COURT: Weren't those the --

MS. KURTZ: Those are the unsecured checks, Your Honor.

THE COURT: Those are the checks that were --

MR. ROZELL: Those were deposited at Chase. They're --

THE COURT: And they are forged, is that correct?

MR. ROZELL: No, Your Honor, they're not forged. According to the purported drawer of the check, the three checks, Ritz Camera Company, according to the purported drawer they are counterfeit checks. In other words --

THE COURT: Okay. So three counterfeit checks were written on Ritz what?

MR. ROZELL: Ritz Camera Centers, Inc.

MS. KURTZ: Ritz Camera.

THE COURT: And they were given, presented somehow to the -- these checks were written to Sort-Rite?

MR. ROZELL: They were made payable to Sort-Rite.

THE COURT: And did Sort-Rite endorse them?

MR. ROZELL: We don't know who endorsed them.

THE COURT: Why would you have cashed them if they weren't endorsed?

MR. ROZELL: We didn't cash them, Your Honor. Those were deposited at Chase Bank, a different bank.

THE COURT: Okay, so Chase Bank, Chase Bank cashed

FORM FED PENGAD • 1-800-631-6989

the checks?

MR. ROZELL: No, they did not cash them, they accepted them for deposit.

THE COURT: Accepted the deposit. Isn't that the same as cashing it?

MR. ROZELL: Well, when you say "cash" I assume you mean they gave cash.

THE COURT: Okay. They didn't turn them into cash, okay, but they turned them into deposits of Sort-Rite.

MR. ROZELL: They put them in for a deposit.

THE COURT: Okay. And then there were checks -- how did they get from there to your bank?

MR. ROZELL: Sort-Rite wrote a check for $450,000. Now, the total disputed checks were over $500,000.

THE COURT: Okay.

MR. ROZELL: Sort-Rite wrote a check on its account at Chase --

THE COURT: Okay.

MR. ROZELL: -- payable to Coastal for $450,000.

THE COURT: Okay.

MR. ROZELL: Okay? Deposited that into an account in the name of this third party at Coastal Bank.

THE COURT: Which third party?

MR. ROZELL: Her name is Letitia Pino or Pinon. She is, as far as we know, some kind of --

FORM FED PENGAD • 1-800-631-6989

THE COURT: So Coastal Bank, I mean not Coastal, the debtor represented that it had $450,000 when it deposited the check into this Ms. Pinon's account?

MR. ROZELL: That's correct.

THE COURT: And you accepted that?

MR. ROZELL: They accepted that, Your Honor, that's correct.

THE COURT: Who did? Who's they? Your bank?

MR. ROZELL: Coastal Bank.

THE COURT: Okay.

MR. ROZELL: Coastal Bank accepted that, Your Honor.

THE COURT: Okay. And that check later bounced?

MR. ROZELL: And that check later bounced because the deposit at Chase was no good. Now, I'd like to clarify a couple of things if I could here, Your Honor. This is my motion and there are some things I'd like to clarify. First of all, we have other claims in this bankruptcy completely unrelated to this. In fact, we have not filed a proof of claim for this and the bar date has expired. We have --

THE COURT: Why didn't you file a proof of claim?

MR. ROZELL: Well, I didn't file a proof of claim, Your Honor, because I didn't become aware of all of this until after the bar date was over. That's also why I am as late as I am in filing the motion. Okay. There's --

THE COURT: Okay. So the bank apparently didn't

FORM FED ® PENGAD • 1-800-631-6989

tell you, their lawyer, even though they hired you to pursue other claims, that they also had a $100,000 claim as a result of a bounced check, basically?

MR. ROZELL: Well, that is essentially it. But we've got other claims, Your Honor, including as a result of the agreement.

THE COURT: Right, you settled some today.

MR. ROZELL: Some today. We've got an unsecured claim. This is a 15-percent plan. Our big issue -- now, I will concede that it looks like no money belonging to Sort-Rite went to anyone, but there's still a big question here, Your Honor, and that is, somebody prepared and deposited checks with a face value of over $500,000 payable to Sort-Rite and nobody knows who it is, or nobody at least is saying who it is or why they did it. Now, normally if I write a check and give it to somebody, it's because I owe them money. And normally if somebody gives me a check, puts it in my, or doesn't put it in my bank account but gives it to me, I know what it's for. That's the big question that we had when all of this started.

THE COURT: Okay. Well, and is this the lady who's dead now that was in charge of this money back then?

MR. ROZELL: No, it is not, it's Ms. Metzger who is still --

THE COURT: So have we deposed her?

FORM FED PENGAD • 1-800-631-6989

MR. ROZELL: Yes.

THE COURT: What did she say?

MR. ROZELL: We did depose her, Your Honor, and she said, she said several things.

THE COURT: She didn't know?

MR. ROZELL: She didn't know where this money came from, she had -- I'm going to be summarizing I guess what she said --

THE COURT: Was there any relationship between these Ritz people and Sort-Rite?

MR. ROZELL: She denies that there is any and I don't know of any, Your Honor.

THE COURT: But they just happened to get $500,000 worth of money from them?

MR. ROZELL: Well, if they had gotten the money we wouldn't be here but they got these checks from them, yes, Your Honor.

THE COURT: Well, they got the money, I mean, and they got to use 100,000 of it to pay to somebody, right?

MR. ROZELL: Right, Your Honor. Now, after I filed this motion an investigation was begun.

THE COURT: Is Ms. Pinon -- what's her name?

MR. ROZELL: Pinon. She apparently lives in Ecuador or somewhere like that.

THE COURT: Well, has she filed a claim for the

FORM FED PENGAD • 1-800-631-6989

remaining 350,000 that came back?

MR. ROZELL: I don't believe so, Your Honor.

THE COURT: So, I mean, if in fact the debtor is the victim of some thief who stole $500,000 worth of checks and transferred them to the debtor for valuable consideration, some sort of shrimp sorter or whatever it was that they did it for, and the debtor received this money and then the debtor in good faith paid the money to Ms. Pinon for some reasonable claim, did the debtor ever -- and then they had to get the money back, all but 100,000, from Ms. Pinon, is Ms. Pinon then seeking the return of her money?

MR. ROZELL: I don't know if she is or not, Your Honor. As far as I know she has not filed a claim in this case.

THE COURT: Do we have any record that she got paid back for it?

MR. MACKEY: Your Honor, that's one of the difficulties at this point in our investigation is neither Mr. Rozell nor I have been able to depose anyone but the four parties that I have told you about. We hope to get Chase Bank deposed. But the people that we have deposed, that is, Ms. Metzger and Coastal Bank and its two employees that handled the wire transfers, they have all told Mr. Rozell and myself that they don't know anything about where the money came from or why it came into the Sort-Rite account. The

FORM FED PENGAD • 1-800-631-6989

only thing they do know is that Ms. Metzger had been expecting wire transfers in a large amount for sales that had been made or some transaction that had been made on behalf of Sort-Rite and that when the checks arrived or appeared at Chase -- I still have not yet found out anything about those checks. We have got a lot of hearsay about them, they've been presented in various reports that are more hearsay and -- well, I won't go into those yet, but. So the answer that Mr. Rozell is struggling with is we just don't know because we haven't asked enough people yet to find out. Ms. Pinon has historically been the sales representative for Sort-Rite in South America, and particularly in Ecuador because it was one of the largest sales areas for shrimp farming and therefore the Sort-Rite products in the '80's and '90's. And so it is not unusual, and Mr. Rozell and I found out that there had been a lot of transactions through Ms. Pinon's account for commissions or whatever it is, handling and taking care of these sales of Sort-Rite equipment down in Ecuador. And that's all we have found out so far and that's why we have to take more depositions because everything about the Ritz Camera checks, everything about Chase Bank's handling of the deposit, we don't yet know how it got deposited. There is no endorsement per se on the checks other than bank endorsements. And Ms. Metzger said she didn't know how it got deposited. So there are a lot of

FORM FED PENGAD • 1-800-631-6989

unanswered questions if we're to go forward on this chase that we have to ask more witnesses.

MR. ROZELL: Your Honor, one thing that I'd like to clarify. Ms. Metzger testified at her deposition that she received a facsimile from someone instructing her to make the wire transfers and that she assumed it was from Ms. Pinon but later learned that it was not. She, that was --

THE COURT: What are you suggesting? Somebody -- I don't know what we're doing, I mean.

MR. ROZELL: Your Honor, what I --

THE COURT: I understand your concern because anytime there's $500,000 of forged checks it's a serious concern. Are you suggesting that somebody in this company was conspiring with the person who wrote the checks in order to get cash into South America or out of the United States into South America or are you suggesting that somebody knew these were bad checks all along and used your bank in order to get the money somewhere else, convert bad checks into good money?

MR. ROZELL: I'm not sure exactly what happened, Your Honor. What I'm saying is that when you've got $546,000 of bogus checks --

THE COURT: Okay, when -- yeah.

MR. ROZELL: -- it needs to be looked into as to where it came from.

FORM FED PENGAD • 1-800-631-6989

THE COURT: Well, I agree with you. Now, what does your bank do anytime it gets a deposit of money from Chase Bank? Do you communicate with Chase National Bank?

MR. ROZELL: They communicate with Chase, Your Honor --

THE COURT: Do you have deposits that cover or guarantee their checks?

MR. ROZELL: I don't know the answer to that, Your Honor. I do know that --

THE COURT: I mean why would your bank ever pay out $500,000 on the basis of a deposit from Chase Bank unless you were guaranteed that the Chase deposit was valid?

MR. ROZELL: Your Honor, I don't know why they did it. Apparently their systems broke down in this particular transaction. But --

THE COURT: Okay. Well, do you have an action against Chase Bank?

MR. ROZELL: I don't think that we do. It doesn't appear that Chase endorsed the checks themselves. I don't know --

THE COURT: So on the basis of just a large check from Chase Bank with nothing but the debtor's signature on it, and perhaps you called to see if there was anything in the account, I don't know whether you did or not, or maybe there's some Internet way you can look at it, although I

FORM FED PENGAD • 1-800-631-6989

doubt that, but you agreed to honor that check?

MR. ROZELL: That appears to be what they did, Your Honor, yes, that does appear to be the case. But I'd like to point out that what we're really interested in is finding out if anybody -- why these other checks were given to the debtor to increase possibly distribution to the unsecureds. That's what we're looking at. The money that we lost, we lost, but we and other unsecured creditors have other claims that are unrelated and there's no doubt --

THE COURT: Do we know -- we know who the checks were written to, don't we?

MR. ROZELL: Yes, we do.

THE COURT: And so what was the 100,000 that didn't come back? Everything else came back, why didn't the 100,000?

MR. ROZELL: They wire-transferred that money out to a couple of banks in New York with instructions that they then be wired on further. They were able to stop one of the wire transfers and recover it. The other one, by the time they notified the receiving bank it had already been sent on to some bank overseas.

THE COURT: All right.

MR. ROZELL: Now, Your Honor --

THE COURT: Well, are you, is this motion to appoint an examiner, you also have an objection to confirmation?

FORM FED PENGAD • 1-800-631-6989

MR. ROZELL: I do not have an objection to the confirmation at this time, Your Honor.

THE COURT: Okay. Well, why would we ever have an examiner if we have a confirmed plan?

MR. ROZELL: Well, we don't have a confirmed plan.

THE COURT: I know we don't yet but it's up for confirmation today. So will this motion be mooted if the plan is confirmed?

MR. ROZELL: If you confirm the plan this motion will be mooted, Your Honor. My point is that I --

THE COURT: If I grant the motion, what does that do to plan confirmation?

MR. ROZELL: I think that creates some problems for plan confirmation, Your Honor.

THE COURT: How's that?

MR. ROZELL: Well, I don't know --

THE COURT: I don't see how --

MR. MACKEY: I don't see that it would. There's no objection based on that and --

THE COURT: I mean somebody could appoint a trustee today and it still, the plan confirmation could go forward. I mean if it doesn't get confirmed the trustee would take over, but if it does get confirmed it would be mooted.

MR. ROZELL: Okay.

THE COURT: Well, let's go on --

FORM FED PENGAD • 1-800-631-6989

MR. ROZELL: My point, Your Honor, is --

THE COURT: Let's go on to confirmation and see where we are.

MR. MACKEY: Well, I actually have the 506A motions to go through.

THE COURT: Okay. Go on to 506A but let's do them, I mean that was supposed to be a 15-minute motion, we took almost 45 minutes, maybe not, but 30 anyway, talking about something that you really didn't even want to hear until the 7th, so let's move a little quicker or we'll never get through. Because I think it's important that we do get through.

MR. MACKEY: Your Honor, I have filed four 506A motions and they are limited in their scope to the debtor's real property situated in Harlingen in Cameron County, Texas. And the gist of the -- I'm sorry, five. The gist of the five 506A motions is that we have a value on the real property of $350,000. From the beginning, that is, from when I filed the schedules and when we had motions to lift stay and all other purposes that we've done, everybody has agreed that the $350,000 is the fair market value or appraised value or whatever value but the value we intend to use in this Chapter 11 of the real property. So my difficulty became I had more creditors asking for more money than I had value, so the debtor's interest in the property was not enough to make all

FORM FED PENGAD • 1-800-631-6989

of these creditors secured. So I asked them to among themselves figure out who primed who and who had the priority liens and we didn't get very far and so I filed the 506A motions which have now been by order consolidated for hearing on four of them, that is, the FCLT and the three taxing authorities, the City of Harlingen, Harlingen CISD and Cameron County. Those four, as I understand their agreement as to Texas law, but we've not gotten it reduced to order, is that the taxing authorities, the City of Harlingen, Harlingen CISD and Cameron County all prime the first mortgage, that is, First City, I'm sorry, First City Loan Trust, FCLT, and therefore as to those four the idea is you take the $350,000, which is the debtor's interest in the property, and you deduct from that the full amount of the claim of the three taxing authorities. They've just amended their claim recently.

MS. ROBERTSON: I have all the information.

MR. MACKEY: Oh, okay, Ms. Robertson has the information. But they've just amended and so what we need to do is take the numbers of these three taxing entities, subtract that from the 350,000, and then they will be fully secured to the amount of their amended proof of claim and then FCLT will have a partially secured and a partially unsecured claim. The unsecured will be dollar for dollar the amount that goes to the taxing authorities. I don't know if

FORM FED PENGAD • 1-800-631-6989

I've stated that clearly but it's my understanding of where they're at.

THE COURT: Okay.

MS. ROBERTSON: Hi. Your Honor, the taxes on the real estate as of the petition date in April, including the 2000's on the real estate, was $23,236.56. It depends on the agreement with regard to payment of the 2000 taxes 10 days from the effective date. If we do that through the plan confirmation it will reduce the amount to $14,037.08. I'm entitled to interest pursuant to 506B from the petition date, and so there's interest on that. Also, even though it's post-petition preconfirmation, on January 1, 2001, an additional lien attached for payment of the 2001 taxes on the real estate and those also may have an effect, I guess, on the status of the --

THE COURT: Okay. So what order do you want me to sign?

MR. MACKEY: We're going to have to bring one in 10 days, but essentially the order is is that the three taxing authorities will be fully secured for the amount of their amended proof of claim, they'll be entitled to interest at the plan rate, which is a separate issue when we get to confirmation, from the petition date on. And then FCLT will be secured for the balance of the 350,000 and then they'll have an unsecured claim for the --

FORM FED PENGAD • 1-800-631-6989

THE COURT: Remainder.

MR. MACKEY: -- the deficiency, the remainder.

THE COURT: Is that --

MR. WALSH: Your Honor, I'd like to just run through the numbers to make sure I understand.

THE COURT: Well, why don't you just run through the numbers when you prepare the order. Because, I mean, we don't know what the orders are, the three of you don't know what the interest is, you don't know what all that is, so I mean it would be very -- you ought to get the order and get the calculation and make sure your banker agrees with you and then sign off on the order and that will be sufficient.

MR. WALSH: Well, it will make a difference with some of the other issues that are going to be raised with respect to the objections that FCLT has to the confirmation of the plan. And --

THE COURT: What is that?

MR. WALSH: -- really I think the only question I have is, is FCLT's claim going, secured claim going to be the $350,000 agreed value amount less the $14,037.08 ad valorem tax secured claim. If that's the number then I can calculate the number. I haven't been given the number of what the debtor is going to agree is our secured claim.

MS. ROBERTSON: Plus the interest on the 14,000 at the rate to be determined today through the confirmation

FORM FED PENGAD • 1-800-631-6989

process.

MR. WALSH: Okay. If that's --

MS. ROBERTSON: So the 14,000 plus the interest.

MR. WALSH: That we can calculate, but if that's what the number is then I'm fine.

THE COURT: Is that it, everybody agrees?

MR. MACKEY: Well, I think what they're struggling over is we've had an agreement, although we're not necessarily agreed on the law, but we have an agreement that the debtor recognizes that the 2000 ad valorem taxes are in fact administrative expenses of this Chapter 11 and they will be paid within 10 days -- well, on the effective date, whatever that works out to be, which is defined in the plan. I think that's what Mr. Walsh is struggling with to make sure that those 2000 taxes are in fact going to be paid in cash on the effective date.

MR. WALSH: Well, I mean, an even more basic question, I just think that my client is entitled to understand what their secured amount is and they haven't been told what that number is. Now, if we have to decide what the interest is, that's fine, we can do that later.

THE COURT: Well, are we arguing over whether or not they're a secured claim because the balance of the $350,000 includes the administrative claim or doesn't include the administrative claim, is that what you're arguing about?

FORM FED PENGAD • 1-800-631-6989

MR. WALSH: That's one of the questions that I have and no one has ever answered it for me.

THE COURT: So what do you think it is?

MR. WALSH: According to my understanding of our agreement, it is only the secured amount of the claim being left to the taxing authorities less that claim, which would render the claim somewhere around 335, 334 thousand dollars. That's what my understanding of the secured claim would be, but no one has given that number to me.

THE COURT: Well, the 16,000 includes the administration claim, doesn't it?

MR. WALSH: No, the full amount owed is 23,236.56, so the administrative claim is about $9,000.

THE COURT: All right. So, is that the way you see this? The administrative claim is $9,000, it gets paid upon confirmation, and the secured claim is the 14,000, even though the administrative claim would be secured also but it's still an administrative claim, and so their secured portion of this is 14 or 15 thousand, somewhere like that, so the remaining balance on the amount owed because of the value of the property is the 350 less the 16,000? Mr. Mackey, do you agree?

MR. MACKEY: No.

THE COURT: No.

MR. MACKEY: I don't think that's what we've talked

FORM FED PENGAD • 1-800-631-6989

about and I don't think that's what our agreement is. The agreement has been that the taxing authorities are entitled to X number of dollars and they prime FCLT, and you take that off of the 350 and FCLT then has a bifurcated claim. Now, as a separate issue, we have agreed that one way the taxing authority is going to get paid on their secured claim is that a certain part of that, that is, the Year 2000, is going to be treated, which it must be, as an administrative claim. But just because we're paying the administrative claim post-confirmation doesn't have the effect, in my opinion, of causing his secured claim to suddenly increase by the amount that we've paid. I think his secured claim has to be fixed at the date of confirmation and however much that is.

THE COURT: Okay. Well, everybody understands what that is and now when we get to confirmation, if you disagree that that's the way it's supposed to be done, that could block confirmation if you're correct. All right, let's move on. We were going to spend a half an hour on everything but confirmation; we've spent an hour and 20 minutes now. So the confirmation, which is supposed to be an hour, could end up taking three or four hours maybe, so let's move on. I don't mind taking three or four hours but I just want, when people announce things I want them to try to keep in that general vicinity. Go ahead.

MR. MACKEY: Your Honor, the next two matters are

FORM FED PENGAD • 1-800-631-6989

the IRS 506A motion and we have filed an adversary against the IRS to determine the extent and validity of their liens concerning the real property of the debtor. And it's a substantially similar issue but the difficulty is, is that the IRS is the third claimant, priority -- third in line in priority for a lien on the real property. And it's my position that the IRS lien gives way entirely to the taxing authorities, and I understand they agree to that, and gives way to the first lien, that is, FCLT, First Mortgage, and that the IRS agrees to that. But where I think we have fallen down on our agreement is that then the IRS has no lien left on the real property. In other words, it goes away because they have no secured claim on the real property, they have only a secured claim -- unsecured claim on the real property. The IRS, though, will end up being a fully-secured creditor because they also have a claim on the debtor's personal property which exceeds the value of the collateral taken up by Coastal Bank because the IRS has a pervasive lien on personal property whereas Coastal only is limited to prepetition inventory and equipment. But the IRS, the intention is, and of the plan, is the IRS will be fully secured as to the personal property but will come away with no lien on the real property. The IRS' position, as I understand it, is that, no, they're just going to keep their inferior lien and then every time this debtor pays down and

FORM FED PENGAD • 1-800-631-6989

opens up a dollar of equity, the IRS inferior lien is going to grab it. Well, that can't be the way it works, I mean it can't work like that because, in the first place, they'll be fully secured at the time under the personal property, and then in the second place, you don't, there's no provision in the Bankruptcy Code to handle anything but secured and unsecured. We can't have someone else down here that's going to suddenly reach up as the debtor pays down --

MS. MASSO: Your Honor?

MR. MACKEY: -- and get their hand on it.

THE COURT: Okay. So do you have any authority for that position?

MS. MASSO: Well, Your Honor, I'm standing in for Jonathan Blacker with our Tax Division today and it was his understanding and the announcement that we'd like to make today that this motion is going to be consolidated with the adversary case. I'm really not prepared to discuss or brief the issues, you know, for the Court today. That was merely what our announcement was going to be and I believe it was an agreement with counsel.

MR. MACKEY: Well, it had the basis of forming an agreement but we could never get together with counsel in Dallas on exactly how their claim was going to somehow go away and I can't get that across to them.

MS. MASSO: Well, no, but our agreement is that this

FORM FED PENGAD • 1-800-631-6989

motion will be consolidated with the adversary that has been filed, Your Honor, and there's a scheduling order. I know that he has issued discovery yesterday. I don't believe that counsel has received it yet.

THE COURT: So did you have that agreement with Dallas counsel?

MR. MACKEY: My agreement with Dallas counsel is that we, I want to consolidate the 506A with the adversary for trial purposes. But the other thing is that the -- I mean, I'm unaware that there's any kind of a scheduling order or anything else in the adversary. So it's not a set, there's nothing set there that I've received. That's not saying it isn't, but.

THE COURT: Well, do you want it set?

MR. MACKEY: Well, I'm not pushing to get the setting. I think we should set it for a conference hearing on February 7, reset the 506 to February 7 and just go down the road. I had hoped to come away with an order on the 506A matter but I'm not pushing to get that today if Ms. Masso believes, and I know that she does, that she's not prepared and it's really outside the scope of the agreement that Mr. Blacker thought he was making with me.

THE COURT: Okay.

MS. MASSO: I believe he's been discussing most of this with Ms. Sanders, Your Honor, he's had difficulty

FORM FED PENGAD • 1-800-631-6989

reaching Mr. Mackey, but my understanding was that the 506A would be consolidated with the adversary, the scheduling order has been issued and that discovery has gone out.

THE COURT: Okay. And, Ms. Sanders, do you have another understanding?

MS. SANDERS: No, that is, that was the understanding.

THE COURT: All right. It's done.

MS. SANDERS: That the two motions are consolidated.

THE COURT: February 7th. Next matter.

MR. MACKEY: Your Honor, that brings us then to the debtor's second amended plan of reorganization and its confirmation issues. I have given the clerk the witness and exhibit list. We have six exhibits. The exhibits --

(Off the record discussion at counsel table)

THE COURT: Any objection to the exhibits?

MR. WALSH: Your Honor, I've got one objection to Exhibit Number 4. Exhibit Number 4 is a purported sales order. That exhibit is in Spanish and it's signed by Shirley Metzger. My understanding is Ms. Metzger is not here today so there's no authenticating witness and I can't, because it's in Spanish, I don't understand what is in this exhibit. Without Ms. Metzger, I can't cross-examine her on the entity that's buying the items in the order, a history with that entity, whether that entity has paid on time in the past or

FORM FED PENGAD • 1-800-631-6989

not, and based on that, that's my objection to Exhibit 4. Everything else I've got no objections to.

MR. MACKEY: Well, Exhibit 4 is in fact in a foreign language, it's Portuguese and not Spanish, and I can't read it either, although it's pretty clear, I think, the equipment that's being ordered, but Mr. Capt, who will be my primary witness, is familiar with the order, has been part of the negotiation of the order and can speak to it. Maybe he cannot and maybe he can authenticate it.

THE COURT: Okay. Well, I'll reserve 4 until we have the testimony. Any other objections to any of the exhibits? All right, they're admitted other than 4.

(Debtor's Exhibits 1, 2, 3, 5 and 6 admitted into evidence)

THE COURT: All right. How many witnesses are you calling?

MR. MACKEY: Your Honor, I have two witnesses.

THE COURT: And who are they?

MR. MACKEY: Mr. George Stone and Mr. William Capt.

THE COURT: Stone and Capt.

MR. MACKEY: And we may have a rebuttal witness, Mr. George Daily.

THE COURT: Okay. Well, we can deal with that at the time. How long are you going to put Mr. Stone on or are you going to do his, do you have a proffer of his testimony?

FORM FED PENGAD • 1-800-631-6989

MR. MACKEY: Mr. Stone is going to primarily be on for maybe 15 minutes because he's --

THE COURT: Can you proffer his testimony?

MR. MACKEY: I can't because it's the updating of the --

THE COURT: Okay. What about Mr. Capt, how long will he be on?

MR. MACKEY: Sir, Mr. Capt will be on for about 45 minutes for me. I don't know how long they'll cross-examine him.

THE COURT: And you don't have a proffer of his testimony prepared either?

MR. MACKEY: I don't have a proffer of his testimony.

THE COURT: All right. Go ahead, call your first witness. Which one is it, Stone or Capt?

MR. MACKEY: Mr. Capt.

THE COURT: All right. Mr. Capt, come forward, please. Come forward. Raise your right hand to be sworn.

WILLIAM CAPT, DEBTOR'S WITNESS #1, SWORN

THE CLERK: Thank you, sir, please take a seat.

THE COURT: Be seated right over here.

THE WITNESS: Thank you.

FORM FED PENGAD • 1-800-631-6989

DIRECT EXAMINATION

BY MR. MACKEY:

Q Please state your name, sir.

A William Capt.

Q And where do you reside?

A Miramar, Florida.

Q And how are you employed?

A I'm chairman of Engineer Thermo Systems.

Q Are you the principal stockholder of Engineer Thermo Systems?

A Yes, I am.

Q And Engineer Thermo Systems is a Florida corporation that is the bidder on the stock under this plan of reorganization, is that correct?

A That is correct, sir.

MR. MACKEY: And, Your Honor, I may be doing a little out of order but just so the Court understands, Mr. Stone will also be testifying to the fact that he has received the $10,000 bid deposit from Engineer Thermo Systems, received it by the deadline pursuant to the bidding procedures that have been previously approved by the Court.

BY MR. MACKEY:

Q And so you understand that you are today the successful bidder and the only bidder for the new stock to be issued under this plan of reorganization?

FORM FED PENGAD • 1-800-631-6989

A That's what I understand, yes.

Q And have you reviewed the plan, do you understand the plan of reorganization?

A Yes, I do.

Q And have you participated in the preparation of the plan of reorganization, the treatment of the various classes of creditors and the payout schedules that have been assigned?

A Yes, I have.

MR. MACKEY: Your Honor, as Mr. Walsh pointed out a few moments ago, Ms. Metzger is in fact not able to be with us today. I have received a facsimile of a letter dated January 4 from her doctors in Houston. She was hospitalized when she returned to the country on the 20th and it's my understanding that she was released on 25 or 6, I don't remember the date, or maybe even closer to New Year's. But the gist of his letter is, is that, he says, "This letter is notification that Shirley Metzger is my patient and is under my medical care and at this point I feel she is unable to testify or participate in legal proceedings," and his phone number and all is here to call. The only reason that's important to me today is because in preparation of the hearing today I had prepared the confirmation declaration and had her sign and notarize it. However, Mr. Capt is the head of the current manager under the management agreement of the debtor, is also the successful bidder and has been a

FORM FED PENGAD • 1-800-631-6989

participant in the preparation of the plan and if the creditors present --

THE COURT: Okay. Well, do you have the confirmation declaration? Does anyone object to the confirmation declaration? I mean usually most of the information in a confirmation declaration is boilerplate. So, I don't want to go over all of this unless somebody thinks there's a real issue as to these things, like whether or not some regulatory agency has control over the prices to be paid or the identity of the officers, the voting trustees, et cetera, and all of those sorts of things, about securities and all that sort of stuff. Is there any objection? Then I'll allow that. So there's no need to go over that kind of information. I think you need to go over the issues that are factually in dispute with respect to confirmation.

MR. MACKEY: Well, in that regard, Your Honor, I would begin with the Internal Revenue Service, and the Internal Revenue Service has filed two objections. One is their first objection dated December 21 and the second is their supplemental objection, which are substantially the same, just on different issues. And I'm going to let her objections, let Ms. Masso speak to those, I mean Mr. Capt can't speak to hardly any of these objections, if that's all right, and just take it, run through the objections.

THE COURT: Well, normally we argue after we put the

FORM FED PENGAD • 1-800-631-6989

witnesses on, I mean.

MR. MACKEY: Well.

THE COURT: Are these legal arguments, I mean do we have any factual disputes?

MR. MACKEY: Well, I don't think we have any factual disputes.

THE COURT: Then we don't need to call any witnesses. They can sit down and we can argue about the law with respect to confirmation.

MR. MACKEY: Then I don't have anything further then.

THE COURT: Unless --

MR. WALSH: I'm going to have some questions for this witness that pertain to some of our objections, so if there's no other questioning, I'll --

THE COURT: All right. So do you have, are you ready to turn him over then for cross-examination?

MR. MACKEY: Well, I don't have any problem in Mr. Walsh cross-examining him on his objections.

THE COURT: I mean I'm not sure what the objections, what the factual parts of the objections are. And I don't, I mean I'm not trying to tell you how to try the case but if there are no, if the only factual disputes are some of the things he wants to bring up, I mean you'll get a chance to redirect him.

FORM FED PENGAD • 1-800-631-6989

MR. MACKEY: Oh, I understand, Judge. I have no problem with the proceeding.

THE COURT: Okay. Go ahead.

MR. WALSH: And, Judge, just so you understand what I'm going to -- I've got two witnesses that I will call and I've got questions I want to ask to Mr. Capt and Mr. Stone, so.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. WALSH:

Q Mr. Capt, my name is Scott Walsh and I represent FCLT Loans LP. We've never met before, correct?

A No, sir.

Q It's my understanding from what you just testified before that you have reviewed the plan and the attached schedules in this case being proposed by Sort-Rite, correct?

A That is correct, sir.

Q And do you understand that for FCLT Loans, for their claim, that there are two alternatives that are being proposed. Do you understand that?

A Could you tell me those two alternatives, refresh me, please?

Q Well, one alternative is a monthly payment for the first year, which will be principal-only payments for the first year on their secured claim, and then the balance to be paid

FORM FED PENGAD • 1-800-631-6989

out at eight percent interest over the remaining term of that treatment term, 10 years. Do you understand that alternative?

A Yes, I do.

Q And are you also aware that there's a second alternative which would allow FCLT to foreclose its lien against this property if they lease back to Sort-Rite for a one-year period, lease payments being $2,000 a month, do you understand that that's an alternative also?

A No, I don't. I don't understand that.

Q Okay. You did review the plan?

A I did review the plan but bring it to me again. You're asking -- let me read it.

MR. WALSH: May I approach the witness, Your Honor?

THE COURT: Yes.

THE WITNESS: Okay. Point out to me --

BY MR. WALSH:

Q And maybe something has been amended that I've missed, but in Section 2 there it states that payments will be made over a 10-year period, $2,000 a month initially and then the rest will be paid eight percent over those 10 years, is that correct?

A Yes, sir, with an estimated 4,000 and some per month afterwards, that's what I understand.

MR. WALSH: Your Honor, if I may have a moment.

FORM FED PENGAD • 1-800-631-6989

THE COURT: All right.

(Off the record discussion at counsel table)

MR. WALSH: Excuse me, Your Honor.

BY MR. WALSH:

Q What I showed you earlier was the disclosure statement. I want to show you page 9 of the plan, Section 5.2. There's an alternative A and an alternative B for treatment of FCLT's claim, correct?

A Well, excuse me.

Q And alternative A is what I just showed you in the disclosure statement is that payment of FCLT's secured claim over 10 years, correct?

A Correct.

Q And the second alternative treatment under that section allows for FCLT to foreclose and then lease back to the debtor for a one-year period, lease payments of $2,000, is that correct?

A That's what alternative B is, yes.

Q Okay. Now, you reviewed that plan and I've refreshed your memory of it. That second alternative is still an open alternative, the plan hasn't been amended to delete that, that you know of, has it?

A That is not an alternative.

Q So it's your understanding that that is no longer an alternative?

FORM FED PENGAD • 1-800-631-6989

A In my mind, yes.

Q Have you instructed the attorney for Sort-Rite to file an amendment to eliminate that from the plan?

A I have not.

Q Was that ever an alternative in your mind?

THE COURT: Are you for it or against that?

MR. WALSH: Your Honor, I'm going to make a point about that alternative treatment. We could go both ways, we're not sure which way we're going to go. I think it's in --

THE COURT: So are you proposing that that alternative is no longer in there? Mr. Mackey?

MR. MACKEY: I think the confusion for Mr. Capt is that the bank finally decided that they were never going to, they were not going to take the alternative, and so we deleted the alternative from the disclosure statement, which is what got Mr. Walsh confused. I left the alternative in as an incurable optimist that we may reach agreement, which he and I in fact were discussing as recently as last Thursday that we might still do the lease, so I've left it in as a, to give us the ability to do that. Mr. Capt and Mr. Walsh's clients have not been able to reach agreement on that. We're not considering that as an alternative that's available because it does require our agreement and theirs, too. So I don't know where he's going with this and I probably didn't

FORM FED PENGAD • 1-800-631-6989

answer your question but that's what I know about it.

THE COURT: Okay.

MR. WALSH: Okay. Your Honor, and I'll move on very quickly.

BY MR. WALSH:

Q But I would like to know whether or not that is an alternative that you will no longer consider.

THE COURT: It's not an alternative unless you agree to it.

BY MR. WALSH:

Q And is it my understanding that you do not want to reach an agreement at this point, at this point that's off the table, you don't want to talk about that?

A On alternative B, yes.

Q But --

MR. MACKEY: I object, Your Honor. This is not the time or place to quiz this witness about if he's going to make an agreement right now. Yesterday maybe or some other time but not when he's on the witness stand and being cross-examined.

THE COURT: I think your point is well taken. Let's move on.

BY MR. WALSH:

Q Earlier in this case I took the deposition of George Daily. He's an employee of, I'm going to call it Thermo

FORM FED PENGAD • 1-800-631-6989

Systems, short, it's a longer name but I'm going to call it Thermo Systems for short, he's an employee of Thermo Systems, correct?

A That is correct, sir.

Q Okay. And it's my understanding that Thermo Systems sells equipment and equipment components, is that correct?

A That is correct, sir.

Q Now, Thermo Systems doesn't have a manufacturing facility, correct?

A No, it does not.

Q What I understand Thermo Systems to do is to contract with third parties to make the products that it sells, is that right?

A Equipment but not the system.

Q Okay. And I'm not talking about the systems that Sort-Rite makes at this point.

A No.

Q I just want to know about the products that Thermo Systems sells.

A Engineer Thermo Systems buys components, puts the components together in the field on a turnkey project.

Q Has Thermo Systems ever contracted with anyone to make shrimp-sorting equipment of the type that Sort-Rite makes?

A Other than Sort-Rite?

Q Yes.

FORM FED PENGAD • 1-800-631-6989

A No.

Q Have they contracted Sort-Rite before to produce shrimp-sorting equipment?

A Yes.

Q And so Thermo Systems has been engaged before and has had contracts of its own to provide shrimp-sorting equipment for its own customers, is that correct?

A Correct.

Q Okay. Now, would you agree with me that once, if you are the successful bidder, if this plan gets confirmed and you are the successful bidder, would you agree with me that it would be important for all the creditors, secured and unsecured, to know whether or not Thermo Systems is going to have operations, procedures in place to keep the business of Sort-Rite and Thermo Systems separate? Would you agree that that would be important?

A I would say, yes, that's important.

Q And have you implemented those procedures and those systems at Thermo Systems to keep those businesses separate?

MR. MACKEY: Judge, I object to the question.

THE WITNESS: That's double.

MR. MACKEY: I don't understand what he's asking. He says "Have you implemented those systems" but I don't know what he's talking about.

THE COURT: Do you understand the question?

FORM FED PENGAD • 1-800-631-6989

THE WITNESS: Not totally, sir.

THE COURT: Okay. Rephrase the question.

THE WITNESS: He's going two different places.

THE COURT: Rephrase the question, please.

MR. WALSH: Okay.

BY MR. WALSH:

Q Well, Thermo Systems is its own, has its own business and its own customers that are separate and apart from Sort-Rite, is that correct?

A No, they're sometimes the same.

Q Are there plans in the future for Thermo Systems and Sort-Rite to work together on projects?

A We have and will continue to.

Q And will there be accounting procedures, any other systems put into place to make sure that the profits, the income, the expenses that are related to Sort-Rite's activities and related to Thermo System's activities are going to be separate, kept separate and not intermingled?

A That is correct.

Q Do you have any plans to liquidate Sort-Rite within the next 10 years?

A Absolutely not.

MR. WALSH: May I approach the witness, Your Honor?

THE COURT: You may.

FORM FED PENGAD • 1-800-631-6989

BY MR. WALSH:

Q I want to show you what has been tendered by the debtor as Exhibit Number 2. Can you tell the Court what that exhibit is?

A That is a quotation that has turned into a contract with Choate Seafood International.

Q And that contract is on the letterhead of Thermo Systems, correct?

A That is correct, sir.

Q And you signed in your capacity as an officer of Thermo Systems entering into that contract, correct?

A That is correct, sir.

Q Now, you understand that that contract is being admitted into evidence of some of the continuing business that the debtor Sort-Rite is going to be entered in. Do you understand that?

A That is correct.

Q Okay. Would you agree, because it has been contended in this case that Sort-Rite has been successful and continues to only make money and sales as a result of the name of the company Sort-Rite and its name that's out in the marketplace?

A Correct.

Q And would you agree also with Shirley Metzger, who has testified in this case, that her continuing involvement in this company is essential because she is known as Mrs. Sort-

FORM FED PENGAD • 1-800-631-6989

Rite and she is the one responsible for 100 percent of the sales?

A I don't know that testimony.

Q But would you agree with that assessment, is she known as Mrs. Sort-Rite and is she responsible for 100 percent of the sales of this company?

A No, sir, she's not.

Q Okay. So, then her testimony earlier in this case in earlier hearings would be wrong?

A I can't say for Ms. Sort-Rite -- Ms. Metzger.

Q But you do agree that her continuing affiliation with the company is essential for the operation of the company?

A At this point she has a lot of knowledge of the industry, very valuable.

Q And is it knowledge of the industry or her contacts in the sales side of the business that is so essential?

A Both.

Q Okay. Then, and again this question comes back to my issue with the intermingling of the business, is Thermo Systems going to continue to solicit sales in addition to Ms. Metzger?

A Sort-Rite will sell to Engineer Thermo Systems at their normal rates. When we do total turnkey projects they look at us to go from the site work to turnkey. We go out and buy components from various manufacturers, put the whole project

FORM FED PENGAD • 1-800-631-6989

together, turn it on and make our profits.

Q I need to ask you what I think is sort of a magical question because I've been asking this for the last several weeks and haven't been able to get an answer. Has Thermo Systems reached an agreement with Ms. Metzger about her compensation and whether she will continue in employment at Sort-Rite?

MR. MACKEY: Your Honor, I object to the characterization that he's been asking this question for several weeks. At the hearing on disclosure statement you ruled that we didn't have to provide any information until we had an identified successful bidder. We've only had that identified successful bidder for about a week and that's Mr. Capt, and if he's trying --

THE COURT: Well, this is sort of argument. The question is, I mean his questions are not evidence, and the argumentative portion of his question goes in one ear and out the other. It's not evidence and I don't hear it, and so you're just going to have to trust the Court. But let's, what I want to hear is the information that he says about the question. Do you have an agreement with Ms. Metzger?

THE WITNESS: A verbal agreement, yes, sir.

BY MR. WALSH:

Q And can you tell me and tell the Court what that agreement is?

FORM FED PENGAD • 1-800-631-6989

A I have offered her a one-year salary draw.

Q And what is that salary during that one year?

A We pay her $2,000 a week for one year on a salary draw against commissions of which she initiates herself and brings to the table.

Q And you'll have to forgive me because I'm ignorant of some of those terms. Is her salary going to be dependent upon the sales that she brings into the company?

A After the first year, yes. We will guarantee her $2,000 a week against salary draw. If she does not make her salary draw after that, then she's on straight commissions.

Q Okay. So after the first year she's straight commission but for the first year it's guaranteed $2,000 a week?

A Against salary, against commissions, sir.

Q Okay. Have you been made aware of a potential environmental problem at the Sort-Rite facility?

A I have heard of a Phase I and Phase II.

Q And are you aware that Phase I and Phase II reveals a potential petroleum leakage from some underground tanks?

A I have not seen the report.

Q And so you're not aware of whether or not any of the surrounding landowners have been made aware of that potential leakage?

A No, sir, I do not.

Q And have you consulted with anybody about any potential

FORM FED PENGAD • 1-800-631-6989

liability that Thermo Systems might have, pass-through liability, if they become the owner of Sort-Rite and this building?

MR. LONDON: Excuse me. Your Honor, I'm sorry, may I object? That calls for attorney-client privilege.

THE COURT: It calls for what?

MR. LONDON: Attorney-client privilege when he asks if he's consulted with somebody as to Engineer's liability.

MR. WALSH: I'm not asking about the content of those questions, I just want to know if he's talked to someone, yes or no.

THE COURT: Do you object to him answering whether he's talked to somebody about it?

MR. LONDON: Only to that extent, Your Honor.

THE COURT: All right. Have you talked to anybody about that liability or potential liability?

BY MR. WALSH:

Q Yes or no?

A No.

Q And my understanding is that you are not the successful bidder yet, it is conditioned upon or contingent upon confirmation in this case, correct?

A That's what I understand.

MR. WALSH: I'll pass the witness, Your Honor.

THE COURT: Okay. Anyone else have questions for

FORM FED PENGAD • 1-800-631-6989

this witness? All right. Mr. Mackey, any other questions? Did you want to ask him some questions?

MR. LONDON: Yes, Your Honor, if I may.

THE COURT: Sure, go ahead.

MR. LONDON: Just for clarification.

CROSS-EXAMINATION

BY MR. LONDON:

Q Mr. Capt, the contract that was referred to as Number, I believe it was Number 2?

A That is correct, sir.

Q That's Engineer's contract with the individual, correct?

A That is correct, sir.

Q And a portion of that contract involves the purchase of Sort-Rite materials, is that correct?

A That is correct, sir.

Q And you've done that in the past?

A I have, sir.

Q And they are the subcontractor that you have used in the past and continue to use and it's your intention to have that as a continuation of your project, correct?

A Yes, sir.

Q Thank you.

THE COURT: All right. Mr. Mackey, any other questions?

MR. MACKEY: One more question, Your Honor.

FORM FED PENGAD • 1-800-631-6989

REDIRECT EXAMINATION

BY MR. MACKEY:

Q Mr. Capt, you heard earlier in the day the possibility that part of Mr. Walsh's claim may in fact arise and become an unsecured claim, did you hear that or do you understand what I'm talking about?

A Yes, sir, I --

Q Is that going to impact your decision in any way on whether or not the deal is as you thought it was, that is, is it going to be something you have to recompute or figure or is this a big problem?

A Well, sir, my accountant and myself have reviewed your plan. We have put our numbers in place according to your plan. We have budgeted according to that plan. Any alterations from that plan that would increase the cost, then of course we have to run the numbers again and take a very close look at it.

MR. MACKEY: No further questions, Your Honor.

THE COURT: All right. You can step down.

THE COURT: Mr. Stone.

MR. MACKEY: Please state your name, sir.

THE WITNESS: George W. Stone.

THE CLERK: We need to swear him in.

MR. MACKEY: I'm sorry.

THE CLERK: Would you please stand and raise your

FORM FED PENGAD • 1-800-631-6989

right hand, sir.

GEORGE W. STONE, DEBTOR'S WITNESS #2, SWORN

DIRECT EXAMINATION

BY MR. MACKEY:

Q Please state your full name.

A George W. Stone.

Q And where do you reside?

A Laguna Vista, Texas.

Q And how are you employed?

A I'm a certified public accountant.

Q Are you engaged to represent Sort-Rite International, the debtor in this case, as a CPA?

A Yes, sir.

Q All right. And have you in fact been made aware of, by me or by the Court's order, on the bidding procedures for the new issued stock?

A Yes, sir.

Q All right. And in connection with that, did you understand that you had the job of being stakeholder or whatever other name we want to put on it for the various bids that might come in in connection with the bidding procedures?

A Yes, sir.

Q And did you in fact receive a $10,000 bid and deposit from Mr. Bill Capt's company, Engineer Thermo Systems, Inc.?

A Yes, sir.

FORM FED PENGAD • 1-800-631-6989

Q And did you deposit it into your account before the bidding deadline?
A I deposited it in a special bid escrow account of Sort-Rite.
Q And do you still have those funds?
A Yes, sir.
Q All right. And are they current funds today --
A Yes, sir.
Q -- in the debtor's account?
A That is correct.
Q All right. You have prepared a couple of updates that have been attached as exhibits and the Court has admitted them to this point, which are updates from the accounting books and records of the debtor, is that correct?
A That is correct.
Q And they are also updates of data and information regarding the projections?
A That is correct.
Q And those are shown in Exhibits 5 and 6 of -- do you have those before you, Mr. Stone?
A These two exhibits?
Q Yes, sir. Is there an order that we should address them or does it matter, we'll just do 5 and then 6?
A I would say 5 and 6.
Q All right. Can you just briefly tell the Court what

we're seeing in Exhibit 5? Or what --

A I'm looking at an exhibit, and I don't have it numbered on my copy but I'm calling it adjustments to --

THE COURT: Well, 5 is Sort-Rite International Adjustments to Claim Amortization, January 10, 2001, plus a page called Sort-Rite International Claims Amortization Schedule, Year 2000 to 2004. Exhibit 6 is Sort-Rite International Calculation of Cash Flow Available, et cetera, et cetera. All right.

THE WITNESS: Yes, Your Honor. Briefly, Schedule 5 takes the original claims amortization schedule which is based upon the classes of claims to be paid within the disclosure statement and adjusts it for four items, makes four adjustments. First, it adjusts out the original FCLT claim paying $350,000 over the 10-year period and adjusts it to paying an amount that is less than $350,000 by a total of $66,096, which is equal to the amended Harlingen CISD claim in the amount of 37,294, City of Harlingen claim, 13,598, and Cameron County claim of 15,204. So the net amount of the difference of 66 less 350 is 283,903.77 and the projection calls for the first one year to be paid at $2,000 a month principal only, leaving a net amortizable amount of 259,903.77. And that's what that adjustment number 1 does, we ran the amortization on it and it amortizes that for the period, principal and interest at eight percent. The second

FORM FED PENGAD • 1-800-631-6989

 one is similar, it takes the Coastal Bank claim and amortizes the agreed $60,000 secured portion in the same manner. And, finally, we adjusted unsecured claims by adding the unsecured portions of FCLT and Coastal Bank into the unsecured Class 7 calculations. The final number on this schedule indicates the adjusted principal and interest for the five years to be paid under the plan. Schedule 6 is called Calculation of Cash Flow Available to Service Principal and Interest on Prepetition Claims, and that schedule takes the total principal and interest paid in each of the five years, compares that to the pro forma operating income, which is equal to cash flow before interest, depreciation and taxes, and calculates the excess cash flow available to the company after service of these prepetition claims.

BY MR. MACKEY:

Q So, and your opinion is a result of Exhibit 5 and 6, an update of the corresponding exhibits under the debtor's approved disclosure statement based on the changes and claims and treatment?

A Yes.

MR. MACKEY: No, further questions, Your Honor.

THE COURT: All right. Mr. Walsh?

CROSS-EXAMINATION

BY MR. WALSH:

Q Mr. Stone, an operating report was filed last month

FORM FED PENGAD • 1-800-631-6989

covering the November period and I think we spoke on the phone but I never got an answer on that and I'd like to ask you that. The November report showed an increase in unsecured debt in this case, an increase over the month of October of over a million dollars, and then an amended report was filed and the number dropped back down somewhere near what the October number was. Can you explain what that drastic change was and what the mistake was?

A The first filed monthly operating report was incorrect and as soon as we were aware of the issue we corrected it and used the correct numbers.

Q Okay. Well, I want to direct your attention to these amended schedules that we've been talking about and especially to FCLT's claim.

A Yes.

Q What, you've got an amortization here, what was the beginning number that you used to calculate the amortization?

A The beginning number was $350,000. And, as I indicated, using amended proofs of claim provided to us by the debtor's attorneys, we reduced that proof of claim, reduced that amount by three claims in the total amount of $66,000, netting the secured portion of FCLT's claim to 283,903.77.

Q Okay. Now, my understanding is the only claim that's going to be reduced or subtracted from the value of the property, the agreed value, are the ad valorem tax, secured

ad valorem tax claim which was about $14,000. What other claims did you subtract to arrive at this $283,000 number?

A I subtracted three different claims, and let me give you those. The first one is the claim of Harlingen CISD, and I am referring to a first amended proof of claim indicated as secured for 37,293.74. The second claim that we put into our calculation was a claim of City of Harlingen indicated as first amended proof of claim, secured, in the amount of $13,598. The third claim was with a creditor named Cameron County, indicated as a first amended proof of claim, secured, in the amount of 15,204.49.

Q Okay. When you subtracted those numbers, did you separate out from those proofs of claim the taxes attributable to the real estate and the taxes attributable to the personal property?

A Well, let me indicate what it says on these proofs of claim to you. First of all, the first one, it says "Basis for claim, ad valorem taxes," and the total amount is shown as 37,293.74. The second proof of claim says "Basis for claim, ad valorem taxes, 13,598.00." The third one says "Basis for claim, ad valorem taxes," and again the 15,204.49. So the answer is, no, we used the total claim based upon the indicated basis of claim.

MR. WALSH: Your Honor, to clarify this I'd like the attorney for the taxing authorities to ask a couple of


questions because I think there's been an intermingling of ad valorem taxes assessed against the personal property and the real property and which Mr. Stone used to arrive at the secured claim for FCLT and come up with this amortization, which of course we have an objection to subtracting personal property --

THE COURT: Any objection to her asking questions now?

MR. MACKEY: I have no objection.

THE COURT: All right, go ahead.

CROSS-EXAMINATION

BY MS. ROBERTSON:

Q Hi, Mr. Stone, my name is Lori Robertson and I represent Cameron County, the City of Harlingen and Harlingen CISD and agree with the amounts of the three claims that you have referenced. On each of those claims, do you have the attachments? There should be two pages attached to each claim.

A There is attachments, that is correct.

Q Okay. If I told you that in each instance, for each of the taxing entities there is one business personal account and one real estate account, would you agree with me?

A Let me reference to that.

Q In each of those instances Exhibit 1, for all three entities, would be the business personal account and Exhibit

2 is going to be the real estate account.

A Okay. If I'm looking at, say, the Cameron County proof of claim, there is a subschedule called "Property description, Sort-Rite inventory, furniture, fixtures, machinery, equipment at the location." The second one says the same thing. And then they talk about -- so, yes, some of these do indicate that it could be taxes on the inventory, furniture and fixtures.

Q Okay.

MS. ROBERTSON: So without doing the calculations and everything for the Court, the $66,000 figure is the real estate and the business personal and includes the 2000 taxes, everything as of the petition date, April 2000, and the personal, I mean the real estate, which is the amount that we're going to reduce, which is the subject of FCLT's, the real estate for 2000 is $9,199.48, the other years that are due on the real estate is 14,037.08, for a total of 23,236.56.

THE COURT: All right.

FURTHER CROSS-EXAMINATION

BY MR. WALSH:

Q Okay. So, Mr. Stone, I think there's probably a problem with the calculation of that amount and that number. We can recalculate that. But I want to move forward to another question that I have about this Exhibit Number 5, this

FORM FED PENGAD • 1-800-631-6989

amortization schedule adjustments. On that schedule you show, each year you divide up the payments and you show the principal amount and the interest amount, is that correct?

A Yes, sir.

Q Now, on FCLT's claim, for 2001 you're only showing $24,000 in the principal column and nothing in the interest column. Why is that?

A It was our understanding for the basis of the calculation that the first year from confirmation would be paid at the rate of $2,000 per month principal only.

Q And no interest included in those payments?

A That is correct, sir.

Q And in calculating the claim have you taken into account the payments, adequate protection payments that the debtors made over the last couple of months?

A Yes, sir, we did do that.

Q And did you treat those as principal-only payments or principal and interest payments or just interest payments?

A Principal-only payments.

Q Now, moving forward in this schedule, you've got the amortization of that claim. Now, my understanding, when you amortize one of these claims over years, if it's amortizing correctly, the amount being paid on principal goes up and the amount on interest goes down. Is that correct?

A It sounds right.

FORM FED PENGAD • 1-800-631-6989

Q Well, my question is, in 2002 you've got principal payments of 11,946 and interest of 19,052, in 2003 the principal goes up, as you would expect, to 22,000 but the interest goes up to 19,303. So my question is, is there a problem here possibly with the amortization that you've used?

A Well, I don't think so. I've got it here, you could certainly review it with me, but this is an amortization program that I've used for years and I know also several local banks that use the same program.

Q Do you know why you've been instructed to calculate this amortization with principal-only payments during the first year?

A Why? No, I don't know why.

MR. WALSH: I'll pass the witness, Your Honor.

THE COURT: Are there any other questions over here before we -- go ahead.

FURTHER CROSS-EXAMINATION

BY MS. ROBERTSON:

Q With regard to the amortizations for the taxing authorities, you used an eight-percent interest calculation, is that correct?

A That's correct.

Q And that interest began on what date?

A We started that interest after confirmation.

Q Okay. Can you give me a specific date, is it February of

2001 or?

A Let me see, I have it here. The first day of interest calculation was April 20th, Year 2001.

Q So there is no interest calculation from the petition date in April 2000 until April 2001, is that correct?

A You are correct.

Q Okay.

MS. ROBERTSON: No more questions, Your Honor, I pass the witness.

THE COURT: All right. Anyone else over here have questions? All right. Mr. Mackey?

MR. MACKEY: No I have no more questions.

THE COURT: All right, you can step down.

THE WITNESS: Thank you.

THE COURT: Well, let me ask you a couple of questions.

THE WITNESS: Yes, sir.

EXAMINATION

BY THE COURT:

Q If it turned out that the, from a legal standpoint, that the bank's claim had to include the $9,000 and 2000 taxes, is the plan still feasible?

A Yes, sir.

Q There's enough cushion that you can pay an additional 9,000 to the bank?

A Yes, Your Honor.

Q If it turns out that the taxing authorities are entitled to interest from the date of confirmation, or from the date of filing through, forward, let's start with eight percent, at eight percent is there sufficient cushion to make the plan feasible?

A Yes, Your Honor.

Q What if it were 12 percent?

A Well -- yes, yes, Your Honor.

Q There's sufficient for all of that?

A Right.

Q Okay. And now what about if the bank's interest started from the date of confirmation, what impact would that have on the feasibility?

A Very little.

THE COURT: Okay. You can step down. All right. Now, you had some witnesses, Mr. Walsh?

MR. WALSH: I've got two witnesses, Your Honor.

THE COURT: All right. Call your witness.

MR. WALSH: The first witness is Darryl Lemke.

THE COURT: All right. Come forward, Mr. Lemke. Did the bank file a motion to lift stay in this case?

MR. WALSH: Yes, Your Honor, that hearing was held in October, and Your Honor ordered adequate protection payments to begin in October and adequate protection payments

were made for October, November and December. The one for January has not been paid yet.

THE COURT: Okay.

DARRYL LEMKE, FCLT'S WITNESS #1, SWORN

THE CLERK: Thank you, sir. Can we get a spelling of this gentleman's name, please, sir?

DIRECT EXAMINATION

BY MR. WALSH:

Q Can you state your name for the record and spell your last name.

A Darryl Lemke, last name is spelled L-E-M-K-E.

Q And can you spell your first name also.

A D-A-R-R-Y-L.

Q Mr. Lemke, I'm going to ask you some questions about some analyses that you have made.

MR. WALSH: First of all, Your Honor, let me, I have some exhibits that I would like to enter into evidence.

(Off the record discussion at counsel table)

THE COURT: Have you seen these exhibits before?

MR. MACKEY: I'm not certain I've seen all of them. He just has added a couple since I've seen this list.

MR. WALSH: Judge, I'm going to submit the exhibits. The two I added was the promissory note and the deed of trust for the bank's claim. I've got four other exhibits. To speed this up, I've got the resumes of Mr. Lemke and my other

FORM FED PENGAD • 1-800-631-6989

witness so that we don't have to go through their qualifications and I've got a Phase I and a Phase II site assessment that has been performed that the next witness is going to testify to.

THE COURT: Who's the next witness?

MR. WALSH: The next witness is Scott Boyd, who was responsible for --

THE COURT: And he's an engineer?

MR. WALSH: Yes.

THE COURT: Isn't he an environmental engineer?

MR. WALSH: Yes.

THE COURT: Okay. Have you seen those assessments, Mr. Mackey?

MR. MACKEY: Yes, Your Honor.

THE COURT: Have you seen the two curriculum vitae or resumes, whatever?

MR. MACKEY: It's been provided to me. I haven't seen it --

THE COURT: Okay. Do you have any objection to the --

MR. MACKEY: -- but I don't have an objection to it.

THE COURT: All right, they're admitted.

MR. WALSH: These are Exhibits 1 through 6, Your Honor.

(FCLT's Exhibits 1-6 admitted into evidence)

FORM FED PENGAD 1-800-631-6989

MR. WALSH: And I've also, I've got an exhibit list there and a witness list as well.

BY MR. WALSH:

Q Mr. Lemke, have you reviewed the debtor's disclosure statement, the plan and all the supporting schedules that are attached thereto?

A I reviewed the disclosure statement.

Q And did you also review in that disclosure statement, in the back of the disclosure statement was a copy of the plan, you saw that also?

A Yes.

Q And you saw the supporting schedules to all of that, too, as well, did you not?

A Yes, sir, I did.

Q Based on your experience and your review of the disclosure statement, plan and all those supporting schedules, have you formed an opinion on what a commercially reasonable interest rate for FCLT's loan would be?

A Yes, sir.

Q What factors did you base your opinion on?

A I looked at their financial statements, their net worth, their historical operating revenues, income statement and their net worth.

Q And what in your opinion would be a commercially reasonable rate for FCLT's claim?

A Well, first of all, I would say that I would have a little bit of difficulty finding a comparable debtor but the closest I would get to that would be an SBA 7A loan which is a government guaranty. The floor for those type of loans would be prime plus two, which currently would be 11 percent, to a ceiling of prime plus two-and-three-quarters, which would be 11-and-three-quarters. So, being generous to the debtor, 11 percent.

Q Have you analyzed the present value of the payments being proposed by the debtor at the interest rate being proposed by the debtor?

A Yes, sir.

Q Did you prepare some statements in accordance with the numbers that you arrived at?

A Yes, sir, I prepared a comparison of the present value of the future payments over its 10-year period at a range of rates.

Q And do you have some extra copies of the documents? We might give one to the Judge so he can see what you're talking about.

A Mr. Walsh, I left it in the gallery.

Q Okay. We can provide that to him later but I'll give my copy to Mr. Mackey. Can you explain how you arrived at your present value figures?

A Well, they have varying payments. The first year, they

have monthly payments of $2,000 for the first year. Thereafter, as I understood, the payments went to $4,220 a month. Basically what I did is I took the present value of the first year's payments to compute the present value as of today. I then took the present value of the annuities for years 2 through 10, computed what that would be and discounted that to the present value as of today.

Q And based upon an eight-percent interest rate, what would be the present value of the payments being proposed by the debtor?

A Well, I computed the present value of those future payments over the 10 years to be $315,197.09.

Q Okay. Now, you made an assumption about what FCLT's claim was going to be, correct, it was going to be about $325,000?

A Initially the disclosure statement indicated it was 350 and I also visited with Mr. Stone on Monday, so somewhere in the 325 to 350 range, yes, sir. But the disclosure statement has payments of 4,220. I understand testimony today that that has differed somewhat in their amended plan.

Q It might actually be higher than the 325 figure?

A I'm sorry? I don't think I understand your question.

Q That FCLT's claim actually might be higher than the $325,000 figure?

A It could be, yes.

Q And the present value at eight percent that you've calculated will be about $319,000, correct, approximately?
A Approximately 315,000, yes, sir.
Q Did you do some additional analyzations of present value at nine, 10 and 11 percent?
A Yes, sir, I did.
Q And as the interest rate increases, what happens to the present value?
A It lowers the present value.
Q Have you analyzed the effect of the payments being proposed by the debtor for the first year of the plan? In other words, what is the result of the payments being proposed by the debtor for the first year?
A Well, as I understand it, the debtor is proposing to make 12 payments of $2,000 a month at no interest rate.
Q And if you calculate that over the term of the loan, would that result in a negative amortization of the loan?
A Well, if you impute it an interest rate of eight percent, Mr. Walsh, at $2,000 a month, that would have a negative amortization after the first 12 months.
Q Correct, and you've corrected me. If you assume that even if the $2,000 were interest-only payments and they were interest-only payments, that would still be a negative amortization?
A Yes, sir. The interest accrues at a rate higher than

FORM FED PENGAD 1-800-631-6989

$24,000 during the first 12 months at a rate of eight percent.

Q Based upon your review of the disclosure statement, plan and the supporting schedules and exhibits and the debtor's own projections and the calculations that are made therein, is it your opinion that this debtor would be able to make larger payments and be able to handle a larger interest rate on FCLT's claim?

A I reviewed the debtor's pro forma operating statement and based upon that I computed a cash flow available for debt service and that was in the disclosure statement. Now, the debtor has provided an amended plan that I did, it changes somewhat, but on both scenarios that the debtor has submitted the pro forma operating statement, there is sufficient cash flow available for debt service to pay your, the FCLT's claim at a rate of eight percent or higher.

Q Even 11 percent?

A Yes, sir.

MR. WALSH: I'll pass the witness, Your Honor.

THE COURT: Okay. Go ahead.

MR. LONDON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LONDON:

Q Good afternoon, sir. Just a few questions. Did you take into consideration the recent announcements by the Fed that

FORM FED PENGAD • 1-800-631-6989

the interest rate is being reduced in your calculations?

A No, sir.

Q Would that impact on your calculations since the Federal Reserve has just recently reduced the bank-to-bank interest rates?

A And, I'm sorry, let me, I stand corrected. I computed it at prime plus two, prime being at nine percent which would be a lower rate. Yes, that would take that in account and I'm sorry, I misspoke.

Q But the rate has been reduced since then, hasn't it?

A It was at nine and a half, the Wall Street Journal prime was, it's since gone down to nine percent, and I computed it at prime plus two at that interest rate. I took the lower rate into account when doing my projections.

Q And what was the interest rate that FCLT had in 1995-1996 when they were getting the benefit, while payments were still being made, sir?

A I do not know that.

Q Do you know if it was at eight percent or greater?

A I said I do not know that, sir.

Q Okay. What interest, what discount rate did you use to get the present value?

A I used it over a range of numbers, sir. Eight percent for time value of money, nine percent, 10 percent and 11 percent.

Q Were all of them on time-valued money?

A Yes, sir, because we're talking about present value of future payments. Basically the theory being that a dollar today is worth more than a dollar 10 years from now.

Q Well, when you testified earlier that the value for FCLT might be higher than the 325, wouldn't the payments also be higher and affect your calculation because the amortization rate and schedule would be higher?

A I'm afraid I don't understand your question.

Q Well, as I understood the prior question on your first chart, the liquidation value of collateral came out to 325 and the present value was I think 319. You then said that it could be a higher amount based on the amended schedules. Did I understand that correct?

A I don't believe so. Those were not my representations as far as liquidation value. You said 319. I don't ever remember mentioning 319.

Q Okay. What was the number? 315, I'm sorry.

A Yes, sir, the present value.

Q And then there was some indication it could be --

A Well, the fact that I understand that the future payments may be for an amount higher than 325 because the claim, the secured claim of FCLT may be larger than that.

Q If the amount is larger wouldn't the amortization also be larger?

FORM FED PENGAD 1-800-631-6989

A It could be, yes, sir.

Q And wouldn't that then impact the number and the 315 would therefore be incorrect --

A It could.

Q -- as comparing to the higher number?

A It could change it, yes, sir.

Q So therefore the projection or assumption of the higher number has no basis with the 315, correct? 315 has no basis to whether there's a higher number or not?

A It's going to be, I have to make some assumptions of the present value based on payments and I based it upon what I understood the amounts were at the time. Now, I understand today they may have changed but I have to make an assumption based on something. So it could be subject to change. I don't think it would be material in this case.

Q Thank you.

A Certainly.

MR. WALSH: May I redirect, Your Honor?

THE COURT: All right.

REDIRECT EXAMINATION

BY MR. WALSH:

Q The information you used to correct, to calculate your present value numbers, that was information provided by the debtor, correct?

A Yes, sir, their disclosure statement and I visited with

FORM FED PENGAD • 1-800-631-6989

Mr. Stone on Monday. I felt that there were some discrepancies in the disclosure statement and I visited -- based from the debtor and from visiting with Mr. Stone.

Q And the payment stream, the numbers that you used to calculate, those are the numbers being proposed by the debtor in its plan for treatment of FCLT's claim, correct?

A Yes, sir.

Q And is it a fair statement to say that one of the biggest reasons why the present value is less than FCLT's claim, regardless of whether that claim goes up or down, is mainly because those first-year payments of $2,000, even if you assume those were interest payments, it would still have a negative amortization, isn't that the biggest problem?

A I don't think that I understand you completely but when we calculate the present value of future payments, it's going to depend on the payments. The sum of the payments will have an influence on the present value.

Q And having such a small payment that first year impacts on that present value to lower that present value of the claim, correct?

A If you had a larger payment in the first year that would, the present value would go up, yes.

MR. WALSH: Pass the witness.

FORM FED PENGAD • 1-800-631-6989

EXAMINATION

BY THE COURT:

Q What's the interest rate that the claim is paid in the plan?

Q I'm sorry?

Q What's the interest rate that the claim is paid in the plan?

MR. WALSH: Eight percent.

THE WITNESS: Eight percent.

BY THE COURT:

Q And then you calculated present value at 11 percent?

A I calculated over a range of numbers, eight, nine, 10 and 11. At eight percent the present value of the money is, according to my calculation, $315,197.

Q So it's equal to, the interest rate and the present value calculation is equal to this present value of the claim if you start with the 315 as the claim and you pay eight percent and you discount it eight percent, the stream of payments you just get the same figure, don't you?

A Well, as I understand it if you're comparing that to the liquidation value of the collateral?

Q No, I thought you were testifying on the issue of that the present value of the claim is not equal to the amount of the claim.

A I'm testifying as to the present value of the future

payments over that 10-year period.

Q And so if the present value number uses 11 percent or anything higher than the interest rate, it's always going to be less than the value, isn't that correct?

A Well, that will lower the present value --

Q Right.

A -- the rate of, the higher rate you're using.

MR. WALSH: But I want to make sure Your Honor is clear on this, though. The way that the claim is going to be calculated is 350,000 less that $14,000 in taxes and some change which involves the interest that has to be calculated, so the actual present value of the claim that's going to be scheduled, I mean the dollar amount there is going to be somewhere around 334,000, and what he's testified to is if you take the payment plan proposed by the debtor and calculate the present value --

THE COURT: I hear you.

MR. WALSH: -- it's 319, it's less than.

THE COURT: I understand that. I understand. Yes, sir?

MR. LONDON: I'm sorry, Your Honor, just one quick redirect, or recross.

RECROSS-EXAMINATION

BY MR. LONDON:

Q Sir, if those payments were interest, the first year's

FORM FED PENGAD • 1-800-631-6989

payments were interest only and then the amount was amortized out, the balance, whatever that was, how would it affect the present value?

A That has no impact. The present value calculates today what the value of a stream of future payments would be, all right? So the disclosure statement gives a, under the statement 12 payments of $2,000 a month and then from years two to 10 at $4,220 a month, and that's what I'm calculating, the present value of those future payments.

Q But isn't it true that the disclosure statement says that the amortization, in the disclosure and in the plan, it says whatever balance is there is then amortized over the entire remaining period. They didn't just pick an arbitrary number, they used the number they had. If in fact it turns out to be a higher number, then that number, that higher number is the number that is then amortized over the remaining nine years, correct?

A Well --

Q Did you understand that as part of the plan?

A I'm not quite clear on your question but, again, my statement goes to the fact I'm giving you the present value of the future payments as stated in the disclosure statement irregardless of what the secured claim is. This is the debtor's disclosure statement and I've used those figures to calculate the present value.

FORM FED PENGAD • 1-800-631-6989

Q Thank you.

THE COURT: All right. You can step down. All right. The next witness is the engineer?

MR. WALSH: Scott Boyd.

THE COURT: Come forward.

THE CLERK: Please raise your right hand.

SCOTT BOYD, FCLT'S WITNESS #2, SWORN

DIRECT EXAMINATION

BY MR. WALSH:

Q Could you state your name for the record.

A My name is Scott Boyd.

Q How do you spell your last name?

A B-O-Y-D.

Q Are you familiar with the Sort-Rite facility in Harlingen?

A Yes, I am.

Q How did you become familiar with it?

A I was employed by FCLT to perform a Phase I site assessment on that property.

Q And when was this Phase I site assessment made?

A I don't recall the exact date, probably early in 2000.

Q What was the result of the Phase I?

A We discovered a number of circumstances on the property that indicated a possibility for environmental contamination and we recommended certain activities to go to Phase II.

FORM FED PENGAD • 1-800-631-6989

Q And was a Phase II conducted?

A Yes, it was.

Q And you conducted that Phase II or your company did?

A Yes.

Q And what was the result of the Phase II?

A Phase II discovered that some of the circumstances didn't result in environmental contamination. We had stains of the building and pattern stains of dead grass outside certain doorways that looked like discharge of solvents. Those came back fairly clean. We had a report, two verbal reports of underground storage tanks. We investigated both those areas. One area of underground storage tanks outside came back clean. An area of underground storage tanks inside the building came back with contaminant levels that exceeded the State's, what they call the action levels for hydrocarbons.

Q And once a landowner has knowledge of those types of problems that you found with the tank inside the building, what does the Texas Natural Resource Conservation Commission require of that landowner, and the Texas Administrative Code?

MR. MACKEY: Objection, Your Honor. This witness has been brought as an expert on environmental issues, not as a lawyer or on the law or the Administrative Code, and we don't believe he has any ability to --

THE COURT: I don't whether he knows the answer or not, but it's not going to be a legal conclusion in any

FORM FED PENGAD • 1-800-631-6989

event. But if you know what you're supposed to do, go ahead and tell us.

THE WITNESS: Yeah, the TNRCC stipulates that once the owner/operator of a leaking storage tank is made aware of a release of fuel, they have 24 hours to notify the local TNRCC and the Austin TNRCC offices.

BY MR. WALSH:

Q And your knowledge of what this next step has to be is based upon your experience of working with landowners and your conducting of Phase I, Phase II and on up over the past few years, is that not right?

A Yes. You're talking the next step once notification is made? Yes.

Q And your knowledge of what the TNRCC requires and the Administrative Code requires?

A Yes.

Q Now, once they have notified the TNRCC, what's the next step?

A The next step is to provide the TNRCC with a work plan for conducting further assessment to discover the extent and degree of contamination.

Q And is it fair to say that further assessment is going to require some expense that has to get paid for those, for that testing?

A Yes.

FORM FED PENGAD • 1-800-631-6989

Q And based upon your experience, can you give a range of what that testing might cost?

A It could range anywhere from eight to ten thousand dollars to 18 to 20 thousand dollars. It's difficult to say.

Q And based upon what you've seen so far, if further cleanup, if cleanup is required, do you have any opinion about what it might cost to clean it up?

A Well, then again, that also takes into consideration a lot of unknown factors at this point. I, in discussion with an individual who works for the TNRCC's reimbursement section about a year ago, he said that they had internally figured an average of about $70,000 statewide for remedial projects. I personally have seen them go up to about $200,000. It depends upon many conditions. We don't know yet.

MR. WALSH: I'll pass the witness.

THE COURT: All right. Any other questions?

CROSS-EXAMINATION

BY MR. MACKEY:

Q In this case, Mr. Boyd, you, out of all the areas that were pointed out to you by the debtor and its employee, you only have one that's come back positive, is that correct?

A Well, they didn't really point anything out, they just had me assess the property and in talking to the property owners and looking around we selected a number of areas that had visual circumstances that caused us concern, and only one

FORM FED PENGAD • 1-800-631-6989

of those came back with soil samples that exceeded any State guidelines.

Q Well, it was my understanding, and perhaps I'm wrong, that when we allowed you access to the facility that Ms. Metzger showed you where she knew all of the buried oil tanks were, and how else could you have located them?

A Well, actually, I've never even met Mrs. Metzger, she wasn't there that time, but a girl that worked there showed us where she thought the tanks were and where Mrs. Metzger had told her they were and it was a generality. We couldn't identify anything on the surface of where the tanks were. And there was a report from I think one of the machinists that said there were tanks outside the building at some time in the past and that's another location we sampled.

Q Okay. So you did find out most of your information from the employees who were trying to help you in your study?

A That and our own experience in, you know, visually inspecting the property.

Q And yet you still only found one place?

A The samples, yes, only returned one confirmation.

Q And have you determined yet who you were working for out there, were you working for Sort-Rite, the debtor, or were you working for the bank or who exactly were you working for?

A My client was FCLT.

Q All right. Is part of your duties in representing FCLT

FORM FED PENGAD • 1-800-631-6989

to report these kinds of spills to state or federal regulatory authorities? Have you done that?

A No.

Q Is it your intention to do so?

A No.

Q Have you had any instructions to do that?

A No.

MR. MACKEY: No further questions.

MR. LONDON: If I may, Your Honor?

THE COURT: Go ahead.

MR. LONDON: Thank you.

CROSS-EXAMINATION

BY MR. LONDON:

Q When you say you found one sample that had a higher than above average reading, how much higher was that reading?

A I don't recall. I've got the report here if I could look at it.

Q Was it a trace or is it --

THE COURT: Do you have it with you?

THE WITNESS: Yes.

THE COURT: Go ahead and find it. It's in this Phase II?

THE WITNESS: It's in the Phase II, if you have a foldout section of a table of laboratory analysis. There was one soil sample that returned a benzene level of 1.22

FORM FED PENGAD • 1-800-631-6989

milligrams per kilogram. The State action level is .5 milligrams per kilogram.

BY MR. LONDON:

Q And that was the only level that was above the State requirements?

A Yes.

Q Thank you.

THE COURT: All right. Any other questions?

MR. MACKEY: None, Your Honor.

THE COURT: So you're suggesting that the owner of a site that finds contamination has a requirement to report it within a certain amount of time?

THE WITNESS: Yes, that's in the Administrative Code.

THE COURT: Yeah, and, but a lienholder on the site doesn't have the same reporting requirement?

THE WITNESS: That I don't know. It only says owner/operator as I read it in the Code.

THE COURT: Okay, thank you. You can step down. Are there any other witnesses?

MR. WALSH: I have no further witnesses.

THE COURT: All right. Any other evidence? Exhibits? Are all the exhibits admitted now?

MR. MACKEY: All of our exhibits are, I think all of Mr. Walsh's.

FORM FED PENGAD 1-800-631-6989

THE COURT: All right. We'll take about a 10-minute break and then we'll have argument.

(Recess at 3:30 p.m. until 4:00 p.m.)

THE COURT: Be seated. Okay. Are you ready to proceed?

MR. MACKEY: We are, Your Honor. As I understood when we began so long ago, that we were going to go through the testimony and then you were going to take up the objections, there are only four, of the creditors.

THE COURT: Well, so what objections do we have left now?

MR. MACKEY: Well, actually --

THE COURT: Do you want -- I think it might be easier for them to just argue and then you reply to them. Okay. Go ahead, Ms. Masso, the IRS objection is?

MS. MASSO: Yes, Your Honor. First of all, Mr. Mackey has agreed to clarify that the priority claim that the IRS has in the amount of $15,031.75 will be paid on the effective date of the plan. He has also agreed to withdraw the language that indicates a designation of payments to the trust fund. He's agreed that that statement should be removed from the plan. What we're having some difficulty with, though, Your Honor, is at Article 9 of the plan. The debtor is suggesting that the plan that was confirmed in this, in a previous bankruptcy filed by Sort-Rite, I believe

FORM FED PENGAD 1-800-631-6989

the confirmation was in '94, the case was actually filed in '92, be rejected as an executory contract and that disturbs us, because in that case the IRS has a priority claim outstanding in the amount of $15,209.19 that has not been paid. We would object to the language, first of all, we don't think that the plan back in the 1992 case is an executory contract that's subject to rejection in this case, but also, the assumption that we're taking from that is that the $15,209.19 of that priority claim, that old priority claim that's still left unpaid, would probably be treated as a general unsecured claim in this case. And if that's the case, then it's an attempted modification of the earlier plan and we would oppose that and we have strong objections in that regard. We are willing to discuss payment options on that priority claim from the first bankruptcy. We haven't been able to start --

THE COURT: So you think when you file a bankruptcy and you get a plan confirmed that provides for priority tax claims for a year and then you're the operator of that plan for some period of time and a new bankruptcy is filed that they have to treat the priority taxes of the previous plan as the priority taxes in the existing plan?

MS. MASSO: Well, what our concern is, is if what they're attempting to do is reject the previous plan, you know. If the Court agrees that they cannot reject the

FORM FED PENGAD • 1-800-631-6989

previous plan, then I have no problem with that, but it kind of flows from there.

THE COURT: What do you mean by reject the previous plan?

MS. MASSO: Well, according to Article 9 of their plan, Your Honor, they wish to -- I would like to quote directly from it. They state, and it's at page 19, "Debtor rejects as of the effective date, to the extent it is or may be found by the Court to be a prepetition executory contract, the plan of reorganization filed on August 12th, 1999 and the order confirming debtor's amended plan of reorganization" --

THE COURT: Okay.

MS. MASSO: -- "entered March 1994."

THE COURT: I understand.

MS. MASSO: In addition, Your Honor, the IRS does have standard, what I would call, for lack of a better term, boilerplate default language that we would like to have inserted into the plan and the debtor has thus far declined to do so.

THE COURT: Okay.

MR. MACKEY: I guess I'll respond one by one?

THE COURT: Well, no, I want to hear all the objections. I can remember them, I promise you.

MR. WALSH: Your Honor, I've got a number of objections by FCLT Loans. The first couple of ones I think

we can clear up rather quickly. A month ago at the disclosure statement hearing, you remember there was an issue about the disclosure of the compensation to be paid by Shirley Metzger, and we agreed that that would be treated as a confirmation issue rather than a disclosure issue. I realize we have had testimony by Mr. Capt that that's going to be $2,000 a week and what that deal is. I will withdraw those objections. The only thing I want to make sure of, and if that representation can be made to us that 2,000 a week is it, there's no stock incentives, there's no life insurance, there's no car payments, there's nothing else, it's just $2,000 a week, then we've got no question about absolute priority issues. And I've got an objection in there because that hasn't been disclosed, that hadn't been disclosed prior to today and there was that --

THE COURT: Okay. So we'll get that before we move any further. Go ahead.

MR. WALSH: Okay. The next objection deals with this potential environmental problem. Under the FCLT's loan documents -- now, these loan documents are fairly old documents, the loan goes back, and nowadays we've got some pretty broad environmental language that goes in the loan documents. These loan documents don't have that but they do have a requirement that the debtor maintain the property in good condition, and because there is now an environmental

problem that we've discovered on the property, it is FCLT's position that that is a default under these loan documents and they are required as a result of that default to cure that default. And under Bankruptcy Code provisions, I think 1123A1 and 5G, they're required to provide for in their plan how they're going to cure that default and they haven't and so we've got an objection to that. The next couple of objections I'll take together and they are the objections about the treatment of FCLT's claim.

THE COURT: Well, your bank, is it the position of your bank that you foreclosed on the property with environmental problems?

MR. WALSH: That --

THE COURT: I mean what's your remedy here? I mean you want to be paid off and not own the property, isn't that correct? Especially now that there's environmental problems.

MR. WALSH: Absolutely, but we have a question about --

THE COURT: So pragmatically what is the, what are you really wanting?

MR. WALSH: There is a default in that there is an environmental problem that exists on this property. If that problem is not taken care of and we end up having to take the collateral back, then we will have to deal with that problem, and so if the debtor is desiring to maintain this facility

and proceed with operations and operate, they're in default under our loan documents and under the Code I think that we have a right to demand that that default be cured.

THE COURT: Okay.

MR. WALSH: And the risk is we're going to end up having to take care of it and if that problem is ongoing, it could get worse. And so it needs, in the very least further assessment needs to be made and that hasn't been provided for.

(Noise)

THE COURT: All right, go ahead. Don't worry about that.

MR. WALSH: Your Honor, and as a side issue, I also think, depending on how the further assessments go, there may be an issue raised here about, if this is a serious contamination, if it's gotten down to the groundwater, then we've got claimants, surrounding landowners that haven't been notified, don't know about it, they'd have a right to file a claim in the suit. That's sort of a tangential issue but I think that is relevant. The next objections deal with --

THE COURT: Well, it's relevant if we're trying to discharge those parties. It's not relevant if we're not trying to discharge them. They're not going to be any worse off, are they, by virtue of this plan?

MR. WALSH: It's just going -- if this plan doesn't

 require them to make further assessments and to treat it and this turns out to be a problem that's getting worse, there is that potential. We just don't know at this -- we know there's a problem, we don't know what's going on with it. We don't know if it's getting worse, if it's contained, if there's no further leakage, we just don't know. So I think there's a potential there, yes.

THE COURT: Well, the potential, though, is if this is the type of site like a service station where people are on notice that there are tanks underneath there and that there's potential environmental damages and the company goes through bankruptcy, they have a responsibility to bring a claim. If they knew or should have known they had a potential claim there, they should have brought that claim. I mean, I don't know, I mean it's possible that some of that liability is actually going to be discharged by virtue of a plan. I don't, I mean I don't know what discharge provisions there even are in this plan, I don't know that there are any discharge provisions in this plan. I know that that was one of the unforeseen offshoots of the Texaco case was that people were thinking, "Okay, Texaco is in bankruptcy just to get rid of the big Pennzoil deal, we don't have to worry about our environmental claims, we don't even have to think about them," and then of course afterwards Texaco wanted to take advantage of all that. But, and I'm not, I'm just

saying -- well, I'm not saying anything. Move on.

MR. WALSH: The next objections deal with the treatment of the claim.

THE COURT: Okay.

MR. WALSH: The undisputed testimony I think that Your Honor has heard is that there is a secured portion of this claim. The proposed treatment right now as it stands for the first year will be payments of $2,000 a month that are principal-only payments, and the debtor is also proposing to treat the adequate protection payments that were made as principal-only payments. That was the testimony of George Stone. FCLT is entitled to have the secured portion of their claim paid with interest and so we object to that first year payments being principal-only payments. Now, even if the plan is amended, as a question sort of indicated at the very end of the testimony of Darryl Lemke, to provide that those $2,000 a month payments are interest-only payments, Mr. Lemke testified that even at interest-only payments, that resulted in a negative amortization. Based upon what the bank's claim is, $2,000 a month would not even cover the interest that's accruing even at the eight-percent interest rate, and we would object to plan payments that result in a negative amortization. FCLT also objects to the interest rate being provided. The interest rate being proposed is eight percent and the testimony was that is not a commercially reasonable

rate for a loan of this type. A reasonable rate would be prime plus two. That's three points higher than the eight-percent interest rate that's being proposed. In support of that I would also point out to Your Honor, schedules provided and the supplemental schedules provided today include a calculation of cash flow available to service principal and interest on those claims, and that includes FCLT's claims and all the other claims that are going to be paid under the plan. And according to the debtor's schedules, Year 2001, the excess cash flow after service of prepetition claims is over $100,000. That goes up in 2002, it goes up in 2003 and so on throughout the years. It is not going to create a feasibility problem to increase the interest rate on FCLT's loan. There is excess cash available to pay that and that interest rate ought to be increased. We also have an objection to the plan and the default provisions which provide in this plan that if there is a default that we would have to come back to the Court to exercise any remedies we have against our collateral. We object to that. We would like some default language entered into the plan to provide for a notice period and that being it. A 10-day notice period I think is reasonable. We shouldn't have to come back to the Court and ask for permission if they default under this plan. And that default I think can be defined by anything that's defined as a default in the loan documents.

In the very least it would be a default in any plan payment, especially to FCLT, on the ad valorem taxes, that any future ad valorem taxes that accrue from here on out, if those are not paid, and if insurance lapses. And those are our objections, Your Honor.

THE COURT: You didn't talk about the amount of your claim. Does the plan determine that you have, I mean the issue of whether or not your claim, your secured claim includes the 2000 taxes?

MR. WALSH: Well, that was, and I would --

THE COURT: So that's also your objection. All right.

MR. WALSH: Yeah. I would hope that would be --

THE COURT: I understand that argument.

MR. WALSH: And we would object to personal property ad valorem taxes being subtracted from that secured claim.

THE COURT: Well, they're not going to do that.

MR. WALSH: I don't think it will but we would object to that.

THE COURT: They're not going to be doing that. All right. Taxing authority?

MS. ROBERTSON: We just want, first, some clarification on the amount of the claim to be paid through the plan and verification that the -- because it is not provided for in the documents presented today and the

FORM FED PENGAD • 1-800-631-6989

projections by the debtor. For the payment of the 2000 ad valorem taxes on the real estate, we have no opposition.

THE COURT: Okay. Well, they've already agreed to that so that would have to be in the order. All right.

MS. ROBERTSON: Okay. The other two issues are real simple. Interest, statutory interest at a rate of 12 percent per annum pursuant to Texas Property Tax Code 3301.

THE COURT: Do we have a -- we have a case on point on that. So what do you think the interest rate is? What did they provide in the plan?

MS. ROBERTSON: Eight percent is what they provided. And I think that if the Court is not willing to give us a statutory interest rate, at a minimum we should get the 11 percent which we're getting right now for Chapter 13's that will be confirmed in this district, and that's the rate from January 4th, it was reset, and so at a minimum we're entitled to 11 percent if we're not entitled, if the Court finds we're not entitled to the 12 percent.

THE COURT: Well, aren't you in better shape than the banks? I mean isn't your lien higher than the banks?

MS. ROBERTSON: Yes, Your Honor, it is.

THE COURT: Isn't there little likelihood -- of course --

MS. ROBERTSON: I'm an involuntary creditor.

THE COURT: We have this whole notion of

environmental problems, but assuming that, and I don't want to suggest that I want to minimize the environmental problems, but forgetting the environmental problems for a minute, there's really very little likelihood that the State is unprotected in this particular case. You're almost like a loan on a CD. I mean it isn't a CD but it's a fixed asset where you are really oversecured. Isn't that true?

MS. ROBERTSON: That's correct, Your Honor.

THE COURT: So I'm not so sure that prime plus two is commercially reasonable under those circumstances. I mean I don't know what it is but, and we haven't had a lot of evidence to that but --

MS. ROBERTSON: And I would also say that there was no evidence by the debtor as to why they chose the eight percent. There's no basis for them choosing eight percent whatsoever.

THE COURT: Okay. Got you. What else?

MS. ROBERTSON: And that the interest we're entitled to under 506B should accrue from the petition date and not some date as of April 2001, whatever that date is. And the default provision, 1123A5G requires an adequate default provision, and we object to the default provision proposed by the debtor. We should not have to come back to Bankruptcy Court to get permission. A specific default provision was proposed in my objection, it's been reviewed by all the

FORM FED PENGAD • 1-800-631-6989

creditors and the only addition was that Mr. Walsh wanted it to be an event of default for failure to maintain insurance. And it basically provides for 10 days written notice, 10 days to cure, and in the event that they do not cure that we can pursue our remedies, and that was presented to the debtor and he declined to include it.

THE COURT: All right.

MR. WALSH: Your Honor, may I beg the Court's patience? There's one that I left out and I'll try to be as brief as I can.

THE COURT: What was that?

MR. WALSH: And, Your Honor, I fully understand that this objection is very difficult to prove but we have had this fear from the beginning of this bankruptcy case, actually probably, not necessarily the beginning but dating back to the management contract and all those issues, but we object, we have an objection to the plan because we have a real fear that the debtor has an intention to liquidate this company within a year, and that fear is based upon, one, the alternative treatment that was initially proposed by the debtor. Apparently it's off the table now but that treatment was that you, that we would foreclose on the property and lease it back for one year. Well, there's only two alternatives if that happens, you walk away from the building and everything in there after that one-year period or you're

FORM FED PENGAD • 1-800-631-6989

going to relocate, and nothing was ever said or disclosed about what might happen.

THE COURT: Well, how can they liquidate without -- who are they going to liquidate to? You've got a lien on the property.

MR. WALSH: Actually, it would just be a walkaway. You would just walk away.

THE COURT: Are you saying -- you're saying, not liquidate, they're going to abandon the property after one year?

MR. WALSH: That would be the effect, and I think that today that sense of fear of that possibility has even been heightened because of the contract that was submitted by the debtor that is on Thermo Systems letterhead and a contract entered into by Thermo Systems, the admission that they have had this type of contract before, the admission that they are going to be working together with Sort-Rite without really any set parameters on how you're going to separate the income from these things, given that all throughout this bankruptcy we've been told and the testimony has been that this company conducts sales solely on Mrs. Metzger being there, yet now we have the president of the new, of the company now owning it producing a contract under his name. The fear being sales are going to be slowly transferred over during this next year period or however long

FORM FED PENGAD 1-800-631-6989

it's going to be and then you walk away from the building and you walk away from the equipment. I think there's a real inference that's been raised. It's very difficult to prove and I understand that that type of thing is circumstantial.

THE COURT: Okay, I understand your argument. There is no, your argument is there's nothing in the plan that protects you from that possibility and since there's a negative amortization schedule for the first one year, you would be injured by such contact. Okay.

MR. WALSH: Yes.

THE COURT: Anyone else? Mr. Rozell?

MR. ROZELL: I don't have anything to add to what's been said.

THE COURT: Mister --

MR. HABERMANN: No, Your Honor, nothing.

THE COURT: All right, Mr. Mackey. Do you want to go one at a time? I can help you as you go along. Okay, the IRS, first argument is default language.

MR. MACKEY: Your Honor, I have told the IRS and the taxing authorities and FCLT that I have set default language in the plan, that it applies to all classes of all creditors, and if they think they are entitled to special or different treatment they should come down here and convince the Court of that. That's been my position.

THE COURT: Okay. The priority claim from the

FORM FED PENGAD • 1-800-631-6989

previous bankruptcy --

MR. MACKEY: The priority claim from the previous bankruptcy. We believe that all the claims in the previous bankruptcy that did not survive that bankruptcy as secured creditors are all unsecured, whether they are priority or what.

THE COURT: Well, I mean it could still be priority if in fact the timing of that bankruptcy -- aren't the priority claims and taxes having to do with certain years and collection?

MR. MACKEY: As a rule they have certain time periods that always reference where they become --

THE COURT: So those within a certain period of time are considered priority, isn't that correct?

MR. MACKEY: That's correct.

THE COURT: So, and furthermore, the time limits are stayed by the filing of a bankruptcy. So if the filing of that bankruptcy stayed enough time to where now it's still priority, well, then it could still be priority, but I'm not aware of any case law to say that if you got priority in one bankruptcy and then that plan, there's a default in that plan, you file a new bankruptcy, that you are bound by the findings of priority in that plan. I don't know any case law to that effect. Do you know of any?

MR. MACKEY: No, Your Honor, I don't, and we've

FORM FED PENGAD • 1-800-631-6989

looked into that matter and I don't believe Ms. Masso or anyone else has that. You heard some of these matters when we did the --

THE COURT: All right. Moving on. FCLT. Is there any stock or back-end deals with Ms. Metzger in this corporation?

MR. MACKEY: No, there -- well, there are not that I have been told about and I have requested specifically that I be told everything about whatever their deal is during the time of this plan.

THE COURT: So it's your understanding and you'll stipulate on the record as attorney for this, the reorganized debtor or the debtor who is seeking reorganization at least, that the reorganized debtor has no contract nor does the party buying this have any contract other than the one that was described by the witness on the stand. Is that correct?

MR. MACKEY: Well, that's correct, but the reason that I hesitate as the lawyer, Judge, is that there is an insurance, life insurance policy that when XM Bank was in the case as a secured creditor went to XM Bank as a beneficiary. That has to be reversed out and how they're going to do that, I don't know. But it is an insurance policy on --

THE COURT: Is it a whole-life policy?

MR. MACKEY: Yes, on Ms. Metzger. But I don't think there's hardly any value left to it but there may be.

FORM FED PENGAD • 1-800-631-6989

THE COURT: Okay.

MR. MACKEY: But the company, the reorganized debtor has to do something with that.

THE COURT: All right. Well, you represent the party buying it. Do you know of any agreements other than what was discussed on the witness stand?

MR. LONDON: No, Your Honor. But for clarification what it was on the witness stand, because that was against sales, and that's why I hesitated when prior counsel said if she makes, she gets commissions, she gets a draw against commissions, she makes a lot of --

THE COURT: Well, does she have some other employment contract other than sales?

MR. LONDON: No, Your Honor, but as my client testified, he guarantees a one-year 2,000 --

THE COURT: At $2,000 a week but after that --

MR. LONDON: Against commissions.

THE COURT: And it's against commissions. If she sells more than 2,000 a week, she gets it.

MR. LONDON: Right.

THE COURT: But in the second year she only gets what she sells.

MR. LONDON: Correct. That is correct, that is what I understand.

THE COURT: Okay. But there are no stock options,

FORM FED PENGAD • 1-800-631-6989

no, none of that other stuff?

MR. LONDON: Nothing. No, Your Honor.

THE COURT: Environmental claims.

MR. LONDON: May I also address the environmental --

MR. MACKEY: I've asked --

THE COURT: You may.

MR. MACKEY: -- Mr. London to address those.

MR. LONDON: In some regard it's be careful what you wish for because you get it. I'm sitting here with the gentleman who's a secured creditor who says "My security should be higher, it should be at 340, 336," and then he presents testimony that the 350 value that we've assessed the property at is really not 350 because we have an environmental issue. And then when I, I as the attorney for the purchaser sit here and hear him say that he wants a default provision that provides 10 days for a notice and admittedly says that the notice provision in his individual loan does not really provide the general language that is now accepted for environmental language but in good condition is sufficient for him to say we're in default, these provisions relating to FCLT's loans concern me. Your Honor, if in fact there's a 20 to 80 thousand dollar environmental issue here, that would reduce the value of the security. It would also impact on the cash flow that's available to make the other payments. My client has built-in contingencies which were

FORM FED PENGAD • 1-800-631-6989

evident when he looked at the plan and when he assisted in the plan, that was to show there is cash flow over and above that, that the plan can be made, that he can reach the issues that are reflected in the plan and still have cash flow for the unknown contingencies. That's why the eight percent. Why? Because the bank-to-banks were at five or six and we did take a favorable rate because we want to make sure --

THE COURT: Okay. Well, let me ask you this then.

MR. LONDON: Yes, Your Honor.

THE COURT: In the 1129A boilerplate language about confirmation, one of those that we never talked about when we went through, we just admitted without objection Ms. Metzger's proffer or affidavit, is that basically the debtor has to be able to prove that they are operating within the law. Now, if there are environmental problems out there, don't you have to give me some assurance that you're going to solve whatever they are or follow Texas, whatever Texas rules and regulations are with respect to the TNRCC or whatever it is that handles environmental problems?

MR. LONDON: Yes, Your Honor, and I think we have to. I think that according to -- if in fact the environmental expert has said that, that my clients, and that's why I spoke to my client outside before we came back after, for closing argument, because it's my opinion that based on what he said, and we have to confirm what he said is true but if

FORM FED PENGAD • 1-800-631-6989

in fact it's true, that we, if we are the purchaser, have to notify the Texas authorities and we have to take care of it. Now, that I believe is -- and when I checked with my client, he assured me that based upon the cash flow analysis that had been provided and that he had made, that it's there, based on the eight percent, based on the payment schedule.

THE COURT: Okay. All right.

MR. LONDON: One other thing, Your Honor, that I would point out is that my client was the only successful purchaser to carry this forward and there was an issue raised about Engineer Thermo Systems having a contract and being the sales person. I don't think it was clearly understood. Engineer sold a system. A part of that system included portions that would be manufactured by Sort-Rite, portions that would be manufactured by someone else. My client is not a manufacturer, he puts the components together.

THE COURT: Okay.

MR. LONDON: And so that he's not the sales force to recreate a wheel, he's using the manufacturing from Sort-Rite as part of his overall package that Engineer has always done. And so I wanted to clarify that so that the Court would understand that.

THE COURT: Okay. All right, we'll go back to now the treatment of the FCLT claim.

MR. LONDON: Thank you, Your Honor.

FORM FED PENGAD • 1-800-631-6989

THE COURT: Certainly. First of all, the eight percent versus the 11 percent.

MR. MACKEY: Well, you're on FCLT? I thought that was under --

THE COURT: Okay. That's the next thing we're on. They have argued, number one, that they got the wrong, that you got the wrong interest rate; number two, that the $200 per month principal, 2,000 per month principal only is inappropriate; and, number three, that even if it's interest that it's a negative amortization.

MR. MACKEY: Well, when you said 11 percent, that was the only number that was specifically requested by the taxing authority so I was, I'm sorry, I was off.

THE COURT: Well, it was their witness who said prime plus two is a reasonable rate.

MR. MACKEY: I understand.

THE COURT: And he was the only mortgage banker that was on the stand. So the only evidence that we have, really, other than -- we have the prime rate, which is some evidence, we have the contract rate, which is some evidence, although nobody has mentioned it, the note's in evidence, so we ought to have that somewhere, and we have the testimony of the banker and former mayor of Sinton, Texas.

MR. MACKEY: So is your question what's the debtor's position on how much the interest rate is?

FORM FED PENGAD • 1-800-631-6989

THE COURT: Right.

MR. MACKEY: Well, we've offered eight percent and our position is is that is a fair number, it's the same number we're offering to all the creditors and it's a number that we chose at the time we chose it in September when we did the first plan of reorganization and the disclosure statement, that that was the most fair number we could come up with for treating all classes under the plan. Now, they're not asking for anything other than they think the eight percent is too low and so they want to tie something into the market. All of his testimony went to market, not to contract. They haven't touched that, although I agree that's something that the Court could look to. But they're talking about --

THE COURT: Well, we have the contract rate in evidence somewhere.

MR. MACKEY: I understand. I know it's here but I'm saying --

THE COURT: Yeah. I haven't heard it but it's in evidence.

MR. MACKEY: That's true. And our position is that the 12 percent is the fairest rate we could come up with and --

THE COURT: Not 12, you're saying eight.

MR. MACKEY: Eight percent, I'm sorry. And that's

FORM FED PENGAD • 1-800-631-6989

what we have done. That's what we have asked that we be allowed to do, that's what the projections are based on, the payments are based on, and we think it is a fair number. To argue one percent point and also to argue that, "Well, we should be paid more just because the debtor can make more money" is specious. I don't think that has anything to do with it, what the debtor's ability to pay is. We could probably pay maybe 10 or 15 or 20 percent, who knows, but that's not a criteria for setting the interest rate. And we stick with the eight. That's what we think is the fairest number to everybody that's involved in the plan.

THE COURT: Okay. The next is the treatment of the $2,000 per month. Number one, it's not enough; number two, you can't give them principal only and call the adequate protection payment principal only; and, number three, even if it is interest, it's negative amortization. And tying that into his last argument, if it's a negative amortization then aren't they harmed if the buyer walks away from the deal after a year?

MR. MACKEY: Well, they're harmed no matter when the buyer walks away, but there's been absolutely no evidence, no nothing that would lead anybody in this case except Mr. Walsh to conclude that this purchaser and now Sort-Rite as a reorganized debtor is going anyplace except perhaps across town to the Free Trade Zone. But to suggest that they're

going to walk away under cover of darkness is, there's no facts to put that in. That's just something that's being thrown out there as a red herring as far as I am concerned. If we look at the issue concerning the two years, the reason the option was put in, the alternative treatment, early on in this from the beginning was that we wanted to lease the property, we wanted to give it back and then turn around and lease it for a year, and they have never agreed to a year's period, they always wanted something much shorter. It wasn't that they weren't willing to take it back or that they weren't willing to take it for a four-year, I mean four-month lease, I think we even got up to a six-month lease one time, but my principals were not able to assure themselves that they would have an alternate building to move to, either purchasing or building or leasing, elsewhere in this community.

THE COURT: Well, I agree with you that there's no evidence, that nobody has come forward with some notion that there's some scheme to suck the assets out of this and leave the bank with a higher debt and the same piece of property. But turning aside the scheme nature of sucking the assets and leaving the debt with a higher, the bank with a higher debt and the same piece of asset, forget the scheme part, that whole notion of negative amortization is the notion that in the context of a plan that we have, how is the bank today?

FORM FED PENGAD • 1-800-631-6989

They have a certain position, maybe it's a debt-to-asset ratio, maybe it's, and in this particular case, they have an unsecured claim and they have a certain secured claim and they have a certain security. A year from now you'd like to think that they're better off than they are now, and two years from now they're better off than they are then, so that each year they get a little bit better, they've got a little equity in their property perhaps, so that they're a little better off from the standpoint of their loan. Your plan, they dip for a year and then you take care of it. Now, you ultimately catch up because you have provided for payments or whatever it is, you've caught it up, but there is a dip there. Now, how do we -- as a general rule I shy away from negative amortization plans. There are plans that I have approved with a little bit of a negative amortization where there's a strong reason to assume that the, for instance, that the debtor is going to want to pay more than one year. For instance, if the debtor has put a bunch of money in that they're going to lose if they walk away from it for a year, there is a lot of good reasons why they shouldn't do it. You can't make, I mean is this, I mean what is the -- why should I go against the general rule that you don't have negative amortization schedules?

MR. MACKEY: Well, of course, as you say, this one has a dip in it. The dip in it coincides with the

alternative treatment of taking a one-year lease. We've taken that alternative out of the disclosure statement because we failed in negotiations to put that together. What Mr. Walsh is doing is he's saying that they didn't even want a four or six-month lease, they wanted, that's all they wanted and they want the land back. And now today they desperately don't want the land back, nor will they talk to us about a lease, because they have found out, because we blew the whistle about environmental problems. And so what they're really trying to do is sell this Court on the idea that this debtor ought to be forced under the plan to satisfy supposed environmental problems that we don't know are there. That's their expert, not ours. And so the dip that we have is to cover that first-year period when the debtor is brand-new in the plan and is just starting out, but it was in the beginning to coincide with the amount of lease payments for a year. The $2,000 a month lease payment came from Mr. Walsh's principal, as I understood it, when we first started about leasing now almost a year and a half ago, and I took his number and that's what I plugged in for the first year. That's why there's a dip, because we were trying to make the plan equally attractive or unattractive for the first year for the bank so that whichever alternative they took they would get the same treatment. Now, granted, perhaps because we are now not involved in any leasing situation and a

FORM FED PENGAD • 1-800-631-6989

foreclosure, that now maybe a negative dip is not appropriate and if it isn't, the debtor is willing to do something to take care of that. Whatever that something has to be, that is not a problem that the debtor considers worth fighting over to lose confirmation. But we don't believe that, for instance, the monthly payments that we've been making as adequate protection payments, this is an undersecured creditor, not oversecured, and we believe that those payments, and you reserved this issue at the, when you ordered the stay not to lift and us to make the payments, that you would address perhaps at confirmation whether or not those should be applied to principal or to interest. I have taken the position that, and perhaps presumptively, that you're going to rule they be applied to principal because the debtor, the creditor wasn't entitled to interest post-petition anyway because he's undersecured. Post-confirmation he will be. So we applied the 2,000 or 2500, I think it's 2500 is what the payments you ordered, should go towards the principal for the period of time that we were in the Chapter 11. And then my instructions to Mr. Stone were that we were going to pay the $2,000 a month for the first year, that would be interest-only, and then to give me a nine-year amortization schedule that would completely pay them off at the end of the nine-year period based on what we thought was a reasonable rate of eight percent. Now, when you look at it

FORM FED PENGAD • 1-800-631-6989

in that direction, that's the explanation and I don't believe it's, I mean that's the factual development of the dip in the partial amortization. Now, if we don't need that now --

THE COURT: Okay. Let's move on to the -- I understand your position. Let's move on to the 2000 taxes issue.

MR. MACKEY: I don't understand --

THE COURT: How is it that the 2000 taxes, which are -- this whole notion, this is always, you know, when you've got an undersecured claim and then you've got a bankruptcy that lasts and goes from year to year and you have taxes that accrue during the bankruptcy, does that deplete the value of the collateral for the purposes of the bank or is that an administrative claim that should be paid like the light bill so that they get to keep their collateral at the same value?

MR. MACKEY: Well, my position from start to finish in all cases but certainly this one has been that the post-petition taxes that come due, whether it be the IRS or from these taxing authorities, are in fact administrative claims. And they'll be paid as I pay administrative claims under the plan, which is cash on the effective date.

THE COURT: Okay. Right.

MR. MACKEY: And that's always, that's what the language says --

FORM FED PENGAD • 1-800-631-6989

THE COURT: Well, that's true, nobody disagrees with that, but now the question is does the secured claim of the bank, is it based upon the value of the property less the 2000 taxes or the value of the property without, in other words, having paid the 2,000?

MR. MACKEY: No, I think it is with all the taxes as they are on the date of confirmation.

THE COURT: Then if that's the case, doesn't the Code provide, it does say the value of the collateral at the day of confirmation, and if the value of the collateral at the day of confirmation is $8,000 less or whatever it is, 9,000 -- what's the, with the 2000 taxes? You can just say it.

MS. ROBERTSON: Nine thousand one hundred.

THE COURT: Okay. If the value has been depleted by $9,000 by the date of confirmation, doesn't the Code provide for an administrative claim to the bank for the difference between their value on the day that they filed their motion to lift stay and the value at confirmation? So that they would be, and it's a wash then, they get their secured claim but they also get an administrative claim for the $9,000.

MR. MACKEY: Well, I don't think the bank gets an administrative claim at all.

THE COURT: Sure they do, that's what -- I think that's right in the Code. I mean normally we don't worry

FORM FED PENGAD • 1-800-631-6989

about this because --

MR. MACKEY: Well, all right, you're --

THE COURT: -- you cut off.

MR. MACKEY: You're talking then that the adequate protection payments or the protection payments you ordered in conjunction with the motion to lift stay, whether they are or they aren't administrative expense, if that's your question, I mean --

THE COURT: I'm just saying that --

MR. MACKEY: I know they are, I mean I don't argue with that.

THE COURT: One of the reasons to file a motion to lift stay in a bankruptcy case is so that on the date of confirmation if the collateral is less you get an administrative claim for the difference in the collateral. Isn't that, I thought that was hornbook law.

MR. MACKEY: Well, it may be but that, I don't think that's what we're talking about when we're talking about the payment of taxes.

THE COURT: Well, if they had a $350,000 secured, if they had collateral worth $350,000 on the date of their motion to lift stay and now it's worth 341,000 because there's taxes in front of them, hasn't the value of their secured claim been diminished and they're entitled to an administrative claim?

FORM FED PENGAD • 1 800-631-6989

MR. MACKEY: Only --

THE COURT: So the practical effect of that is, is that whether you say that the $9,000 is paid in administrative claim but you don't get to credit it against their claim, or you say you get to credit it against their claim but then you've got to pay them another administrative claim because you've lowered their -- it really doesn't matter. But either way you do it that way, it's not the way you're providing in the plan, are you?

MR. MACKEY: Well, that's not how I understood it. I thought what I was providing is that the 2000 taxes were in place, we knew what they were by estimate at least when we did the motion to lift stay back in September or October, it's no surprise that those taxes were there and the amount has probably not changed $500.

THE COURT: But they hadn't been assessed against the property.

MR. MACKEY: Well, but that brings us back to the other problem, is they were, the taxes were assessed on the first of the year. The tax rate wasn't set until much later.

THE COURT: Right. So we have all that, you know, we go back to all that stuff.

MR. MACKEY: I mean we'd get into that story and I've tried to avoid that, because it's not necessary --

THE COURT: Okay.

FORM FED ® PENGAD • 1-800-631-6989

MR. MACKEY: -- if I treat it as an administrative expense.

THE COURT: Okay. Let's go to the taxing authorities' rate of interest.

MR. MACKEY: Well, if she feels that she's entitled to 11 percent under a statute that gives her that, the debtor is not arguing statutory entitlement to interest rates. Our effort and our interest, I mean our intent was not to reduce the interest rate below what any statute might require. I'm not, of course, familiar with her statute.

THE COURT: Is she entitled, she's entitled to interest from the date of petition, isn't she?

MR. MACKEY: Oh, I've never questioned that and I don't know how that got into --

THE COURT: Okay.

MR. MACKEY: -- the deal except perhaps we didn't write it as precisely as we could have.

THE COURT: All right. Now, you've addressed all the issues that they have presented. Do you want to now take a few minutes and make any other comments? I mean you don't have to, you can say more about them if you want to.

MR. MACKEY: Could I have just a moment, Your Honor?

THE COURT: All right.

MR. LONDON: May I have a moment?

THE COURT: Sure.

FORM FED PENGAD • 1-800-631-6989

MR. LONDON: Just a final statement and question relating to the negative amortization and the reason that the budget was provided, was because for the unforeseen expenses during the first year after we went through. The biggest one now comes up as the CPA issue which under, as I understand Texas law, we are going to have to address. The negative amortization, you asked what benefit they get. The benefit they're going to get while we're making this negative amortization is that we're going to be cleaning up the property and expending that extra cash flow that we've built in to make that property better for them. If they took it --

THE COURT: So, are you suggesting to me that you would agree to a provision in the plan that provides that you're required to remediate the property during the first year?

MR. LONDON: I would suggest to you that we're required to go to the Texas authority. During this time it's going to be a third, as I understood it, there's a phase 3 before you make -- so I don't know if it's going to be improvement but we're going to have to go forward with phase 3 during this time frame and expending those extra monies. Yes, Your Honor, I think that the plan has to reflect that that information is there and either we're going to redo the Phase II and find out that the information is incorrect, or that if it's correct, we have to notify the Texas

FORM FED PENGAD • 1-800-631-6989

authorities. And we probably have to notify them even if it's incorrect and do the new study to find out what our requirements are.

THE COURT: Well, I know that the notification of benzene spills is certainly on the front page of the Corpus Christi newspapers these days but I don't think that that is quite the same as, the kind of thing they're talking about isn't quite the same thing as this. This is an underground seepage, apparently, and not some direct thing that everybody knew about. But I certainly don't want to suggest that there's any bankruptcy authority or anything that I have said today to interfere with whatever Texas law provides with respect to notification or remediation of environmental problems, because I don't intend to try to discourage people from following the law, I encourage them to do it.

MR. LONDON: And I think we have to. And I think my client has been advised of that and that's what that cash flow, the additional cash flow is built in, for those exigencies which were not known, and this is now one of the largest ones. And they're certainly getting a value because we're going to be doing it and they don't have to expend the money to do it, because if they were under the other scenario they become the owners and they have to do it.

THE COURT: All right.

MR. LONDON: Thank you, Your Honor.

FORM FED PENGAD • 1-800-631-6989

THE COURT: Okay. Yes, sir?

MR. MACKEY: Judge, in all the objections to confirmation that we've wandered through here, they come down to, as you well know, interest rate. I've told you why we selected the eight percent, we thought it was fair, we still do, but the eight percent interest rate or a change in the interest rate either up or down is not something that this debtor will resist and will pay an interest rate that the Court determines, even on a creditor-by-creditor basis, to be fair and equitable to the particular creditor or to all creditors at once. If the negative amortization dip that has been identified in the FCLT loan, because we've tried to track it with the lease option, is a problem, and that is, the only time it becomes a problem is if the Court believes or suspects we're going to run away or give it back, then the debtor is willing to cure that so that there is no negative dip if that's an important problem, and we would prefer to confirm the plan with the higher --

THE COURT: What is the interest rate?

MR. MACKEY: The interest rate --

THE COURT: I mean not the interest rate, what's the principal of this, approximately 350,000?

MR. MACKEY: Well, it's going to end up in a round number I think of about 330. Maybe a little more, maybe a little less. We've only had this amended tax return for less

FORM FED PENGAD • 1-800-631-6989

than 24 hours and I just haven't memorized the numbers to get it straight, but I think 330 is about what they'll come down to.

THE COURT: So the difference between $2,000 a month and making the interest payments is approximately $1,000 a month, is that -- do we have the CPA, where's the --

MR. STONE: I'm sorry.

MR. MACKEY: He's hiding back there. His question --

THE COURT: Have you calculated what the interest-only payments for a year would be on this note? I mean, I just did it, it looks to me like it's $36,000. Eleven percent, if it's 11, would be $36,000.

MR. STONE: I'd say that's --

THE COURT: All right.

MR. MACKEY: And then the only other issues that really any of the creditors have raised besides the interest matter is the matter of the notice provisions in the plan for default or the default provisions, and if my default provisions are too basic, the debtor is certainly open to whatever it takes to make those conform with what the Court thinks are fair and reasonable. I've just not been inclined or reached -- oh, well, maybe I'm misspeaking.

MR. LONDON: May I approach, Your Honor?

THE COURT: Sure.

FORM FED PENGAD • 1-800-631-6989

MR. LONDON: I have some severe concerns relating to the provisions they're requesting and my biggest is of course the bank having already said we're in default on an EPA requirement that they've extended beyond --

THE COURT: Well, do you have any problem with a default provision that provides for payment of taxes, insurance and the principal and interest, if there's principal due or interest if there's just interest, that you get 10 days notice or they're in default?

MR. LONDON: No.

THE COURT: And that any other kind of default they have to come to Court?

MR. LONDON: I have no problem with that provision, Your Honor.

THE COURT: Okay.

MR. LONDON: Thank you. We do believe that the interest rate of the eight percent, and I did want to address it, we built that in, again, because of the cash flow issues, but I understand the Court's issue relating to adequate assurances.

THE COURT: It's not really adequate assurance, it's an evidentiary issue. I am entitled to look at a reasonable interest rate and, you know, at a time when prime was higher than it is now, in the area of taxes, the Fifth Circuit said that 12 was inappropriate, so I have a hard time finding that

FORM FED PENGAD • 1-800 631-6989

12 percent is an appropriate interest rate for the taxing authorities just simply because it's very difficult to distinguish that case from this case. However, I mean, I know of one District Court at least that has read that case to think that maybe 13 is better. I mean, you know, because this debtor has been in bankruptcy before, 13 percent sounds like a better. And, you know, that's the problem with bankruptcy is that we have, we do things that normal people, I won't say non-bankruptcy, let's say normal people, because I think District Judges are normal, they would read the same language and say, "Well, okay, that means 13 percent, it doesn't mean less than 12." So the point is, is that if we're in a contested confirmation, the record had better be clear as to what the evidence is about the interest rate. Now, we do have evidence about the interest rate in this particular case and the evidence is the prime rate, I can take judicial notice of the prime rate, I can use common sense to believe that Greenspan is going to lower it again probably if the economy doesn't get any better and so it's probably on a downward trend at the present time, I can look at what the expert said, the banker said was a reasonable rate under these circumstances and I can look at the contract rate. That's all the evidence I have.

MR. LONDON: I agree. Thank you, Your Honor.

THE COURT: Okay. All right. Yes, sir?

FORM FED PENGAD • 1-800-631-6989

MR. WALSH: And, Your Honor, just for clarification, I looked back and the contract rate was 11 percent. Also, I'm not sure how the Court is going to rule on the environmental issue but if they are going to comply with Texas law, whatever that is, with regard to the environmental issue, we would request that we be provided with notice of all the steps being taken.

THE COURT: Okay. Well, does your note of your lending documents require they do that?

MR. WALSH: No.

THE COURT: Or do you just want that notice?

MR. WALSH: If the Court determines that this is a default and they're not in compliance with it or if it determines that they've got to be in compliance with whatever State regulatory --

THE COURT: Okay.

MR. WALSH: -- then we request that we be provided notice with whatever steps are being taken.

THE COURT: Okay.

MR. WALSH: They've indicated they may do it voluntarily.

THE COURT: Well, I would think that if we were to look at what the intent of the parties was at the time of this contract, nobody thought that having an underground storage tank was a violation of anybody's -- I mean I don't

FORM FED PENGAD • 1-800-631-6989

know, it's hard to think in terms of 1999 or 2000 or 2001 business policies when this contract was written because environmental problems were not heard of at that time and they are now, so I don't know if the intent of the parties -- well, I understand what you're saying. All right. Are we ready? Here's what I would confirm: I would give the IRS their default language, because I always give the IRS their default language. Would not give the IRS a priority claim for the previous taxes. I don't know of any legal authority that allows me to do that. With respect to the FCLT, the environmental claims are not a default. It is a default to be out of, to use the property in violation. I'm sure that there's a provision in the note, though, that being outside of the law, using it for an illegal purpose or whatever, is probably a violation, and now that we know that there are environmental questions, whether it's a violation of that or whether it's a violation of the Bankruptcy Code, you've got to cure the environmental problem, so the debtor has a responsibility to take whatever steps Texas law requires to cure environmental problems. We don't discharge that liability. The treatment, I think, under the circumstances of this case it would be very difficult for me to support a finding other than that there is an 11-percent interest rate for the bank. The bank's interest rate, it apparently was 11 percent, prime plus two is a reasonable interest rate usually

FORM FED PENGAD • 1-800-631-6989

in a classified loan and a loan which, this is not even an 80-percent loan. I mean if you used traditional analysis, and this is why District Courts have a hard time with our concept of what a reasonable interest rate is, if this debtor tried to get this loan they couldn't get it. There is no bank in the world that would lend on 100 percent, a debtor in bankruptcy, with prime plus two. So when you read the case law, I mean, it sounds like the District Court is right. I don't think that's the interpretation, though, that we're intending in the bankruptcy sense. We're intending on some hypothetical reasonable loan based on reasonable circumstances, and I think the banker did a good job of saying that prime plus two is a reasonable loan under these circumstances, even though if somebody came in off the street under these circumstances or went to Equifax or one of those and tried to get a bunch of banks to bid on it, nobody would bid on it, certainly not at 11 percent. Maybe 23 percent, you might get one, something like that. But that is not what was intended by the statute. So I would expect 11 percent. Number two, I don't think that you can have the negative amortization so it would seem to me the plan would need to provide for somewhere in the neighborhood of 3,000 a month and that it would be to interest only, and that if you pay more than the interest during that year then it can be principal. I agree with Mr. Mackey that the adequate

FORM FED PENGAD 1-800-631-6989

protection payments post-petition for an undersecured loan are interest, so those -- I mean are principal. The default language should provide that, for payment of principal or interest, taxes or insurance, that with 10 days notice the stay lifts and they can exercise, or if there's not stay, whatever, the confirmation terms, whatever, they can exercise whatever remedies they would want to exercise. For any other kind of violation like violation of environmental laws or anything of that sort, they should seek permission from the Court first. Taxing authority. It seems to me -- here's another one of those fictions that we're supposed to look at. The interest rate, it seems to me, for the taxing authority should be something less than the reasonable interest rate for the lender who's behind the taxing authority and has a 100-percent loan, or maybe it would be an 80-percent loan if we were looking at normal commercial situations. They've got a loan that's basically got, what, 10 times their -- I don't know, but it's well, well oversecured and there's no likelihood that they wouldn't protect. So it seems to me that I have to reasonably take the evidence that we have that we've adduced on the loan to the bank and then pick an interest rate that would be lower than the bank rate and it seems to me that under these circumstances 10 percent would be a reasonable interest rate for the taxing authority. I understand that Mr. Mackey said 11 but if I'm ruling on it I

would think something a little less than the bank rate would be the reasonable rate and so I would pick 10, although of course it starts from the petition date. And default provisions, again, are the same default provisions that I discussed before. I think I've dealt with everything.

MS. MASSO: I have one question, Your Honor. Are you overruling the IRS' objection to the Article 9 language saying if this tort finds the earlier bankruptcy plan to be an executory contract that it's rejected by this plan? We have problems with that language and --

THE COURT: Yeah, I don't think it's an executory contract, I think it's a contract that's been defaulted upon prepetition, so there is no --

MS. MASSO: Okay.

THE COURT: So I don't, I'm not, I don't know how that impacts, whether I have to overrule your objection, then I am overruling your objection and allowing them to treat your taxes --

MS. MASSO: As unsecured.

THE COURT: -- as though they are taxes but, from the periods where they were done, but then you are stayed by the imposition of that previous bankruptcy. Your collection efforts are stayed so that's not counted against you when you do your calculations. So whatever that turns out to be, which I suspect it was old enough that it turns out that they

FORM FED PENGAD • 1-800-631-6989

are now all unsecured claims and not priority claims.

MS. MASSO: Thank you, Your Honor.

MR. WALSH: Your Honor, one other --

THE COURT: But I am giving you your default language. I'm giving the IRS their standard default language. I'm giving everybody else the default language that I just suggested.

MS. MASSO: It's much appreciated.

THE COURT: Now, that, now, and then we come to the following problem, which is that I don't write plans, so I have now said proposals that the debtor has to adopt if they want them confirmed. If they don't, then they don't have to accept this.

MR. WALSH: Your Honor, I have one other clarification. I understand that in order to raise an environmental issue we'll have to come back, as a practical matter, and unless we get notice of what steps are being taken, we won't know. Also --

THE COURT: Oh, well, I don't have any problem with notifying you of the remediation efforts as well as the copies of whatever reports are done. I don't have any problem with that.

MR. WALSH: And also possibly permission for us to conduct further assessments ourselves if --

THE COURT: Well, I think that if you want to do the

assessments for them they probably would love to have you do it. So I don't think there's any problem, I think you always still have discovery rights that you can exercise, but I don't know that we'd want to write those into the plan. All right. So, Mr. Mackey, if your client is interested in this plan and if the buyer is still interested in the purchase under these circumstances, you may prepare an order consistent with what I've just ruled and I will confirm the plan.

MR. MACKEY: Your Honor, the debtor does adopt each of the provisions of the Court's order.

THE COURT: All right. And then I will also sign the order as well.

MR. MACKEY: Yes, Your Honor.

THE COURT: All right, we're in recess until tomorrow at 9:00 o'clock for Chapter 13's. Thank you.

MS. KURTZ: Your Honor, you are confirming the plan and the motion to appoint an examiner is --

THE COURT: Is denied, it's moot. And thank you. I know it was a long day but the lawyers, I appreciate that you continually keep me interested in it so that we can get this handled.

(The proceedings ended at 5:03 p.m.)

FORM FED PENGAD • 1 800-631-6989

INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR THE DEBTOR: | | | | |
| William Capt | | | | |
| Mr. Mackey | 36 | | 54 | |
| Mr. Walsh | | 40 | | |
| Mr. London | | 53 | | |
| George Stone | | | | |
| Mr. Mackey | 55 | | | |
| Mr. Walsh | | 58<br>62 | | |
| Ms. Robertson | | 61<br>64 | | |
| The Court | 65 | | | |
| WITNESSES FOR FCLT: | | | | |
| Darryl Lemke | | | | |
| Mr. Walsh | 67 | | 76 | |
| Mr. London | | 73 | | 79 |
| The Court | 78 | | | |
| Scott Boyd | | | | |
| Mr. Walsh | 81 | | | |
| Mr. Mackey | | 84 | | |
| Mr. London | | 86 | | |

EXHIBITS:

| | | Received |
|---|---|---|
| Debtor's: | | |
| 1 | Ballot Summary (w/ballots attached) | 34 |
| 2 | Sales Order, 1/2/01, Upcoming Sale to Choate Seafood, $1,549.349 | 34 |
| 3 | Sales Order, 12/6/00, Sale to Valley Equipment $358,400 | 34 |
| 5 | Claims Amortization Schedule | 34 |
| 6 | Cash Flow Analysis | 34 |
| FCLT's: | | |
| 1 | Resume of Darryl Lemke | 68 |
| 2 | Resume of Scott Boyd | 68 |
| 3 | Phase I Site Assessment Report | 68 |
| 4 | Phase II Site Assessment Report | 68 |
| 5 | Promissory Note | 68 |
| 6 | Deed of Trust | 68 |

FORM FED PENGAD • 1-800-631-6989

I certify that the foregoing is a correct transcription from the electronic sound recording of the proceeds in the above entitled matter.

APR 03 2001

Judith M. Garcia

| | | | |
|---|---|---|---|
| **Insured** | SHIRLEY JEAN METZGER | | |
| **Specified Amount** | $1,500,000 | DECEMBER 1, 1987 | **Policy Date** |
| **Policy Number** | JP4038973 | | |
| | B | | |

**Jefferson-Pilot Life Insurance Company will pay**

1. The Death Benefit of this policy to the Beneficiary immediately upon receipt of due proof of the death of the Insured while the policy is in force and prior to the Maturity Date, or

2. the Maturity Value of this policy to the Owner on the Maturity Date if the policy is in force and the Insured is alive on that date.

This policy is a legal contract between the Owner and the Company. All provisions on the following pages are a part of this contract.

**Ten Day Right to Examine Policy**

This policy may be surrendered within ten days after it is delivered by returning it to the Company or to one of its agents. Upon such surrender, the policy will be considered void from the beginning and any premiums paid will be refunded.

Signed for the Company at its home office in Greensboro, North Carolina, on the policy date.

Secretary

Chairman of the Board
Chief Executive Officer

Form 87-130

**Flexible Premium Adjustable Life Insurance Policy**

Adjustable death benefit payable at death prior to the Maturity Date. Maturity Value payable on the Maturity Date i the Insured is then alive. Flexible premiums payable during Insured's lifetime until the Maturity Date Non-participating.

ɪder one of the following options

ption A The Death Benefit is the larg of

The Specified Amount on the date of death plus the cash alue at the beginning of the policy month of death, or

A percentage of the cash value at the beginning of the policy ıor of death. The percentage is defined below.

ption B The Death Benefit is the largest of

. The Specified Amount on the date of death, or

. The cash value at the beginning of the policy month of death, lus $25,000, or

. A percentage of the cash value at the beginning of the policy ıonth of death. The percentage is defined below.

| ttained Age | Percentage | Attained Age | Percentage | Attained Age | Percentage |
|---|---|---|---|---|---|
| -40 | 140% | 55 | 125 | 70 | 110 |
| 41 | 139 | 56 | 124 | 71 | 109 |
| 42 | 138 | 57 | 123 | 72 | 108 |
| 43 | 137 | 58 | 122 | 73 | 107 |
| 44 | 136 | 59 | 121 | 74 | 106 |
| 45 | 135 | 60 | 120 | 75 & over | 105 |
| 46 | 134 | 61 | 119 | | |
| 47 | 133 | 62 | 118 | | |
| 48 | 132 | 63 | 117 | | |
| 49 | 131 | 64 | 116 | | |
| 50 | 130 | 65 | 115 | | |
| 51 | 129 | 66 | 114 | | |
| 52 | 128 | 67 | 113 | | |
| 53 | 127 | 68 | 112 | | |
| 54 | 126 | 69 | 111 | | |

Jnder either option, the Death Benefit will be reduced by any ndebtedness on the date of death. In addition, any premium paid after the beginning of the policy month of death will be refunded. The cash value at the beginning of the month of death used in calculating the death benefit above is after subtracting all parts of the monthly deduction for the month except for the cost of insurance.

The Specified Amount at issue and the option in effect at issue are shown on page three. Either may be changed as described below. The Death Benefit payable is subject to all provisions of this policy.

**Maturity Value** The Maturity Date is shown on page three. The Maturity Date is the date the policy will terminate if the policy is in force and the Insured is alive on that date. The Maturity Value will be paid on termination on the Maturity Date. The Maturity Value will be the cash value less any indebtedness on that date. It is possible that the policy will terminate without value prior to the Maturity Date. This will happen if premiums paid and interest credited are not sufficient to continue coverage to that date.

may be changed at any time after the first policy year on written request by the Owner. The changes which can be made are:

1. Increase in the Specified Amount.
2. Decrease in the Specified Amount.
3. Change in the existing death benefit option
4. Change in the Maturity Date, subject to the consent of the Company.

If a change would result in an increase in the amount payab death, such change will be subject to satisfactory evidence insurability. The Specified Amount may not be decreased below $25,000. A decrease in the Specified Amount will ap first against insurance with the most recent effective date. w the Initial Specified Amount being last to be decreased. A change will be effective on the Monthly Anniversary Day on next following the date of approval by the Company of the request for the change, unless another date acceptable to t Company is requested.

## Premium Provisions

**Payment of Premiums** The initial premium is due on the policy date. Subsequent premiums may be paid at any tim and in any amount, subject to the following conditions, unle otherwise agreed to in writing by the Company.

The amount of each premium must be at least $25.00.

The maximum amount of premium the Company will accep any policy year will be three times the yearly planned prem shown on page 3.

All premiums are payable either at the home office or to ar authorized agent. If paid to an agent, the agent will furnish official premium receipt. This receipt must be signed by th Secretary of the Company and countersigned by the agen agent has the authority to collect a premium unless he has a receipt.

**Grace Period** If on a Monthly Anniversary Day the cash value less any indebtedness is less than the monthly dedu due, a grace period of 60 days from that date will be allov the payment of the minimum amount needed to continue t policy. The cash value and monthly deductions are descri in the Nonforfeiture Provisions.

The Company will notify the Owner and any Assignee of t minimum amount due at least 30 days before the end of t grace period. If the amount specified is not paid within th grace period, the policy will terminate without value at the of such period. If the Insured dies within the grace perioc amount needed to continue the policy to the end of the p month of death will be deducted from the amount otherw payable.

## Non-participating

No dividends will be paid on this policy.

SURED SHIRLEY JEAN METZGER

EC'"IED AMOUNT $1,500,000 DECEMBER 1, 1987 POLICY DATE

LIC( NUMBER JP4038973

ATH BENEFIT OPTION B

TURITY DATE DECEMBER 1, 2032

NOTE: THE MATURITY DATE SHOWN IS THE DATE THE POLICY WILL MATURE IF IT IS IN FORCE ON THAT DATE. EVEN IF COVERAGE CONTINUES TO THE MATURITY DATE, THERE MAY IN FACT BE LITTLE OR NO VALUE TO BE PAID. IT IS POSSIBLE THAT COVERAGE WILL TERMINATE PRIOR TO THE MATURITY DATE SHOWN. THIS WILL HAPPEN IF PREMIUMS PAID AND INTEREST CREDITED ARE NOT SUFFICIENT TO CONTINUE COVERAGE TO THAT DATE.

;SUE AGE 50

'LANNED PREMIUM $1,004.48 MONTHLY

)WNER AS PROVIDED IN RIDER

3ENEFICIARY PAYABLE AS PROVIDED IN RIDER

:HEDULE OF BENEFITS AND PREMIUMS - POLICY NUMBER JP-4038973

| )RM JMBER | BENEFIT | | EFFECTIVE DATE | MONTHLY DEDUCTION | RATE CLASS | YEARS PAYABLE |
|---|---|---|---|---|---|---|
| 7-130 | INITIAL SPECIFIED AMOUNT | 1,500,000 | DEC 1, 1987 | SEE PAGE 6 | STD | |

## General Provisions

**The Contract** This insurance is issued in return for the application and the payment of the initial premium.

The policy and the application make up the entire contract. A copy of the application is attached to the policy. Only statements contained in the application can be used to contest a claim or the validity of the policy. These statements are considered representations and not warranties, in the absence of fraud.

**Incontestability** This policy becomes incontestable if it is in force and the Insured is alive two years after the policy date. After that time the validity of the policy cannot be contested due to misrepresentation of material facts in the application.

An addition to the Specified Amount becomes incontestable if it is in force and if the Insured is alive two years from its effective date.

**Modification** No agent or other person, except an officer in the home office of the Company, has the power to act for the Company. Only such officers can modify the terms of this policy. No promise made by any other person with regard to the terms or benefits of this policy is binding on the Company. The agent is not authorized to accept any information for the Company that is not in the application, to extend the time allowed for paying a premium, or to waive and of the Company's rights or requirements.

**Settlement** All sums payable by the Company are payable at the home office. Any sum due will be mailed or otherwise delivered. In any settlement under this policy all indebtedness will be first deducted. The term indebtedness means the balance owed to the Company on a loan on this policy.

**Reinstatement** If this policy terminates because a premium or other required amount is not paid, but it is not surrendered for cash, it may be reinstated. Reinstatement means the policy is put back in full force. Reinstatement may be made at any time within five years from the date of termination and prior to the Maturity Date. Satisfactory evidence of insurability must be furnished at that time. The minimum payment required will be an amount sufficient to keep the policy in force for at least two months. Any indebtedness which existed on the date of termination must also be repaid or reinstated. Reinstatement will be effective on the Monthly Anniversary Day on or next following the date of approval by the Company of the request for reinstatement, unless another date acceptable to the Company is requested.

**Suicide** If the Insured commits suicide, while sane or insane, within two years from the policy date, the amount payable under this policy will be the sum of the premiums paid less any indebtedness and less any partial surrenders.

If the Insured commits suicide, while sane or insane, within two years from the date of an addition to the Specified Amount, the amount payable under such addition will be the sum of the monthly deductions for such addition.

**Misstatement of Age or Sex** If the date of birth or the sex of the Insured has been misstated, the amount of death benefit will be adjusted to the amount which would have been provided by the most recent cost of insurance deduction at the true age and sex.

**Assignment** This policy may be assigned. An assignment will not be binding on the Company unless it is in writing and filed at the home office. The Company is not responsible for the validity or sufficiency of an assignment.

**Ownership** The Owner of this policy is shown on page 3 or in a rider attached to the policy. While the Insured is living, the Owner may exercise every right and option and receive every benefit provided by the policy. The rights of the Owner are not subject to consent of the Beneficiary.

**Beneficiary** The Beneficiary may be changed by written request satisfactory to the Company filed at its home office. Any change will take effect on the date of the written request if the Insured is alive at that time. However, a change is subject to any payment made or action taken by the Company prior to the time such request is filed at the home office.

If any Beneficiary dies before the Insured, benefits which would have been paid such Beneficiary shall be paid to the Owner, if living, unless otherwise provided. If the Owner is not living, such proceeds will be paid to the estate of the Owner, unless otherwise provided. The interest of any Beneficiary will be subject to the rights of any Assignee.

**Monthly Anniversary Day** The monthly anniversary day in each month is the same day of the month as the policy date.

## lon-Forfeiture Provisions (Continued)

**on' ation of Insurance** This policy and all riders will ɔntinue in force according to their terms as long as the ash value, less any indebtedness, is sufficient to cover the ionthly deduction. If such value is not sufficient, the policy ill terminate according to the Grace Period provision. In no ase will the policy continue past the Maturity Date nor will a der continue past its termination date. If premiums are iscontinued on any date, the value on that date will be used provide insurance under this provision.

**asis of Values** Minimum cash values are based on the 958 Commissioners' Standard Ordinary Mortality Table, ge nearest birthday, with interest at 4% per year. A detailed tatement of the method of computation of cash values nder this policy has been filed with the insurance lepartment of the state in which this policy was delivered. ash values under this policy are not less than the minimum alues required by law.

**urrender and Surrender Value** This policy may be urrendered at any time prior to the Maturity Date. Written equest must be made by the Owner. The surrender value vill be the cash value as of the date of surrender less any ndebtedness and less the charge for full surrender.

f surrender is requested within 30 days after the end of a olicy year, the surrender value will not be less than the urrender value at the end of that year less any policy loans or p l surrenders made since the end of that year.

The Company has the right to defer the payment of any surrender value for up to six months after receiving written equest.

**Partial Surrender** A partial surrender of this policy may be made at any time prior to the Maturity Date. Written request must be made by the Owner. A partial surrender will not be allowed if the remaining surrender value would be less than the minimum required by law. The partial surrender may be for any amount not to exceed the surrender value at the time, less $500.00.

When a partial surrender is made,

1. the cash value will be reduced by the amount of the partial surrender, plus a fee of $25.00, plus the charge for the partial surrender.

2. the death benefit will also be reduced by the same amount as the reduction in cash value. The Specified Amount will be reduced by such amount if the policy is under death benefit option B at the time. A partial surrender cannot be allowed if it would reduce the Specified Amount below $25,000.

The Company has the right to defer the payment of a partial surrender for up to six months after receiving written request. A partial surrender made for the purpose of paying premiums to the Company will not be deferred.

**Surrender Charges** If the policy has been in force less than ten years (120 months) there will be a charge for full or partial surrender. The charge will be the amount of excess interest credited to the policy or to the amount of the partial surrender for the period immediately preceding surrender as shown below. For full surrender during the first 12 months, there will be an additional charge of $30.00 for each policy month less than 12 the policy has been in force.

| Number of full months the policy has been in force prior to surrender | Excess interest charge |
|---|---|
| Less than 60 | 12 months excess interest |
| 60-71 | 10 months excess interest |
| 72-83 | 8 months excess interest |
| 84-95 | 6 months excess interest |
| 96-107 | 4 months excess interest |
| 108-119 | 2 months excess interest |
| 120 or more | no surrender charge |

## .oans

he Company will make a policy loan on the security of this olic·· Loans are subject to the following conditions:

. W...en request for a loan must be made to the Company.

:. The loan value at any time is the then current cash value ess an amount equal to the surrender charge which would ipply if the policy were surrendered on the date of the loan. he maximum loan at any time is the loan value at that time ess any existing loan. Loan interest to the end of the policy ear, if not paid in cash, will be deducted from the loan amount.

3. Interest on a policy loan will be payable in advance. nterest will be charged at the rate of 5.66% per year in advance, which is equivalent to a rate of 6% payable at the end of the year.

4. If loan interest is not paid when due, it will be added to the oan balance and bear interest at the same rate. If the loan balance plus accrued interest at any time equals or exceeds the cash value, the policy will terminate. In such event the Company will give at least one month's notice (not less than 30 days) to the Owner and any Assignee before the policy is terminated.

5. Every payment to the Company will be considered a premium payment unless clearly marked for loan repayment or for payment of loan interest.

6. The Company has the right to defer making a policy loan for ι· ·o six months after receiving written request. A loan for the , pose of paying premiums to the Company will not be deferred.

# )ptional Methods of Settlement

ıe r ımount payable under this policy may be applied ıde. ıe of the following options, provided.

a. The amount applied must be at least $2,500.

b. The periodic payments must be at least $25.

c. Consent of the Company is needed if the policy is assigned or if the payee is an executor, administrator, trustee, corporation, partnership or association.

. **Payments for a Specified Period** Under this option, ıe Company will make equal monthly payments for a ɔecified number of years. The first payment will be made ımediately. Table I shows the monthly payment for each 1,000 applied.

. **Life Income with Payments for a Guaranteed eriod** Under this option, the Company will make equal ıonthly payments for the life of the original payee. If the riginal payee dies during the guaranteed period, the ompany will continue the payments to the payee's eneficiary for the balance of the guaranteed period. The uaranteed period can be 5, 10, 15, or 20 years. The first ayment will be made immediately. Table II shows the ıonthly payment for each $1,000 applied.

. **Amount Left at Interest** Under this option, the ompany will retain the amount payable for a specified eriod for 30 years or less or for the life of the original payee. ıter' vill be paid on the balance held at a rate declared ıy the ompany. Such rate will not be less than 3% per year. he amount of each interest payment per $1,000 held by the ompany will not be less than $30.00 annually, $14.89 emi-annually, $7.42 quarterly, or $2.47 monthly.

. **Payments of a Fixed Amount** Under this option, the ompany will make equal annual, semi-annual, quarterly or nonthly payments of a fixed amount. The payments will be nade until the balance held runs out. Interest will be added o the balance held at a rate declared by the Company .Such ate will not be less than 3% per year. The fixed payment nay not be less than 8% per year of the original amount left vith the Company.

In the event of the death of the last surviving payee before all payments have been made under any of the above options, the present value of the remaining guaranteed payments under Option 1 or 2, or the balance held under Option 3 or 4 will be paid in one sum to the estate of that payee. The present value will be calculated using an interest rate of 3% per year.

Payments under Option 1 or 2 can also be made annually, semi-annually, or quarterly. The amount of such payments will be equivalent to the monthly payments at 3% per year.

The amounts guaranteed under Option 1 and 2 are based on an interest rate of 3% per year. Such excess interest as the Company may declare will be payable on the 15th day of December of each year. No excess interest will be paid under Option 2 after the guaranteed period.

The Owner may elect any of the above options, or may change or revoke a previous election. A change of Beneficiary automatically revokes a settlement option previously elected. If the Owner elects a settlement option, the Beneficiary cannot change the election unless the right to do so is given the Beneficiary in the election. If at the death of the Insured the proceeds of the policy are payable to the Beneficiary in a single sum, the Beneficiary may elect a settlement option at that time.

Payments under a settlement option may not be assigned. To the extent permitted by law, funds held and payments made shall not be subject to claims of creditors, nor to execution or other legal process by creditors.

5. **Annuity Settlement Option** Instead of the above options, the amount payable may be used to provide income according to the Company's Single Premium Immediate Annuity rates in effect at that time. The amount of the payments under this option will be 104% of the payments which the amount applied would otherwise purchase, adjusted so the first payment is immediate. No excess interest will be payable under this option.

**COMPLAINT NOTICE:** Should any dispute arise about your premiums or about a claim that you have filed, write to Jefferson-Pilot Life Insurance Company, PO Box 21008, Greensboro, NC 27420. If the problem is not resolved, you may also write the State Board of Insurance, Department C, 1110 San Jacinto Street, Austin, Texas 78786. This notice of complaint is for information only and does not become a part or condition of this contract.

(Texas)
BJ-5130

# Amendments to the Policy

**Rid 'orming a part of the policy to which attached.**

The **Death Benefit** provision on page 2 is hereby replaced by he following:

**Death Benefit** The Death Benefit of the policy will be defined under one of the following options:

Option A The Death Benefit is the larger of
1. The Specified Amount on the date of death plus the policy value at the beginning of the policy month of death, or
2. A percentage of the policy value at the beginning of the policy month of death. The percentage is defined below.

Option B The Death Benefit is the larger of
1. The Specified Amount on the date of death, or
2. A percentage of the policy value at the beginning of the policy month of death. The percentage is defined below.

| Attained Age | Percentage | Attained Age | Percentage | Attained Age | Percentage |
|---|---|---|---|---|---|
| 0-40 | 250% | 55 | 150 | 70 | 115 |
| 41 | 243 | 56 | 146 | 71 | 113 |
| 42 | 236 | 57 | 142 | 72 | 111 |
| 43 | 229 | 58 | 138 | 73 | 109 |
| 44 | 222 | 59 | 134 | 74 | 107 |
| 4 | 215 | 60 | 130 | 75-90 | 105 |
| 4ι | 209 | 61 | 128 | 91 | 104 |
| 47 | 203 | 62 | 126 | 92 | 103 |
| 48 | 197 | 63 | 124 | 93 | 102 |
| 49 | 191 | 64 | 122 | 94 | 101 |
| 50 | 185 | 65 | 120 | 95 | 100 |
| 51 | 178 | 66 | 119 | | |
| 52 | 171 | 67 | 118 | | |
| 53 | 164 | 68 | 117 | | |
| 54 | 157 | 69 | 116 | | |

Under either option, the Death Benefit will be reduced by any indebtedness on the date of death. In addition, any premium paid after the beginning of the policy month of death will be refunded. The policy value at the beginning of the month of death used in calculating the death benefit above is after subtracting all parts of the monthly deduction for the month except for the cost of insurance.

The Specified Amount at issue and the option in effect at issue are shown on page 3. Either may be changed as described below. The Death Benefit payable is subject to all provisions of this policy.

The General Provisions contained in this policy are hereby amended by adding the following paragraph:

**Compliance with the Internal Revenue Code** The Company reserves the right to: 1. refund any premium payment, or 2. refuse to make any change in the Specifie Amount or the Death Benefit Option – if such premium or change would cause this policy to fail to qualify as life insurance under the Internal Revenue Code.

Jerry L. Engle
Secretary

BJ-5146

Jefferson-Pilot
Life Insurance Company

Jefferson-Pilot Life
Insurance Company
P.O. Box 21008
Greensboro, NC 27420

## SPLIT DOLLAR ENDORSEMENT
## FOR UNIVERSAL LIFE POLICY

Policy No. __________ or New Application dated __________

on the life of SHIRLEY JEAN METZGER
Name of Insured

Jefferson-Pilot Life Insurance Company is requested to make the provisions of this form a part of the policy. Any previous designations of beneficiary or contingent beneficiary and election of settlement options are hereby revoked.

I. Definitions - Where the terms below appear, they are defined as follows:

"Employer": SORT-RITE INTERNATIONAL, INC.

"Co-Owner": SHIRLEY JEAN METZGER

"Co-Beneficiary": (Check (X) the appropriate block and insert the desired Co-Beneficiary.)

( ) __________, __________ of the Insured, if living; otherwise __________, __________ of the Insured, if living; otherwise the Co-Owner, if living; otherwise the estate of the Co-Owner.

( XX ) DEBRA ANN METZGER, DAUGHTER, KATHERINE LEE METZGER, DAUGHTER, AND FRANCES E. MERRICK, MOTHER OF INSURED SHARE AND SHARE ALIKE, SURVIVOR OR SURVIVORS.

"Net Premiums": For the purpose of this Endorsement, the term "Net Premiums" means the total premiums paid on the policy by the Employer less (1) any outstanding policy loans made by the Employer plus accrued interest thereon, (2) any partial withdrawals made by the Employer, and (3) any other amounts received by the Employer from the Co-Owner as a reimbursement of premium paid by the Employer.

B-5250A

39

Copyright 1986. By LifeComp Programs, Inc.

II. Payment of Premiums

The Employer and Co-Owner agree to the following plan for payment of premiums:
(Check (X) appropriate box.)

( ) EMPLOYER PAYS ALL - The Employer agrees to pay the entire gross premium(s) on the policy. Co-Owner may make voluntary additional premium contributions to the Employer and Employer shall pay each such amount as an increased premium.

( XX ) CO-OWNER PAYS COST OF INSURANCE - Each premium on the policy shall be paid by the Employer as it becomes due. The Co-Owner agrees to pay to the Employer an amount equal to the cost of the insurance provided to the Co-Owner by the policy each year. Co-Owner may make voluntary additional premium contributions to the Employer and Employer shall pay each such amount as an increased premium.

III. Division of Death Proceeds

This endorsement contemplates a division of death proceeds between two beneficiaries: the Employer and the Co-Beneficiary.

Upon the death of the Insured while this Split Dollar Endorsement is in effect:
(Select one)

1. ( ) The Co-Beneficiary shall receive the net death proceeds less the Net Premiums. Employer shall receive the remainder of any net death proceeds.

2. ( ) The Co-Beneficiary shall receive the lesser of (1) $____________, or (2) the net death proceeds less the Net Premiums. The Employer shall receive any remainder of the net death proceeds, except that if the net death proceeds are less than the Net Premiums, the entire net death proceeds shall be payable to the Employer.

3. (XX ). The Employer shall receive the greater of (1) $ 1,000,000.00, or (2) the Net Premiums. The Co-Beneficiary shall receive any remainder of the net death proceeds, except that if the net death proceeds are less than the Net Premiums, the entire net death proceeds shall be payable to the Employer.

Regardless of the option selected above, the amount payable to the Co-Beneficiary shall be referred to as "Co-Beneficiary Death Proceeds".

Notwithstanding the above, in no event shall the Co-Beneficiary be entitled to receive an amount which is less than the Policy Value or Cash Value less the total of Net Premiums and any policy loans by the Co-Owner.

Jefferson-Pilot Life shall pay the entire net death proceeds in one sum to the joint order of the Employer, the Co-Beneficiary, and any collateral assignee. Payment by Jefferson-Pilot Life in accordance with the above will fully and finally discharge Jefferson-Pilot Life for the amount so paid.

27:SD2

40

Copyright 1986, By LifeComp Programs, Inc.

IV. Ownership Rights

Unless otherwise stated herein, the Employer, acting alone, may exercise the following rights:

1) The right to borrow against, pledge or assign the policy, however, in an amount not to exceed the Net Premiums.

2) The right to make partial surrenders of the cash surrender value, provided the aggregate amount of such partial surrenders shall not exceed the amount of the Net Premiums.

3) The right to designate and change the beneficiary for the Employer's share of the death proceeds.

4) The right to change the planned premium, the mode of premium payment and the frequency of premium payment.

Unless otherwise stated herein, the Co-Owner, acting alone, may exercise the following rights:

1) The right to designate and change the Co-Beneficiary and to change a settlement option for the Co-Beneficiary.

2) The right to exercise the Conversion Privilege of any Spouse Term Rider or Children's Term Rider which is included in the policy and be the Owner and premium payor of any new policy issued in lieu of such Rider.

3) The right to transfer, assign or pledge the Co-Owner's interest in the policy.

Unless otherwise stated herein, the Employer and Co-Owner must act jointly to exercise the following rights:

1) The right to change the Specified Amount of the policy and the death benefit option.

2) The right to reinstate the policy.

3) The right to borrow against or make a partial surrender of the Co-Owner's interest in the policy.

The Employer's consent to these transactions shall not be unreasonably withheld.

The Employer and Co-Owner hereby agree that Jefferson–Pilot Life is authorized to recognize the Employer's claims to its rights hereunder and to rely on the Employer's determination of any amount payable to the Employer under this policy prior to the death of the Insured, with no further inquiry of any nature. The exercise of these rights and determination of these amounts by the Employer shall be binding on the Co-Owner, and the rights of any other persons or parties having an ownership or beneficiary interest in the policy shall be subject to such exercise and/or such determination.

Copyright, 1986. By LifeComp Programs, Inc.

Nevertheless, as between the Employer and the Co-Owner, the Employer covenants that it will not exercise any rights, options and privileges not specifically reserved to the Employer in a manner which would impair any right or interest of the Co-Owner or Co-Beneficiary. In a like manner, the Co-Owner covenants that it will not exercise any rights, options or privileges not specifically reserved to the Co-Owner in a manner which would impair any right or interest of the Employer.

V. Termination

A. Upon the termination of the Insured's employment with the Employer for any reason other than death of the Insured or if the Co-Owner shall fail to pay that portion of each premium payment, if any, required in II above, the Employer shall have the following rights, without the consent of the Co-Owner:

(1) If the Surrender Value of the policy is less than the Net Premiums, the Employer shall have the right to

(a) surrender the policy and receive all surrender proceeds to the exclusion of the Co-Owner and Co-Beneficiary (however, the Co-Owner shall owe and pay to the Employer the difference between the surrender proceeds and the Net Premiums), or

(b) sell the policy to the Co-Owner for an amount equal to the Net Premiums. The Co-Owner may purchase said policy within 15 days following the date of the Employer's written offer to sell.

(2) If the Surrender Value exceeds the Net Premiums, the following shall apply

(a) The Employer may split the policy into two separate policies, one to be owned by the Employer and one to be owned by the Co-Owner. The Employer shall receive a policy which has a Cash Surrender Value equal to the Net Premuims and a Death Benefit which shall not exceed that to which the Employer was entitled under Article III. The remaining cash values shall then be applied to a policy for the Co-Owner, issued with the same policy date as this policy and with a Death Benefit not to exceed the Co-Beneficiary's Death Proceeds determined under Article III.

(b) If the Employer elects not to take a policy pursuant to (a) above, then the Employer shall make a partial surrender in an amount equal to the Net Premiums and shall have no further incidence of ownership in the policy; however, the Death Benefit may be adjusted, if necessary, so that the Death Benefit is no greater than the Co-Beneficiary's Death Proceeds as determined in Article III.

Copyright 1986. By LifeComp Programs, Inc.

The type and insured amount of any new policy shall conform to Jefferson-Pilot Life's policy rules in effect on the date of the issue or reissue of the new policy.

Jefferson-Pilot Life shall have no responsibility for determining the Net Premiums for the purposes of this Section V but instead shall rely solely upon the statements and representations of the Employer and shall be fully protected in relying thereon.

B. Upon the adjudication of the Employer as an insolvent or as a bankrupt, the Co-Owner may pay to the Employer an amount equal to the Net Premiums in exchange for the transfer by the Employer of all ownership rights to the Co-Owner, including the right to change the beneficiary.

C. This Endorsement may be cancelled only upon the joint request of the Employer and the Co-Owner.

D. In the event of a conflict between the terms of this Endorsement and the policy to which it is attached, the terms of the policy shall control.

Dated at Harlingen Texas this the 1st day of September, 1987

Witness

(Signature of Applicant/Co-Owner) Shirley Metzger

ATTEST:

Title: VP

(Name of Employer)

By Shirley Metzger

Title:

Jefferson-Pilot Life Insurance Company acknowledges and has recorded this Split Dollar Endorsement.

December 17, 1987

Date recorded

By: Doris J. Calliott

_/:SD5

43

Copyright 1986, By Lifecomp Programs, Inc.

Life
ance Company
Box 20727
nsboro, NC 27420-0727

Pilot Life

fe Insurance Application Part One

Pr ull name of proposed insured: Sherley Jean Metzger

| Date of Birth | Month | Day | Year | Age | State of Birth | Sex |
|---|---|---|---|---|---|---|
| | 5 | 20 | 38 | 49 | Col | F |

11. Amount: $1,500,000
12. Plan: UL203N
13. APL ☐ Yes ☐ No — Not Available on U.L. or Term
14. Premium Basis: DTMS
15. Premium: $985.13
16. ☐ Non Par
17. ☐ Premium Waiver
18. ☐ Accidental Death Benefit ☐ 2 times ADB
19. ☐ Par — Dividend Option: ☐ cash ☐ left on dep ☐ paid up add ☐ reduce prem ☐ 1 YT-add ☐ 5 DO-dep ☐ 5 DO-add ☐ 5 DO-rp
20. Universal Life Option
☐ Option A—Death benefit equals specified amount plus cash value
☒ Option B—Death benefit equals specified amount
21. Additional benefits or riders
22. Special instructions

Residence address
No. and Street: 2206 Treasure Hills Apt #9
City: Harlingen State: Texas
County: Cameron Zip: 78550

Social Security Number: 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

. Owner if not insured (full name, relationship & address)
Sort Rite International, Inc
PO Box 1805
Harlingen Texas 78551

. Social Security or Federal Tax I.D. number of owner if not insured: 74-1982177

. Premium payor if not insured (full name & address)
Sort-Rite International, Inc.
PO Box 1805
Harlingen Tx 78551

. a. Beneficiary (full name & relationship to insured)
See Split Dollar Endorsement

b. Contingent Beneficiary (full name & relationship to insured)

c. The policyowner reserves the right to change the beneficiary. Yes ☒ No ☐

8. Insurance now in force on the life of the proposed insured. If none, check here ☐

| Amount | ADB | Date | Company |
|---|---|---|---|
| | | | |

9. Occupation: President - CEO.

0. Name & address of employer
Sort Rite International, Inc
P.O. Box 1805
Harlingen TX 78551

23. Date application was completed: 9-1-87
24. City and state where signed: Harlingen Tx.
25. Amount collected with application $ $1,160.96
26. Driver's license number of the proposed insured and state of issue: Texas 04076241
27. Within the past 12 months have you smoked cigarettes? If the answer is "yes," smoker's rate is accepted. Yes ☐ No ☒
28. Is the Non-Medical Alternative being used? ☐ ☒
29. Will this insurance replace any existing insurance or annuities on the life of the proposed insured? ☐ ☒
If yes, show the amount, plan, company & payor

Ho Office Endorsements
~~RATED PREMIUM CLASS~~
~~Age 50~~

As of the close of business on December 31, 1986, Pilot Life Insurance Company changed its name to Jefferson-Pilot Life Insurance Company. At the same time it changed its address to 101 North Elm Street, Greensboro, North Carolina 27401. Any reference to Pilot Life Insurance Company on the form to which this is attached shall be deemed to mean Jefferson-Pilot Life Insurance Company.

BJ-6576

Ex-Im Bank-1539

Part One of application continues on Page 2

**Part one of Application Continued.**

| | | Yes | No |
|---|---|---|---|
| 30. | Have you ever had an application for life or accident and sickness insurance or for reinstatement declined, postponed or rated? | ☐ | ☒ |
| 31. | you have an application for insurance or reinstatement pending in this or any other company? | ☐ | ☒ |
| 32. | Within the past 2 years have you flown other than as a passenger or do you plan to do so? (If yes, and coverage is desired, complete Aviation Questionnaire) | ☐ | ☒ |
| 33. | Within the past 5 years have you been convicted of 2 or more moving violations, driving under the influence of alcohol or other drugs or had your driver's license suspended or revoked? | ☐ | ☒ |
| 34. | Within the pa years have you engaged in or do you have any plans to engage in motor racing on land or water, underwater or sky diving, ballooning, hang gliding or parachuting? | ☐ | |
| 35. | In the past ten years have you: | | |
| | (1) had or been told you had Acquired Immune Deficiency Syndrome ("AIDS"), AIDS Related Complex ("ARC"), or AIDS related conditions? | ☐ | |
| | (2) received advice or treatment in connection with any of the categories mentioned in (1) above? | ☐ | |
| | (3) tested positive for antibodies to the AIDS (Human T-cell Lymphotropic, Type III; HTLV-III) virus? | ☐ | |

36. Details of "yes" answers - identify the question being answered.

**Statement**

I have paid to the Company $ 1160.96 which is equal to at least one month's premium. I have received, read and agre the terms of the conditional receipt.

Under penalties of perjury, I, the Owner, declare that the Tax Identification Number or Social Security Number shown is correct that the Internal Revenue Service has not notified me that I am subject to back-up withholding for failing to properly report divider interest income.

The answers in this application and on the examination are to the best of my knowledge complete, true and written as I gave the no money has been paid with this application there will be no insurance unless: (1) a policy has been issued and delivered to (2) the full first premium has been paid and; (3) the answers to the questions contained in the application continue to be corr understand that only an officer of the Company can make or change a contract of insurance. I have received and read the "Noti Applicant". I agree that my accepting a policy issued on this application will be acceptance of any changes, additions or correc made by the Company in the space provided for "Home Office Endorsements". No changes will be made in age at issue, pl insurance, amount, classification, or benefits unless I agree in writing. I agree that a copy of this application shall be attached to made a part of any policy issued.

**If this block ☐ is checked, I request an interview if an investigative consumer report is made.**

W. E. May — Signature of agent taking application

0152 — Account No.

Harlingen TX — City and state where signed

9-1-87 — Date

Signature of proposed insured (if under age 15, parent)

Signature of policyowner (if other than Insured)

Shirley [signature] — Signature of applicant

Ex-Im Bank-1540

Proposed Insured (First name - Middle initial - Last name) Shirley Metzger    Birthdate (Month - Day - Year) 5 20 1938

1 a. Name and address of your personal physician? DR Burnzian - Dignostic Hospital Houston
b. Date and reason last consulted? 1/87 - Physical
c. What treatment was given or medication prescribed? Allergies

2 Have you, within the past 10 years, been treated for or had any known indication of:

| | Yes | No | Details of "Yes" answers. (Identify question number, circle applicable items: Include diagnoses, dates, duration, names and addresses of all physicians and medical facilities.) |
|---|---|---|---|
| a. Disorder of eyes, ears, nose or throat? | ☐ | ☒ | |
| b. Dizziness, fainting, convulsions, headache, paralysis or stroke; mental or nervous disorder? | ☐ | ☒ | |
| c. Shortness of breath, persistent hoarseness or cough, asthma, bronchitis, pleurisy, emphysema, tuberculosis or chronic respiratory disorder? | ☐ | ☒ | |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart attack, murmur or other disorder of the heart or blood vessels? | ☐ | ☒ | |
| e. Jaundice, intestinal bleeding, (ulcer), colitis, diverticulitis, recurrent indigestion, or other disorder of the stomach, intestines, liver or gallbladder? | ☒ | ☐ | 2 months - 1986 DR Burnzian |
| f. Sugar, albumin, blood or pus in urine, sexually transmitted diseases, stone or other disorder of kidney, bladder or prostate? | ☐ | ☒ | |
| g. Diabetes, thyroid or other endocrine disorders? | ☐ | ☒ | |
| h. Neuritis, arthritis, gout, or disorder of the muscles or bones, including the spine, back or joints? | ☐ | ☒ | |
| i. Deformity, lameness, or amputation? | ☐ | ☒ | |
| j. Disorder of skin, lymph glands, cyst, tumor or cancer? | ☐ | ☒ | |
| k. (Allergies), anemia or other disorder of the blood? | ☒ | ☐ | To Smoke + etc Burnzian |
| l. Need for treatment because of alcohol or drug abuse? | ☐ | ☒ | |
| m. Abnormalities, disease or disorder of the reproductive organs or breasts, menstruation or pregnancy? | ☐ | ☒ | |
| 3 Are you now under observation or taking treatment? | ☐ | ☒ | |
| 4 Have you had any change in weight in the past year? | ☒ | ☐ | 10# - dieting |
| 5 Other than the above, have you within the past 5 years: | | | |
| a. Had any mental or physical disorder not listed above? | ☐ | ☒ | |
| b. Had a checkup, consultation, illness, injury or surgery? | ☒ | ☐ | Corrective hand & foot - Dr. Burns + C[illegible] |
| c. Been a patient in a hospital, clinic, sanatorium or other medical facility? | ☒ | ☐ | 2/82 - Park Plaza Houston |
| d. Had electrocardiogram, X-ray, or other diagnostic test? | ☒ | ☐ | |
| e. Been advised to have any diagnostic test, hospitalization, or surgery which was not completed? | ☐ | ☒ | |
| 6 Have you ever had military service deferment, rejection or discharge because of a physical or mental condition? | ☐ | ☒ | |
| 7 Have you ever requested or received a pension, benefits or payment due to an injury, sickness or disability? | ☐ | ☒ | |
| 8 To the best of your knowledge and belief are you now pregnant? | ☐ | ☒ | |
| 9 Family History: Tuberculosis, diabetes, cancer, high blood pressure, (heart) or kidney disease, mental illness, alcoholism or suicide? | ☒ | ☐ | Father died 197[illegible] |

| Parents | Age if Alive | Age at Death | Cause of Death | Siblings | Age if Alive | Age at Death | Cause of Death |
|---|---|---|---|---|---|---|---|
| Father | | 60 | Heart | Brothers | 45 | | |
| Mother | 71 | | | Sisters | 41 | | |

The answers to the above questions are to the best of my knowledge complete, true and written as I gave them.

For the purpose of underwriting this application for life insurance, I authorize any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, insurance company, the Medical Information Bureau or other organization, institution or person that has any records or knowledge of the proposed insureds or their health to give Pilot Life Insurance Company and its reinsurers such information. I also authorize the foregoing, except for the Medical Information Bureau, to give such information to any consumer reporting agency acting on behalf of Pilot Life. I further authorize Pilot Life to give all such information to my personal physician upon request and I waive any privilege to such information. I understand either I or my authorized representative may obtain a copy of this authorization. This authorization shall be valid for 30 months from this date and a copy of this authorization shall be as valid as the original.

Harlingen, TX — City and state where signed

9/1/87 — Date

Shirley Metzger — Signature of proposed insured (if under age 15, parent)

SEP 0 9 1987

**Important: Please read your policy carefully.**

Additional life insurance service or information about your policy may be obtained from our nearest agent or by writing to the home office.

Your policy is a valuable asset. Please let us examine any proposal to change your policy or to allow it to lapse.

If you change your address, please notify the Company at P.O. Box 21008, 101 North Elm Street, Greensboro, N. C. 27420. In any correspondence, give your full name and policy number.

**Guide To Policy Provisions**

Annual Report . . . . . . . . . . . . . 8
Assignment . . . . . . . . . . . . . . . 5
Beneficiary . . . . . . . . . . . . . . . 5
Cash Value . . . . . . . . . . . . . . . 6
Exchange Privilege . . . . . . . . . . 8
General Provisions . . . . . . . . . . 5
Grace Period . . . . . . . . . . . . . 2
Insurance Coverage Provisions . . . . . . . . . . . . . 2
Interest . . . . . . . . . . . . . . . . . 6
Loans . . . . . . . . . . . . . . . . . . 9
Maturity . . . . . . . . . . . . . . . . . 2
Optional Methods of Settlement . . . . . . . . 11-12
Nonforfeiture Provisions . . . . 6-7
Ownership . . . . . . . . . . . . . . . 5
Premium Provisions . . . . . . . . 2
Policy Specifications . . . . . . . . 3
Reinstatement . . . . . . . . . . . . . 5
Table of Guaranteed Maximum Insurance Rates . . . . . . . . . . . . . . . . . 10

Additional Benefit Provisions, if any, and a copy of the Application will be found following Page 12.

Flexible Premium Adjustable Life Insurance Policy. Adjustable death benefit payable at death prior to the Maturity Date. Maturity Value payable on the Maturity Date if the Insured is then alive. Flexible premiums payable during Insured's lifetime until the Maturity Date. Non-participating.

Jefferson
Pilot

Jefferson-Pilot Life
Insurance Company
P.O. Box 21008
Greensboro, NC 27420

# SPLIT DOLLAR ENDORSEMENT FOR UNIVERSAL LIFE POLICY

Policy No. ____________ or New Application dated ____________

on the life of SHIRLEY JEAN METZGER
Name of Insured

Jefferson-Pilot Life Insurance Company is requested to make the provisions of this form a part of the policy. Any previous designations of beneficiary or contingent beneficiary and election of settlement options are hereby revoked.

I. Definitions - Where the terms below appear, they are defined as follows:

"Employer": SORT-RITE INTERNATIONAL, INC.

"Co-Owner": SHIRLEY JEAN METZGER

"Co-Beneficiary": (Check (X) the appropriate block and insert the desired Co-Beneficiary.)

( ) ____________ ____________ of the Insured, if living; otherwise ____________ ____________ of the Insured, if living; otherwise the Co-Owner, if living; otherwise the estate of the Co-Owner.

(XX) DEBRA ANN METZGER, DAUGHTER, KATHERINE LEE METZGER, DAUGHTER, AND FRANCES E. MERRICK, MOTHER OF INSURED SHARE AND SHARE ALIKE, SURVIVOR OR SURVIVORS.

"Net Premiums": For the purpose of this Endorsement, the term "Net Premiums" means the total premiums paid on the policy by the Employer less (1) any outstanding policy loans made by the Employer plus accrued interest thereon, (2) any partial withdrawals made by the Employer, and (3) any other amounts received by the Employer from the Co-Owner as a reimbursement of premium paid by the Employer.

B-5250A

EXHIBIT B

Ex-Im Bank-1543

Copyright 1986, By LifeComp Programs, Inc.

IV. Ownership Rights

Unless otherwise stated herein, the Employer, acting alone, may exercise the following rights:

1) The right to borrow against, pledge or assign the policy, however, in an amount not to exceed the Net Premiums.

2) The right to make partial surrenders of the cash surrender value, provided the aggregate amount of such partial surrenders shall not exceed the amount of the Net Premiums.

3) The right to designate and change the beneficiary for the Employer's share of the death proceeds.

4) The right to change the planned premium, the mode of premium payment and the frequency of premium payment.

Unless otherwise stated herein, the Co-Owner, acting alone, may exercise the following rights:

1) The right to designate and change the Co-Beneficiary and to change a settlement option for the Co-Beneficiary.

2) The right to exercise the Conversion Privilege of any Spouse Term Rider or Children's Term Rider which is included in the policy and be the Owner and premium payor of any new policy issued in lieu of such Rider.

3) The right to transfer, assign or pledge the Co-Owner's interest in the policy.

Unless otherwise stated herein, the Employer and Co-Owner must act jointly to exercise the following rights:

1) The right to change the Specified Amount of the policy and the death benefit option.

2) The right to reinstate the policy.

3) The right to borrow against or make a partial surrender of the Co-Owner's interest in the policy.

The Employer's consent to these transactions shall not be unreasonably withheld.

The Employer and Co-Owner hereby agree that Jefferson-Pilot Life is authorized to recognize the Employer's claims to its rights hereunder and to rely on the Employer's determination of any amount payable to the Employer under this policy prior to the death of the Insured, with no further inquiry of any nature. The exercise of these rights and determination of these amounts by the Employer shall be binding on the Co-Owner, and the rights of any other persons or parties having an ownership or beneficiary interest in the policy shall be subject to such exercise and/or such determination.

Copyright, 1986, By LifeComp Programs, Inc.

Nevertheless, as between the Employer and the Co-Owner, the Employer covenants that it will not exercise any rights, options and privileges not specifically reserved to the Employer in a manner which would impair any right or interest of the Co-Owner or Co-Beneficiary. In a like manner, the Co-Owner covenants that it will not exercise any rights, options or privileges not specifically reserved to the Co-Owner in a manner which would impair any right or interest of the Employer.

V. Termination

A. Upon the termination of the Insured's employment with the Employer for any reason other than death of the Insured or if the Co-Owner shall fail to pay that portion of each premium payment, if any, required in II above, the Employer shall have the following rights, without the consent of the Co-Owner:

(1) If the Surrender Value of the policy is less than the Net Premiums, the Employer shall have the right to

(a) surrender the policy and receive all surrender proceeds to the exclusion of the Co-Owner and Co-Beneficiary (however, the Co-Owner shall owe and pay to the Employer the difference between the surrender proceeds and the Net Premiums), or

(b) sell the policy to the Co-Owner for an amount equal to the Net Premiums. The Co-Owner may purchase said policy within 15 days following the date of the Employer's written offer to sell.

(2) If the Surrender Value exceeds the Net Premiums, the following shall apply

(a) The Employer may split the policy into two separate policies, one to be owned by the Employer and one to be owned by the Co-Owner. The Employer shall receive a policy which has a Cash Surrender Value equal to the Net Premuims and a Death Benefit which shall not exceed that to which the Employer was entitled under Article III. The remaining cash values shall then be applied to a policy for the Co-Owner, issued with the same policy date as this policy and with a Death Benefit not to exceed the Co-Beneficiary's Death Proceeds determined under Article III.

(b) If the Employer elects not to take a policy pursuant to (a) above, then the Employer shall make a partial surrender in an amount equal to the Net Premiums and shall have no further incidence of ownership in the policy; however, the Death Benefit may be adjusted, if necessary, so that the Death Benefit is no greater than the Co-Beneficiary's Death Proceeds as determined in Article III.

27:SD4

Copyright 1988. By LifeComp Programs, Inc.

The type and insured amount of any new policy shall conform to Jefferson-Pilot Life's policy rules in effect on the date of the issue or reissue of the new policy.

Jefferson-Pilot Life shall have no responsibility for determining the Net Premiums for the purposes of this Section V but instead shall rely solely upon the statements and representations of the Employer and shall be fully protected in relying thereon.

B. Upon the adjudication of the Employer as an insolvent or as a bankrupt, the Co-Owner may pay to the Employer an amount equal to the Net Premiums in exchange for the transfer by the Employer of all ownership rights to the Co-Owner, including the right to change the beneficiary.

C. This Endorsement may be cancelled only upon the joint request of the Employer and the Co-Owner.

D. In the event of a conflict between the terms of this Endorsement and the policy to which it is attached, the terms of the policy shall control.

Dated at Harlingen Texas this the 1st day of September, 1987

Shirley Pretzger

Witness (Signature of Applicant/Co-Owner)

ATTEST:

(Name of Employer)

Frances E. Morris VP By Shirley Pretzger

Title: Title:

Jefferson-Pilot Life Insurance Company acknowledges and has recorded this Split Dollar Endorsement.

December 17, 1987 By: Doris J. Callicutt

Date recorded

27:SD5

43

Copyright 1986, By Lifecomp Programs, Inc.

**To Policyowner Service Dept.**

XX **Change of Beneficiary**

☐ **Name Change**

Jefferson-Pilot
Life Insurance Company
PO Box 21008
Greensboro, NC 27420

**When this form is used for an annuity "Insured" shall mean "Annuitant"**

Policy No. JP4038973

Insured SHIRLEY JEAN METZGER

All previous beneficiary designations and optional methods of settlement selected under the above numbered policy are hereby cancelled, and the proceeds of said policy upon the death of the Insured are to be paid to:

Primary Beneficiary(ies) if living, Name(s) in full — Relationship(s)

LETICIA ELIZALDE DE PINO - FRIEND OF THE INSURED

**Address Must Be Shown on Reverse Side of Page 2**

Otherwise to Contingent Beneficiary(ies) if living, Name(s) in full — Relationship(s)

DEBRA ANN METZGER — DAUGHTER

**Address Must Be Shown on Reverse Side of Page 2**

Otherwise to Second Contingent Beneficiary(ies) if living, Name(s) in full — Relationship(s)

X

KATHERINE LEE METZGER — DAUGHTER

**Address Must Be Shown on Reverse Side of Page 2**

**If no beneficiary is living, payment will be made as provided in the policy.**

☐ If checked, I hereby elect to provide that in no case shall any payment be made to any beneficiary designated in this policy until ________ days after the Insured's death, and in the event of the death of a beneficiary during such period, payment shall be made in the same manner provided in this policy had said beneficiary predeceased the insured.

Unless otherwise stated above, if joint beneficiaries are named in any of the three classes (Primary, Contingent, or Second Contingent) proceeds are to be paid equally to the survivor or survivors, if any, in that class. If unnamed children of the Insured are designated abo as beneficiaries, the proceeds are to be paid to the Insured's lawful children. This change in beneficiary is subject to any assignment of this policy recorded with the company.

If there is a provision in said policy requiring that it accompany any request for change of beneficiary or that such change shall not take effect until endorsed by the Company on the policy, such provision is hereby modified, and the beneficiary may be changed pursuant to this written request, which change will be effected by recordation by the Company at its Home Office without endorsement on the policy, and when so recorded shall take effect as of the date of this request, but subject to any payment made or action taken by the Company before such recordation.

**Name Change**

Policy required to change Insured's name if the reason is other than marriage, divorce or adoption. ☐ Change the Name of the ☐ Insured ☐ Annuitant ☐ Owner to ________ First, Maiden, Married Name if applicable. Because of ☐ Marriage ☐ Divorce ☐ Other

(If the name has been changed for any reason other than marriage, divorce or adoption, a certified copy of the legal document authorizing the change must be submitted.)

SORT-RITE INTERNATIONAL, INC. [signature] 8/16/95

By SHIRLEY METZGER, PRESIDENT Secretary [signature] SEP 6 1995 Recorded Date

**This acknowledgement should be attached to the policy after it is received back from Home Office.**

[signature]

Policy Owner: Please type or print in the box below the name and address to which the acknowledged copy is to be sent.
☐ Check here if this is a change of address for the policyowner. If checked, the address is changed at the time the Change of Beneficiary and/or name is recorded in the Home Office.

Sort Rite International Inc.
P O Box 1805
Harlingen, TX 78551

**See Instructions on Reverse Side Of Last Page**

BJ-6625 Rev 2-94

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | NO. 00-21094-B-11 |
| | § | |
| SORT-RITE INTERNATIONAL, INC. | § | CHAPTER 11 |
| TAX I.D. No.: 74-1982167 | § | |
| DEBTOR | § | |
| | § | |

# SECOND AMENDED PLAN OF REORGANIZATION FILED BY THE DEBTOR

## ARTICLE I
## INTRODUCTION

**SORT-RITE INTERNATIONAL, INC.**, the Debtor and Debtor-in-Possession in this Bankruptcy Case, proposes this Second Amended Plan of Reorganization (the Plan or the Plan or Reorganization), which includes the first and second amendments. **ALL CREDITORS AND SHAREHOLDERS ARE ENCOURAGED TO CONSULT THE DISCLOSURE STATEMENT PREPARED BY SORT-RITE INTERNATIONAL, INC., AS APPROVED BY THE BANKRUPTCY COURT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. NO OTHER SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.**

## ARTICLE II
## DEFINITIONS

Whenever from the context it appears appropriate, each term stated in either the singular or the plural will include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, the feminine and the neuter. Unless the context requires otherwise, the following words and phrases will have the meanings set forth below when used in initially-capitalized form in this Plan:

**Administrative Expense** means (a) any cost or expense of administration of the Chapter 11 Case (including, without limitation, Professional Charges of the Chapter 11 Professionals) allowed under Section 503(b) and 507(a)(1) of the Bankruptcy Code, and (b) any fees or charges assessed against the Debtor's estate under title 28, United States Code, Section 1930; (c) any indebtedness or obligations incurred or assumed by the Debtor-in-Possession in connection with the conduct of its

business, (d) any actual and necessary costs and expenses of operating the business of the Debtor; or (e) post-petition loans made to the Debtor, after Court approval.

**Administrative Expense Bar Date** means the date established by the Bankruptcy Court or the Plan as the last date for filing requests for allowance of Administrative Expenses, other than costs or expenses in the ordinary course of operation of the Debtor.

**Affiliate** has the meaning set forth as defined in Section 101(2) of the Bankruptcy Code.

**Allowed** means, with respect to Claims and Existing Shareholder' Interests, (a) any Claim against, or Interest in, the Debtor, proof of which is timely filed or by order of the Bankruptcy Court is not or will not be required to be filed, (b) any Claim or Existing Shareholders' Interest that has been or is hereafter listed in the schedules of liabilities filed by the Debtor, as liquidated in amount and not disputed or contingent or (c) any Claim or Existing Shareholder Interest allowed pursuant to this Plan and, in each such case in (a) and (b) above, which either (i) no objection to allowance has been interposed within the applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (ii) such objection is so interposed and the Claim or Existing Shareholders' Interest will have been allowed by a Final Order (but only to the extent so allowed).

**Asset** means all property of the Debtor as defined in Section 541(a) of the Bankruptcy Code.

**Ballot** means with respect to any class of Claims or Existing Shareholder Interests that are Impaired and entitled to vote under Article VI and 8.1 of this Plan, the form being distributed to holders of Claims or Existing Shareholder's Interests in such Class to be used for showing acceptance or rejection of this Plan, concerning the solicitation of acceptances or rejections of this Plan by the Debtor. The Ballot is attached to the Disclosure Statement as Exhibit "2".

**Bankruptcy Code** means Title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas, Brownsville Division.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended, promulgated under Section 2075 of title 28 of the United States Code and the Local Rules of the Bankruptcy Court, as applicable from time to time during the Bankruptcy Case.

**Bar Date** means August 14, 2000, the date fixed by a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 3003(c)(3), by which all Entities asserting Claims against the Debtor (other than Administrative Expense, Priority Claims, or Rejection Claims) were required to file proofs of claim or be forever barred from asserting such claims against the Debtor or its property and from voting on this Plan and/or sharing in any distribution thereunder.

**Business Day** means any day other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

**Cash** means cash, cash equivalents, and readily marketable securities or instruments, including but not limited to, bank deposits, certified or cashiers' checks, timed certificates of deposit issued by any bank, commercial paper, and readily marketable direct obligations of the United States of America or agencies or instrumentalities thereof.

**Causes of Action** mean all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

**Chapter 11 Professionals** means the professionals retained by the Debtor or the Committee of Unsecured Creditors, if any, wherever they are referred to collectively in the Plan, the retention of which has been approved by the Bankruptcy Court and includes attorneys and accountants.

**Claim** means (a) any right to (i) payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (ii) an equitable remedy for breach of performance if such breach causes a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. When used with respect to any litigation, the term "**Claim**" will also include any claim that has been or could be asserted in any litigation. Notwithstanding anything to the contrary set forth in this Plan, for purposes of this Plan, the term "Claim" will have the broadest possible meaning permitted by applicable law.

**Claimant** means the holder of any Claim.

**Closing Date** means ten (10) days after the Confirmation Order becomes a Final Order that has not been stayed by any Court of competent jurisdiction.

**Collateral** means any property or interest in property of the estate of the Debtor subject to a lien or security interest that secures the payment or performance of a Claim, which lien or security interest is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code, applicable state law, or Order of the Bankruptcy Court.

**Confirmation Date** means the date on which the Confirmation Order is entered on the docket maintained by the Clerk of the Bankruptcy Court with respect to the Bankruptcy Case.

**Confirmation Hearing** means the date or dates on which the Bankruptcy Court considers whether to confirm this Plan.

**Confirmation Order** means the Final Order of the Bankruptcy Court confirming this Plan.

**Creditors' Committee** means the Official Committee of Unsecured Creditors in the Bankruptcy Case appointed pursuant to Section 1102(a) of the Bankruptcy Code, if any, as the same may be reconstituted from time to time.

**Debtor** means Sort-Rite International, Inc., a Texas corporation.

**Disclosure Statement** means the Debtor's Disclosure Statement, as the same may be amended and modified from time to time (currently the Second Amended Disclosure Statement), distributed to holders of Claims and Existing Shareholder Interests according to Section 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3018.

**Disputed** means, with respect to Claims, any Claim that is not Allowed after filing of a Proof of Claim in the case.

**Disputed Claims Reserve** means the reserve established for Disputed Claims according to Article 8.2 of this Plan.

**Distributions** means distributions to the various classes of Claims and Existing Shareholders' Interests as provided in this Plan.

**Effective Date** means the date which is ten (10) days after entry of the Confirmation Order. The Effective Date may be extended to the day on which the conditions specified in Section 7.6 of the Plan have been satisfied or waived, which date shall be not later than 30 days after the Confirmation Order is entered.

**Entity** means any individual, corporation, limited or general partnership, limited liability company, joint venture, association, joint stock company, estate, entity, trust, trustee, United States trustee, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof.

**Existing Shareholders** means the Debtor's current shareholders: Shirley Metzger,

**Existing Shareholders' Interests** means all equity interests in the Debtor, including the interests of the Existing Shareholders. The Existing Shareholders' Interests are classified as Class 8 Interests. The treatment afforded Class 8 Interests is set forth in Section 5.8 of the Plan.

**Filing Date** means April 10, 2000, which is the date on which the voluntary case under Chapter 11 of the Bankruptcy Code was commenced by the Debtor.

**Final Order** means an order, ruling or judgment of the Bankruptcy Court or other court of competent jurisdiction that may hear appeals from the Bankruptcy Court (i) which is not stayed, (ii) the time to appeal, seek reconsideration or rehearing or to seek review by petition for certiorari

from which having expired, without a pending appeal or application for review, rehearing or reconsideration having been filed, and (iii) which is in full force and effect.

**Holder** means the holder, as of the Record Date, of any Claim, Shareholder Interest, including any one or more of Administrative Expenses, Priority Claims, Other Secured Claims, Convenience Claims, General Unsecured Claims, Existing Shareholders' Interests or Claims of Existing Shareholder's Interests.

**Impaired** means any Claim or Interest impaired within the meaning of Section 1124 of the Bankruptcy Code.

**Initial Distribution Date** means the date that is three (3) months subsequent to the Effective Date, or as soon thereafter as is possible (e.g., if the Effective Date is January 20, 2001, then the Initial Distribution Date would be April 20, 2001).

**Interest** means any equity or other ownership interest in the Debtor, and any option, warrant or other agreement requiring the issuance of any such equity interest.

**Lien** means that as set forth in Section 101(37) of the Bankruptcy Code.

**Successful Bidder** means an entity which has purchased all of the outstanding new shareholder interests of the Reorganized Debtor as provided under this plan.

**New Shareholder Interests** means 100,000 of new common stock of the Reorganized Debtor, no par value, which will have only one class and such rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable non-bankruptcy law, the Amended Sort-Rite Articles of Incorporation and the Amended Sort-Rite Bylaws, issued by the Reorganized Debtor on or after the Effective Date, representing all of the Interests in the Reorganized Debtor.

**Other Priority Claim** means any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**Plan** means this Plan of Reorganization as amended or modified from time to time.

**Plan Supplement** means any forms of documents specified in the Plan.

**Priority Tax Claim** means any Claim entitled to priority of payment under Section 507(a)(8) of the Bankruptcy Code.

**Professional Charges** means the Allowed interim and final Professional Charges of Chapter 11 Professionals

**Pro Rata** means regarding Claims, the ratio of the amount of an Allowed Claim in a particular Class to the aggregate amount of Allowed Claims in such Class.

**Qualified Offer** means an offer which complies with all provisions as stated in Section 7.2 of this Plan.

**Qualified Bidder** means a bidder making a Qualified Offer.

**Quarter** means the period beginning on the Initial Distribution Date and ending on the next June 30, September 30, December 31, and March 31 and each three month period thereafter.

**Record Date** means the day that is the Confirmation Date.

**Rejection Claim** means any Claim arising out of the rejection of a lease or executory contract pursuant to Section 365 of the Bankruptcy Code Allowed Rejection Claims are classified as Unsecured Claims and treated in Class 7.

**Reorganization Case** means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on the Filing Date.

**Reorganized Debtor** means the Debtor after the Effective Date or any successor thereto by merger, consolidation or otherwise.

**Schedules** means the Schedules of Assets and Liabilities, the List of Holders of Interests, and the Statement of Financial Affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto through the Confirmation Date.

**Secured Claim** means any Claim, to the extent reflected in the Schedules or a timely filed proof of claim as being secured and timely perfected, which is secured by a timely perfected lien or security agreement on the Collateral, to the extent of the value of the Estate's interest in such Collateral, as determined as of the date before the Confirmation Date in accordance with 11 U.S.C. 506.

**Shareholders' Claims** means the Claims of the Existing Shareholders, including, but not limited to, damages, quarterly tax distributions, expenses, claims for rejection damages or cure amounts, if any, and any amounts whatsoever in connection with, associated with or arising, directly or indirectly, from or in any way related to the purchase and sale or recession of a purchase or sale of equity interests in the Debtor, owed to any existing or past shareholder, but exclude claims for indemnity The Shareholders' Claims are classified as Class 9 Claims. The treatment afforded Class 9 is set forth in Section 5.9 of the Plan.

**Unsecured Claim** means any Claim against the Debtor (other than an Administrative Expense, Priority Claim, Priority Tax Claim, Secured Claim(s), Existing Shareholders' Claims or an Existing Shareholders' Interest).

## ARTICLE III
## TREATMENT OF ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS

3 1 *(a) Administrative Expense.* Except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment, the Reorganized Debtor shall provide to each holder of an Allowed Administrative Expense (a) Cash in an amount equal to such Allowed Administrative Expense on the latest of (i) the Effective Date, (ii) the date such Administrative Expense becomes an Allowed Administrative Expense or (iii) the date such Allowed Administrative Expense is due in accordance with the terms and conditions of the particular transactions or governing documents or (b) such other treatment as the Debtors and such holders shall have agreed upon in writing, provided however, that Allowed Administrative Expenses (other than Claims under Section 330 of the Bankruptcy Code) representing obligations incurred in the ordinary course of business of or assumed by the Debtor in Possession shall be paid in full and performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

3.2 Professional Compensation and Reimbursement. All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3), 503 (b)(4) or 503(b)(5) of the Bankruptcy Code (a) will file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by the date that is 60 days after the Confirmation Date or such other date was may be ordered by the Bankruptcy Court and (b) if granted, such award by the Bankruptcy Court, will be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) ten days after the date the Administrative Expense becomes an Allowed Administrative Expense, or (ii) on such other terms as may be mutually agreed upon between the Holder of an Allowed Administrative Expense and the Debtor in Possession or, on and after the Effective Date, the Reorganized Debtor. The Allowed Administrative Expenses of Chapter 11 Professionals for Professional Charges will be paid from the Cash available on the Effective Date.

3.3 Priority Tax Claims. Except to the Extent that the holder of an Allowed Priority Tax Claim agrees to a different treatment, the Reorganized Debtor shall pay to each holder of an allowed Priority Tax Claim, at the sole option of the Reorganized Debtor, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) equal annual cash payments in arrears in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to eight (8.0%0 percent, over a period through the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim, with the first such payment being made on the Initial Distribution Date, or upon such other terms determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such

Allowed Priority Tax Claim, with all such payments attributable first to payment of the principal balance due on trust fund taxes.

# ARTICLE IV
# CLASSIFICATION OF CLAIMS AND EXISTING SHAREHOLDERS' INTERESTS

Claims and Existing Shareholders' Interests are divided into the following Classes under the Plan:

4.1 **Class 1: Other Priority Claim**. Class 1 consists of Other Priority Claims not included in paragraph 3.3 above for priority tax claims.

4.2 **Class 2: FCLT Secured Claim**. Class 2 consists of the Allowed FCLT Secured Claim.

4.3 **Class 3: Coastal Bank, ssb, Secured Claim**. Class 3 consists of the Allowed Secured Claim of Coastal Bank, ssb, San Benito, Texas, which is subject to objections of the Debtor. If the claim of Coastal Bank does not become an Allowed Secured Claim, then it shall become a Class 7 unsecured claim in an amount as approved by the Court.

4.4 **Class 4: Allowed Secured Tax Claims on Debtor's Real Property.** Class 4 consists of four separate classes as follows:

4.A. Class 4.A is the secured tax claim of the City of Harlingen, Texas;
4.B Class 4.B is the secured tax claim of Harlingen CISD;
4.C Class 4.C is the secured tax claim of Cameron County, Texas; and
4.D Class 4.D is the secured tax claim of the Internal Revenue Service.

4.5 **Class 5: Allowed Secured Tax Claims on Debtor's Personal Property.** Class 5 consists of four separate classes as follows:

5.A. Class 5.A is the secured tax claim of the City of Harlingen, Texas;
5.B Class 5.B is the secured tax claim of Harlingen CISD;
5.C Class 5.C is the secured tax claim of Cameron County, Texas; and
5.D Class 5.D is the secured tax claim of the Internal Revenue Service if there is no interest available for Class 4.D to attach.

4.6 **Class 6: Allowed Convenience Claims.** Class 6 consists of the Allowed Claims of Claimants holding unsecured claims of less than $500.00.

4.7 **Class 7: Unsecured Claims**. Class 7 consists of all Unsecured Claims that become Allowed Claims.

4.8 **Class 8: Claims of Existing Shareholders.** Class 8 consists of the Claims of Existing Shareholders (but not the Existing Shareholders' Interests).

4.9 **Class 9: Existing Shareholders' Interests**. Class 9 consists of the Existing Shareholders' Interests.

## ARTICLE V
## TREATMENT OF CLAIMS

The following treatment will be accorded to Claims in Class 1 through Class 8 and the Existing Shareholders' Interests in Class 9:

5.1 **Class 1: Other Priority Claims**

**(a) Treatment.** The Class 1 Claimants, unless different treatment is agreed to by any such claimants, will be paid in full, on or before the later of the Effective Date or ten (10) days after the date each such Allowed Other Priority Claim becomes an Allowed Other Priority Claim.

**(b) Impairment.** Class 1 is **Not Impaired** by the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.2 **Class 2: FCLT Secured Claim (Real property collateral).**

***(a) Treatment.*** The Class 2 Claim will be paid over a period of ten (10) years from the Effective Date as follows: (i) the first twelve monthly (12) payments shall be in an amount of $2,000.00 each, which shall commence on the Initial Distribution Date, and (ii) thereafter, in monthly payments of an amount necessary to fully pay the claim by the end of the ten year period, together with interest at the rate of eight (8.0%) percent per annum. The Class 2 Claim will retain its lien, if any, upon confirmation of this Plan.

***(b) Alternative Treatment.*** In the alternative, upon agreement between the Debtor and FCLT, The Class 2 claim shall receive, on the Effective Date, its collateral, consisting of the Debtor's land and buildings in Harlingen, Cameron County, Texas, in full satisfaction of all its claims. If the alternative treatment is agreed upon, then in addition thereto, FCLT shall lease back to the Debtor the buildings at 825 W Jefferson, Harlingen, Cameron County, Texas, for a term of one (1) year commencing on the Effective Date for a monthly lease amount of $2,000.00, payable monthly in advance.

**(b) Impairment.** Class 2 is **Impaired unless the alternate treatment above is agreed to by the Debtor and FCLT**. Therefore, the Class 2 Claimant will have the right to vote to accept or reject the Plan.

5.3 **Class 3: Coastal Bank, ssb, Secured Claim (Personal property collateral).**

**(a) Treatment.** The Class 3 Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter, at the sole option of the Debtor, except to the extent that a Holder of the Allowed Secured Claim agrees to a different treatment, and if the Coastal Bank ssb claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which shall be sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 3 Claim. The Class 3 Claim will retain its lien, if any, upon confirmation of this Plan.

**(b) Impairment.** Class 3 is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.4 **Class 4: Secured Tax Claims on Debtor's Real Property.**

5.4.A **Class 4.A, Secured Tax Claim of City of Harlingen:**

**(a) Treatment**. The Class 4.A Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the City of Harlingen claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which shall be sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 4.A Claim. The Class 4.A Claim will retain its lien, if any, upon confirmation of this Plan.

**(b) Impairment.** Class 4.A is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

**5.4.B Class 4.B, Secured Tax Claim of the Harlingen CISD.**

**(a) Treatment.** The Class 4.B Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Harlingen CISD claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 4.B Claim. The Class 4.B Claim will retain its lien, if any, upon confirmation of this Plan.

**(b) Impairment.** Class 4.B is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

**5.4.C. Class 4.C, Secured Tax Claim of Cameron County, Texas.**

**(a) Treatment.** The Class 4.C Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Cameron County claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 4.C Claim. The Class 4.C Claim will retain its lien, if any, upon confirmation of this Plan.

**(b) Impairment.** Class 4.C is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

**5.4.D Class 4.D, Secured Tax Claim of the Internal Revenue Service.**

**(a) Treatment.** The Class 4.D Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Internal Revenue Service claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of

eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 4.D Claim. The Class 4.D Claim will retain its lien, if any, upon confirmation of this Plan.

**(b) Impairment.** Class 4.D is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.5 **Class 5: Secured Tax Claims on Debtor's Personal Property.**

5.5.A **Class 5.A, Secured Tax Claim of City of Harlingen:**

**(a) Treatment**. The Class 5.A Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the City of Harlingen claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over five (5) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the five (5) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 5.A Claim. The Class 5.A Claim will retain its lien, if any, upon confirmation of this Plan.

**(b) Impairment.** Class 5.A is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

**5.5.B Class 5.B, Secured Tax Claim of the Harlingen CISD.**

**(a) Treatment.** The Class 5.B Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Harlingen CISD claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over five (5) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the five (5) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 5.B Claim. The Class 5.B Claim will retain its lien, if any, upon confirmation of this Plan.

**(b) Impairment.** Class 5.B is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.5.C. **Class 5.C, Secured Tax Claim of Cameron County, Texas.**

**(a) Treatment.** The Class 5.C Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Cameron County claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over five (5) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the five (5) year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 5.C Claim. The Class 5.C Claim will retain its lien, if any, upon confirmation of this Plan.

**(b) Impairment**. Class 5.C is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.5.D. **Class 5.D, Secured Tax Claim of the Internal Revenue Service.**

**(a) Treatment**. The Class 5.D Claimant, if any, shall receive the same treatment accorded the Class 4.D Claimant over a ten (10) year period. This Class is a contingent class awaiting the I.R.S. decision or Order of the Court concerning the priority of claims on the Debtor's interest, if any, in its real property.

**(b) Impairment.** Class 5.D is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.6 **Class 6: Convenience Claims**.

**(a) Treatment.** Class 6 Claimants will be receive, unless less favorable treatment is otherwise agreed, payment in full, without interest, no later than the Effective Date, Cash in an amount equal to 100% of each such Holder's Allowed Convenience Claim not to exceed $500.00

**(b) Election.** Any Creditor who chooses to be treated as a Class 6 Creditor must (i) waive all portions of its Claim in excess of $500.00 and (ii) notify Debtor in writing of its election to be treated as a Class 6 Creditor by designating such election on a validly and timely submitted Ballot for accepting or rejecting this Plan. Electing Creditors in this Class shall not have a Class 7 Claim for the amount of their Claims

in excess of $500.00.

**(c) Impairment**. Class 6 is **Not Impaired**. Therefore, the Class 6 Claimants will not have the right to vote to accept or reject the Plan.

5.7 **Class 7: Unsecured Claims**.

**(a) Treatment.** In full settlement, satisfaction and discharge of their respective Allowed Unsecured Claims, Class 7 Claimants will receive Cash paid over a period of five (5) years in equal quarterly installments, the first such payment being due and payable on the Initial Distribution Date, in an amount equal to fifteen (15%) per cent of their Allowed Unsecured Claim.

**(b) Impairment.** Class 7 Claims are **Impaired**, and are therefore entitled to vote on the Plan.

5.8 **Class 8: Claims of Shareholders**.

**(a) Treatment.** Class 8 Existing Shareholders' Claims shall be deemed subordinate, under the provisions of 11 U.S.C. 510, to the Claimants in Class 1 through 7 above. If and to the extent the Bankruptcy Court concludes the Plan cannot be confirmed with subordination of the Class 8 Existing Shareholders' Claims, then the Class 8 Existing Shareholders' Claims shall be treated as Class 8 General Unsecured Claims.

**(b) Impairment.** Class 8 Existing Shareholders' Claims are **Impaired.** Therefore the Holders of Class 8 Existing Shareholders Claims are entitled to vote to accept or reject the Plan.

5 9 **Class 9: Existing Shareholder's Interests**

**(a) Treatment.** Class 9 Existing Shareholder's Interests shall be cancelled on the Effective Date, and Holders of such Existing Shareholder's Interests shall not be entitled to, and shall not receive or retain any property or interest in property of the estate on account of such Existing Shareholder's Interest. On and after the Effective Date, the Debtor and Reorganized Debtor will have no obligations or liabilities to the Holders of Allowed Existing Shareholder's Interests and such Holders will have no rights against Debtor or Reorganized Debtor for any amount due on or right created by the Existing Shareholder's Interest.

**(b) Impairment.** Class 9 Existing Shareholders' Interests are **Impaired** and receive or retain nothing on account of the interests under the Plan.

## ARTICLE VI
## IMPAIRMENT OF CLASSES

Classes 1 and 6 are not Impaired under the Plan. Classes 2, 3, 4, 5, 7, 8, and 9 are Impaired under the Plan.

## ARTICLE VII
## IMPLEMENTATION, CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTOR

7.1 **General.** Subject to Section 7.2, on or before the Effective Date, the **Successful Bidder** will pay the Cash Consideration to the Debtor in consideration for the issuance of 100,000 shares of the new common stock to be issued to **Successful Bidder** on the Effective Date or to the Qualified Bidder, if it is the successful bidder will pay such Cash Consideration for the issuance of the New Shareholder. Upon the Effective Date, the Debtor's Existing Shareholder's Interests shall be cancelled and erased. On the Effective Date, without any further act or action under applicable law, regulation, order, or rule, in exchange for payment of the Cash Consideration by the **Successful Bidder** or other Qualified Bidder to the Debtor, the Reorganized Debtor shall be authorized to issue to ***Successful Bidder*** or other *Qualified Bidder the New Shareholder Interests. On the Effective* Date, the amended *Sort-Rite* Articles of Incorporation and Amended *Sort-Rite* Bylaws will be adopted substantially in the forms attached.

7 2 **Competing Offers.**

Any competing offers for the New Shareholder Interests shall be governed by the Bidding Procedures approved by Order of the United States Bankruptcy Court

7 3 **Management of the Reorganized Debtor**. On and after the Effective Date, the operation of Reorganized Debtor shall become the responsibility of its Board of Directors and management.

(a) **Meeting of Reorganized Sort-Rite Stockholders**. In accordance with the Amended Sort-Rite Articles of Incorporation and Amended Sort-Rite Bylaws, as the same may be amended from time to time, the first annual meeting of the stockholders of the Reorganized Debtor will be held on a date prior to April 10, 2001, as selected by the Board of Directors of the Reorganized Debtor.

(b) **Board of Directors**. On the Effective Date, the management, control and operation of the Reorganized Debtor will become the general responsibility of the Board of Directors of Reorganized Sort-Rite. The **Successful Bidder** shall appoint one person to serve as the chairman of the meeting of the reorganized Sort-Rite Board of directors, which shall be held on the Effective Date or as soon thereafter as possible, and at such organizational meeting such agent shall nominate at least three (3) directors to serve on the Reorganized Sort-Rite Board of Directors, including

himself or herself, if desired. In order for a Qualified Offer by a Qualified Bidder, in the event it is the highest acceptable offer, to be accepted, the names of the new Board of Directors proposed by the Qualified Bidder that it intends to nominate and serve as the Reorganized Debtors Board of Directions must be submitted to the Debtor, and the Plan will be immaterially modified accordingly.

(c) **Executive Management**. On and after the Effective Date, the Executive Management of the Debtor will serve as the Executive Management of Reorganized Debtor. After the Effective Date, the Reorganized Debtor will retain Mr. William Capt as President.

(d) **Amended Bylaws and Articles of Incorporation**. The Amended Sort-Rite Bylaws and Amended Sort-Rite Articles of Incorporation will be amended and restated as of the Effective Date to effectuate the provisions of the Plan, without any further action by the Debtor, Reorganized Debtor, Existing Shareholder Interests or the Debtor's existing Board of Directors.

(e) **Issuance of New Shareholder Interests**. The issuance of the New Shareholder Interests by the Reorganized Debtor is hereby authorized without further act or action under applicable law, regulation, order, or rule.

7.4 **Implementation**. The Debtor and Reorganized Debtor will be authorized to take all necessary steps and perform all necessary acts to consummate the terms and conditions of this Plan. The Bankruptcy court may direct the Debtor and any other necessary party to execute or deliver or to join the execution or delivery of any instrument required to effect the Plan, and to perform any other act necessary to consummate the Plan.

7.5 **Termination of the Creditors' Committee**. On the date by which both (a) the Effective Date has occurred and (b) the Confirmation Order has become a Final Order, the Creditors' Committee, if any, shall cease to exist, and its members and employees or agents (including without limitation, attorneys, financial advisors, accountants and other professionals) will be discharged from any further authority, duties, responsibilities, and obligations relating to, arising from, or in connection with their services to the Creditors' Committee

7.6 **Conditions Precedent to Effectiveness of the Plan**. The Plan will not become effective unless and until the following conditions will have been satisfied or waived by the Debtor and **Successful Bidder** or other Qualified Bidder:

(a) the Confirmation Order, in form and substance reasonably acceptable to the Debtor and the **Successful Bidder**, or other Qualified Bidder, will have been signed by the judge presiding over the Chapter 11 case, and there will not be a stay or injunction in effect with respect thereto and the order shall provide, among other things, for approval of issuance of new equity either to the **Successful Bidder** or other Qualified Bidder and approval of the Amended Bylaws and Amended Articles of Incorporation of Sort-Rite;

(b) the Debtor will have received all authorizations, consents, approvals, letter, opinions or documents determined by **Successful Bidder** or other Qualified Bidder to be necessary to implement the Plan,

(c) receipt by the Debtor of the Cash Consideration.

7.7 **Effect of Failure of Conditions**. In the event that one or more of the conditions specified in Section 7.6 of the Plan have not occurred by the Effective Date, and upon notification submitted by the Debtor to the Bankruptcy Court, (a) the Confirmation Order will be vacated; (b) no distributions under the Plan will be made; (c) the Debtor and Interest Holders will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; (d) the Debtor's obligations with respect to the Claims and Existing Shareholder Interests will remain unchanged and nothing contained herein will constitute or be deemed a waiver or release of any Claim or Interest by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor, and (e) the Releases set forth in the Plan will be deemed void.

## ARTICLE VIII
## PROVISIONS REGARDING VOTING, DISTRIBUTIONS AND DISPUTED CLAIMS RESERVE

8.1 **Voting of Claims and Interests**. Each Holder of an Allowed Claim or Interest in an impaired Class will be entitled to vote separately to accept or to reject the Plan.

8 2 **Disputed Claims Reserve**. No later than ten (10) days from the Effective Date, or as soon after that as practicable, Debtor or Reorganized Debtor will establish the Disputed Claims Reserve.

(a) **Distributions**. No later than ten (10) days from the Initial Distribution Date, or as soon after as practicable, Reorganized Debtor will make Distributions from the Disputed Claims Reserve, as, when and if Disputed Claims become Allowed Claims, from the Disputed Claims Reserve Fund, to the holders of Allowed Claims of the amount of Cash that such Claimants are entitled to under this Plan on account of their Allowed Claim.

(b) **Investment of Disputed Claims Reserve**. Reorganized Debtor, or its appointed Agent, will be permitted to invest all or part of the Cash held in the Disputed Claims Reserve within the restrictions contained in Section 345 of the Bankruptcy Code.

8.3 **Distributions Under the Plan**. All distributions under the Plan will be made by the Reorganized Debtor to the Holder of each Allowed Claim at the address of such Holder as listed on the Schedules as of the Effective Date.

(a) Any payment of Cash made by the Reorganized Debtor pursuant to the Plan will be made by check drawn on a domestic bank or branch bank situated within the state of Texas.

(b) Any payment or distribution required to be made under the plan on a day other than a Business Day will be made on the next succeeding Business Day.

(c) No payment of Cash less than twenty-five dollars will be made by the Reorganized Debtor to any Holder of a Claim unless a request therefore is made in writing to the Reorganized Debtor.

8.4 **Distribution of Unclaimed Property**. Any distribution of Cash under the Plan that is unclaimed after ninety (90) days after the distribution shall be transferred to the Reorganized Debtor, and the Holder of such Claims shall cease to be entitled to such unclaimed Cash. All right, title and interest in such unclaimed Cash shall vest in the Reorganized Debtor.

8.5 **Payments in Complete Satisfaction**. The payments, distributions and other treatments provided in respect to each Allowed Claim under this Plan shall be in complete satisfaction, discharge and release of all such Allowed Claims.

8.6 **Distributions to Holders as of the Record Date.** As of the close of business on the Record Date, the claims register (for Claims) and the stock transfer ledgers (for Existing Shareholder Interests) will be closed and there will be no further changes in the record Holders of any Claims or Interests. The Debtor or Reorganized Debtor will have no obligation to recognize any transfer of any Claims or Interests occurring after the Record Date and, instead, will be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan) with only those record Holders stated on the claims register (for Claims) and transfer ledgers (for Interests) as of the close of business of the Record Date.

8.7 **Cancellation and Surrender of Existing Interests and Agreements**.

(a) On the Effective Date, share certificates, warrants and other instruments evidencing any Claim or Interest will be deemed canceled without further act or action under any applicable agreement, law , regulation, order or rule and the obligations of the Debtor and Reorganized Debtor under the agreements, certificates, warrants or other instruments governing such Claim or Interest, as the case may be

(b) Each Holder of a share certificate, warrant or other instrument evidencing a claim or Interest will surrender such promissory note, share certificate, warrant or instrument to the Reorganized Debtor, unless such requirement is waived by the Reorganized Debtor. No distribution of property hereunder will be made to or on behalf of any such Holders unless and until such promissory note, share certificate, warrant or instrument is received by the Reorganized Debtor, or the unavailability of such note, share certificate or instrument is established to the reasonable satisfaction of the Reorganized Debtor, or the Reorganized Debtor waives such requirement.

# ARTICLE IX
# EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1 **Executory Contracts and Unexpired Leases.**

A. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor entered into before the Filing Date, including without limitation any indemnification obligation, will be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (i) which has been rejected pursuant to a motion for authority to reject that the Debtor may have filed and an order of the Bankruptcy Court entered before the Confirmation Date, or (ii) which is the subject of a motion for authority to reject that has been filed and served before the Confirmation Date to be filed on or prior to the hearing on Confirmation. The Debtor reserves the right to assume or reject executory contracts between the date hereof and the Confirmation Date.

B. Debtor rejects, as of the Effective Date, any and all employee-related agreements and policies, including any employment agreement, management agreement or stock option provided to any employee in connection with an employment agreement or other agreement which existed prior to Filing, including but not limited to any and all related employment and severance practices and policies, and all related compensation and benefit plans, policies and programs of the Debtor applicable to its officers and employees, including insurance plans, health care plans, severance benefit plans, disability and other insurance plans provided thereunder.

C. Debtor rejects, as of the Effective Date, to the extent it is or may be found by the Court to be a pre-petition executory contract, the Plan of Reorganization filed on August 12, 1999, and the Order Confirming Debtor's Amended Plan of Reorganization entered on March 15, 1994, in Case No. 92-21053-B-11, in the U. S. Bankruptcy Court for the Southern District of Texas, Brownsville Division.

9.2 **Approval of Assumption or Rejection of Leases and Contracts**. Entry of the Confirmation Order shall constitute (i) the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 9.1 of the Plan and (ii) approval, pursuant to Section 365(a) of the Bankruptcy Code, and (iii) the disallowance of all Claims, except as provided in Section 9.4, arising from contracts and leases assumed prior to or as of the Effective Date

9.3 **Rejection Claims Bar Date**. Any Rejection Claim must be filed with the Bankruptcy Court and served upon the Debtor or Reorganized Debtor by, the earlier of, 30 days after (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, or (ii) ten (10) days after the Confirmation Date. Any such Claim that is not filed with the Bankruptcy Court within the time provided above will be deemed discharged and not entitled to participate in Distributions under the Plan. Unless otherwise ordered by the Court, all Claims arising from the

rejection of executory contracts and unexpired leases will be treated under Sections 5.4 or 5.5 of the Plan, depending upon the amount of the Claim provided, that the Holder of any such Claim may elect to be treated in Section 5.4 of the Plan.

9.4 **Cure of Defaults**. Except as otherwise agreed between the parties, Reorganized Debtor will cure all undisputed defaults existing under and pursuant to any executory contracts or unexpired leases assumed pursuant to the Plan or any motion for authority to assume that is pending and served before the Confirmation Date no later than ten (10) days from the Initial Distribution Date, or as soon thereafter as is practicable. All disputed defaults that are required to be cured will be cured within 30 days of the entry of a Final Order determining the amount, if any, of the Debtor's or the Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

9.5 **Indemnification Obligations**. For purposes of the Plan, the obligations of the Debtor and Reorganized Debtor to defend, indemnify, reimburse or limit the liability of its present and any former directors, officers, or employees that were directors, officers or employees, respectively, before, on or after the Commencement Date against any claims or obligations pursuant to the Debtor's certificates of incorporation or bylaws, applicable state law or specific agreement, or any combination of the foregoing, will survive confirmation of the Plan, remain unaffected thereby, and not be discharged irrespective of whether indemnification , defense, reimbursement or limitation is owed in connection with an event occurring before, on, or after the Commencement Date. The Reorganized Debtor reserves the right to contest or otherwise defend any such asserted or alleged indemnity Claim.

## ARTICLE X
## VESTING OF PROPERTY AND DISCHARGE

10.1 **Revesting to Reorganized Debtor**. On the Effective Date, the property of the Estate of Debtor shall revest in the Reorganized Debtor, except as otherwise provided in the Plan.

10.2 **Operation by Reorganized Debtor**. From and after the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire and dispose of property free of any restrictions imposed under the Bankruptcy Code.

10.3 **Free and Clear of Liens**. As of the Effective Date, except as otherwise expressly provided in the Plan, all property of the Debtor and the Reorganized Debtor will be free and clear of all liens, Claims and Existing Shareholder's Interests.

10.4 **Discharge**.

(a) Except as otherwise specifically provided by this Plan, the confirmation of this Plan shall discharge and release the Debtor, Debtor in Possession, and Reorganized Debtor, its successors and assigns and their respective assets and properties from any debt, charge, liability, encumbrances, security interest, Claim, Existing Shareholders' Interest or other cause of action of any kind, nature

or description (including, but not limited to, any claim of successor liability) that arose before the Confirmation Date, and any debt of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of claim is filed or is deemed filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim has voted on this Plan (including, without limitation, any liabilities arising under environmental laws in respect of the Debtor or any of the Debtor's successors or assigns or their respective assets or properties or any such partnership which result, in whole or in part, from any condition, event, occurrence or happening prior to the Confirmation Date, whether or not known or unknown, discovered or undiscovered, asserted or unasserted, latent or patent, and regardless of whether any Claim was, is or could have been asserted for such liability), and upon such discharge and release, no such liabilities shall continue to be obligations of the Debtor, Reorganized Debtor, or their successors or its assets or properties, whether under the doctrine of successor liability or otherwise.

(b) Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by this Plan, the rights that are provided in this Plan and the treatment of all Claims will be in exchange for and will be in complete satisfaction, discharge and release of (i) all Claims and Causes of Action against, liabilities of, liens on, charges, encumbrances, security interests, obligations of and Existing Shareholders' Interests of any nature whatsoever, against the Debtor , Debtor in Possession and Reorganized Debtor or the direct or indirect assets and properties of the Debtor or Reorganized Debtor, whether known or unknown, and (ii) all Causes of Action, whether known or unknown, either directly or derivatively through the Debtor, or the successors and assigns of the Debtor based on the same subject matter as any Claim, Existing Shareholder's Interest, in each case, regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on this Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on this Plan.

10.5 All injunctions, liens or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on or immediately before the Confirmation Date will remain in full force and effect until the Effective Date.

10.6 **Injunction**. Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, all entities who have held, hold or may hold Claims against or Interests in the Debtor, are permanently enjoined, on and after the Effective date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor or Reorganized Debtor for or on account of any such Claim or Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtor or Reorganized Debtor for or against the Debtor or Reorganized Debtor for or on account of any such Claim or Interest, and (d) asserting any right of set off, subrogation or recoupment of any kind against any obligation due from the Debtor or Reorganized Debtor for or against the property

or interests in property of the Debtor on account of any such Claim or Interest. Such injunction will extend to successor of the Debtor and Reorganized Debtor, and their respective properties and interests in property.

10.7 **Release of environmental Claims.** All claims for environmental damage or indemnity existing on the Confirmation Date against the Debtor or which may be asserted under any local, state, or federal law or regulation against the Debtor by any entity as of the Confirmation Date, are released as of the Confirmation Date.

## ARTICLE XI
## RESERVATION OF CLAIMS

11.1 Except as otherwise provided in the Plan, all Claims and Causes of Action in favor of the Debtor, including, without limitation, all claims under Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, will become assets of the Reorganized Debtor and are reserved and may be prosecuted after the Confirmation Date by the Reorganized Debtor, or its authorized Agent. To the extent necessary, the Reorganized Debtor, or its authorized Agent, shall be deemed a representative of the estate under Section 1123(b) of the Bankruptcy Code. On and after the Effective Date, the Reorganized Debtor will have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such Causes of Action without approval of the Bankruptcy Court.

## ARTICLE XII
## OBJECTIONS TO CLAIMS

12.1 **Objections to Claims**. Reorganized Debtor, or its authorized Agent, will have full right, power and authority to investigate and if necessary, object to any Claim on or within sixty days (60) of the Effective Date, unless the Bankruptcy Court extends such time on notice for cause shown. The Reorganized Debtor shall litigate to judgment, settle or withdraw objections to contested claims.

## ARTICLE XIII
## DEFAULT UNDER THE PLAN

Any holder of an Allowed Claim may notify the Debtor or Reorganized Debtor in writing of a default under the Plan. In the event such written notice of a default is transmitted to the Debtor or Reorganized Debtor, the Debtor, Reorganized Debtor or any party in interest will have thirty (30) days from receipt of the notice to cure the alleged default. Absent cure, the aggrieved party may seek relief from the Bankruptcy Court.

## ARTICLE XIV
## MODIFICATION OF THE PLAN

The Debtor reserves its right, according to the Bankruptcy Code, to amend or modify the Plan before the Confirmation Date. After the Confirmation Date, the Debtor may, upon order of the Bankruptcy Court, and according to Section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intentions of the Plan.

A Claimant that has accepted or rejected the Plan will be deemed to have either accepted or rejected, as the case may be, any modifications to the Plan, even if they are made after the solicitation of votes of acceptance or rejection of the Plan, unless the Bankruptcy Court orders that such Claimant may change its previous vote within a time established by the Bankruptcy Court for such changes to be made.

## ARTICLE XV
## RETENTION OF JURISDICTION

The Bankruptcy Court will retain exclusive jurisdiction of all matters arising out of the Bankruptcy Case and the Plan as long as necessary for the purposes of Sections 105(a), 1127, 1142(b) and 1144 of the Bankruptcy Code and for, inter alia, the following purposes:

(a) to recover all Assets of the Debtor, wherever located;

(b) to decide any objections to the allowance, disallowance or subordination of Claims or a controversy as to the classification of Claims;

(c) to decide and fix (i) all Administrative Claims, (ii) Claims arising from the rejection of any executory contracts or unexpired leases, (iii) Liens on any property or any proceeds thereof, and (iv) any other fee and expense authorized to be paid or reimbursed under the Bankruptcy Code;

(d) to liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any disputed, contingent or unliquidated Claims;

(e) to adjudicate any matters as may be provided for in the Confirmation Order;

(f) to effectuate payments under and enforce the provisions of the Plan;

(g) to hear and determine any pending applications, adversary proceedings or contested matter including all controversies, suits and disputes that may arise in connection with the

interpretation or enforcement of the Plan, and matters concerning state, local and federal taxes according to Sections 346, 505 and 1146 of the Bankruptcy Code;

(h) to amend or to correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(i) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated;

(j) to consider any modification of the Plan pursuant to Section 1127 of the Bankruptcy Code or modification of the Plan after substantial consummation, as such terms is defined in Section 1101(2) of the Bankruptcy Code;

(k) to determine any causes of action as specified in Section 11.1;

(l) to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code; and

(m) to enter a final decree closing the Bankruptcy Case.

## ARTICLE XVI
## GENERAL PROVISIONS

16.1 **Notices**. Except as otherwise specified, all notices and requests will be given by any written means, including but not limited to, telex, telecopy, telegram, first class mail, express mail or similar overnight delivery service and hand delivered letters, and any such notice or request will be deemed to have been given when received. Notices will be delivered as follows:

To the Debtor or Reorganized Debtor:

Sort-Rite International, Inc.
P. O Box 1805
Harlingen, Texas 78550
956-423-2427

and

KEN E. MACKEY
Attorney at Law
P. O. Box 429
San Ygnacio, Texas 78067
956-712-3451

To the Office of the U.S. Trustee, Southern District of Texas:

Office of the United States Trustee
Assistant U. S. Trustee
1107 Wilson Plaza West
606 North Carancahua Street
Corpus Christi, Texas 78476

16.2 **Extension of Payment Dates**. If any Distribution date falls due on any day that is not a Business Day, then such payment date will be extended to the next Business Day.

16.3 **Confirmation by Non-Acceptance Method**. The Debtor requests, confirmation of the Plan pursuant to Bankruptcy Code Section 1129(b) with respect to any Impaired Class that does not vote to accept the Plan.

16.4 **Vesting** As of the Closing Date, the Reorganized Debtor will be vested with all Assets, free and clear of all Claims, liens, security interests, assignments, encumbrances, charges, and other interests of the Claimants (except those Claimants whose Claims have been modified and restructured and survive as provided in the Plan); and except where the Bankruptcy Court has retained jurisdiction regarding any specified aspect of the activities of the Debtor, the Reorganized Debtor may operate Assets free of any restrictions imposed by the Bankruptcy Code and in all respects as if there were no pending bankruptcy case under any chapter or provision of the Bankruptcy Code.

16.5 **Withdrawal of Plan**. The Plan may be withdrawn or revoked before the entry of the Confirmation Order at the sole and absolute discretion of the Debtor.

16.6 **Payment of Statutory Fees**. All fees payable pursuant to Section 1930 of title 28 of the United States Code will be paid until the Court enters a final decree or the case is converted or dismissed.

16.7 **Payment of Post-Confirmation Fees and Expenses**. From and after the Confirmation Date, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the Debtor and Reorganized Debtor will pay the reasonable fees and expenses of professional persons thereafter incurred by the Debtor and Reorganized Debtor, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

16.8 **Exculpation**. The Debtor, Reorganized Debtor, Creditors' Committee, and any of their respective members, officers, directors, employees, advisors or agents, will have nor incur any liability to any Holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor, Reorganized Debtor,

Creditors' Committee, and each of their respective members, officers directors, employees, advisors and agents, will be entitled to rely upon the advise of counsel with respect to their duties and responsibilities under the Plan; provided however, that nothing contained in this Section will exculpate, satisfy, discharge or release any avoidance claims against present or former officers, directors or employees of the Debtor in their capacities other than as present or former officers, directors or employees.

16.9 **Headings**. The headings used in the Plan are inserted for convenience only and constitute neither part of the Plan nor in any manner affect the provisions or interpretations of the Plan

16.10 **Enforceability**. Should any provision of the Plan be determined to be unenforceable for any reason, such determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

16.11 **Exemption from Transfer Taxes**. Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, of equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any agreement or assignment executed in connection with any of the transactions contemplated under the Plan will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

16.12 **Binding Effect**. On the Effective Date, according to Section 1141 of the Bankruptcy Code, the provisions of this Plan will bind the Debtor, Reorganized Debtor, any entity acquiring Assets under the Plan, and any holder of a Claim or an Existing Shareholders' Interest, whether or not the Claim or Existing Shareholders' Interest is Impaired under the Plan and whether or not the holder of the Claim or Existing Shareholders' Interest has accepted the Plan.

16.13 **Plan Supplement**. Forms of the documents relating to the Amended Sort-Rite Articles of Incorporation, the Amended Sort-Rite Bylaws, the Employment Agreement, if any, will be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court no later than the hearing established by the Bankruptcy Court to consider the adequacy of the Disclosure Statement

16.14 **Pre-petition Lawsuits**. On the Effective Date, all pre-petition lawsuits, litigation, administrative actions or other proceedings, judicial or administrative, shall be dismissed as to the Debtor Such dismissal shall be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan.

16.15 **Subordination of Penalty and Shareholder Claims.** The filing of this Plan and its submission to the Holders of Penalty and Shareholder Claims shall constitute an action seeking to subordinate all such Claims pursuant to Section 510 of the Bankruptcy Code. The Confirmation

Order, except as provided herein, shall constitute an order subordinating such Claims to all other Claims pursuant to Section 510 of the Bankruptcy Code.

    16.16   **Severability**. Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or transaction, the Debtor may modify the Plan in Accordance with Article XIV of the Plan so that such provision shall not be applicable to the Holder of any Claim. Such a determination of unenforceability shall not (1) limit or affect the enforceability and operative effect of any other provision of the Plan or (2) require the resolicitation of any acceptance or rejection of the Plan.

    16.18   **Creditor Defaults**. Any act or omission by a creditor in contravention of a provision within this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Debtor or Reorganized Debtor may seek to hold the defaulting party in contempt of the Confirmation Order. If such creditor is found to be in default under the Plan, such party shall pay the reasonable attorneys' fees and costs of the Debtor or Reorganized Debtor in pursuing such matter.

    16.19   **Allocation of Plan Distributions between Principal and Interest**. Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

Respectfully submitted this 14 day of November, 2000.

SORT-RITE INTERNATIONAL, INC.
Debtor and Debtor in Possession

By: ______________________
Shirley Metzger, Its President

DEBTOR'S ATTORNEY

______________________

KEN E. MACKEY
P. O. Box 429
San Ygnacio, Texas 78067
956-712-3451