## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 2 6 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JEFFERSON PILOT | § | |
| LIFE INSURANCE CO. | § | |
| | § | |
| v. | § | CASE NO. B-01-142 |
| | § | |
| SORT-RITE INTERNATIONAL, | § | |
| INC., | § | |
| AND | § | |
| LETICIA PINO, DEBRA FINCH, | § | |
| AND KATHERINE METZGER. | § | |

## MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT
## FILED BY LETICIA PINO, DEBRA FINCH,
## AND KATHERINE METZGER
## WITH MEMORANDUM
## OF ARGUMENTS AND AUTHORITIES

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW LETICIA PINO, DEBRA FINCH, and KATHERINE

METZGER, and file this their Motion for Reconsideration of Summary

Judgment with Memorandum of Arguments and Authorities, wherein they

request that this Honorable Court reconsider its summary judgment granted

in favor of Sort-Rite International, Inc. This motion is authorized by Federal

Rule of Civil Procedure 59(e).

## A. **INTRODUCTION**

1. This suit was initiated by JEFFERSON PILOT LIFE

INSURANCE COMPANY, who filed a Complaint in Interpleader, and

tendered into the Registry of the Court the proceeds of a life insurance policy written in the face amount of $1,500,000. Two claimants to the proceeds have been dismissed from this case, and the remaining claimants are SORT-RITE INTERNATIONAL, INC. and Movants herein, LETICIA PINO, DEBRA FINCH, and KATHERINE METZGER.

2. This Honorable Court granted summary judgment granted in favor of Sort-Rite International, Inc. by order dated September 5, 2002 (Dkt. 62), and Final Judgment (Dkt. 63) dated September 11, 2002, and entered September 12, 2002.

## B. <u>PROCEDURAL ISSUES</u>

1. <u>**Contested Issues Remain Outstanding.**</u> Movants respectfully submit that SORT-RITE INTERNATIONAL, INC. has made claims to only $1,000,000 of the face amount of $1,350,000 which remain in the Registry of the Court after amounts disbursements to the settling claimants, COASTAL BANC ssb and EXPORT-IMPORT BANK OF THE UNITED· STATES. While SORT-RITE INTERNATIONAL, INC. does claim a portion of the remaining $350,000 face amount (distinguished as 'face amount' because these funds have accrued interest), for premium reimbursement and attorney's fees, it does not claim the entirety. A contest remains outstanding regarding these funds, the summary judgment does not

resolve all of the issues in this case, and the summary judgment should, therefore, not be treated as one which will support a final judgment.

2. **Missing Response.**    Movants filed, as a single document, "Response of Pino, Metzger, and Finch to Sort-Rite's Motion for Summary Judgment and Reply to Sort-Rite's Response to Motion for Summary Judgment Filed by Pino, Metzger, and Finch" on July 11, 2002 in the United States District Clerk's Office for the Southern District of Texas in Houston, Texas.    The Brownsville Division of the United States District Clerk's Office does not reflect that filing.    A copy of this document is attached hereto as Movants' Exhibit 'PFM-A.'

3. Opposing counsel's firm received a copy of this response, as evidenced by the postal mailing receipt 'green card' receipt, also attached to this motion, as Exhibit 'PFM-E,' which shows receipt by the law firm of Stapleton, Curtis, and Boswell on July 16, 2002.    Additionally, the law firm of Jordan, Hyden, Womble, & Culbreth, located in Corpus Christi, Texas, and James DeAnda, Co-Counsel on this case, each received a copy of this response on July 11th and July 28th, respectively.    The undersigned counsel obtained a date-stamped copy of the filing at the time, but has been unable to locate it.    The affidavits of Constance Singleton, James DeAnda, and Shaun

Claybourn, which relate to this matter, are attached hereto as Exhibits 'PFM-B,' 'PFM-C,' and 'PFM-D,' respectively.

 4. This Response contains arguments which directly address Sort-Rite's motion for summary judgment, as well as Sort-Rite International, Inc.'s response to Movants' motion for summary judgment. Specifically, the Response includes the following:

 a. The fact that Jefferson Pilot's Complaint in Interpleader states that the change of beneficiary form was executed in Shirley Metzger's corporate capacity;

 b. The fact that Jefferson Pilot has take a position in the affidavit of its counsel, Carl Semmler which is in direct contradiction to that taken in its Complaint in Interpleader;

 c. The fact that Carl Semmler's deposition is based on hearsay, and provides no admissible facts;

 d. The fact that the original page of the change of beneficiary form, which Shirley Metzger signed and which was returned to her, does not bear the signature, or even bear a space for the signature upon which Jefferson Pilot now states that it relied;

 e. Peculiarities contained in the change of beneficiary form used by Jefferson Pilot Life Insurance Company, a blank original of which form was attached to the deposition of Carl Semmler, the original of which deposition was filed with the Court, so that the original was available for the court's review (At the deposition, the parties agreed that the original would not be separated from the original deposition).

 f. Specific cites to Carl Semmler's deposition which establish it to be one based on hearsay.

      g. Arguments and evidence which dispute Sort-Rite International, Inc.'s assertion that it is entitled to a reimbursement of premiums.

5. Movants request that this Court reconsider its granting of SORT-RITE INTERNATIONAL, INC.'s motion for summary judgment and consider the contents of Movants' response and reply, attached hereto as Exhibit 'PFM-A.'

6. Movants' counsel only discovered after this Court's September 5, 2002 ruling on the summary judgment motions that the Brownsville Division's District Clerk's Office did not have Movants' response docketed as received by that division of the United States District Clerk's Office for the Southern District of Texas. Movants respectfully request that this Court consider their response in order to avoid a manifest injustice to Movants.

## C. ARGUMENTS IN SUPPORT OF MOTION FOR RECONSIDERATION

1. Independent of the above request for reconsideration based upon the missing Response, Movants submit that the judgment contains a clear error of law, and reconsideration is necessary to prevent manifest injustice. *Collision v. International Chem. Workers Un. Local 217*, 34 F.3d 233, 236 (4th Cir. 1994).

2. The following is a summary of the specific points:

a. Policy requirements for effecting a change of beneficiary are primarily for the benefit of the insurer, and may be waived by the insurer. The ousted beneficiary has no standing to assert that the change was made without substantial compliance with the requirements. *Fidelity Union Life Ins. Co. v. Methven,* 162 Tex. 323, 346 S.W.2d 797 (1961).

b. *In Re CVA General Contractors* and *In Re Gladding,* each argued by Sort-Rite International, and each relied on by the Court, do not stand for the proposition presented, and address facts easily distinguished from the case at bar. Neither case involved a Chapter 11 plan of reorganization, and each involved transactions which pre-dated the filing of the bankruptcy, and triggered insurance carrier obligations to pay, so as the preclude the application of executory contract status.

c. Sort-Rite International, Inc. was a Debtor-in-Possession, and had the authority of a trustee to assume or reject executory contracts.

d. Sort-Rite International presented no evidence to support a finding that it did not reject the policy as an executory contract, and has no pleading on file wherein it asserts this position.

e. Shirley Metzger, individually, and not Jefferson Pilot Life Insurance Company, was the non-debtor who retained the right to terminate the contract.

f. The 1996 'Standard Confirmation Inquiry' does not demonstrate that Shirley Metzger recognized Sort-Rite International, Inc. to be a beneficiary under the policy after the 1995 beneficiary designation change.

### a. Jefferson Pilot's Recordation of the 1995 Change of Beneficiary Form Constituted a Waiver of the Two-Signature Requirement

1.  This Court based its ruling, in part, on a finding that the 1995 Change of Beneficiary form was required to bear the signatures of two corporate officers, and was ineffective because it did not.

2.  The insurance policy specifically states that Sort-Rite International, Inc. had the right to change the beneficiary designation for its portion of the policy, and the Co-Owner Insured had the right to change the beneficiary designation for her portion of the policy (Dkt. 48, Exhibit SJX-2, Policy, page 41, para. IV, Ownership Rights:  For Employer, sub. para. (3); For Co-Owner, sub. Para. (1)).  The 1995 beneficiary change form was executed by Shirley Metzger, on behalf of Sort-Rite International, Inc., as its President (Dkt. 1, Complaint in Interpleader, para. 12), but the form bore only her signature, and not that of another corporate officer.

3.  The requirement to include the second corporate signature was one imposed upon the insured, not by statute or any regulatory body, but by the insurance carrier, Jefferson Pilot Life Insurance Company. (Sort-Rite International, Inc. stated in its motion for summary judgment that "Texas law requires strict compliance with change of beneficiary requirements." (Dkt. 48, Sort-Rite International, Inc.'s Motion for

Summary Judgment, page 11, second para.),  This statement is not true, as will be addressed below).  The beneficiary form itself states that the change will become effective when recorded (Dtk. 48, Exhibit SJX-6). The form was endorsed and recorded by Jefferson Pilot Life Insurance Company within days of its receipt.  A review of the executed change of beneficiary form demonstrates that Jefferson Pilot's representatives endorsed the form directly beside Shirley Metzger's corporate signature.

4.  While the insurer has the right to insist on compliance with its provisions relating to the change of beneficiary, it is well settled that the insurer may waive noncompliance with such provisions.  *Stewart v. Mutual Ben. Life Ins. Co.,* 522 S.W.2d 257 (Tex.Civ.App. Amarillo 1975), *writ ref'd n.r.e.*  The rationale for this rule is that such requirements are solely for the protection of the insurer.  Accordingly, only the insurer may object if the change of beneficiary designation does not comply with its requirements.  *Fidelity Union Life Ins. Co. v. Methven,* 162 Tex. 323, 346 S.W.2d 797 (1961); *Johnson v. Johnson,* 139 F.2d 930 (5th Cir. 1943).  Jefferson Pilot's recordation of the beneficiary change, which is not disputed, constitutes its waiver of the two-signature requirement.

5.  The clear language of the change of beneficiary form dictates that the change will become effective when recorded. This instrument expresses the intention of the parties, and this intent that controls. Where the language of an insurance contract is plain, it must be enforced as made. *American Amicable Life Insurance Company v. Lawson,* 419 S.W.2d 823 (Tex. 1967).

### b. *Creighton v. Barnes* **Is Inapplicable to the Case at Bar;** *Fidelity Union Life Ins. Co. v. Methven* **Applies.**

1.  Sort-Rite International incorrectly applied the holding in *Creighton v. Barnes,* 257 S.W.2d 101 (Tex. 1953). It does not stand for the proposition that "a purported change in beneficiary will be given effect only if the insured has substantially complied with the requirements or done all she reasonably could have done to comply." (Dkt. 48, Sort-Rite International's motion for summary judgment, page 12). In the facts of *Creighton v. Barnes,* no change of beneficiary designation of any kind was filed with the insurance company; instead, the insured had provided in his will for certain legatees to receive the proceeds of his insurance policies, and these individuals were not the same as those listed by the insurance company as the named beneficiaries of the policies. The Texas Supreme Court held that the provisions of the will did not constitute a change in the beneficiary designation, and

observed that the life insurance policy provided that 1). That no change of beneficiary will be effective until endorsed by the insurance company, and 2). That the insurance contract itself provided that "the beneficiary named in the certificate had a right, by virtue of the contract, to require that a change be made substantially in accordance with the manner provided." *Creighton v. Barnes,* at 102.

2.   In the instant case the change of beneficiary designation was accepted and endorsed by the insurance company, and the contract itself contains no provision like the one in the *Creighton* facts, where the beneficiary named in the policy retained the right to require substantial compliance with the insurance company's requirements regarding the manner of changing the beneficiary.

3.   In *Fidelity Union Life Insurance Company v. Methven,* 346 S.W.2d 797 (Tex. 1961), decided eight years after *Creighton v. Barnes,* the Texas Supreme Court held that where the policy requirements for effecting a change of beneficiary have been waived by the insurer, and a change in beneficiary effected in a manner satisfactory to the insurer and insured during the insured's life, the ousted beneficiary lacks standing, after the insured's death, to assert that the change was made without substantial compliance with the policy requirements.

4.   In the instant case, Jefferson Pilot Life Insurance Company endorsed and recorded the 1995 Change of Beneficiary form, and when it filed its Complaint in Interpleader in this cause, it specifically identified that 1995 beneficiary change as executed by Shirley Metzger in her corporate capacity, as President of Sort-Rite International (Dkt. 1, Complaint in Interpleader, paragraph 10).

5.   Jefferson Pilot Life Insurance Company's requirements relating to the effectiveness of its Change of Beneficiary form were for its sole benefit, and no one else but Jefferson Pilot Life Insurance Company had the right to insist upon compliance with these provisions or to complain about a waiver thereof.   When the life insurance policy requirements have been waived, and designation of beneficiary has been completed in a manner satisfactory to the insurer and insured during insured's lifetime, no ousted alternate or potential beneficiary has legal standing to assert that the designation was effected without substantial compliance with policy requirements. *Morehead v. Morehead,* 738 S.W.2d 42 (Tex. App. Texarkana 1987), *rev'd on other grounds,* 741 S.W2d 381 (Tex. 1987). The original beneficiary, Sort-Rite International, Inc., has no standing to object to Jefferson Pilot's waiver of the requirement of the second signature. *See also Wyatt v. Wyatt,* 63 S.W.2d 268 (Tex.Civ.App. 1933),

*writ dism'd w.o.j.* Sort-Rite International, Inc. had no vested interest in the life insurance policy proceeds, and had no standing to assert that the change of beneficiary form was ineffective. *Fidelity Union v. Methven,* 346 S.W.2d 797 (Tex. 1961).

### c. Policy Provision Restricting Co-Owner's Exercise of Rights Does Not Address the Facts of This Case.

1.   Sort-Rite International argued in its motion for summary judgment that any change which removes Sort-Rite International as a beneficiary was a violation of provisions in the Jefferson Pilot policy because it impairs Sort-Rite's interest.   The exact language of the referenced policy provision is as follows:

> ...the Employer covenants that it will not exercise any rights, options and privileges not specifically reserved to the Employer in a manner which would impair any right or interest of the Co-Owner or Co0-Beneficiary.   In a like manner, the Co-Owner covenants that it will not exercise any rights, options or privileges not specifically reserved to the Co-Owner in a manner which would impair any right or interest of the Employer.

(Dkt. 1, Complaint in Interpleader, Policy exhibit, page 42, first paragraph).  The Co-Owner, Shirley Metzger, did not exercise any rights at all in executing the 1995 change of beneficiary form.  The Employer, Sort-Rite International, through its President, Shirley Metzger, executed the 1995 change of beneficiary form.

2.  The policy endorsement specifically provides that the Employer retains the right to change the designation of the beneficiary of its portion of the policy (Dkt. 1, Complaint in Interpleader, Policy exhibit, page 41, IV, 3).  The exercise of this right, which is specifically reserved, cannot be said to constitute a violation of another part of the policy.  The provision which is the target of Sort-Rite's argument addresses only those actions which are not reserved to one party, yet are performed by that party, and which adversely affect rights reserved to the other party. This provision has no application to the facts of this case.

### d. 'Substantial Compliance' Fact Issue Where Instructions Are Obscured.

1.  Independent of issues argued elsewhere, Movants submit that a genuine issue of material fact remains as to whether the change of beneficiary form was executed in "substantial compliance" with the insurance company's requirements.  *Cody v. Metropolitan Life Ins. Co.,* 334 Pa. 137, 5 A.2d 887 (1939).

2.  Sort-Rite International argues that, because the instructions on the reverse side of the last page of the multi-paged form state that a corporate action on the beneficiary designation is to bear two corporate signatures, the designation cannot be treated as one executed on behalf of the corporation unless it, in fact, bears two signatures.

3. In the instant case, Movants respectfully submit that, independent of arguments made elsewhere in this motion, a genuine issue of material fact remains regarding whether Shirley Metzger substantially complied with the form's requirement of the second corporate signature. This issue arises because of the way the form was designed by Jefferson Pilot, which obscures the instructions. An original, intact version of the form is attached to the original deposition of Carl Semmler, which original deposition was filed with the District Clerk in order to retain the integrity of this original exhibit, which counsel for the parties agreed would not be separated from that deposition (related testimony is found at pages 84-85 of the deposition). The original, multi-copy form is attached to the deposition as Exhibit 13.

4. The form does not disclose the requirement of a second signature on the front page. It merely states, "See instructions on reverse of last page. The form provides no space for a second signature. The Metzger signature upon which Carl Semmler relies in his affidavit to support the position that Jefferson Pilot treated the change as done in Shirley Metzger's individual capacity is not found on the first page at all. It is the signature line which only appears on the next page of the form, at the very bottom, where it says "Signature of Policyowner." This is very

curious in view of the language on the first page which indicate that the first page is the one to be returned to the policyowner. This would mean that the policyowner's copy, evidencing the beneficiary change, would be one without a signature. Additionally, it is of critical importance that there is no way to ascertain whether Shirley Metzger ever got a copy of the instructions now the focus of this suit.

5. Movants would respectfully address the Court's attention to two different versions of the executed change of beneficiary form attached to Sort-Rite's motion for summary judgment.

6. The first appears as Exhibit SJX-6, attached to Sort-Rite's motion, referenced in the body of the motion as "a copy of the Change of Beneficiary Form." (Dkt. 48, Sort-Rite's motion for summary judgment, page 3, para. D). This document, attached to this motion as Exhibit PFM-'F,' is endorsed by Jefferson Pilot Life Insurance Company, and bears a stamped, recording date of September 6, 1995. This version does not contain any language regarding any instructions relating to the form.

7. The second appears again in Sort-Rite's Motion for Summary Judgment, as part of Exhibit SJX-7, the affidavit of Carl Semmler, (attached as Exhibit SJX-A-1 to the Semmler affidavit). Movants herein include this second version as Exhibit 'PFM-G' attached hereto. In his

affidavit Carl Semmler, Assistant Vice President and Associate Counsel for Jefferson Pilot Life Insurance Company, refers to this Exhibit SJX-A-1 as a copy of the Change of Beneficiary form which he reviewed (Dkt. 48, Sort-Rite's motion for summary judgment, Exhibit SJX-7, Affidavit of Carl Semmler, para. 4). However, this version is not the same as the one presented as Sort-Rite's motion for summary judgment Exhibit SJX-6. This second Change of Beneficiary form does not show the recordation signatures or the recordation date, but it does state, at the bottom, "See instructions on Reverse Side of Last Page."

8. The discrepancy between these two versions of Sort-Rite's summary judgment exhibits places in question the clarity of the instruction itself. The more complete version, bearing the recordation signatures and date from the insurance company, is the one which is missing the instruction. Additionally, there is nothing in the record to establish that the instructions were part of the version of the beneficiary designation form which Shirley Metzger herself received. These facts present a genuine issue of material fact issue relating to whether there was substantial compliance with the Jefferson Pilot requirements to effect a change of beneficiary, since compliance requires knowledge of the instruction.

9.     Additionally, Movants submit that where the insurance company has accepted the change of beneficiary form, and has recorded it, that the carrier's act of recordation constitutes *prima facie* evidence of substantial compliance with the insurance carrier's requirement, which precludes summary judgment.

### d.    Texas Law Provides That Insurance Company Can Waive Its Own Requirements.

1. Texas substantive law governs this diversity suit. *Erie Railroad v. Tompkins,* 304 U.S. 64 (1938).   Sort-Rite International's summary judgment motion misstates Texas law, through a misstatement of the holding of *Creighton v. Barnes, supra,* relating to the right and effect of the insurance carrier's waiver of its own requirements.

2. The clear, well-settled law is that the insurance company can waive its requirements.   *Fidelity Union Life Insurance Company v. Methven,* 346 S.W.2d 162 (Tex. 1961).

3. In the instant case, Jefferson Pilot did so waive any requirement regarding a second corporate signature (This is true independent of the issue addressed above regarding whether the instructions to provide a second signature were clearly presented on the form).   The beneficiary designation change executed by Shirley Metzger as President of Sort-Rite bears both the hand-written and stamped endorsement by Jefferson Pilot

17

Life Insurance Company, and those annotations are affixed directly beside Shirley Metzger's corporate signature (Dkt. 48, Exhibit SJX-6, Sort-Rite International's motion for summary judgment). The document itself reflects the following statements, quoted below, which are critical to the issues before this Court:

    a. All previous beneficiary designations and optional methods of settlement selected under the above numbered policy are hereby cancelled, and the proceeds of said policy upon the death of the insured are to be paid to: [Found on Change of Beneficiary Form, top of form].

    b. Where there is a provision in said policy requiring that it accompany any request for change of beneficiary or that such change shall not take effect until endorsed by the Company on the policy, such provision is hereby modified, and the beneficiary may be changed pursuant to this written request, which change will be effected by recordation by the Company at its Home Office without endorsement on the policy, and when so recorded shall take effect as of the date of this request, but subject to any payment made or action taken by the Company before such recordation. [first paragraph, third sentence]

Jefferson Pilot Life Insurance Company accepted the beneficiary designation change, endorsed the change on the form, and recorded the change.

    4. Additionally, Jefferson Pilot acknowledged the 1995 change of beneficiary designation in its Complaint in Interpleader (Dkt. 1,

Complaint in Interpleader, page 4, para. 12).   Under that paragraph,

Jefferson Pilot states:

> 12.   The Insured, in her capacity as President of SORT-RITE
> INTERNATIONAL, INC., changed the beneficiary designation
> in August 1995, naming LETICIA ELIZALDE de PINO, friend,
> as primary beneficiary and DEBRA ANN METZGER FINCH
> and KATHERINE LEE METZGER as contingent beneficiaries.

5.   This was also the position of Jefferson Pilot before the

Complaint in Interpleader was filed.  Through a letter dated May 11, 2001, a

copy of which is attached hereto as Exhibit 'PFM-N,' Carl Semmler

addressed counsel for all claimants and, among other things, advised that the

change of beneficiary form was signed by Shirley Metzger as President of

Sort-Rite International, Inc. (Exhibit 'PFM-N' page 2, fourth para.).

e.   **Effect of Bankruptcy Proceedings Upon Sort-Rite's Interest in
Policy.**

1.   This Court based its ruling, in part, on a finding that Sort-Rite

International, Inc. did not, through bankruptcy proceedings, relinquish its

rights in the subject life insurance policy proceeds (Dkt. 62, page 7).

This finding is further based, in part, on the Court's finding that the

representations to the Bankruptcy Judge during the confirmation hearing

constitutes a disclosure of the policy to the Bankruptcy Court (Order,

Dkt. 62, page 8, line 3).

2.   Movants respectfully request that this Honorable Court take judicial notice of the following papers and matters contained in the bankruptcy files in Case No. 92-21053-B-11 and Case No. 00-21094-B-11, which were the two Chapter 11 bankruptcy cases filed on behalf of Sort-Rite International, Inc.

3.   In 1992, Sort-Rite International, Inc. filed Case No. 92-21053-B-11.   A copy of the voluntary petition and Schedule B (Schedule of Personal Property) are attached hereto as Exhibit 'PFM-J.'   On page 3 of the Schedule, there is a request for "Contingent and non-contingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust." (Exhibit 'PFM-J,' Schedule, page 3).   Sort-Rite International, Inc.'s response is "Keyman life insurance policy in Shirley Metzger name for benefit of SBB&T, Export-Import Bank and First City Texas, NA."

4.   In its second bankruptcy, filed in April 2000, Case No. 00-21094-B-11, Sort-Rite International, Inc. filed a Schedule B, Schedule of Personal Property, attached as part of its voluntary petition, which recites that Sort- Rite hold no interests in insurance policies (Exhibit 'PFM-K,' Schedule B, Item 9).

5. Movants do not dispute that the policy was discussed during this second bankruptcy's January 10, 2001 confirmation hearing (Case No. 00-21094-B-11). It was Movants who brought attached the transcript of the hearing as an exhibit to their motion. The bankruptcy court was advised that the policy was in existence. The representations made at the hearing were that the policy was not considered one of Debtor's assets, and, accordingly, the policy would have to be "reversed out."

6. The January 10, 2001 hearing, referenced above, addressed a plan of reorganization which was confirmed by the bankruptcy court through order dated January 30, 2001, wherein the subject life insurance policy was rejected as an executory contract. A copy of that confirmed plan of reorganization (Debtor's Second Amended Plan of Reorganization) was attached to Motion for Summary Judgment filed by Leticia Pino, Debra Finch, and Katherine Metzger, and is also attached hereto as Exhibit 'PFM-I.' The plan recites that Sort-Rite is rejecting:

> ...all related employment and severance practices and policies, and all related compensation and benefit plans, policies and programs of the Debtor applicable to its officers and employees, including insurance plans, health care plans, severance benefit plans, disability and other insurance plans provided thereunder.

(Exhibit 'PFM-I,' Second Amended Plan of Reorganization Filed By Debtor, page 19, Paragraph 9.1 B).

7.  On January 10, 2001, there was a confirmation hearing before the Bankruptcy Judge regarding the proposed plan.  In their Motion for Summary Judgment, Movants herein quoted certain language from that hearing.   Specifically, Debtor's attorney, Ken Mackey, advised the Bankruptcy Court that the policy would have to be "reversed out."  This language is also cited by this Court in its Order, upon which this motion for reconsideration is filed (Order, Dkt. 62, page 3).

8.  This language is inconsistent with a later position by Sort-Rite International, Inc. that it intended to retain an interest in the policy.  This language expressly advises the bankruptcy court that Sort-Rite International, Inc. does not intend to retain an interest in the policy, just as the plan of reorganization states.

9.  The insurance policy itself provides for the event of the Employer's insolvency.  Specifically, it states:

> Upon the adjudication of the Employer as an insolvent or as a bankrupt, the Co-Owner may pay to the Employer an amount equal to the Net Premiums in exchange for the transfer by the Employer of all ownership rights to the Co-Owner, including the right to change the beneficiary.

(Dkt. 49, Motion for Summary Judgment Filed by Leticia Pino, Debra Finch, and Katherine Metzger, Exhibit 'B,' page 43, para. 5B; Motion for Summary Judgment Filed by Sort-Rite International, Inc., Exhibit SJX-

2).  Mr. Mackey's position regarding Debtor's intent to "reverse out" the policy is consistent with the language of the insurance policy itself.

10.  It is noteworthy in this regard that Sort-Rite International made no further payments under the policy after January 4, 2001, six days before the confirmation hearing.  The Court's September 5, 2002 order makes note of this fact.  The January 4, 2001 payment was written just six days before the confirmation hearing held on January 10th.  This is significant because Sort-Rite International, Inc. was bound under the terms of the insurance policy to make payments on the life insurance policy.  It was no longer so bound after its rejection of this policy was recognized and approved by the Bankruptcy Court.  After the January 10, 2001 hearing, where the bankruptcy judge advised the parties that he would confirm the plan (Dkt. 49, Exhibit A, Transcript of Hearing, page 133), Sort-Rite International, Inc. had no further obligation to make these payments, and it ceased further payments, consistent with its decision to reject this contract.

**f.  Shirley Metzger Was the 'Non-Debtor,' Not Jefferson Pilot.**

1.  It was Sort-Rite International, Inc.'s position, adopted by this Court in its Order (Dkt. 62, page 7, first paragraph) that a Debtor's rejection of an executory contract does not terminate or forfeit the non-

debtor's rights under the contract. Movants do not dispute this; however, Sort-Rite International misapplied this language, which is codified as 11 U.S.C. §365(g). This language speaks to the continued rights of a <u>non-debtor</u>, not the debtor. In the instant case, the non-debtor is Shirley Metzger, individually.

    2. Jefferson Pilot Life Insurance Company has no stake in the continuation or termination of the contract. As long as premium payments continue to be made, without regard to who it is who makes those premium payments, Jefferson Pilot will continue to be bound, under the terms of the policy, to pay insurance proceeds upon the death of Shirley Metzger. The insurance policy provisions bound Sort-Rite International, Inc. to make premium payments. The exact language is quoted below:

> The Employer and Co-Owner agree to the following plan for payment of premiums:
>
> CO-OWNER PAYS COST OF INSURANCE – Each premium on the policy shall be paid by the Employer as it becomes due. The Co-Owner agrees to pay to the Employer an amount equal to the cost of the insurance provided to the Co-Owner by the policy each year. Co-Owner may make voluntary additional premium contributions to the Employer and Employer shall pay each such amount as an increased premium.

(Policy, page 40, Sort-Rite International Inc.'s Motion for Summary Judgment, Exhibit SJX-2, page 40, paragraph II). When Sort-Rite

International rejected this executory contract, it was no longer bound under the insurance policy to continue making premium payments. Consistent with this release of obligation, it ceased to make further payments.

3. There is no dispute that the insurance policy continued in force after the filing of the bankruptcy, and after the confirmation of Sort-Rite's plan of reorganization. The non-debtor, Shirley Metzger, still had rights and could have advised Jefferson Pilot Life Insurance Company, had she so desired, that she had no intent to continue the coverage. The insurance remained in force until it lapsed for non-payment. *In Re CVA General Contractors Inc.,* 267 B.R. 773 (W.D. Tex 2001), cited by Sort-Rite International, Inc. merely reinforces the position of Movants herein.

4. Sort-Rite International, Inc. has led this Court into error by asserting that the 'non-debtor' referenced in *CVA General Contractors Inc.* is Jefferson Pilot Life Insurance Company. The non-debtor was Shirley Metzger.

g. ***CVA General Contractors* Is Not Applicable to the Facts of This Case, and Inferentially Supports Movants' Position, Not Sort-Rite's**

1. This Court cited with approval (Dkt. 62, Order dated September 5, 2002, page 7) the case of *In Re CVA General Contractors, Inc.,* 267 B.R. 773 (W.D. Tex. 2001), which case was addressed in Sort-Rite International's response to Movants' motion for summary judgment (Dkt. 52, pages 4-5).

Any reliance on *CVA General Contractors* as support for Sort-Rite International, Inc.'s summary judgment arguments is error.

2. In *In Re CVA General Contractors,* the Debtor was in Chapter 7, not Chapter 11. When the Chapter 7 case was filed, there was pending in state court a suit filed against CVA for personal injuries sustained two and one-half years before the Chapter 7 filing, covered by a policy of general liability insurance for a policy period which also pre-dated the Chapter 7 filing by more than two years. The Debtor, CVA, had, long before the bankruptcy filing, paid all premiums on the policy in full, and all that remained was for the insurance company to defend it on the suit, which it did. As part of this defense, the insurance carrier brought a third-party action against another contractor for contractual indemnity.

3. When the Chapter 7 bankruptcy was filed, the trustee was permitted by the bankruptcy court to abandon any interest in the law suit. The third-party contractor then filed a motion to "show authority," arguing that the insurance carrier had no authority to bring the action because any rights the carrier had to seek indemnity "ceased to exist" when the Chapter 7 trustee had failed to assume the contract.

4. In summarizing his opinion, Judge Leif Clark wrote:

> Baker's argument is fatally flawed for three reasons: (1) rights and obligations under a contract do not "cease to

> exist" just because the contract is statutorily rejected under
> §365; (2) the insurance contract in this case was not
> "executory" in nature as of the filing; and (3) the expiration
> of an insurance policy period does not terminate or forfeit an
> insured's or insurer's rights and obligations under a policy,
> if those rights and obligations arose prior to the policy's
> expiration.

*In Re CVA General Contractors,* at 776. It was because the insurance policy expired before the filing of the Chapter 7 case that it was not to be considered an executory contract. This opinion does not speak to the facts of the instant case, which involved an on-going life insurance contract, where the insured, as co-owner, retained a status of non-debtor after the Chapter 11 Debtor-in-Possession had rejected the contract.

**h.    Sort-Rite International, Inc. was a Debtor-in-Possession, and Had the Rights of a Trustee to Reject Executory Contracts.**

1. In Case No. 00-21094-B-11, Sort-Rite International, Inc. was a Debtor-in Possession. (Dkt. 49, Exhibit 'D;' also Exhibit 'PFM-I,' Second Amended Plan of Reorganization, page 1, first sentence). There was no trustee appointed by the Bankruptcy Court in the Sort-Rite bankruptcy.

2. A Debtor-in-Possession "shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, ... of a trustee serving in a case under this chapter." 11 U.S.C. Section 1107. Sort-Rite International implies that only a bankruptcy trustee can effect the rejection of an executory contract.

insurance policy proceeds as long as the policy remained in force, and would have no obligation to pay in the event that the policy lapsed for non-payment of premiums. It was not the non-debtor party having rights under a rejected executory contract.

     5. The fact that the policy was in force when Shirley Metzger died, that it had not yet lapsed from non-payment of premium, and that Jefferson Pilot Life Insurance Company interpled the funds, as was its duty under the policy, is irrelevant to Sort-Rite's decision to reject the insurance policy as part of its plan of reorganization.

**i.  Representations Made By Sort-Rite Internation in Bankruptcy Case No. 00-21094-B-11 Leave No Doubt That It Rejected the Policy As An Executory Contract.**

     1. Movants respectfully request this Honorable Court to take judicial notice of the contents of "Second Amended Plan of Reorganization Filed by the Debtor," filed by Sort-Rite International, Inc. in its Chapter 11 proceeding, No. 00-21094-B-11, in Brownsville, Texas (Case. 00-21094-B-11, Dkt. 152), and its companion document, "Second Amended Disclosure Statement For the Plan of Reorganization Filed by Sort-Rite International, Inc. (Case 00-21094-B-11, Dkt. 153). A copy of the plan of reorganization was attached to Movants' Motion for Summary Judgment as Exhibit 'D,'

9. On the Effective Date, the property of the Estate of Debtor shall revest in the Reorganized Debtor, except as otherwise provided in the plan (Article X, page 20, para. 10.2).

10. The confirmation of the plan shall discharge and release the Debtor, Debtor in Possession, and Reorganized Debtor from any debt, charge, liability, encumbrances or other cause of action of any kind, nature, or description (Article X, page 20-21, para. 10.4(a) and (b)).

11. On the Effective Date, the provisions of this plan will bind the Debtor, Reorganized Debtor, and any entity acquiring assets under the plan (Article XVI, page 26, para. 16.12).

3. From Second Amended Disclosure Statement (Exhibit 'PFM-H'):

1. The plan provides for Engineered Thermo Systems, Inc. or other Qualified Bidder, to pay the Cash Consideration of $10,000 or more to the Debtor (page 3, II. A).

2. Upon such payment, the shares of the Debtor will be cancelled and New Shareholder Interests will be issued to Engineered Thermo Systems, Inc., in the form of 100,000 shares of common stock in the Reorganized Debtor (page. II. A).

3. Shareholders' interests, as existed on the Filing Date, will be cancelled and receive nothing if the plan is confirmed (page 4, third para.)

4. Any and all claims by shareholders are treated as Class 8 claims, and will receive nothing under the plan. This specifically includes "rejection damages." (page 12-13, para. (8)).

5. Shareholders' interests are treated as Class 9 claims, and existing shareholders receive nothing under the plan for their stock or other equity interests (page 13, para. (9)).

6. Engineered Thermo Systems, Inc. has made an initial bid of $10,000 (page 15, para. G.; also Exhibit 8 attached to Dkt. 153).

7. "Section 365 of the Bankruptcy Code generally gives the Debtor the ability, subject to approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases before the confirmation of a plan of reorganization. An executory contract or unexpired lease may be assumed or rejected either through a plan of reorganization or by order of the Bankruptcy Court on motion, after notice and hearing. Following a debtor's rejection of an executory contract or unexpired lease, the Bankruptcy Court grants the other

party to the contract or lease a limited period in which to file a proof of claim for any damages incurred because of the rejection. To assume an executory contract or unexpired lease, the Bankruptcy Code requires a debtor promptly to cure existing defaults, with certain limitations, and provide adequate assurance of future performance of its obligations under the executory contract or lease." (page 15-16, para. H(1)).

8. "Under the Plan, all executory contracts and unexpired leases of the Debtor entered into before the Filing Date that are not rejected before the Confirmation Date are deemed to be rejected of the Confirmation Date." (page 15, para. H(2)).

9. "At this time, the Debtor intends to reject all employment agreements, management agreements or stock options provided to any employee in connection with an employment agreement or other agreement which was entered into or existed prior to Filing, including any related employment and severance practices and policies, compensation and benefit plans, policies and programs of the Debtor applicable to its officers and employees pre-petition employment agreement, including insurance plans, health care plans, severance benefit plans, disability and other insurance plans, but excluding retiree benefits defined in 11 U.S.C 1114." (page 16, para. (5)).

10. All existing interests of Debtor, including issued and outstanding stock, securities and warrants, will be automatically cancelled on the Effective Date. (page 26, para. B. (2)).

4. What these facts demonstrate is that Sort-Rite International, Inc. entered and consummated a plan of reorganization wherein the old shareholders' interests were stripped away, and new shares were issued to a new slate of shareholders when the plan of reorganization was confirmed. The connection with the old shareholders was terminated, and the insurance policy at issue in this case, along with all benefits relating to the old shareholders, was terminated. Executory contracts are identified and discussed in the disclosure statement, with additional

language regarding executory contracts which is more explanatory than that found in the plan of reorganization. The language of these documents belies the present position of Sort-Rite International, Inc. that it did not intend to terminate its interest in the life insurance policy at issue in this case.

**j.** ***In Re Gladding* Does Not Support Sort-Rite's Summary Judgment Arguments.**

1. Sort-Rite relies on *In Re Gladding*, 22 B.R. 632 (Bkrtcy. D. Mass. 1982) for its position that a premium agreement for insurance does not constitute an executory contract (Dkt. 50, Sort-Rite International, Inc.'s Response to Leticia Pino, Debra Finch, and Katherine Metzger's Motion for Summary Judgment, page 6). *Gladding* is completely distinguishable from the facts at bar, and its dicta is consistent with a finding that the insurance agreement in the instant case is an executory contract.

2. First, this case is a holding under the Bankruptcy Act of 1898, which was repealed by the Bankruptcy Reform Act of 1978 (*Gladding*, at 633, fn.1).

3. Second, the insurance at issue in the *Gladding* case was workers' compensation coverage, where the insurance agreement provided that amount of the premiums owed for the year would be equal to the amount which the insurance company had paid in claims for that year, plus

an amount for administrative expenses which was to be determined through a formula to be applied when the year was over. An estimated premium was paid throughout the year, and the 'final' premium payment due from the corporation to the insurance carrier was based upon the total claims paid plus the formula for administrative costs.

4. The policy in question was for the year ending May 15, 1977. Gladding Corp. filed its bankruptcy petition on April 9, 1977, just 36 days short of the worker's compensation policy's year-end. The insurer asserted that approximately $169,000 was due it at that time, and sought payment of this amount through a claim filed as an administrative expense, which meant that it would receive an advantage over creditors of a lower class. Its right to assert its claim as an administrative claim was dependent on the underlying contract being characterized as "executory."

5. Sort-Rite has quoted the following language from *Gladding*:

> [A] debtor-insured retains his present interest in the policies whether they be assumed or not... There is no forfeiture of past benefits. Likewise, the insurance company gains nothing by assumption of the contract, except the right to its pre-petition debt paid ahead of general claims.

(Dkt. 50, Sort-Rite International, Inc.'s Response to Leticia Pino, Debra Finch, and Katherine Metzger's Motion for Summary Judgment, page 6).

34

But Sort-Rite left out the portion of the opinion which explains what the above-sentence means.

6.  What follows is the complete quote from *In Re Gladding*:

> [A]n examination of these contracts leads me to conclude that they should be found not to be "executory" under the Act.  Unlike the contract of deed where the debtor-vendee might have to forfeit his present interest, a debtor-insured retains his present interest in the policies whether they be assumed or not.  That is, if the insurance was in force on the date of the filing and had not been previously cancelled, the insurer's liability was fixed as of that date, whether the debtor had previously performed or not.  The insurance contracts are only terminable *in futuro*, and therefore the debtor's interest in maintaining them is only for the protection of its assets in the future.  There is no forfeiture for past benefits.  Likewise, the insurance company gains nothing by assumption of the contract, except the right to have its pre-petition debt paid ahead of general claims.

*Gladding*, at 636.  The insurer had already been required to pay the claims, and was now seeking reimbursement from the debtor as provided in the contract.  There was no performance left for the insurer to undertake; it was simply another creditor.  This is completely different from the facts of the instant case, where Jefferson Pilot had incurred no claim obligation at the time of the confirmation of the plan.

7.  It is also noteworthy that the *Gladding* opinion was bankruptcy litigation where a proof of claim was contested prior to the confirmation of a plan of reorganization.  Gladding Corp. had *applied* to reject the contracts at the time the opinion was written, and this opinion addressed matters

dispositive of the Court's approval of that application. *Gladding*, at 633, fn. 4. "In a Chapter 11 reorganization, a debtor-in-possession has until a reorganization plan is confirmed to decide whether to accept or reject an executory contract, although a creditor may request the Bankruptcy Court to make such a determination within a particular time." 11 U.S.C. Section 365(d)(2). *National Labor Relations Board v. Bildisco and Bildisco*, 104 S.Ct. 1188 at 1198, 79 L.Ed. 482, at 497 (1983).

8. In the instant case, Sort-Rite, in its plan of reorganization, specifically identifies "any and all insurance plans" as contracts which will be rejected by the Debtor if the plan is confirmed, and its plan was confirmed by the Bankruptcy Court. Sort-Rite is bound by its plan.

9. In its Response to Motion Summary Judgment Filed by Pino, Finch, and Metzger, (Dkt. 50), Sort-Rite for the first time argues that its payment of premiums on the life insurance policy prior to the date of confirmation constitutes an assumption of the policy (Dkt. 50, page 10, second para.). However, assumption of an executory contract must be effected through express order of the bankruptcy court. *In Re Gamma Fishing Company, Inc.,* 70 B.R. 949 (Bkrtcy. S.D. Cal. 1987). Bankruptcy Court approval is obtained through the confirmation of a plan of reorganization which specifically recites the assumption or rejection of the

36

contract. 11 U.S.C. Section 1123(b)(2). In the instant case, Sort-Rite specifically states in its plan of reorganization that it is not assuming any contracts, that all are to be rejected ( Exhibit 'PFM-I,' Second Amended Plan of Reorganization, Article IX, page 19).

**h. The Life Insurance Standard Confirmation Inquiry of 1996 Does Not Show That Shirley Metzger Certified that Sort-Rite Remained a Beneficiary.**

1. Sort-Rite International, Inc. presented, as one of the exhibits attached to its motion for summary judgment, a document entitled "Life Insurance Standard Confirmation Inquiry" (Dkt. 48, Exhibit SJX-10). Sort-Rite International, Inc. asserted that Shirley Metzger signed this document "confirming that Sort-Rite remained the beneficiary of the policy in question." (Dkt. 48, Sort-Rite's Motion for Summary Judgment, page 4, para. G). The Court relied on Sort-Rite's representations, and includes, as part of its Order, "Shirley Metzger herself, in 1996, continued to certify that Sort-Rite was a beneficiary in the Life Insurance Standard Confirmation Inquiry in 1996." (Dkt. 62, Order, pages 2-3).

2. This is not what the document shows.

3. An examination of this document reveals the following:

a. Shirley Metzger is not certifying or otherwise confirming anything. She is authorizing Jefferson Pilot to provide financial information to Sort-Rite's accountant, Frank Hyde.

b. Her authorization is dated April 30, 1996, and Jefferson Pilot's representative dated its response July 8, 1996.

c. No where on the form is there any representation that Sort-Rite is a beneficiary of record; the form merely provides, beside the block "Beneficiaries as shown on the policies" the name "Sort-Rite International." (Found at Item 'C').

d. The form, in fact, has a space to provide "Beneficiary of Record" and that space has been left blank (Found at Item '11').

e. Although numerous objections can be made to the document, such as the fact that, taken on its face, it is a three-way correspondence, apparently initiated by Shirley Metzger, sent to Jefferson Pilot with a request to fill in certain information, primarily financial, and return it to Sort-Rite's accountant in Oklahoma, Frank Hyde, and the fact that it is not possible to identify what information was on the form when Shirley Metzger made the request, these objections are unnecessary because the document does not provide the information for which it is proffered.

3.   Of critical importance is the fact that the document itself distinguishes between the "Beneficiaries as shown on the policies" (Item 'C'), which would have been Sort-Rite International for the $1,000,000 portion of the policy, and "Beneficiary of Record" (Item '11'), which would address any changes made after the original policy was purchased.  It is also of critical importance that Jefferson Pilot did not respond to Item '11.'

4.   There is no dispute that the policy, as written, provided that it "contemplates" that the "Employer" would be the beneficiary of certain policy proceeds if the insured died "while this Split-Dollar Endorsement

is in effect." (Dkt. 48, Sort-Rite International's motion for summary judgment, Exhibit SJX-2, page 40, paragraph III). The document provides no information relevant to this suit than to reiterate this fact. It does not show that Shirley Metzger confirmed or certified that Sort-Rite International remained a beneficiary of any part of the policy after the 1995 change of beneficiary designation was executed.

## CONCLUSION

For the foregoing reasons, Movants pray that its Motion for Reconsideration be granted.

Respectfully submitted,

CONSTANCE Y. SINGLETON
ATTORNEY-IN-CHARGE
FOR LETICIA PINO,
KATHERINE METZGER, AND
DEBRA METZGER FINCH
Fed. ID. 6567
SBOT 18435600
(281)-687-0100
Fax: (713) 802-1202
215 Bayland Avenue
Houston, Texas 77009

OF COUNSEL:

JAMES DEANDA
Solar & Associates
Fed. ID. 15484
SBOT 05624000
(713) 850-1212
Fax: (713) 850-1199
2800 Post Oak Blvd., Suite 6300
Houston, Texas 77056

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Reconsideration has been sent, via certified mail, Return Receipt Requested, No. 7000 1670 0004 3104 9899 to the counsel of record named below, on this the 25th day of September, 2002:

Stapleton, Curtis & Boswell, LLP
 P. O. Box 2644
Harlingen, Texas 78551
Attn: Mr. Chris Boswell

CONSTANCE Y. SINGLETON

## CERTIFICATE OF CONFERENCE

I hereby certify that on September 25, 2002 I personally spoke with Chris Boswell, attorney for Sort-Rite International, Inc. regarding the filing of this motion for reconsideration, and he advised me that this motion is opposed.

CONSTANCE SINGLETON

40

## AFFIDAVIT OF ATTORNEY

STATE OF TEXAS     }
                  }
COUNTY OF HARRIS  }

      BEFORE ME, the undersigned authority, on this day appeared CONSTANCE SINGLETON, who is a person known to me, who, first being duly sworn upon her oath, deposed and stated:

      My name is CONSTANCE SINGLETON. I am over the age of eighteen years, have never been convicted of a felony or crime involving moral turpitude, and am mentally competent to execute this affidavit. I have personal knowledge of the matters set forth herein. The exhibits appended to this motion are genuine and authentic copies of the originals, as presented to me through discovery in this case. The exhibits appended to this motion which are from bankruptcy court records were retrieved by me from the Clerk of the Bankruptcy Court in Corpus Christi, Texas, relating to Sort-Rite International, Inc.'s two bankruptcy cases, Case No. 92-21053 and Case No. 00-21094. Those bankruptcy court records appended to this motion as exhibits are genuine and authentic copies of the documents which I received from the bankruptcy court's files. Exhibit 'E,' appended to this motion, is a genuine and authentic copy of the receipt for certified mail stamped by the clerk for the United States Postal Service, and the 'green card' evidencing delivery. The letters from Carl Semmler, dated May 11, 2001, February 28, 2001, and March 15, 2001, are authentic and genuine copies of the originals received as part of the Jefferson Pilot Life Insurance Company's file on this policy, which was provided during the deposition of Carl Semmler. The excerpts of the depositions of Carl Semmler included in the Exhibit Appendix made a part of this motion are authentic and genuine copies of the originals. The language contained in this motion was personally prepared by me, and where that language states that certain documents contain certain facts, I

have personally reviewed those documents, and have personal knowledge that those documents, do, in fact, make such representations.

FURTHER, AFFIANT SAYETH NOT.

CONSTANCE SINGLETON

SUBSCRIBED AND SWORN to before me on the 24 day of September, 2001, to certify which witness my hand and seal.



NOTARY PUBLIC   Nov. 22, 2006
STATE OF TEXAS

2

# APPENDIX
## TO
## MOTION FOR RECONSIDERATION
### FILED BY LETICIA PINO, DEBRA FINCH, AND
### KATHERINE METZGER


Exhibit 'A'            **Response to Motion for Summary Judgment
                        Filed by Sort-Rite International
                        And Reply to its Response**

Exhibit 'B'            **Affidavit of Constance Singleton**

Exhibit 'C'            **Affidavit of James DeAnda**

Exhibit 'D'            **Affidavit of Shaun Claybourn,
                        Assistant to Harlin Womble
                        Jordan, Hyden, Womble, & Culbreth**

Exhibit 'E'            **Copy of Certified Mail Receipt
                        And 'Green Card' Return Receipt**

Exhibit 'F'            **Change of Beneficiary Form
                        Version One**

Exhibit 'G'            **Change of Beneficiary Form
                        Version Two**

Exhibit 'H'            **Second Amended Disclosure Statement
                        Filed by Sort-Rite International
                        From Case No. 00-21094-B-11**

Exhibit 'I'            **Second Amended Plan of Reorganization
                        Filed by Sort-Rite International
                        From Case No. 00-21094-B-11**

Exhibit 'J'            **Voluntary Petition Cover Page and Sch. B
                        Filed by Sort-Rite International
                        From Case No. 92-21053-B-11**

**Exhibit 'K'**                **Voluntary Petition Cover Page**
                                          **And Schedule B**
                              **Filed by Sort-Rite International**
                              **From Case No. 00-21094-B-11**

**Exhibit 'L'**        **Excerpts from Deposition of Carl Semmler**

**Exhibit 'N'**          **May 11, 2001 Letter from Carl Semmler**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JEFFERSON-PILOT LIFE INS. CO. | § | |
| | § | |
| V. | § | CASE NO. B-01-142 |
| | § | |
| | § | |
| SORT-RITE INTERNATIONAL, | § | |
| ET AL. | § | |

**<u>RESPONSE OF PINO, METZGER, AND FINCH</u>
<u>TO</u>
<u>SORT-RITE'S MOTION FOR SUMMARY JUDGMENT</u>**

**<u>AND</u>**

**<u>REPLY TO SORT-RITE'S RESPONSE</u>
<u>TO</u>
<u>MOTION FOR SUMMARY JUDGMENT FILED BY</u>
<u>PINO, METZGER, AND FINCH</u>**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW LETICIA PINO, DEBRA FINCH, and KATHERINE METZGER,

and file this their Response to the Motion for Summary Judgment filed by SORT-

RITE, INTERNATIONAL, and their Reply to the Response which SORT-RITE

filed to the Motion for Summary Judgment filed by Parties Herein, PINO, FINCH,

and METZGER.

PFM - 'A'

## SUMMARY OF RESPECTIVE POSITIONS OF THE PARTIES

### Summary of Position of PINO, FINCH, and METZGER.

1. SORT-RITE had no claim to the insurance proceeds after the 1995 Beneficiary Designation Change was accepted by Jefferson Pilot Life Insurance Company.

2. SORT-RITE specifically rejected the subject life insurance policy in its Bankruptcy Plan of Reorganization under Chapter 11, Case No. 00-21094, which was confirmed seven weeks before the insured's death, and is judicially estopped to assert an interest in the proceeds of the policy in the proceeding now before this Court.

3. SORT-RITE did not list the insurance policy as an asset in its Chapter 11 Bankruptcy, Case No. 00-21094, and is judicially estopped to assert, in the case at bar, an interest in the proceeds of the policy.

4. Confirmation hearing testimony by SORT-RITE'S management company, which company became its new owner upon plan confirmation, was that SORT-RITE would not continue to provide insurance on the life of its former principal shareholder, Shirley Metzger. SORT-RITE's counsel advised the Bankruptcy Court on the record in that same hearing that the transaction would have to be 'reversed' out. These representations constitute a separate, additional basis for the application of judicial estoppel.

5. SORT-RITE had no insurable interest in the life of Shirley Metzger, and, could not, therefore, be a legal beneficiary.

### Summary of Position of SORT-RITE, INTERNATIONAL

1. SORT-RITE asserts that it is entitled to proceeds from the $1,000,000 portion of the policy because that is the way the policy was originally drafted in 1987. SORT-RITE denies that the 1995 Beneficiary Designation Change addressed the Employer's portion of the policy. Instead, it asserts that the Beneficiary Designation Change addressed only the individual portion of the policy.

2.    In support of the above position, SORT-RITE asserts that Jefferson Pilot "considered the 1995 Change of Beneficiary as one only to Shirley Metzger's individual portion of the policy." (Sort-Rite's Response, page 9).

3.    SORT-RITE asserts that only Jefferson Pilot could reject the contract, and it had not done so, since it paid the proceeds into the Registry of the Court.

4.    SORT-RITE asserts that the transcript of the January 10, 2001 confirmation hearing does not support the application of judicial estoppel.

5.    SORT-RITE asserts that because it had an interest in the insurance policy at one time, Tex. Ins. Code Sec. 3.49-1 insulates it from any later attack on its legal status as one holding an insurable interest.

6.    Further, SORT-RITE asserts that it paid 100% of the premiums which were paid during the life of the policy.

7.    Last, SORT-RITE asserts that Parties METZGER and FINCH have no claim to any of the proceeds since they were only contingent beneficiaries under the 1995 Beneficiary Designation Change.

## SUMMARY OF PINO, METZGER AND FINCH RESPONSE TO SORT-RITE'S MOTION FOR SUMMARY JUDGMENT

SORT-RITE's motion for summary judgment is based solely on its position that the policy, as written in 1987, provided that the proceeds from the $1,500,000 policy would be divided into a $1,000,000 portion, characterized as the Employer's portion, and a $500,000 portion, characterized as the Employee's portion (in this case, the employee was Shirley Metzger).

The language of the policy makes it clear that this original plan of proceeds distribution was not irrevocable. Specifically, the split-dollar endorsement portion of the policy recites that "This endorsement *contemplates* a division of death

proceeds between two beneficiaries: The Empoyer and the Co-Beneficiary." (Split-Dollar Endorsement, para. III) [Emphasis added]. It further states: Upon the death of the Insured *while this Split Dollar Endorsement is in effect*..." (Split-Dollar Endorsement, para. III, second sentence) [Emphasis added]. Additionally, the Endorsement provides that the Employer has the right "to designate and change the beneficiary for the Employer's share of the death proceeds." (Endorsement, para. IV, sec. 3).

Despite these facts, SORT-RITE has taken the position that it is entitled to the $1,000,000 portion of the proceeds because of the manner in which the policy was originally set up, and asserts that the Beneficiary Designation Change executed in 1995 merely changed the beneficiary designation of the individual portion of the policy, not the Employer's portion.

SORT-RITE supports this view with the affidavit of Carl Semmler, the attorney for Jefferson Pilot who received the file from Jefferson Pilot's Claims Department after Shirley Metzger's death, and who handled the Jefferson Pilot matters relating to the referral of the file to local Harlingen, Texas counsel, who filed this interpleader on Jefferson Pilot's behalf.

The portion of the Carl Semmler affidavit upon which SORT-RITE relies is in direct contradiction to Jefferson Pilot's pleadings on file in this case. Additionally, the oral deposition of Carl Semmler, taken on May 3, 2002,

4

demonstrates that Mr. Semmler's statements are based on rank hearsay, in the form of information which he received from another Jefferson Pilot employee, Mack Scott, which information was also hearsay. The affidavit cannot support SORT-RITE's summary judgment, does not constitute summary judgment evidence, and Jefferson Pilot is estopped to take a position which is the opposite of that contained in its interpleader complaint.

## <u>REPLY TO SORT-RITE'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT FILED BY PINO, METZGER, AND FINCH</u>

SORT-RITE asserts, without support, in its response to the PINO, METZGER, and FINCH Motion for Summary Judgment that the life insurance policy was not an executory contract. It then asserts that even if it was, there was no rejection of that contract. SORT-RITE's arguments fail to join issue with the summary judgment arguments made by PINO, METZGER, and FINCH regarding the consequences of SORT-RITE's decision in the bankruptcy proceeding to reject all executory contracts, which SORT-RITE further specified to include the life insurance policy at issue in the instant case. SORT-RITE submits that since Jefferson Pilot honored the insurance contract upon the death of Shirley Metzger, there was no rejection of the contract.

SORT-RITE's response is merely an effort to present the illusion of legitimate controversy where none exists. SORT-RITE sought and obtained a

confirmed plan of reorganization in its Chapter 11 Bankruptcy proceeding. That plan provided that all executory contracts were rejected, and further defined executory contracts to include the subject policy. SORT-RITE's creditors made their bankruptcy-related decisions based upon SORT-RITE's plan, disclosure statement, and the sworn testimony of the representatives of the company which purchased SORT-RITE through the plan of reorganization. Judge Richard Schmidt, who presided over the bankruptcy proceedings, confirmed the plan based on these same representations. The confirmed plan recites that the executory contracts, including the subject life insurance policy, are rejected. It is irrelevant that the policy remained in force after the proceeding, and that Jefferson Pilot remained bound under the insurance contract to pay proceeds upon Shirley Metzger's death.

SORT-RITE presents no credible response to the PINO, METZGER, and FINCH summary judgment arguments relating to judicial estoppel. SORT-RITE generically asserts that Movants have mischaracterized the recorded and transcribed statements of counsel and the witness at the January 10, 2001 confirmation hearing. The statements addressed in the Motion for Summary Judgment are not characterized or mischaracterized; they are quoted in the body of the document, and the transcript is attached as an exhibit.

The judicial estoppel arguments presented in the Motion for Summary Judgment filed by PINO, METZGER, and FINCH are based not only upon the January 10, 2001 confirmation hearing testimony and attorney statements; they are also based upon SORT-RITE's representations in the documents which it filed with the bankruptcy court. These documents include the voluntary petition, where the insurance policy is not listed as an asset, and the plans of reorganization and the disclosure statements which were filed in the bankruptcy proceeding. These representations, addressed in more length in the motion itself, present a compelling basis for the application of judicial estoppel. SORT-RITE has no response to these arguments.

## SPECIFIC ARGUMENTS IN RESPONSE
## TO SORT-RITE'S MOTION FOR SUMMARY JUDGMENT

SORT-RITE's Motion for Summary Judgment is based exclusively on its position that the August 1995 Beneficiary Designation Change does not affect the Employer's portion of the policy, and that SORT-RITE should receive that portion because the insurance policy contract, as executed in 1987, is drafted with the anticipation that it will receive such proceeds. SORT-RITE relies heavily on the affidavit of Jefferson Pilot's attorney, Carl Semmler, as support for this position. In turn, Semmler's opinions, as expressed in the affidavit and his subsequently delivered oral deposition, focus on numerous peculiarities in the way that the

7

Beneficiary Designation Change form was drafted. Because this form is central to the issues in this case, it is necessary to inspect the form in detail.

## THE 1995 BENEFICIARY DESIGNATION CHANGE

On August 16, 1995 Shirley Metzger, signed, as President of SORT-RITE INTERNATIONAL, INC., Jefferson Pilot's 'Change of Beneficiary' form, which states, as its first sentence:

> All previous beneficiary designations and optional methods of settlement selected under the above numbered policy are hereby cancelled, and the proceeds of said policy upon the death of the Insured are to be paid to:

The form then provides that Leticia Elizalde de Pino is the primary beneficiary, with Debra Ann Metzger [Finch] the Contingent Beneficiary, and Katherine Metzger the Second Contingent Beneficiary.

## Information About the Form Itself

The first third of the form provides spaces for information about the new primary and contingent beneficiaries. The middle third of the form contains language addressed to the individual signing the form, followed by a request for 'Name Change' information, if applicable, followed by a signature line. "Sort-Rite International, Inc." is typed on the signature line, below which is typed "Shirley Metzger, President." Beside the typed name "Sort-Rite International, Inc." is the signature "Shirley Metzger." Immediately below the signature line is the

statement, in bold print, "This acknowledgement should be attached to the policy after it is received back from Home Office."

The Change of Beneficiary form which Jefferson Pilot used was a multiple-copy form, separated by carbon sheets. The bottom part of the form is not the same on the first page when compared to the copies. On the original there is a perforation horizontally across the page, so as to permit the lower portion to be detached easily, with the following language addressed to the "Policy Owner":

> Please type or print in the box below the name and address to which the acknowledged copy is to be sent.
> Check here if this is a change of address for the policyowner. If checked, the address is changed at the time the Change of Beneficiary and/or name is recorded in the home office.

The box is not checked and Sort-Rite's post office address is typed into the space on the form.

The first multiple of the form, just below the carbon, does not bear a perforation, and contains language which differs from the 'master' page. The carbon page bears a small box, beside which is stated "The policyowner's address is being changed to that shown below." The address follows and below it a line for the signature of the "policyowner." Shirley Metzger signed on this line. This signature is not part of the 'master' page, but is a only on the copies which follow the first carbon. The signature follows a statement on the first carbon copy that "The policyowner's address is being changed to that shown below."

9

This second signature does not appear there because the second page, (the first carbon copy) of the form is approximately one-half inch longer than the first page, and it is in that extension that the signature appears, on a line identified as "Signature of Policyowner." The name "Shirley Metzger" is signed on this line. A copy of the form's original and first carbon are attached hereto, for the Court's convenience, as Exhibits 'A' and 'B.' [These pages are copies of Exhibit 9, page 11 and Exhibit 12 to the oral deposition of Carl Semmler, an attorney employed by Jefferson Pilot Life Insurance Company. The original of Mr. Semmler's deposition is a part of the Court's file].

It is SORT-RITE's position that this second signature, where Shirley Metzger signed as Policyowner, is the only controlling signature, and makes the beneficiary change one which only addresses the individual portion of the policy, not the Employer's portion.

Such a distorted interpretation is contrary to the language of the form itself. As quoted above, the form recites that it "cancels" "all previous beneficiary designations" "under the above numbered policy" and the "proceeds of said policy" are to be paid as follows on the form. The form in no way distinguishes between the Employer's portion of the policy and the individual's portion of the policy, but speaks to "all" previous designations under Policy No. JP 4038973, which is the subject policy.

While it is certainly true that the one signing the beneficiary form cannot extend beneficiary status over a portion of the policy not his (or hers) to give, in the instant case, at the time that Shirley Metzger signed the 1995 Beneficiary Change, she represented not only herself, but also the corporation. Prior to the March 15, 2002 affidavit executed by Carl Semmler, it was Jefferson Pilot's position that Shirley Metzger executed the form in her corporate capacity. The Semmler affidavit and the testimony in his later deposition reflects a change in that view, with Jefferson Pilot, through the affidavit and deposition, taking the position that the controlling signature was her personal signature at the bottom of the second page. Independent of other arguments made elsewhere, the logical conclusion of this curious development is that Shirley Metzger had the apparent ability, under a single form, to cancel previous beneficiary designations for both portions of the split-dollar endorsement.

The two signatures found on the beneficiary designation change form will hereafter be identified as the corporate signature (the one in which Shirley Metzger signed as President of Sort-Rite International) and the individual signature. The corporate signature is the one which directly follows the information regarding the change in beneficiary, and it is the signature immediately below which the Jefferson Pilot employee signature and stamp are affixed. It is the signature beside which the Jefferson Pilot recordation date of September 6, 1995 is stamped.

11

Because of the proximity of the Jefferson Pilot signature, stamp, and recordation date to the location of the corporate signature of Shirley Metzger, there is no reasonable way for Jefferson Pilot to assert that its representatives overlooked that signature when the beneficiary change was recorded, or that they were otherwise unaware that Shirley Metzger had signed in her corporate capacity.

The second signature does not appear on the 'master' page at all, but on the carbon page, following language that the policy owner's address is being changed.

**Jefferson Pilot Treated the Beneficiary Designation Change as Reaching the Employer's Side of the Policy, Not the Individual's Side.**

SORT-RITE asserts that Jefferson Pilot Life Insurance Company "considered the 1995 Change of Beneficiary as one only to Shirley Metzger's individual portion of the policy." (Sort-Rite's Response, page 9). This is not true. On August 15, 2001 Jefferson Pilot Life Insurance Company filed its Original Complaint for Interpleader. On page four of the complaint, at paragraph 12, Jefferson Pilot pled:

The Insured, in her capacity as President of SORT-RITE INTERNATIONAL, INC., changed the beneficiary designation in August 1995, naming LETICIA ELIZALDE de PINO, friend, as primary beneficiary and DEBRA ANN METZGER FINCH and KATHERINE LEE METZGER as contingent beneficiaries.

Further, on page three, at paragraph 10, Jefferson Pilot pled:

Pursuant to a Split-Dollar Endorsement for Universal Life Policy under the Policy, SHIRLEY J. METZGER was Co-Owner and SORT-RITE

INTERNATIONAL, INC. was the Employer Co-Owner of the Policy. The Co-Beneficiaries under the Split-Dollar Endorsement for Universal Life Policy of the Policy were DEBRA ANN METZGER FINCH, KATHERINE LEE METZGER and FRANCIS E. MERRICK.

In the above two paragraphs from Jefferson Pilot's interpleader complaint it identified the present beneficiaries under the split-dollar endorsement as follows:

1. Under the Employer's portion, LETICIA PINO, whose beneficiary status arose from the August 1995 beneficiary designation change, and

2. Under the individual's portion, DEBRA FINCH, KATHERINE METZGER, and Francis Merrick (Deceased).

Additionally, approximately three months before the interpleader action was filed Carl Semmler, Assistant Vice President and Associate Counsel for Jefferson Pilot, made the following statements in a letter dated May 11, 2001, a copy of which is attached hereto as Exhibit 'C,' which was written jointly to all counsel for claimants:

> Finally, we received a change of beneficiary form dated August 16, 1995, from Ms. Metzger. This document named Leticia Elizalde de Pino-friend of the insured, as the primary beneficiary. The contingent beneficiary was Deborah Ann Metzger, Daughter, and the second contingent beneficiary was Katherine Lee Metzger, Daughter. That form was signed by Shirley Metzger as President of Sort-Rite International, Inc. A copy of this form is enclosed.

[May 11, 2001 letter, page two, 4th paragraph]. The referenced copy of the beneficiary change which was enclosed with Mr. Semmler's letter is the second page, the carbon copy which includes both the corporate and the individual

signatures. This is significant because it was Mr. Semmler's deposition testimony, when asked about the language of his May 11, 2002 letter, that he had not seen the second signature, and had only addressed the corporate signature.

When the May 11, 2002 letter was written, and when the interpleader complaint was filed, Jefferson Pilot took the position that the August 1995 change of beneficiary was executed by Shirley Metzger as President of SORT-RITE INTERNATIONAL, INC., and not in her individual capacity.

On page seven of the interpleader complaint, at paragraph 28, Jefferson Pilot states that it has not colluded with any of the Claimants regarding this dispute. Based upon these representations, and its assertions that it was nothing more than an innocent stakeholder without an interest in the disputed proceeds, it sought to be dismissed from the suit. PINO, FINCH, and METZGER relied on the contents of Jefferson Pilot's interpleader complaint and the representations of its counsel when they agreed to a stipulation of dismissal with prejudice as to Jefferson Pilot. On December 6, 2001, this Honorable Court granted the dismissal with prejudice as to Jefferson Pilot based upon these representations. Additionally, it was granted attorneys' fees disbursed from the interpled funds, without contest, based on Jefferson Pilot's representations. To the extent that Jefferson Pilot now takes a different and inconsistent position, it should be estopped from the assertion of a view which is contrary to that contained in its interpleader action.

14

**Specific Matters Which Impugn the Credibility of Jefferson Pilot's Post-Dismissal Change of Position .**

By letter dated February 28, 2002 from counsel for SORT-RITE INTERNATIONAL, INC. to Carl Semmler, a copy of which is attached hereto as Exhibit 'D,' Carl Semmler agreed to execute an affidavit which contained the following statement:

I have internally investigated the Change in Beneficiary Form used in 1995 in the Metzger Policy and concluded that Jefferson Pilot would have treated the Change in Beneficiary as a change to the individual's portion of the policy and not to the corporate employer portion of the policy since the corporation doesn't designate a beneficiary.

[Exhibit 'D'].

By letter dated March 15, 2002 from Carl Semmler to counsel for SORT-RITE INTERNATIONAL, INC., Mr. Semmler recanted his agreement regarding this language because "[a]s we discussed, I have subsequently learned that the corporation is permitted to name a beneficiary, so that portion of the statement is not accurate." (Letter dated March 15, 2002, a copy of which is attached hereto as Exhibit 'E').

In fact, the language of the Split Dollar Endorsement specifically provides that the Employer has the right to "designate and change the beneficiary for the Employer's share of the death proceeds." (Split Dollar Endorsement, Para. IV, para. 3.) The fact that Mr. Semmler did not know this when he executed the

February 28, 2002 letter agreement is an embarrassing commentary on the "internal investigation" referenced in that February 28th letter.

On March 15, 2002, Carl Semmler executed the affidavit which is attached as Exhibit 7 to SORT-RITE INTERNATIONAL, INC.'s Motion for Summary Judgment.

On May 3, 2002 Carl Semmler was deposed at the Jefferson Pilot offices in Greensboro, North Carolina. The original of this deposition has been filed with this Court. The following pertinent statements are taken from Carl Semmler's deposition. These statements demonstrate that Carl Semmler is not competent to speak of these matters, which are hearsay to him, and, additionally, they define his affidavit as one based totally on speculation and inadmissible hearsay:

1.    Carl Semmler is Assistant Vice President and Associate Counsel for Jefferson Pilot Life Insurance Company, and has been employed by Jefferson Pilot since 1985 (Page 7, line 10-12).

2.    He first received the Shirley Metzger file when it was referred to him by the Claims Department after Shirley Metzger died (Page 8, lines 10-20).

3.    The 'internal investigation' referenced in his affidavit was a discussion which he had with Mack Scott in the Client Services Department ( Page 14, lines 2-9).

4.    Mack Scott did not give him any indication that he remembered or had been involved in the facts of the 1995 Metzger beneficiary change ( Page 76, lines 16-21).

5.    Semmler's discussions with Mack Scott were based on a hypothetical situation, and not from Mack Scott's awareness of the 1995 beneficiary change (Page 68, lines 2-5; Page 75, lines 11-25).

16

6.  He found nothing in the file to indicate that Jefferson Pilot had a question about the beneficiary change when it was received ( Page 17, lines 12-21).

7.  If the beneficiary change had been reviewed by the Legal Department, there should be documentation in the file to reflect that review ( Page 17-18).

8.  Shirley Metzger signed the change of beneficiary form in two capacities, one of which was her corporate capacity (Page 18, lines 14-25; Page 20, lines 18-20).

9.  When he first looked at the form he considered it to be an individual designation, not a corporate designation (Page 21, lines 18-25; Page 22, lines 1-3).

10. The documents in the file were "all very inconsistent" and he and Jefferson Pilot treated the change as an individual change (Page 24, lines 9-19).

11. When he wrote the May 11, 2001 letter, he had overlooked the second signature, and only addressed the first signature (Page 34, lines 1-11).

12. Jefferson Pilot accepted the beneficiary change when it was received (Page 30, lines 14-17).

13. The Jefferson Pilot file does not reflect that it sent Shirley Metzger any paper which addressed a concern about the ambiguity in the way the form was signed. (Page 30, lines 18-22).

14. The file contains no secretary's notes, or information on any computer which shows or indicates any communication with Shirley Metzger regarding an ambiguity in the way the form was signed (Page 30, lines 23-25; Page 31, lines 1-5).

15. Jefferson Pilot's position that the beneficiary designation reached only the individual side is not based on the lack of a second corporate signature (Page 31, lines 6-11; Page 65, lines 20-25).

16. The line on the beneficiary change form where Shirley Metzger signed as President is a line that is supposed to be signed by a representative of Jefferson Pilot (Page 60, lines 1-6).

17. The form does not say that this line is for the Jefferson Pilot employee (Page 61, 71).

18. He thinks it was the assumption of Client Services that Shirley Metzger intended the beneficiary change as one affecting the individual portion of the policy (Page 62, lines 10-20).

19. If the Client Services Department accepted the beneficiary change as applying to the Employer's portion of the policy, it accepted it with only one signature.

20. Semmler was unaware, prior to telephone conversations with counsel for PINO, FINCH and METZGER, that the policy provided that the employer had the right to change the beneficiary of its portion of the policy (Page 70, lines 20-25).

21. If Jefferson Pilot had had a concern about what was intended, there would have been a follow-up in the file (Page 69, lines 14-19).

22. There is nothing in the Jefferson Pilot file which shows that Jefferson Pilot treated the beneficiary change as affecting only the individual portion of the policy (Page 74, lines 21-25).

23. The Client Services Department "is not very familiar" with the language of the split dollar endorsement (Page 76, lines 22-25).

24. Jefferson Pilot did not consider there to be an ambiguity in the beneficiary change designation, so they did not follow up on it (Page 77, lines 19-25).

25. The original, or first page of the beneficiary change form does not have a place for the second signature (where Shirley Metzger signed in her individual capacity) (Pages 82-83).

26. The first page of the beneficiary change form was sent to Jefferson Pilot, where it was stamped and dated, and returned to Shirley Metzger (Pages 80-83).

Jefferson Pilot has taken a position which is inconsistent to that which it presented in its Complaint. Additionally, a review of Carl Semmler's deposition demonstrates that he has no personal knowledge of the way in which the beneficiary designation change was treated by Jefferson Pilot in 1995, and his statements regarding these matters are rank hearsay. Further, his hearsay understanding was obtained from Mack Scott, who also had no personal knowledge, and, according to Carl Semmler, provided his comments to Semmler in response to a hypothetical posed to him by Semmler. Scott's statements, even if they had been received first hand, are also rank hearsay. Semmler's affidavit does not constitute summary judgment evidence.

## REPLY TO MISCELLANEOUS ARGUMENTS

### Issue Regarding Insurable Interest

SORT-RITE argues that because it was, at the policy's inception, designated as the Employer entitled to receive the Employer's portion of any death proceeds, its status as one with an insurable interest is forever protected under Tex. Ins. Code Sec. 3.49-1. This argument raises a new set of considerations, not previous addressed. Of central importance is the fact that the SORT-RITE which brings the claim in the instant case is one whose shares of stock were issued after January 10, 2001. Pursuant to the confirmed plan of reorganization, all 'old' shareholders were completely divested of any interest in the corporation through a cancellation of

their respective shares of stock. The confirmed plan of reorganization provided that new shares of stock would be issued to the 'Successful Bidder' as that term was defined by the plan. The plan distinguishes the status and entitlements of the corporation with separate references to 'Sort-Rite' (the old corporation) and 'Reorganized Sort-Rite' (the new, post-confirmation corporation, whose shares of stock were issued pursuant to the provisions of the plan). The old corporation was, along with Shirley Metzger, a co-owner of the insurance policy. The new corporation was not.

Although there are credible arguments which could be made that dispute SORT-RITE's blanket application of Tex. Ins. Code Sec. 3.49-1 to the facts of the instant action, they are unnecessary. The SORT-RITE which asserts an interest in this suit is a unique business entity, the progeny of the bankruptcy court, born from the death of the old corporation. No vestiges of the old corporation remain, no shares of stock, no shareholders, no reserved rights, no liabilities. The only connection between the two corporations is that all of the assets and liabilities of the new corporation were defined and limited as set out in the plan of reorganization, which plan was molded from the cloak of the old corporation. No torch was passed from the first corporation to the second. The torch was extinguished by the bankruptcy court, which used its remains to fashion a new torch, which was then used to 'begat,' for lack of a better term, the new

corporation. The new Reorganized SORT-RITE did not exist until some date after January 30, 2001, when the plan was confirmed. As defined in the plan, it had no relationship with the insurance policy that was rejected under the confirmed plan. Shirley Metzger was never an officer, or even an employee of that new, Reorganized SORT-RITE, and the new, Reorganized SORT-RITE was never a beneficiary of the insurance policy. It never had an insurable interest, and there is no application of Sec. 3.49-1.

## Issue Relating to the Payment of Premiums

SORT-RITE continues to assert a claim based on the payment of premiums. Initially, SORT-RITE asserted that it had paid over $260,000 in premiums on this policy. It continued with that position long after discussions regarding the fact that the policy was in force for 160 months, and the monthly premium was $1,004.48, so that the total premiums could not possibly exceed 160 X $1,004.48, or $160,716.80. The deposition testimony of Jefferson Pilot's Manager of Customer Service, James Kettenring, was that the total premiums paid under the policy was $100,447.90. SORT-RITE has presented checks which show that the total amount paid by SORT-RITE was only $63,282.24. Additionally, all of that amount was paid prior to the confirmation of the plan, by the old corporation; none was paid by the new corporation.

Metzger) for the "cost of the insurance" provided to the Co-Owner. The "cost of the insurance" is not the same as the premium, it is some amount much less than the amount of the premium. SORT-RITE has presented no evidence regarding what the "cost of insurance" was for this policy. The deposition testimony of James Kettenring was that, for both portions of the policy, not just the portion accorded to Shirley Metzger, the amount would have been around $500-$600, or generally 50% to 60% of the amount of the monthly premium. (Deposition of James Kettenring, page 29-30). Attached as an Exhibit to James Kettenring's deposition as his Exhibit 4, a copy of which is attached hereto as Exhibit 'F,' is a copy of Jefferson Pilot's Statement of Account for 1998, which shows that the cost of insurance varies from month to month, and that, during 1998 was in an amount between $527 and $532.

SORT-RITE has made no attempt to quantify the "cost of insurance" during the life of this insurance policy, and has presented no evidence to support a claim for reimbursement. Additionally, the SORT-RITE which is asserting this claim did not pay even one premium, it did not present a claim for reimbursement with the bankruptcy court, and its rights were defined in the bankruptcy forum, which did not provide for such reimbursement.

### Issue of Standing of METZGER and FINCH

SORT-RITE has, in its motion for summary judgment and in its response to the motion filed by PINO, METZGER, and FINCH, raised a somewhat undeveloped argument which submits that Parties METZGER and FINCH have no rights in the lawsuit except for their agreement with Party PINO. Although untethered to any of SORT-RITE's summary judgment points, this statement creates confusion and is, therefore, addressed here.

METZGER and FINCH were two of three original beneficiaries under the $500,000 portion of the policy. The 1995 Beneficiary Designation Change, signed by Shirley Metzger in her corporate capacity, designated PINO as the beneficiary of the $1,000,000 portion. That was the original position taken by Jefferson Pilot Life Insurance Company, as recited in its Interpleader Complaint, and Jefferson Pilot provided no indication of any other view held by its representatives until the letter from Carl Semmler dated March 15, 2002.

In addition to these claimants there were two banks who claimed an interest in the proceeds through assignments, one of which was executed by Shirley Metzger individually, so as to be a claim against the $500,000 portion, and one of which was executed by Shirley Metzger as President of SORT-RITE, so as to be a claim against the $1,000,000 portion of the policy. Coastal Banc's claim was based upon four separate debt transactions, one which was against the corporation,

and the remainder against Shirley Metzger individually. Export Import Bank of the United States had a claim based on a corporate debt. Each bank also asserted a claim against Shirley Metzger individually, which claims arose from her personal guaranties of the corporate debts.

These facts provided fertile ground for a limitless array of conflicts among METZGER, FINCH and PINO regarding legal strategies concerning the combined claims made by the banks.

Additionally, there was a potential conflict between PINO on one side, and METZGER and FINCH on the other with respect to the interpretation that the 1995 Beneficiary Designation Change actually cancelled the beneficiary designations of both portions of the policy, leaving PINO the sole beneficiary of the entire $1,500,000. Through an agreement among these parties, these conflicts were resolved.

## CONCLUSION

SORT-RITE INTERNATIONAL, INC. relinquished all interest in the subject life insurance proceeds, to the extent it had an interest, during proceedings relating to the confirmation of its plan of reorganization in Bankruptcy Case 00-21094-B-11. This relinquishment took the form of SORT-RITE's rejection of the policy of insurance as one of several rejected executory contracts. This representation was repeated in open court during the January 10, 2001

24

confirmation hearing, and is also emphasized by the fact that the policy was not listed as an asset on the voluntary petition which initiated the Chapter 11 proceeding. SORT-RITE's creditors relied on SORT-RITE's representations in making their bankruptcy-related decisions regarding objections to the plan. Concomitantly, the bankruptcy judge presiding over the case made his decision to confirm the plan based upon the representations ancillary to the presentation of the plan and based on the contents of the plan, both of which asserted that the insurance policy was among the executory contracts which were to be rejected by the new, Reorganized SORT-RITE.

It must be remembered that it was no secret that the Beneficiary Designation Change had been executed in 1995. The reason that SORT-RITE chose to reject the policy was that the policy was only a liability to SORT-RITE. It was paying the premiums, but would derive no benefit. It was, after all, in recognition of the fact that it had no interest in the life insurance policy that SORT-RITE did not list the policy as an asset in this bankruptcy.

After the plan was confirmed, SORT-RITE paid no further premiums on the policy. SORT-RITE is judicially estopped to now assert an interest in the policy, and, additionally, it has no insurable interest in the life of Shirley Metzger.

WHEREFORE, PREMISES CONSIDERED, Parties PINO, METZGER, and FINCH pray that this Honorable Court grant their joint motion for summary

judgment, and deny the motion for summary judgment filed by SORT-RITE INTERNATIONAL, INC.

Respectfully submitted,

ATTORNEYS FOR LETICIA PINO,
KATHERINE METZGER, AND
DEBRA METZGER FINCH

JAMES DEANDA
SOLAR & ASSOCIATES
Fed. ID. 15484
SBOT 05624000
2800 Post Oak Blvd., Suite 6300
Houston, Texas 77056
(713) 850-1212
Facsimile: (713) 850-1199

CONSTANCE Y. SINGLETON
Fed. ID. 6567
SBOT 18435600
215 Bayland Avenue
Houston, Texas 77009
(281) 687-0100
Facsimile: (713) 802-1202

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent, via certified mail to the following counsel of record or parties, on this the 10th day of July, 2002:

Chris Boswell
Stapleton, Curtis & Boswell, LLP
P. O. Box 2644
Harlingen, Texas 78551

CONSTANCE Y. SINGLETON

**Policyowner Service Dept.**

Jefferson Pilot
Life Insurance Company
PO Box 21008
Greensboro, NC 27420

x **Change of Beneficiary**

⊥ **Name Change**

**Jefferson Pilot**

When this form is used for an ar~~~ity
"Insured" shall mean "Annuitant~

| ~y No.    JP4038973 | Insured    SHIRLEY JEAN METZGER |
|---|---|

previous beneficiary designations and optional methods of settlement selected under the above numbered policy are hereby cancelled,
~ the proceeds of said policy upon the death of the Insured are to be paid to:

| ~imary Beneficiary(ies) if living, ~me(s) in full | Relationship(s) |
|---|---|
| LETICIA ELIZALDE DE PINO - FRIEND OF THE INSURED | |

~dress Must Be Shown on Reverse Side of Page 2

| ~erwise to Contingent Beneficiary(ies) if living, ~me(s) in full | Relationship(s) |
|---|---|
| DEBRA ANN METZGER | DAUGHTER |

~ress Must Be Shown on Reverse Side of Page 2

| ~herwise to Second Contingent Beneficiary(ies) if living, ~me(s) in full | Relationship(s) |
|---|---|
| | X |
| KATHERINE LEE METZGER | DAUGHTER |

~dress Must Be Shown on Reverse Side of Page 2

**~o beneficiary is living, payment will be made as provided in the policy.**

⌐ If checked, I hereby elect to provide that in no case shall any payment be made to any beneficiary designated in this policy
~til _____ days after the Insured's death, and in the event of the death of a beneficiary during such period, payment shall
~made in the same manner provided in this policy had said beneficiary predeceased the insured.

~ess otherwise stated above, if joint beneficiaries are named in any of the three classes (Primary, Contingent, or Second Contingent)
~oceeds are to be paid equally to the survivor or survivors, if any, in that class. If unnamed children of the Insured are designated abo
~ beneficiaries, the proceeds are to be paid to the Insured's lawful children. This change in beneficiary is subject to any assignment o~
~is policy recorded with the company.

~ere is a provision in said policy requiring that it accompany any request for change of beneficiary or that such change shall not take ef-
~ until endorsed by the Company on the policy, such provision is hereby modified, and the beneficiary may be changed pursuant to this
~itten request, which change will be effected by recordation by the Company at its Home Office without endorsement on the policy, and
~en so recorded shall take effect as of the date of this request, but subject to any payment made or action taken by the Company before
~ch recordation.

**~me Change**

| ~licy required to change ~sured's name if the ~son is other than ~rriage, divorce or ~option. | ☐ Change the Name of the | ☐ Insured to ☐ Annuitant ☐ Owner | First, Maiden, Married Name if applicable | Because of ☐ Marriage ☐ Divorce ☐ Other |
|---|---|---|---|---|
| | | (If the name has been changed for any reason other than marriage, divorce or adoption, a certified copy of the legal document authorizing the change must be submitted.) | | |

~ORT-RITE INTERNATIONAL, INC.    *Shirley Metzger*    8/16/95

SHIRLEY METZGER, PRESIDENT    Secretary *Darlene Alexia*    SEP 6 1995 Recorded Date

**~is acknowledgement should be attached to the policy after it is received back from Home Office.**

*Robert L Reed*

Policy Owner: Please type or print in the box below the name and address to which the acknowledged copy is to be sent.
☐ Check here if this is a change of address for the policyowner. If checked, the address is changed at the time
the Change of Beneficiary and/or name is recorded in the Home Office.

Sort Rite International Inc.
P O Box 1805
Harlingen, TX  78551

**~e Instructions on Reverse Side Of Last Page**

~-6625 Rev 2-94

EXHIBIT 'A'

**Policyowner Service Dept.**

**Change of Beneficiary**

**Name Change**

Jefferson-Pilot
Life Insurance Company
PO Box 21008
Greensboro, NC 27420

**Jefferson Pilot**

When this form is used for an annuity "Insured" shall mean "Annuitant"

| icy No. | Insured |
|---|---|
| JP4038973 | SHIRLEY JEAN METZGER |

revious beneficiary designations and optional methods of settlement selected under the above numbered policy are hereby cancelled, the proceeds of said policy upon the death of the Insured are to be paid to:

nary Beneficiary(ies) if living,                                      Relationship(s)
me(s) in full

LETICIA ELIZALDE DE PINO – FRIEND OF THE INSURED

dress Must Be Shown on Reverse Side of Page 2

erwise to Contingent Beneficiary(ies) if living,                    Relationship(s)
me(s) in full

DEBRA ANN METZGER                    DAUGHTER

ress Must Be Shown on Reverse Side of Page 2

erwise to Second Contingent Beneficiary(ies) if living,             Relationship(s)
me(s) in full                                          ER

~~KATHERLINE~~
KATHERINE LEE METZGER                DAUGHTER

dress Must Be Shown on Reverse Side of Page 2

o beneficiary is living, payment will be made as provided in the policy.

If checked, I hereby elect to provide that in no case shall any payment be made to any beneficiary designated in this policy ___ days after the Insured's death, and in the event of the death of a beneficiary during such period, payment shall ade in the same manner provided in this policy had said beneficiary predeceased the insured.

ss otherwise stated above, if joint beneficiaries are named in any of the three classes (Primary, Contingent, or Second Contingent), the ceeds are to be paid equally to the survivor or survivors, if any, in that class. If unnamed children of the Insured are designated above eneficiaries, the proceeds are to be paid to the Insured's lawful children. This change in beneficiary is subject to any assignment of olicy recorded with the company.

re is a provision in said policy requiring that it accompany any request for change of beneficiary or that such change shall not take ef- til endorsed by the Company on the policy, such provision is hereby modified, and the beneficiary may be changed pursuant to this request, which change will be effected by recordation by the Company at its Home Office without endorsement on the policy, and n so recorded shall take effect as of the date of this request, but subject to any payment made or action taken by the Company before recordation.

me Change

cy required to change    ☐ Change the   ☐ Insured to                                    Because of ☐ Marriage
ed's name if the            Name of the   ☐ Annuitant   First, Maiden, Married Name if applicable    ☐ Divorce
on is other than                            ☐ Owner                                              ☐ Other
iage, divorce or
ption.                    (If the name has been changed for any reason other than marriage, divorce or adoption, a certified copy of the legal document authorizing the change must be submitted.)

RT-RITE INTERNATIONAL, INC.        *Shirley Metzger*        SEP 6 1995
SHIRLEY METZGER, PRESIDENT  Secretary  *signature*  8/16/95    Recorded Date
acknowledgement should be attached to the policy after it is received back from Home Office.

☐ The policyowner's address is being changed to that shown below.

Sort Rite International Inc.
P O Box 1805
Harlingen, TX 78551

EXHIBIT "B"                                    SJX "6"

se Date
Sign
haded Space



## JEFFERSON PILOT
FINANCIAL

Carl D. Semmler,
JD, FLMI
*Assistant Vice President
and Associate Counsel*

Jefferson Pilot Financial
PO Box 21008
Greensboro, NC 27420

bus:  336 691 3369
fax:  336 691 3258
email: carl.semmler@
          jpfinancial.com

May 11, 2001

Jane Akin Brasch
Brasch & Taylor, LLP
806 Morgan
Suite J
Harlingen, Texas  78550

Lynn Frizzelle
Sr. Vice President
Coastal Bank, ssb
P. O. Drawer 2468
Harlingen, Texas  78551

Ken E. Mackey
Attorney at Law
724 South Alamo Street
Suite 1
San Antonio, Texas  78205

William Mays
Office of the General Counsel
Export-Import Bank of the United States
811 Vermont Avenue, NW
Washington, DC  20571

Constance Y. Singleton
Attorney at Law
215 Bayland Avenue
Houston, Texas  77009

Re:    Shirley Jean Metzger;  Policy No. JP4038973

Dear Mesdames and Messrs:

I have been asked to contact each of you concerning the proceeds due under the above referenced policy.  Jefferson-Pilot has heard from each of you in connection with this policy and it is clear that there is disagreement as to the proper recipient(s) of the policy proceeds.  For that reason, Jefferson-Pilot will not make payment of the proceeds at this time, or until some resolution can be reached about their proper payment.

EXHIBIT "C"

Ex-Im Bank-1726

For your information, I am enclosing documentation from our file concerning the history of beneficiary designations and assignments on this policy. Hopefully, this will be of use to you in evaluating the claims of your respective clients.

On the original application for this policy, the beneficiary designation was stated as "See Split Dollar Endorsement." A copy of that Split Dollar Endorsement for Universal Life Policy is enclosed. As you can see, it shows Sort-Rite International, Inc. as the Employer and Shirley Jean Metzger as the Co-Owner. The Co-Beneficiaries were "Deborah Ann Metzger, Daughter, Katherine Lee Metzger, Daughter, and Frances E. Merrick, Mother of Insured, share and share alike, survivor or survivors." Shirley Metzger signed this form both as Applicant/Co-Owner and on behalf of the Employer.

In December of 1987, Jefferson-Pilot received an assignment in favor of San Benito Bank & Trust Company. This assignment was executed by Shirley Metzger. A copy of that document is enclosed. A second assignment was received in July of 1988 in favor of the Export-Import Bank of the United States. This assignment was signed by Shirley Metzger and by Shirley Metzger, President of the Sort-Rite International, Inc. A copy of this assignment is also enclosed.

Finally, we received a change of beneficiary form dated August 16, 1995, from Ms. Metzger. This document named Leticia Elizalde de Pino-friend of the insured, as the primary beneficiary. The contingent beneficiary was Deborah Ann Metzger, Daughter, and the second contingent beneficiary was Katherine Lee Metzger, Daughter. That form was signed by Shirley Metzger as President of Sort-Rite International, Inc. A copy of this form is enclosed.

Jefferson-Pilot has been contacted by each of you concerning this policy and a number of questions have been raised about the proper payment of the proceeds. It is my understanding that Sort-Rite International, Inc., is involved in bankruptcy proceedings. Ms. Singleton, on behalf of Leticia de Pino, has suggested that the August 1995 change of beneficiary, executed on behalf of Sort-Rite International, extinguished their claim to any benefits. Mr. Mackey, on behalf of the company, has questioned the validity of the assignments. There have also questions raised about the effect of the different signatures on our documents and whether they bind Sort-Rite International or Ms. Metzger individually, or both.

As a result, Jefferson-Pilot now finds itself the recipient of conflicting claims. We admit that the policy proceeds are due and payable, but if we pay them incorrectly, we run the risk of being sued by one or more of the interested parties. The solution for us is to file an action in interpleader by paying the proceeds into the Court, naming all of you as defendants and asking the Court to determine the proper recipients. If it becomes necessary for us to do that, we will ask the Court to reimburse us for costs and attorney's fees out of the policy proceeds. In addition, each of you will incur the costs associated with defending your claims against each other before the Court. Given the size of this policy, we would seriously consider this action in Federal Court. The interpleader rules

Ex-Im Bank-1727

are clear that we are entitled to take this action regardless of our opinion of the relative merit of your respective claims.

Before we take that action, we would like to offer you an opportunity to resolve this matter between yourselves. If you can agree on a mutually acceptable division of the proceeds and can provide Jefferson-Pilot with the appropriate releases and indemnifications, we will be happy to pay the proceeds according to your agreement. Please advise me whether you want to pursue such an agreement. We are willing to hold the proceeds while you negotiate a settlement, but unless all of you agree to work toward such an agreement, Jefferson-Pilot will proceed with an action in interpleader.

I would ask that Ms. Brasch advise me whether the insured's estate has any claim to these proceeds. If not, I will not include her in future correspondence. Also, I would appreciate it if Ms. Frizzelle would provide documentation to show that Coastal Bank, ssb is the successor in interest to San Benito Bank & Trust Company.

Jefferson-Pilot will anticipate hearing from each of you within the next 20 days. — May 31 If we do not, or if you indicate that you prefer not to work out a mutual agreement, we will then proceed by filing our action in interpleader.

We appreciate your prompt attention to this matter and look forward to hearing from each of you.

Very truly yours,

Carl D. Semmler

CDS/m

Enclosures

Cc:   Katie Pulaski - 5310
      Rosie Hernandez - 78124

Ex-Im Bank-1728

# STAPLETON, CURTIS & BOSWELL, L.L.P.
## ATTORNEYS AT LAW
### 515 EAST HARRISON - SUITE A
### HARLINGEN, TEXAS 78550

JERRY L. STAPLETON
THOMAS P. CURTIS
CHRISTOPHER H. BOSWELL*

*Board Certified-Civil Trial Law
Texas Board of Legal Specialization

P.O. BOX 2644
HARLINGEN, TEXAS 78551
TELEPHONE (956) 428-9191
FAX (956) 428-9283
E-MAIL tcurtis@southtexlaw.com
cboswell@southtexlaw.com

February 28, 2002

Mr. Carl D. Semmler
Assistant Vice-President and
        Associate Counsel
Jefferson Pilot Financial
Greensboro, NC 27420
**Via Facsimile 336-691-3258**

Re:    Shirley Jean Metzger: Policy No. JP4038973

Dear Mr. Semmler:

This will confirm our telephone conversation of today in which you told me that you would sign an affidavit containing the following statement:

"I have internally investigated the Change in Beneficiary Form used in 1995 in the Metzger Policy and concluded that Jefferson Pilot would have treated the Change in Beneficiary as a change to the individual's portion of the policy and not to the corporate employer portion of the policy since the corporation doesn't designate a beneficiary."

Due to time constraints we are not preparing an affidavit today.

If you you agree with the statement contained in quotations above, please sign in the space provided below.

Sincerely yours,

Chris Boswell

AGREED: _____
              Carl D. Semmler

EXHIBIT 'D'



**JEFFERSON PILOT**

FINANCIAL

**Carl D. Semmler,**
**JD, FLMI**
*Assistant Vice President*
*and Associate Counsel*

Jefferson Pilot Financial
PO Box 21008
Greensboro, NC 27420

bus: 336 691 3369
fax: 336 691 3258
email: carl.semmler@
       jpfinancial.com

March 15, 2002

*Via* FACSIMILE: 956.428.9283

Chris Boswell
Stapleton, Curtis & Boswell, LLP
P.O. Box 2644
Harlingen, Texas 78551

  Re: Shirley Jean Metzger; Policy No. JP4038973

Dear Mr. Boswell:

  I have reviewed the draft Affidavit which you sent to me earlier this week. Attached is a revised draft of the Affidavit, which I think reflects the facts as we discussed them. I have not made extensive changes, but have sought to clarify several points. If you are satisfied with this revised document, I will execute it and return an original copy to you. If you would like to discuss it first, please feel free to call me.

  Given this new Affidavit and our discussion about the Employer's rights under the Split Dollar Endorsement, I trust that it will not be necessary for you to rely on the letter agreement that I signed and sent to you on February 28, 2002. As we discussed, I have subsequently learned that the corporation is permitted to name a beneficiary, so that portion of the statement is not accurate.

  Also as I mentioned to you, Ms. Singleton has requested a copy of the premium history on Ms. Metzger's policy. In order to provide the same information to both of the interested parties, I have enclosed a copy of that history for your file. The "as of" date on this chart is the date to which the payment was credited. As you can see, it corresponds with the due date of the premium. By my calculations, the total premiums paid were $100,447.90. In the same vein, I have advised Ms. Singleton that you and I have had discussions about the 1995 beneficiary change and that you are preparing an affidavit for my signature. My hope is that I can provide the information that both you and Ms. Singleton need so that a deposition will not be necessary.

  I hope this information is of help to you. Please let me know how you want me to proceed with the Affidavit. I will look forward to hearing from you.

       Very truly yours,

       Carl D. Semmler

CDS/am
Enclosure

EXHIBIT `E`

# JEFFERSON-PILOT                                    STATEMENT OF ACCOUNT

Jefferson-Pilot Life Insurance Compa.                          for period ending 12-01-1998
PO Box 21008
Greensboro NC 27420
800-487-1485

| | |
|---|---|
| Policy Number: JP4038973 | Coverage Type: FLEXIBLE PREMIUM ADJUSTABLE LIFE (UL203   ) |
| Policy Date: 12-01-1987 | Death Benefit Option: LEVEL   Planned Premium: MONTHLY |
| Insured: SHIRLEY JEAN METZGER | Planned Premium: $1,004.48 |
| Date of Birth: 05-20-1938 | Specified Amount: $1,500,000.00 |
| Issue Age: 50 | Net Death Benefit: $1,487,586.24 |
| Sex: F | |
| Owner: SORT RITE INTERNATIONAL INC | Policy Values as of:        12-01-1997      12-01-1998 |
| PO BOX 1805 | |
| HARLINGEN TX 78551 | Net Policy Value:    $15,173.40      $7,280.55 |
| | Surrender Value:    $15,173.40      $7,280.55 |
| | Loan Balance:         $.00     $12,413.76 |

## REPORT OF MONTHLY POLICY ACTIVITY

| Month Ending | Premiums Received | Expense Charges | Interest at Guar Rate * | *Credited Excess | Total % Rate | Cost of Insurance | Cost of * Rider(s)* | Partial Surrenders | End of Month Policy Value |
|---|---|---|---|---|---|---|---|---|---|
| 01-01-1998 | 2,008.96 | 160.72 | 50.45 | 24.10 | 6.10 | 530.78 | .00 | .00 | 16,565.41 |
| 02-01-1998 | .00 | .00 | 52.49 | 25.15 | 6.10 | 530.02 | .00 | .00 | 16,113.03 |
| 03-01-1998 | .00 | .00 | 51.01 | 24.40 | 6.10 | 530.27 | .00 | .00 | 15,658.17 |
| 04-01-1998 | .00 | .00 | 49.52 | 22.52 | 6.00 | 530.52 | .00 | .00 | 15,199.69 |
| 05-01-1998 | .00 | .00 | 48.02 | 2.65 | 6.00 | 530.76 | .00 | .00 | 14,719.60 |
| 06-01-1998 | .00 | .00 | 46.46 | 1.79 | 6.00 | 531.03 | .00 | .00 | 14,236.82 |
| 07-01-1998 | .00 | .00 | 44.86 | .84 | 5.80 | 531.29 | .00 | .00 | 13,751.23 |
| 08-01-1998 | .00 | .00 | 43.28 | .06 | 5.80 | 531.55 | .00 | .00 | 13,263.02 |
| 09-01-1998 | .00 | .00 | 41.68 | .00 | 5.80 | 531.81 | .00 | .00 | 12,772.89 |
| 10-01-1998 | 9,040.32 | 723.23 | 42.79 | 1.04 | 5.80 | 532.08 | .00 | .00 | 20,601.73 |
| 11-01-1998 | .00 | .00 | 65.72 | 9.64 | 5.80 | 527.84 | .00 | .00 | 20,149.25 |
| 12-01-1998 | .00 | .00 | 64.23 | 8.91 | 5.80 | 528.08 | .00 | .00 | 19,694.31 |
| Totals | 11,049.28 | 883.95 | 600.51 | 121.10 | | 6,366.03 | .00 | .00 | |

Interest has been credited monthly in determination of policy values.  The minimum rate of interest guaranteed
is   4.00%.  Interest in excess of the guaranteed rate may be credited as described in the policy.  Such
interest, if any, is shown above under "Excess".  Excess interest credited on any policy value held as security
for a policy loan may be at a different rate.

Based on the company's schedule of monthly cost of insurance rates in effect as of 12-01-1998, your rate per
$1000 net amount at risk for the policy year beginning 12-01-1998 will not be greater than  0.591690.

This policy contains non-guaranteed factors that may have changed during the policy year.  The columns with the
non-guaranteed factors are asterisked above.

## PROJECTION OF NEXT YEAR'S CASH SURRENDER VALUE

Assuming no premiums are paid, your policy value on the 12-01-1999 policy anniversary is projected as follows:

| | Cash Surrender Value | Policy Value |
|---|---|---|
| Using Current Interest and Cost of Insurance Rates | $14,141.34 | $13,603.95 |

The net death benefit is the death benefit after any outstanding loan balance is deducted.

Using guaranteed interest and cost of insurance rates, your policy will terminate before the end of the policy
year.

IMPORTANT POLICY OWNER NOTICE: You should consider requesting more detailed information about your policy to
understand how it may perform in the future.  You should not consider replacement of your policy or make changes
in your coverage without requesting a current illustration.  You may annually request, without charge, such an
illustration by calling 800-487-1485, writing to Jefferson-Pilot Life Insurance Company at PO Box 21008,
Greensboro, NC 27420, or contacting your agent.  If you do not receive a current illustration of your policy
within 30 days from your request, you should contact your state insurance department.

EXHIBIT
4

Agency:  16701
Agent:  0001520

THANK YOU FOR ALLOWING US TO BE OF SERVICE

EXHIBIT 'F'

## AFFIDAVIT OF CONSTANCE SINGLETON

STATE OF TEXAS    }
                     }
COUNTY OF HARRIS  }

     BEFORE ME, the undersigned authority, on this day appeared CONSTANCE SINGLETON, who is a person known to me, who, first being duly sworn upon her oath, deposed and stated:

     My name is CONSTANCE SINGLETON. I am over the age of eighteen years, have never been convicted of a felony or crime involving moral turpitude, and am mentally competent to execute this affidavit. I have personal knowledge of the matters set forth herein.

     On July 11, 2002 I filed with the Houston Division of the Southern District of Texas a twenty-six page document, and, additionally, exhibits, which document was entitled "**Response of Pino, Metzger, and Finch to Sort-Rite's Motion for Summary Judgment and Reply to Sort-Rite's Response to Motion for Summary Judgment Filed by Pino, Metzger, and Finch.**"

     Additionally, I separately filed the original depositions of Carl Semmler and James Kettenring, which were to be exhibits to that Response, and are referenced in the Response. The original of the Carl Semmler deposition contains the only obtainable blank, original, multi-carbon form used by Jefferson Pilot Life Insurance Company in 1995 to effect a change of beneficiary and it was agreed during the deposition of Carl Semmler that this original document would remain a part of the original deposition and not be separated from it. The physical properties of that form are relevant to issues in this case, and it was my opinion that I did not have the liberty to remove it from

EXHIBIT 'PFM-B'

the deposition. These physical properties are discussed in the Response.

After receiving this Court's September 5, 2002 order granting Sort-Rite International, Inc.'s motion for summary judgment, I reviewed the Court's docket sheet and discovered that it does not reflect the filing of the **Response of Pino, Metzger, and Finch to Sort-Rite's Motion for Summary Judgment and Reply to Sort-Rite's Response to Motion for Summary Judgment Filed by Pino, Metzger and Finch.**

The file did reflect the receipt of the depositions, which were also filed in the Houston Division of the United States District Clerk's Office for the Southern District of Texas.

I had personal copies of this Response date-stamped at the time, but cannot now find them.

On July 11, 2002, I sent a copy of the Response, via certified mail, to opposing counsel, Chris Boswell, of the law firm of Stapleton, Curtis & Boswell; Article No. 7000 1670 0004 3104 9905, which green card return receipt was signed by one Dorothy E. Barclay for the firm on July 16, 2002. A copy of both the postage receipt and the return receipt is appended to this motion as an exhibit.

On the day that this document was filed, I also sent a copy, via e-mail, to the law firm of Jordan, Hyden, Womble, & Culbreth, P.C.; located at 900 Bank of America Bldg.; 500 North Shoreline; Corpus Christi, Texas 78471. Harlin Womble of that firm is consulting counsel with respect to the bankruptcy issues relating to this file.

Immediately following the filing of this response, I was on vacation with my family out-of-state until July 27, 2002.

On Sunday, July 28, 2002, I sent, via e-mail, a copy of this Response to James DeAnda, who is associated on this file. He is located at 6300 Williams Tower; 2800 Post Oak Blvd.; Houston, Texas 77056.

2

I have personally spoken with the personnel at the United States District Clerk's Office in Brownsville, Corpus Christi, and Houston Divisions, in efforts to locate this Response. I have requested that each personally review the Clerk's file in an effort to retrieve this document, and have been advised that no one has yet found it.

The matters contained in the Response are and responsive to both Sort-Rite's Motion for Summary Judgment and to the response which it filed to the motion for summary judgment which I filed on behalf of Claimants Pino, Finch, and Metzger.

I have included as additional exhibits the affidavit of James DeAnda, who received a copy of the Response on July 28, 2002, as well as the affidavit of Shaun Claybourn, who is the legal assistant for Harlin Womble, and who personally received the e-mail at Jordan, Hyden, Womble, & Culbreth on July 11, 2002.

FURTHER, AFFIANT SAYETH NOT.

CONSTANCE SINGLETON

SUBSCRIBED AND SWORN to before me on the 24 day of September, 2002, to certify which witness my hand and seal.

Mary A. Olivar
NOTARY PUBLIC   Nov. 22, 2006

STATE OF TEXAS

## AFFIDAVIT OF JAMES DEANDA

THE STATE OF TEXAS    §
         §
COUNTY OF HARRIS   §

   BEFORE ME, the undersigned authority, on this day appeared JAMES DEANDA,

a person known to me, who, having been first duly sworn upon his oath deposed and said:

   My name is JAMES DEANDA.  I am over the age of eighteen years and
have never been convicted of a felony or a crime involving moral turpitude.
I am fully competent to make this affidavit.

   On July 28, 2002 I received from Constance Singleton a copy of a 26-page
document entitled "Response of Pino, Metzger, and Finch to Sort-Rite's
Motion for Summary Judgment and Reply to Sort-Rite's Response to
Motion for Summary Judgment Filed by Pino, Metzger and Finch."

   Further, Affiant sayeth not.



         JAMES DEANDA

SUBSCRIBED AND SWORN to before me on this the ___ day of September,

2002, to certify which, witness my hand and seal.

     DEBBIE BOUNDS
   Notary Public, State of Texas
    My Commission Expires
     December 18, 2003

         Notary Public, State of Texas

EXHIBIT PFM-C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JEFFERSON-PILOT LIFE INS. CO.    §
                                 §
V.                               §
                                 §        CASE NO. B-01-142
                                 §
SORT-RITE INTERNATIONAL,         §
ET AL.                           §

## AFFIDAVIT OF SHAUN D. CLAYBOURN

**STATE OF TEXAS**          §
                            §    **KNOW ALL MEN BY THESE PRESENTS:**
**COUNTY OF NUECES**        §

BEFORE ME, the undersigned authority, personally appeared, Shaun D. Claybourn, and upon her oath testified as follows:

1. "My name is Shaun D. Claybourn. I am over the age of 21 years and am competent to make this affidavit. The facts stated herein are true and correct to the best of my knowledge."

2. " I received a copy of the document entitled *Response of Pino, Metzger, and Finch to Sort-Rite's Motion for Summary Judgment and Reply to Sort-Rite's Response to Motion for Summary Judgment Filed By Pino, Metzger, and Finch* via electronic mail from Constance Singleton on July 11, 2002 ."

FURTHER AFFIANT SAYETH NOT.

_Shaun D. Claybourn_
Shaun D. Claybourn

SWORN AND SUBSCRIBED TO before me this 19th day of September, 2002.

_Melba Ramirez_
Notary Public, State of Texas

MELBA RAMIREZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 02 - 09 - 2003

EXHIBIT 'PFM-D'

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JEFFERSON-PILOT LIFE INS. CO. §
§
V. §
§
§        CASE NO. B-01-142
§
SORT-RITE INTERNATIONAL, §
ET AL. §

**RESPONSE OF PINO, METZGER, AND FINCH**
**TO**
FOR SUMMARY JUDGMENT

AND

T-RITE'S RESPONSE
TO
RY JUDGMENT FILED BY
GER, AND FINCH

JUDG

A FINC

on for :

Reply to

ent filec

PFM - 'E'

**To Policyowner Service Dept.**

☐ **Change of Beneficiary**

☐ **Name Change**

Jefferson-Pilot
Life Insurance Company
PO Box 21008
Greensboro, NC 27420

**Jefferson Pilot**

**When this form is used for an "Insured" shall mean "Annuita**

| Policy No. | Insured |
|---|---|
| JP4038973 | SHIRLEY JEAN METZGER |

All previous beneficiary designations and optional methods of settlement selected under the above numbered policy are hereby can and the proceeds of said policy upon the death of the Insured are to be paid to:

Primary Beneficiary(ies) if living,                                          Relationship(s)
Name(s) in full

LETICIA ELIZALDE DE PINO - FRIEND OF THE INSURED

**Address Must Be Shown on Reverse Side of Page 2**

Otherwise to Contingent Beneficiary(ies) if living,                          Relationship(s)
Name(s) in full

DEBRA ANN METZGER                          DAUGHTER

**Address Must Be Shown on Reverse Side of Page 2**

Otherwise to Second Contingent Beneficiary(ies) if living,                   Relationship(s)
Name(s) in full                                                     RR

**KATHERLINE**
KATHERINE LEE METZGER                      DAUGHTER
**Address Must Be Shown on Reverse Side of Page 2**

## If no beneficiary is living, payment will be made as provided in the policy.

☐ If checked, I hereby elect to provide that in no case shall any payment be made to any beneficiary designated in this policy until _____ days after the Insured's death, and in the event of the death of a beneficiary during such period, payment s be made in the same manner provided in this policy had said beneficiary predeceased the insured.

Unless otherwise stated above, if joint beneficiaries are named in any of the three classes (Primary, Contingent, or Second Contingent) proceeds are to be paid equally to the survivor or survivors, if any, in that class. If unnamed children of the Insured are designated abo as beneficiaries, the proceeds are to be paid to the Insured's lawful children. This change in beneficiary is subject to any assignment o this policy recorded with the company.

If t___ is a provision in said policy requiring that it accompany any request for change of beneficiary or that such change shall not take fe_____ til endorsed by the Company on the policy, such provision is hereby modified, and the beneficiary may be changed pursuant to wr____, request, which change will be effected by recordation by the Company at its Home Office without endorsement on the policy, a when so recorded shall take effect as of the date of this request, but subject to any payment made or action taken by the Company bet such recordation.

## Name Change

Policy required to change Insured's name if the reason is other than marriage, divorce or adoption.

☐ Change the Name of the

☐ Insured to
☐ Annuitant
☐ Owner

First, Maiden, Married Name if applicable

(If the name has been changed for any reason other than marriage, divorce or adoption, a certified copy of the legal document authorizing the change must be submitted.)

Because of ☐ Marriage
☐ Divorce
☐ Other

SORT-RITE INTERNATIONAL, INC.                                        SEP 6 1995
By SHIRLEY METZGER, PRESIDENT    Secretary                           8/16/95
**This acknowledgement should be attached to the policy after it is received back from Home Office.**                                        Recorded Date

☐ The policyowner's address is being changed to that shown below.

Sort Rite International Inc.
P O Box 1805
Harlingen, TH 78551

PYM-'F'                                        **SJX "6"**

Signature of Policyowner

**To Policyowner Service Dept.**

XX **Change of Beneficiary**

☐ **Name Change**

Jefferson-Pilot
( ) Life Insurance Company
PO Box 21008
Greensboro, NC 27420

Jefferson [ )t

**When this form is used for an annui**
**"Insured" shall mean "Annuitant"**

| Policy No. | Insured |
|---|---|
| JP4038973 | SHIRLEY JEAN METZGER |

All previous beneficiary designations and optional methods of settlement selected under the above numbered policy are hereby cancelled, and the proceeds of said policy upon the death of the Insured are to be paid to:

Primary Beneficiary(ies) if living,
Name(s) in full                                                                Relationship(s)

LETICIA ELIZALDE DE PINO - FRIEND OF THE INSURED

**Address Must Be Shown on Reverse Side of Page 2**

Otherwise to Contingent Beneficiary(ies) if living,
Name(s) in full                                                                Relationship(s)

DEBRA ANN METZGER                          DAUGHTER

**Address Must Be Shown on Reverse Side of Page 2**

Otherwise to Second Contingent Beneficiary(ies) if living,
Name(s) in full                                                                Relationship(s)

                                                                        X

KATHERINE LEE METZGER                    DAUGHTER
**Address Must Be Shown on Reverse Side of Page 2**

**If no beneficiary is living, payment will be made as provided in the policy.**

☐ If checked, I hereby elect to provide that in no case shall any payment be made to any beneficiary designated in this policy until _____ days after the Insured's death, and in the event of the death of a beneficiary during such period, payment shall be made in the same manner provided in this policy had said beneficiary predeceased the insured.

Unless otherwise stated above, if joint beneficiaries are named in any of the three classes (Primary, Contingent, or Second Contingent), the proceeds are to be paid equally to the survivor or survivors, if any, in that class. If unnamed children of the Insured are designated above as beneficiaries, the proceeds are to be paid to the Insured's lawful children. This change in beneficiary is subject to any assignment of this policy recorded with the company.

If there is a provision in said policy requiring that it accompany any request for change of beneficiary or that such change shall not take ef-f until endorsed by the Company on the policy, such provision is hereby modified, and the beneficiary may be changed pursuant to this w n request, which change will be effected by recordation by the Company at its Home Office without endorsement on the policy, and w.... so recorded shall take effect as of the date of this request, but subject to any payment made or action taken by the Company before such recordation.

**Name Change**

| Policy required to change Insured's name if the reason is other than marriage, divorce or adoption. | ☐ Change the Name of the | ☐ Insured   to ☐ Annuitant ☐ Owner | First, Maiden, Married Name if applicable | Because of | ☐ Marriage ☐ Divorce ☐ Other |
|---|---|---|---|---|---|

(If the name has been changed for any reason other than marriage, divorce or adoption, a certified copy of the legal document authorizing the change must be submitted.)

SORT-RITE INTERNATIONAL, INC.        *Shirley Metzger*        8/16/95
y SHIRLEY METZGER, PRESIDENT    Secretary                    Recorded Date

**This acknowledgement should be attached to the policy after it is received back from Home Office.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Policy Owner: Please type or print in the box below the name and address to which the acknowledged copy is to be sent.
☐ Check here if this is a change of address for the policyowner. If checked, the address is changed at the time the Change of Beneficiary and/or name is recorded in the Home Office.

*Exhibit "A-1"*

e Instructions on Reverse Side Of Last Page    PFM 'G'

I-6625 Rev 2-94

ase Date
l Sign
Shaded Space              *Shirley Metzger*              8/16/95



# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | No. 00-21094-B-11 |
| SORT-RITE INTERNATIONAL, INC. | § | |
| DEBTOR | § | |
| TAX I.D. No. 74-1982167 | § | CHAPTER 11 |

# DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT
## FOR THE PLAN OF REORGANIZATION
## FILED BY SORT-RITE INTERNATIONAL, INC.

## I. INTRODUCTION

Sort-Rite International, Inc. has prepared this Second Amended Disclosure Statement ("Disclosure Statement") to provide the holders of both Claims and Interests with adequate information about the Second Amended Plan of Reorganization (the "Plan'), filed herein by the Debtor. A full copy of the Second Amended Plan is attached to this Second Amended Disclosure Statement as **Exhibit "1."**

For the most part, all capitalized terms used in both this Disclosure Statement and the Plan of Reorganization are defined in the Plan, at pages 1 through 6. Unless otherwise expressly stated, the information contained in this Disclosure Statement has been prepared based upon information contained in the Debtor's filings in the Bankruptcy Case. All persons receiving this Disclosure Statement and the Plan attached hereto are urged to review fully the provisions of the Plan and all other exhibits attached hereto, in addition to reviewing the text of this Disclosure Statement. This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid in your review of the Plan and in an effort to explain the terms and implications of the Plan. Every effort has been made to explain fully the various aspects of the Plan as it affects all holders of Claims and Interests. However, to the extent any questions arise, the Debtor urges you to seek independent legal advice.

A.      **Adequacy of Disclosure Statement.** By Order dated December ___, 2000, the Bankruptcy Court determined that this Disclosure Statement contains information of a kind and in sufficient detail to enable a reasonable, hypothetical investor to make an informed judgment concerning the Plan. Because some terms are used on a limited basis in the Disclosure Statement, several additional terms are defined in the text of the Disclosure Statement as those terms are used. The Bankruptcy Court has not authorized any other representation, statement, or warranty concerning the Plan, the Debtor, its future business operations, or the value of the Debtor's Assets. You should not rely upon any information, representation, or inducement that might have been made to

*153*

obtain your acceptance that varies with or is otherwise inconsistent with the information in this Disclosure Statement.

       **B.**     **Ballots.**  A Master Ballot accompanies this Disclosure Statement for use in voting on the Plan and is attached as **Exhibit "2".** If you are entitled to vote to accept or reject the Plan, you should complete the appropriate Ballot and return it to the Debtor. The voting procedure is fully described at Article VIII of the Plan and in this Disclosure Statement.  Please note that facsimile copies of the Ballot will be accepted, BUT the Ballot must bear an original signature.

       **C.**     **Source of Information.** Except as otherwise expressly indicated, portions of this Disclosure Statement describing the Debtor, its business, properties, and management have been prepared from information furnished by the Debtor.

       **D.**     **Disclaimers.** APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.  APPROVAL OF THIS DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS AND EQUITY HOLDERS OF THE DEBTOR TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED IN THIS DISCLOSURE STATEMENT. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. ALL CREDITORS, INTEREST HOLDERS, AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN OR TAKE A POSITION WITH RESPECT TO THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN

ARE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION. ALL CREDITORS AND INTEREST HOLDERS SHOULD READ CAREFULLY AND CONSIDER FULLY THE SECTION HEREOF ENTITLED "RISK FACTORS" BEFORE VOTING FOR OR AGAINST THE PLAN. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, IT IS THE DEBTOR'S POSITION THAT THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS, DEBTOR'S ASSERT THAT THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, AND IT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE DEBTOR'S REORGANIZATION ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

## II. DESCRIPTION OF PLAN

A.    **Summary of the Plan.** The Plan consists of seven Classes of Claims, which classes are summarized in the following paragraphs. This summary is qualified in its entirety by reference to the provisions of the Plan, a copy of which is annexed hereto as Exhibit "1". The Plan provides for the continuation of the Debtor's business operations. The Plan provides for Engineered Thermo Systems, Inc., or other Qualified Bidder, to pay the Cash Consideration in the amount of $10,000.00 or more, if bidding for the New Shareholder Interests occurs, to the Debtor. The Interests of Existing Shareholders of the Debtor will be cancelled and Existing Shareholder Interests will receive nothing under the Plan. In consideration for payment of the Cash Consideration, and upon occurrence of the Effective Date, the New Shareholder Interests will be issued to the Engineered Thermo Systems, Inc. or other Qualified Bidder. The New Shareholder Interests consist of 100,000 shares of no par value common stock of the Reorganized Debtor. The Plan provides for the full payment of Administrative and Priority Claims on the later of the Effective Date or ten (10) days after the date the Claim is Allowed, or the time that the Allowed Claim is due in accordance with the terms and conditions of its governing documents. Allowed Priority Tax Claims will be paid in full at the sole discretion of the Debtor on the later of the Initial Distribution Date or the date that the Priority Tax Claim becomes an Allowed Claim, or over a six year period from assessment date by equal quarterly Cash payments, with interest at a fixed annual rate equal to eight (8.0%) percent.

Allowed Secured Claims are treated in three ways. Sort-Rite retains the option to: (i) return collateral securing the claim of a value equaling the total amount of the claim in

3

complete satisfaction of the Allowed Secured Claim, (ii) provide the Holder with cash in the amount of the Allowed Secured Claim, or (iii) the Plan will alter the legal, equitable and contractual rights that Holders of Allowed Secured Claims may be entitled by providing for amendments to the term of the debt, interest rates, amount and number of payments, and other terms and conditions as provided or allowed under the Bankruptcy Code.

Unsecured creditors are to be paid pro rata from funds available, an amount which equals fifteen (15%) percent of the total amount of each Allowed Unsecured Claim of each holder thereof, over a period of five (5) years.

The Plan provides for all Allowed Claims of existing equity holders to be subordinated to the Allowed Claims of Unsecured Creditors pursuant to the provisions of 11 U.S.C. 510, and they will receive nothing under the Plan. Shareholder's Interests, as existed on the Filing Date, will be canceled and receive nothing if the Plan is confirmed.

**B.    Classification and Treatment of Claims and Interests.**

Under Chapter 11 of the Bankruptcy Code, which concerns reorganization of a business, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and stockholders. In addition to permitting rehabilitation of the debtor, another goal of Chapter 11 is to promote equality of treatment of creditors with substantially similar claims or interests with respect to the distribution of the value of the debtor's assets. In furtherance of these two goals, upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code generally provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's Chapter 11 case.

The Plan sets forth the means for satisfying claims and interests in the Debtor. Confirmation of the Plan makes the Plan binding upon the Debtor, any issuer of securities under the Plan, any person or entity acquiring property under the Plan and any creditor or holder of an interest in the Debtor, whether or not the creditor or interest holder is impaired under the Plan, has accepted the plan, or receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the Plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the Plan and substitutes therefor the obligations specified under the confirmed Plan and terminates all rights and interests of pre-petition equity holders.

The Plan is annexed hereto as Exhibit " 1" and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions set forth in the Plan. A summary of Classes of Claims and Interest and their treatment is set forth below. This Disclosure Statement DOES NOT summarize all of the provisions of the Plan. You are required to read the Plan itself in order to understand all of the terms and conditions of the Plan.

4

**C.    Administrative Expenses.**

(1) Treatment of Administrative Expense. As specified in Section 3.1 of the Plan, except to the extent that any entity entitled to payment of any Allowed Administrative Expense agrees to different treatment, each Holder of an Allowed Administrative Expense will receive Cash in an amount equal to such Expense on the later of the Effective Date, the Date such Administrative Expense becomes an Allowed Administrative Expense, or the date the Allowed Administrative Expense is due in accordance with the terms and conditions of the particular transaction or its governing documents. The foregoing does not include Administrative Expenses representing liabilities incurred in the ordinary course of business by the Debtor in Possession or liabilities arising under loans or advances to or other obligations incurred by the Debtor in Possession, to the extent authorized and approved by the Bankruptcy Court, if such authorization and approval were required under the Bankruptcy Code, will be paid in full and performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such post-petition transactions Administrative Expenses include, without limitation, any actual and necessary costs and expenses of preserving the estate, any actual and necessary costs and expenses of operating the Debtor's business, and indebtedness or obligations incurred or assumed by the Debtor in connection with the conduct of its business or for the acquisition or lease of property or the rendition of services, and any fees or charges assessed against the estate under Section 1930, Chapter 123, Title 28, United States Code. The amount of Allowed Administrative Expenses, as of the date of filing this Disclosure Statement, which the Debtor estimates to be in the approximate amount of $45,00.00, represents the Debtor's normal and regular monthly post-petition operating expenses and costs, the costs associated with the assumption of various executory contracts and unexpired leases pursuant to the Plan, if any, sums due to the U.S. Trustee pursuant of 28 U.S.C. 1930, and professional fees and expenses as approved by the Bankruptcy Court for the Debtor's attorneys, accountants, and other professionals.

(2) Administrative Expense Bar Date. The holder of an Administrative Expense, other than (i) an Allowed Administrative Expense or (ii) an Administrative Expense that represents a liability incurred by the Debtor in the ordinary course of business, must (a) file a proof of Administrative Expense on or before the Administrative expense Bar Date, which is established as being a date that is thirty days after entry of the order confirming the Debtor's Plan and (b) serve a copy of such proof of Administrative Expense upon the Reorganized Debtor. Failure to timely file such proof of Administrative Expense shall result in the Administrative Expense being forever barred and discharged.  An Administrative Expense, other than a professional Fee Expense, proof of which has been timely filed, shall become an Allowed Administrative Expense if no objection thereto is filed within thirty (30) days after the later of the Confirmation Date or the date of filing and service of such proof of Administrative Expense. If an objection is filed within such thirty (30) day period, the Administrative Expense shall only become an Allowed

5

Administrative Expense to the extent allowed by Final Order of the Bankruptcy Court after hearing on such objection(s).

(3) Treatment of Professional Compensation and Reimbursement Expenses. The Debtor's Professionals have been paid pursuant to the Local Bankruptcy Rules for Payment of Professionals. The Plan requires that any entity seeking an award for compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Section 503(b)(2) through (b)(5) of the Bankruptcy Code, (a) must file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred no later than 60 days after the Confirmation Date or such other date as may be ordered by the Bankruptcy Court and (b) if granted, such award by the Bankruptcy Court, will be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) ten days after the date the Administrative Expense becomes an Allowed Administrative Expense, or (ii) on such other terms as may be mutually agreed upon between the Holder of an Allowed Administrative Expense and the Debtor or, on and after the Effective Date, by the Reorganized Debtor. The Debtor estimates that the Chapter 11 Professionals will have Administrative Expenses for Professional Charges in the approximate amount of $45,000.00, representing unpaid fees and expenses of (i) Debtor's counsel and co-counsel in connection with the handling all other matters in the case, and (ii) Debtor's C.P.A. and accountant's.

D.    **Priority Tax Claims.**

As specified in Section 5.3 of the Plan, except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim will receive, at the sole option of the Reorganized Debtor, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (b) equal quarterly Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to eight (8.0%) percent over a period through the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim, as permitted by Section 1129(a)(9)(C) of the Bankruptcy Code. The first such payment to be made on the Effective Date, or upon such other terms determined by the Bankruptcy Court, to provide the Holder of such Allowed Priority Tax Claim, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim. Each distribution will be attributable first to payment of the principal balance due on trust fund taxes, if any. The following Priority Tax Claims holders have timely filed proofs of claim:

| | |
|---|---|
| Internal Revenue Service: | $ 65,031.75 |
| State of Florida - Dept. of Revenue | $ 13,535.49 |
| Texas Comptroller of Public Accts. | $  1,886.62 |
| Texas Workforce Commission | $  1,294.54 |

6

|            |              |
|------------|--------------|
| TOTAL      | $ 81,748.40  |

The Debtor has objected to the State of Florida-Dept. of Revenue Proof of Claim as a Priority Tax Claim because the claim arose prior to March, 1992 and meets none of the tests for Priority treatment under 11 U.S.C. 507(a)(8).  If successful, the claim will become a general unsecured claim in Class 7 under the Plan.  The Debtor has filed a missing or lost Form 941 tax return with the I.R.S. for June 1999, which should reduce the I.R.S. Amended Proof of Claim filed on October 3, 2000, by $50,000.00, all of which should in turn reduce the Priority Tax Claim by such amount.

### E.  Classification and Treatment of Claims and Equity Interests

#### (1).  Other Priority Claims.

**Class 1 consists of Other Priority Claims.** Each Holder of an Allowed Other Priority Claim in Class 1 will receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date or ten (10) days after the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim.  Allowed Other Priority Claims are claims within the meaning of Section 507(a)(3) of the Bankruptcy Code.  The holders of Class 1 Other Priority Claims and who have timely filed a Proof of Claim are as follows:

| Sandra M. Balta      | $ 1,256.25 |
|----------------------|------------|
| Bernice U. Cook      | $   512.10 |
| Buitron Enterprises: | $ 3,111.95 |
|                      |            |
| TOTAL                | $ 4,880.30 |

The Debtor has objected to the Proof of Claim filed by Buitron Enterprises as a Priority Claim because it meets none of the tests for Priority treatment under 11 U.S.C. 507(a)(3) and the claim in not supported by proof of amount of the claim, if any.  If successful, the claim will become a general unsecured claim in Class 7 under the Plan or will not be an allowed claim in any class.

Other Priority Claims are not impaired by the Plan; therefore the holders of such Claims are deemed to accept the Plan.  Consequently, no solicitation of votes for the acceptance or rejection of the Plan will be sought from Holders of Other Priority Claims.

#### (2).  Secured Claim

**Class 2 consists of Allowed F.C.L.T. Secured Claim.** The sole Claimant in Class 2 is F.C.L.T., whose disputed claim was scheduled by the Debtor as $350,000.00, the extent of the value of the Debtor's interest in the real property collateral on the Petition Date.  The Class 2 Claim will be paid over a period of ten (10) years from the Effective Date as follows: (i)  the first twelve monthly (12) payments shall be in an amount of $2,000.00 each, which shall commence on the Initial Distribution Date, and

(ii) thereafter, in monthly payments of an amount necessary to fully pay the claim by the end of the ten year period, estimated to be $4,220.94 each, together with interest at the rate of eight (8.0%) percent per annum.

The Class 2 claim of F.C.L.T. is impaired under the Plan; therefore the holder of such Claim can vote to accept or reject the Plan.

(3).     **Secured Claim of Coastal Banc, ssb on Debtor's personal property**

**Class 3 Secured Claim** consists of the of the claims of Coastal Bank, ssb, for money loaned to the Debtor prior to March 1992.   The Proof of Claim filed by Coastal Bank ssb is for an amount of $91,960.03.   The Debtor has filed its objection to the Coastal Bank ssb Proof of Claim and has filed an adversary proceeding to determine the extent and validity of its liens.  If the Coastal Bank ssb claim is in fact determined by the Court to be secured, then the Debtor intends to pay the balance due on the claim over ten (10) years at a monthly rate of $1,108.41, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, which shall commence on the Initial Distribution Date, until paid, or if there is a balance due at the end of the ten year period, then a final balloon payment is to be paid by the Debtor of the entire then due balance of the Class 3 Claim.  Otherwise, if the Class 3 claim is found to be unsecured, then it will become a Class 7 unsecured claim and receive distribution thereunder.

The Class 3 claim of Coastal Bank ssb is impaired under the Plan;  therefore the holder of such Claim can vote to accept or reject the Plan.

(4).     **Allowed Secured Tax Claims on Debtor's real property:**
The holders of Class 4 A, B, C, and D claims are to be paid over a period of ten (10) years on their allowed secured claims.

**Class 4.A, Secured Tax Claims of the City of Harlingen**
The Class 4.A Claim holder timely filed a Proof of Claim in the amount of $5,021 01 and will be paid over ten (10) years at $62.04 per month, which shall commence on the Initial Distribution Date, which includes interest on the Blanca at the rate of eight (8.0%) per annum, until paid, and will retain its lien, if any, upon confirmation of the Plan.

**Class 4.B, Secured Tax Claims of Harlingen CISD**
The Class 4.B Claim holder timely filed a Proof of Claim in the amount of $13,569.14 and will be paid over ten (10) years at $167.65 per month, which shall commence on the Initial Distribution Date, which includes interest on the balance at the rate of eight (8.0%) per annum, until paid,  and will retain its lien, if any, upon confirmation of the Plan.

**Class 4.C, Secured Tax Claims of Cameron County, Texas**

8

The Class 4.C Claim holder timely filed a Proof of Claim in the amount of $7,258.12 and will be paid over ten (10) years at $69.68 per month, which shall commence on the Initial Distribution Date, which includes interest on the balance at the rate of eight (8.0%) per annum, until paid, and will retain its lien, if any, upon confirmation of the Plan.

### Class 4.D, Secured Tax Claims of Internal Revenue Service

The Class 4.D Claim holder timely filed a Proof of Claim in the amount of $83,298.87 and will be paid over ten (10) years at $1,029.19 per month, which shall commence on the Initial Distribution Date, which includes interest on the balance at the rate of eight (8.0%) per annum, until paid, and will retain its lien, if any, upon confirmation of the Plan.

The Class 4 claims are impaired under the Plan and are entitled to vote for or against the Plan.

NOTE:   The fair market value of the real property owned by the Debtor at 825 Jefferson Street, Harlingen, Cameron County, Texas, is $350,000.00 The Debtor's interest in the real, as of the petition date, and also is anticipated to be as of the confirmation date, is $0.00. The FCLT Loans, L.P. lien on the real property equal the full amount of the value of the real property. Because the Debtor has no interest in the real property, the Class 4.A, B, C, and D Secured Tax Claims will be zero unless they have some priority over the FCLT lien. The Debtor intends to file a 11 U.S.C. 506(a) contested matter seeking to determine the secured portion, if any, of each Class 4 Secured Tax Claim on the Debtor's real property. Based upon the Court's ruling on such contested matter, the Class 4.A, B, C, and D Secured Tax Claims may become Class 7 unsecured claims, or possibly become Class 5.A, B, C, or D Class 5 Secured Tax Claims on Debtor's personal property, depending on the liens held by each. Should the I.R.S. Class 4.D Secured Tax Claim on the Debtor's real property be inferior to the FCLT lien, then the Debtor anticipates that the I.R.S. will seek to become a Class 5.D Secured Tax Claim on the Debtor's personal property.

### (5)   Allowed Secured Tax Claims on Debtor's personal property:

The holders of Class 5.A, B, C, and D claims are to be paid over a period of five (5) years on their allowed secured claims.

### Class 5.A, Secured Tax Claims of the City of Harlingen

The Class 5.A Claim holder timely filed a Proof of Claim in the amount of $8,689.83 and will be paid over five (5) years at $179.00 per month, which shall commence on the Initial Distribution Date, which includes interest on the balance at the rate of eight (8.0%) per annum, until paid, and will retain its lien, if any, upon confirmation of the Plan.

**Class 5.B, Secured Tax Claims of Harlingen CISD**

The Class 5.B Claim holder timely filed a Proof of Claim in the amount of $23,529.95 and will be paid over five (5) years at $484.73 per month, which shall commence on the Initial Distribution Date, which includes interest on the balance at the rate of eight (8.0%) per annum, until paid, and will retain its lien, if any, upon confirmation of the Plan.

**Class 5.C, Secured Tax Claims of Cameron County, Texas**

The Class 5.C Claim holder timely filed a Proof of Claim in the amount of $10,543.30 and will be paid over five (5) years at $217.20 per month, which shall commence on the Initial Distribution Date, which includes interest on the balance at the rate of eight (8.0%) per annum, until paid, and will retain its lien, if any, upon confirmation of the Plan.

**Class 5.D, Secured Tax Claims of the I.R.S.**

The Class 5.D Claim holder timely filed a Proof of Claim in the amount of $83,298.87 on Debtor's real property. As noted above in Class 4 Claims, the Debtor has no interest in its real property and, absent some priority of the I.R.S. claim over the FCLT lien on such real property, the I.R.S. may seek to have its secured claim on the Debtor's personal property. If so, than the claim will be paid over ten (10) years at $1,029.19 per month, which shall commence on the Initial Distribution Date, which includes interest on the balance at the rate of eight (8.0%) per annum, until paid, and will retain its lien, if any, upon confirmation of the Plan.

The Class 5 Claims are impaired under the Plan and are entitled to vote for or against the Plan.

NOTE: The Secured Claim of Coastal Banc, ssb, if allowed in the full amount of its Proof of Claim of $91,960.03, and the Class 5.A, B, and C Secured Tax Claims in the total amount of $42,763.08, or a total of $134,723.11, have liens on the Debtor's pre-petition equipment and inventory. The Debtor believes that its interest in the personal property subject to such liens exceeds the total amount of such liens. However, if some or all of the Class 4.A, B, C, and D Secured Tax Claims on the Debtor's real property are cut off by the FCLT lien, the Debtor anticipates that such claims holders will seek to become Class 5 Secured Tax Claims on the Debtor's personal property. The possible additional Class 5 claims could increase by a total of $109,147.14, so that the total liens on the Debtor's personal property could become as much as $243,870.25, which may be more, equal to, or less than the Debtor's interest in such personal property on the confirmation date.

(6).     **Convenience Claims**

10

**Class 6 Holders of Allowed Convenience Claims** will receive, on the Effective Date, Cash in an amount equal to 100% of each such Holder's Allowed Convenience Claim. A Holder that filed a proof of claim and has total unsecured claims of less than $500.00, will have all of its unsecured claims treated as a Convenience Claim. A Holder that files such a proof of claim and has total unsecured claims in excess of $500.00, not including Credit Claims, will be treated as a Class 7 General Unsecured Claim. Any Holder of an Allowed General Unsecured claim but may elect to become the Holder of an Allowed Convenience Claim, thereby reducing the Claim to $500.00, by electing such treatment on such Holder's Ballot received by the Debtor on or before the Ballot Deadline. Debtor estimates that there are 9 Holders of Convenience Claims for an aggregate of $819.19 in Class 6. The Debtor urges all holders of Allowed Claims in the amount of $2,000.00 or less to consider electing Convenience Class treatment. The Holders of Convenience Claims are not impaired under the Plan and are not entitled to vote to accept or reject the Plan.

| | | |
|---|---|---|
| H E. Butt Grocery | $ | 35.38 |
| Corporate Express | $ | 7.04 |
| Acetylene Oxygen Company | $ | 128.51 |
| Baldwin Cooke | $ | 95.80 |
| Tarpon Fire and Safety | $ | 129.36 |
| GCR Truck Tire Center | $ | 101.07 |
| Advanced Superior Paging | $ | 35.56 |
| Colonial Ins. | $ | 228.76 |
| Digital Communications | $ | 48.71 |

**TOTAL**                                                  **$  819.19**

(7).    **General Unsecured Claims**

**Class 7 General Unsecured Claims**, as specified in Section 4.7 of the Plan, each Holder of an Allowed General Unsecured Claim will receive from the Debtor, by election made on its Ballot, the sums payable as follows: (i) Cash on the Effective Date of $500.00, by making an election to become the Holder of an Allowed Convenience Claim in Class 6, or (ii) Cash payable pro rata on the Holder's Allowed General Unsecured Claim, paid over a period of five (5) years, in equal quarterly installments, the first such payment being due and payable on the Initial Distribution Date for a total of fifteen (15%) percent of each Allowed General Unsecured Claim. The holders of Class 7 Claims who have timely filed a Proof of Claim or have been listed and not disputed, contingent, or unliquidated by the Debtor in its schedules are as follows:

| | | |
|---|---|---|
| I. R. S. | $ | 6,777.36 |
| I.R.S. (1992 chapter 11) | $ | 15,209.19 |
| CP&L | $ | 2,055.05 |
| Frank Hyde, C.P.A. | $ | 11,371.05 |

| | |
|---|---|
| Heller Financial Leasing | $  6,214.23 |
| John Kimpton | $ 32,722.97 |
| United Parcel Service | $  1,413.86 |
| Con-way Transportation Svcs | $    640.17 |
| Tool Crib Div. Hardy Ind. Inc. | $    718.01 |
| DeVlieo Bullard | $  2,644.26 |
| Buds Quality Plumbing | $  3,899.96 |
| Shrimp News International | $  1,000.00 |
| James R. Eltzroth Company | $  1,000.00 |
| Sandra M. Balta | $  2,512.50 |
| G&M Trucking | $  1,050.00 |
| McMaster-Carr | $    658.37 |
| Southwestern Bell Telephone | $    750.53 |

**TOTAL**                                    **$90,637.51**

At the distribution rate of 15%, the class will receive a total of $13,595.63 in distributions under the Plan. The quarterly payments are estimated to be $698.50.

The Holders of General Unsecured Claims are impaired under the Plan and are entitled to vote to accept or reject the Plan.

NOTE: The Class 7 general unsecured claims may increase depending on the outcome of the Class 4 Secured Tax Claims on Debtor's real property competing priorities with the FCLT lien on the Debtor's real property and as discussed in the Note's under Class 4 and Class 5 above. Additionally, the Debtor's adversary against Coastal Banc, ssb, to determine the extent and validity of its liens may result in some or all of the Class 3 claim becoming a Class 7 general unsecured claim.

(8).    **Class 8. Claims of Existing Shareholders**

**Class 8 consists of the Allowed Claims** of the Debtor's Existing Shareholder, Shirley Metzger. Class 8 also consists of the Claims of Debtor's Existing Shareholders for quarterly tax distributions, expenses, claims for rejection damages or cure amounts and claims in connection with the purchase and sale of equity interests in the Debtor. Those claims will be subordinated under 11 U.S.C. 510. The Plan will subordinate the Allowed Claim of Shirley Metzger, pursuant to the provision of 11 U.S.C. 510, governing claims arising from the advances made or debts incurred by the Debtor to Shirley Metzger pre-petition, or under principals of equitable subordination. Because Shirley Metzger's claim(s) is subject to subordination under 11 U.S.C. 510, the Allowed Claim of Shirley Metzger is subject to treatment under the Plan in a class, along with other shareholder claims, other than the unsecured class. As of the drafting of this Disclosure Statement, Shirley Metzger has not filed a Claim in connection with Sort-Rite's bankruptcy proceedings. The Plan provides that the Class 8 Allowed

12

Claim of Shirley Metzger, if any, will receive nothing under the Plan. The Class 8 Claims of Existing Shareholders are Impaired under the Plan. Holders of Class 8 Claim are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan. If and to the extent the Bankruptcy Court concludes the Plan cannot be confirmed with subordination of the Class 8 Existing Shareholders' Claims, then the Class 8 Existing Shareholders' Claims shall be treated as Class 7 General Unsecured Claims.

(9).    **Existing Shareholders' Interests**

Class 9 consists of the **Existing Shareholders' Interests.** The Existing Shareholders will receive nothing on account of their Existing Shareholders' Interests and the equity interests will be cancelled on the Effective Date. Because Class 9 is Impaired, the Existing Shareholder Interests are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan. The Class 9 interest holders are as follows as of the Petition Date:

| | |
|---|---|
| SHIRLEY METZGER | 85% |
| Debbie Ault | 5% |
| Daniel Ault (a minor) | 5% |
| Cathy Metzger | 5% |

**Summary of the Plan Debt:**

The total plan debt, which is the total of all allowed claims and administrative expenses, anticipated as of the Confirmation Date, is $705,261.51. The Debtor anticipates that its efforts in objections to Proofs of Claim and validity of liens will reduce the total plan debt by $91,498.00, to a final total of $613,763.51 to be paid to all classes and expense holders in the manner and over the time described above in each such class.

Approximately $65,000.00 in cash will have to be paid on the Effective Date of the Plan, pursuant to the provisions of the Code. The Debtor hopes that it can reach agreements with some of the administrative expense holders and priority claim holders, which will reduce the cash amount which will be due on the Effective Date to about $50,000.00. The Debtor anticipates that it will be paid the Court's trial award of approximately $57,000.00, on the Debtor's collection attempts of the pre-petition account receivable from JBS Packing Company, Inc., prior to the hearing on confirmation of the Plan. If such payment does occur, then the Debtor intends to reserve that cash, or as much as possible, for the Effective Date cash requirements. If the payment does not occur by the confirmation of the Plan, then the Debtor anticipates that it will have been able to reserve that amount in cash from operations of its business so as to be able to meet the anticipated Effective Date cash requirements.

F        **Means of Implementation of the Plan**

13

**(1).     Payment of Cash Consideration.**

On or before the Effective Date, it is expected that Engineered Thermo Systems, Inc. (see Exhibit "8") or a successful Qualified Bidder, will pay the Cash Consideration, in the amount of $10,000.00 or more, as the case may be, to the Debtor. The $10,000.00 Cash Consideration will be distributed to the Debtor's general account, pursuant to the provisions of the Plan, for payments to be made on the ~~Initial Distribution~~ Date. If bidding occurs, any amount received in excess of $10,000.00 shall also be allocated to the Debtor's General Account for payments to be made on the ~~Initial Distribution~~ Date.

**(2).     Payment to Administrative and Priority Claimants.**

On or before the Effective Date, it is expected that the Debtor will have sufficient Cash available to fund payments required to be made at that time under the Plan. All such sums will come from the working capital of Debtor and any sources of financing that Debtor may utilize from time to time in the conduct of its business, including the Cash Consideration discussed above and possible recovery of the judgment against JBS Packing Company, Inc

**(3).     Payment to Classes and Interests.**

Payment of Allowed F.C.L.T. Secured Claim, Other Secured Claims, Convenience Claims, General Unsecured Claims, and Priority Tax Claims, required on either the Effective Date or the Initial Distribution Date, will be made from the working capital of the Debtor and any sources of financing that Debtor may utilize from time to time in the conduct of its business, including the Cash Consideration discussed above

**(4).     Issuance of New Common Stock.**

On the Effective Date, all existing equity interests, including warrants, of the Debtor shall be cancelled and erased. Unless a competing Qualified Offer, as described below, is made, accepted, and is not matched by Engineered Thermo Systems, Inc., and in consideration for the payment of the Cash Consideration by the Engineered Thermo Systems, Inc. to the Debtor, the Reorganized Debtor shall be authorized to issue the new common stock to Engineered Thermo Systems, Inc.. If a Qualified Offer of a Qualified Bidder prevails, the New Shareholder Interests will be issued to the successful Qualified Bidder. The new common stock shall consist of 100,000 shares of no par value stock.

**(5). Engineered Thermo Systems, Inc..**

Engineered Thermo Systems, Inc. is a Florida Corporation, whose directors and officers include Mr. William Capt, of Miami, Florida.

**G.     Competing Offers for issuance of New Common Stock**

The Plan contemplates that Debtor's existing shareholder interests will be cancelled on the Effective Date, and new shares in the Reorganized Debtor will be issued to Engineered Thermo Systems, Inc. However, a mechanism is provided under the Plan for Qualified Bidders, defined in the Plan, to compete for the right to purchase the new common stock of the Reorganized Debtor. The bidding procedures approved by Order of the Court are attached as **Exhibit "3"**.   The initial bid of $10,000.00 of Engineered Thermo Systems, Inc. is attached hereto as **Exhibit "8"**.

Marketing Efforts. Debtor has attempted to market its business to numerous individuals and entities. In addition to establishment of bidding procedures to openly market itself, the Debtor intends to place ads in industry magazines and newspapers describing the bidding opportunity.

**H.     Executory Contracts and Unexpired Leases**

(1).  Section 365 of the Bankruptcy Code generally gives the Debtor the ability, subject to approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases before the confirmation of a plan of reorganization. An executory contract or unexpired lease may be assumed or rejected either through a plan of reorganization or by order of the Bankruptcy Court on motion, after notice and hearing. Following a debtor's rejection of an executory contract or unexpired lease, the Bankruptcy Court grants the other party to the contract or lease a limited period in which to tile a proof of claim for any damages incurred because of the rejection. To assume an executory contract or unexpired lease, the Bankruptcy Code requires a debtor promptly to cure existing defaults, with certain limitations, and provide adequate assurance of future performance of its obligations under the executory contract or lease. The Debtor estimates that approximately $0.00 in rejection damages have been filed by lessees under rejected leases. The Debtor estimates that it is not in default on assumed leases, and that no cure claims will be required to be paid.

(2).  Under the Plan, all executory contracts and unexpired leases of the Debtor entered into before the Filing Date that are not rejected before the Confirmation Date are deemed to be rejected of the Confirmation Date. Any executory contract or unexpired lease (i) which has been assumed pursuant to a final order of the Bankruptcy Court entered prior to the Confirmation Date; (ii) which has been rejected pursuant to a Final Order of the Bankruptcy Court entered prior to the Confirmation Date; or (iii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, shall be rejected or assumed in accordance with such motion or Final Order. The Disclosure Statement sets forth in the executory contracts and unexpired leases to be rejected under the Plan, including, as of the Effective Date, to the extent it is or may be found by the Court to be a pre-petition executory contract, the Plan of Reorganization filed on August 12, 1999, and the Order Confirming Debtor's Amended Plan of Reorganization entered on March 15, 1994, in Case No 92-21053-B-11, in the U. S Bankruptcy Court for the Southern District of Texas, Brownsville Division.

15

(3). All Claims arising from the rejection of an executory contract and unexpired lease shall be evidenced by the filing of a properly executed proof of Claim form filed with the Bankruptcy Court within the earlier of thirty (30) days of notice of entry of an order approving the rejection of such executory contract and unexpired lease; or ten days from the Confirmation Date. Failure to file a proof of Claim on or before such deadline shall result in disallowance in full of any such Claim and the holder of such Claim shall be forever barred from asserting such Claim against the Debtor ' or Reorganized Debtor, and their respective successors and assets and properties. The Debtors or the Reorganized Debtor shall have six months from the Effective Date to object to Claims.

(4).    The Debtor reserves the right to assume or reject executory contracts between the date hereof and the Confirmation Date. The Debtor will cure all defaults existing under and pursuant to any executory contracts or unexpired leases assumed no later than ten (10) days from the Initial Distribution Date. Assumed contracts appear on Schedule "4".

(5).    At this time, the Debtor intends to reject all employment agreements, management agreements or  stock options provided to any employee in connection with an employment agreement or other agreement which was entered into or existed prior to Filing, including any related employment and severance practices and policies, compensation and benefit plans, policies and programs of the Debtor applicable to its officers and employees pre-petition employment agreement, including insurance plans, health care plans, severance benefit plans, disability and other insurance plans, but excluding retiree benefits defined in 11 U.S.C. 1114.

THE DEBTOR INTENDS TO AND DOES REJECT ANY AND ALL EXECUTORY CONTRACTS AND AGREEMENTS, WHETHER ORAL OR WRITTEN, WHETHER BASED UPON PRIOR DEALINGS OR PRACTICES OF THE DEBTOR OR UPON EXPRESS PROVISIONS, WHICH INVOLVE OR AFFECT THE PRE-PETITION MEDICAL TREATMENT OR PROCEDURES INVOLVING EACH EMPLOYEE, OFFICER, OR DIRECTOR OF THE DEBTOR, IRRESPECTIVE OF THE CAUSE OR REASON FOR SUCH MEDICAL TREATMENT OR PROCEDURES, AND WHICH OBLIGATE THE DEBTOR TO DIRECTLY OR INDIRECTLY PAY FOR OR RE-IMBURSE THE COSTS AND EXPENSES, INCLUDING DOCTORS' AND HOSPITAL BILLS AND ALL IN-PATIENT AND OUT-PATIENT TREATMENT OF ANY KIND OR PURPOSE.

I.    **Discharge**

Unless expressly provided otherwise in the Plan, the rights afforded and the Distributions to be made under the Plan will discharge the Debtor and Reorganized Debtor, their successors and assigns and their respective assets and properties, from any debt arising before the Confirmation Date and any debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based on such debt has been filed or is deemed filed under Section 502 of the Bankruptcy

Code; or (b) the holder of such Claim has accepted the Plan. All Holders of Claims and Interests will be precluded from asserting against Debtor, Reorganized Debtor, their respective successors and assigns and their respective assets and properties, any other or further Claim, whether allowed or not, based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, at least to the extent provided in 11 U.S.C. 1141(d).

**J.      Revesting of Assets**

Except as otherwise provided in the Plan or the Confirmation Order, title to all assets of the Debtor will vest in the Reorganized Debtor free and clear of all Claims and Interests on the Effective Date. After the Effective Date, the Reorganized Debtor may operate its business and may use, acquire and dispose of property free of any restriction of the Bankruptcy Code or Bankruptcy Rules. As of the Effective Date, the Reorganized Debtor will be free and clear of all pre-confirmation Claims and Interests, except as otherwise provided in the Plan or the Confirmation Order.

**K.      Other Provisions**

**(1).     Reservation of Claims**

Except as otherwise provided in the Plan, all Claims and Causes of Action in favor of the Debtor or Reorganized Debtor, including but not limited to all claims under Sections 544, 545, 547, 548, and 549, 550, and 553 of the Bankruptcy Code, are reserved and may be prosecuted after the Confirmation Date by the Reorganized Debtor. The Plan further provides that, *to the extent necessary, the Reorganized Debtor shall be deemed representative of the estate under Section 1123(b) of the Bankruptcy Code.* Pursuant to the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including cash, made while insolvent during the ninety (90) days immediately prior to the filing of its Petition in respect of pre-existing debts to the extent the transferee received *more than it would have in respect of the pre-existing debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code.* The recovery period is one year if the recipient of the preferential transfer is an insider of the Debtor. Certain defenses to such recoveries exist, and are provided for in the Bankruptcy Code. *The Debtor is continuing to review the payments made during the ninety days prior to the Filing Date to creditors and during the one year prior to the Filing Date to insiders to determine whether the Debtor or Reorganized Debtor should institute an action to seek recovery of such payments under Section 547 of the Bankruptcy Code. The Debtor's review is not yet complete,* and therefore, except as provided in the Plan, the Debtor or Reorganized Debtor reserves the right to commence an avoidance action under Section 547 and 550 of the Bankruptcy Code. No value has been given to any possible recovery for such claims in the Debtor's pro formas because, among other things, payments to creditors who are parties to executory contracts, payment to holders of Secured Claims and payments made in the ordinary course of the Debtor's business are generally not subject to recovery. Also pursuant to the Bankruptcy Code and state law, a debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or

which rendered it insolvent if and to the extent the Debtor received less than fair value for such property. The Debtor is continuing to review all transfers that may constitute fraudulent transfers to determine whether the Debtor should seek recovery of any such payments or transfers under Sections 548 and 550 of the Bankruptcy Code. No value has been given to any possible recovery for such claims in the Debtor's pro formas because Debtor does not believe, at this stage of analysis, that any fraudulent conveyances exist.

### (2). Objections to Claims

(a). **Objection Deadline.** As soon as practicable, but in no event later than 60 days from the Effective Date, unless extended by order of the court, objections to Claims shall be filed with the Court. Under the Plan, the Debtor or Reorganized Debtor has full right, power, and authority to investigate and, if necessary, object to any Claim after the Confirmation Date.

(b). **Treatment of Disputed Claims.** Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a contested Claim, unless and until such contested Claim becomes an Allowed Claim. No Disputed or Contested Claims are entitled to vote with respect to the Plan, unless such Claim is estimated, for voting purposes, by order of the Court. Distributions due holders of Allowed Claims are determined by computing the pro rata distribution required by the Plan as if all disputed Claims are Allowed Claims in the full amount claimed by the holder thereof. Distributions for holders of disputed Claims shall be reserved and segregated, pending determination of entitlement thereto under the terms of the Plan. At such time that a Disputed Claim becomes an Allowed Claim, the Distribution reserved for such Claim shall be delivered to the Holder of such Allowed Claim as provided for in the Plan based upon the allowed amount.

(c). **Disputed Claim Reserve.** The Reorganized Debtor will withhold from the property to be distributed to holders of Claims or Interests within a given class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class as of the Effective Date, and will place such withheld property in the Reserve; provided, however, that in no event shall the Reorganized Debtor place in Reserve amounts for classes of Claims which shall receive no distribution pursuant to the Plan. The Debtor will analyze the variances between its records and filed proof of Claims, and reserve such amounts

(d). **Distributions after Disallowance.** If any of the property withheld in the Reserve remains after all objections to Disputed Claims or Interests of a particular Class have been resolved, then such property will be used to pay Allowed Unsecured Claims, with such payment credited to amounts due the Allowed General Unsecured Claims under the Plan. However, such distribution does not and shall not increase the percentage of the total distribution to be paid to Class 7 Allowed General Unsecured Claims under the Plan.

### L.   Default Under the Plan

18

The Plan allows any holder of an Allowed Claim to notify the Debtor or Reorganized Debtor in writing of a default under the Plan. If such a written notice of a default is transmitted to the Debtor or Reorganized Debtor, the Debtor or any party in interest will have thirty (30) days from receipt of the notice to cure the alleged default. If the alleged default is not cured, the aggrieved party is authorized to seek relief from the Bankruptcy Court. (Plan, Article XIII)

### M.    Modification of the Plan

The Debtor reserves its right under the Plan, according to the Bankruptcy Code, to amend or modify the Plan before the Confirmation Date. After the Confirmation Date, the Debtor may, upon order of the Bankruptcy Court, and according to Section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intentions of the Plan.

### N.    Revocation of the Plan

The Debtor may revoke or withdraw the Plan at any time prior to the Confirmation Date.   If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then it will be deemed null and void.

### O.    Retention of Jurisdiction

The Plan provides for the Bankruptcy Court to retain jurisdiction over many aspects of the Plan. The specific purposes for which the Bankruptcy Court retains jurisdiction with respect to the Reorganization Case are set forth in Article XV of the Plan.

### P.    Termination of the Creditors' Committee, if any

Except as otherwise provided in the Plan, on the date by which both (a) the Effective Date has occurred and (b) the Confirmation Order has become a Final Order, the Creditors' Committee, if any, shall cease to exist, and its members and employees or agents (including without limitation, attorneys, financial advisors, accountants and other professionals) will be discharged from any further authority, duties, responsibilities an obligations relating to, arising from, or in connection with their services to the Creditors' Committee.


## III. DESCRIPTION OF THE DEBTOR

### A. Business of Sort-Rite

Sort-Rite is a manufacturer, supplier and distributor of shrimp sorting and grading equipment to a world wide customer base.  Sort-Rite maintains a corporate headquarters,

operational and manufacturing base in Harlingen, Texas. At Filing, Sort-Rite employed approximately twenty employees, located in Texas. Sort-Rite's primary products are large shrimp grading and sorting assembly line type equipment.

### B. History of the Debtor

Sort-Rite International, Inc. was founded by Wallace N. Merrick in 1952, based on new concepts, and most importantly, on new equipment designed by him. He subsequently patented much of the equipment. The business originally consisted of two employees, Wallace and Shirley Metzger, his daughter. Within six months of opening, the number of employees increased to five.

Wallace Metzger left the business in 1964. Shirley Metzger became president in 1965 after leaving in 1956 to get marries and raise a family. She continued to run the company until 1990. Frances Merrick, spouse of Wallace Merrick, rant he business until 1995, which the exception of a few months in 1991. Jim Houston operated the business during the early 1991 period. Shirley resumed management of the business on the death of Frances Merrick in 1995.

Sort-Rite steadily increased the size of its operations. In 1990, Sort-Rite had approximately 40 employees and gross sales of $2,000,000.00. However, Sort-Rite began to encounter problems in 1991. The number of shrimpers, and graders, began to decline in the United States when most coastal areas initiated gambling as their major industries. a second problem was that the Sort-Rite equipment was of such a high quality that it did not wear out. The shrimpers who went out of business in the United States were able to sell their equipment to those entering the business in foreign count5ries. Additionally, Sort-Rite did not have may repeat customers. The over result was that Sort-Rite was forced to file for protection under chapter 11 in March of 1992. A plan of reorganization was confirmed in March of 1994.

As business was improving, the Asian Stock Market dropped and the pending orders for the Sort-Rite equipment was put on hold by the customers and many were eventually cancelled.

Then the shrimp industry world wide was hit by the "Tara Viraes", which decreased the production from 35% to 17% in most markets. This disease delayed the need for Sort-Rite shrimp processing equipment all over the world.

Just as the Asian Stock Market settled out and the shrimp farmers conquered the "Tara" disease, then the shrimp farms were hit by the white spot disease, which resulted in an approximately 80% worldwide casualty rate on shrimp production. The cumulative effect was a reduction in Sort-Rite annual income of over $500,000.00

Even with all the above calamities, Sort-Rite managed to pay $1,138,860.63 of the plan debt owed from the 1994 Confirmed Plan of Reorganization out of a total plan debt of $2,083,592.05.

There are three more complete shrimp plants that will come on line within the next two or three months for which letters of commitment are in hand or are expected soon. Sort-Rite's part of the three plan construction will be a little over $1,500,000.00.

Sort-Rite has been working with Engineered Thermo Systems, Inc. on "turn key" shrimp plant designs and together have finished one plant in Belize in 2000 and a pending order for additional equipment in the amount of $94,000.00 to be constructed near the end of 2000 or the first quarter of 2001. Sort-Rite expects to do more custom work for the refrigeration industry.

Brazil is now starting to be a big player in the shrimp farming industry. Sort-Rite has several shrimp plants and shrimp farms in Brazil using Sort-Rite equipment. Sort-Rite has quoted $895,460.00 in new equipment construction to customers in Brazil. Representatives of Sort-Rite have been invited to attend the Brazil EXPO at the end of November, 2000 to share the Sort-Rite paper "Shrimp is Gold".

Summary. Even though the shrimp industry (boat caught and shrimp farms) has had its problems which caused Sort-Rite's current financial difficulties, the Debtor believes that Sort-Rite can succeed.

## C. The Debtor's Shareholders

As of the petition date, the shareholders of debtor, and their respective interests. are as follows:

| | |
|---|---|
| SHIRLEY METZGER | 85% |
| Debbie Ault | 5% |
| Daniel Ault (a minor) | 5% |
| Cathy Metzger | 5% |

Debtor's Plan calls for the cancellation of Existing Shareholder Interests on the Effective Date. Holders of the Existing Shareholder Interests shall not be entitle to, and shall not receive or retain any property or interest in property on account of such Existing Shareholder Interest under the terms of the Plan.

## C. Management of the Debtor

(1). Since 1995, the manager of the Debtor has been Shirley Metzger.

(2). On July 20, 2000, after notice and a hearing, the Bankruptcy Court approved a Management Agreement between the Debtor the Engineered Thermo Systems, Inc., a Florida corporation, whereby all management operations of the Debtor were turnover to and assumed by Engineered Thermo Systems, Inc. pursuant to an interim Order. A final hearing on the Management Agreement was set for August 23, 2000. At the final hearing on August 23, 2000, the Court made modifications and conditions to the Management

Agreement regarding payment of the management fee(s) and payment of salary to insiders and provided that such payments can only be made by order of the Court after application therefor, and approved the balance of the Management Agreement.

(3).  Post confirmation management of the reorganized Debtor will be essentially the same as during the Chapter 11 case under the Management Agreement described above.  Mr. George Daily will continue to serve as the General Manager of Sort-Rite and its manufacturing plant in Harlingen, Texas.  Shirley Metzger will continue to be in charge of sales for Sort-Rite and will be employed on the basis of a percentage commission for sales.

## D. Events Leading to the Commencement of the Chapter 11 Case

Sort-Rite filed a voluntary petition on April 10, 2000, as a result of activities of the Internal Revenue Service and FCLT Loans, L.P. in connection with liens on the Debtor's property.

## IV. FINANCIAL INFORMATION

### A. Current Financial Statement

Sort-Rite balance sheets for April 10, 2000 to October 31, 2000 (during the period in chapter 11) are attached hereto as **EXHIBIT "4"**.

### B. Future Operation and Projected Net Operating Income

The Reorganized Debtor will continue in existence and will operate and conduct business after the Effective Date as determined by its Board of Directors and as consistent with its Amended Certificate of Incorporation, Amended Bylaws and applicable state and federal law. At the present time, Debtor anticipates that the post-confirmation business operation of the Reorganized Debtor will focus on the continued sales and development of its existing products. Debtor has analyzed its ability to meet its obligations under the Plan. As part of this analysis, Debtor has prepared projections of its financial performance for a period following Confirmation. These projections, and the significant assumptions on which they are based are included in attached **Exhibit "5"** to the Disclosure Statement. The Debtor believes, based on this analysis, that the Plan provides a feasible means of reorganization and operation from which there is a reasonable expectation that, subject to the risks disclosed, the Debtor will be able to make all payments required to be made under the Plan.

### C. Business Plan

The Debtor has developed a business plan for the period following Confirmation ("Business Plan"). The Business Plan was developed by Engineered Thermo Systems, Inc. in cooperation with the Debtor's C.P.A.  A copy of the business plan is attached

22

hereto as **Exhibit "7"**. The Business Plan may be subject to revision by the officers or directors of Sort-Rite; however, no such revision is anticipated at this time. Additionally, other than discussion of the Business Plan contained in this Disclosure Statement, Debtor does not intend to further publish its Business Plan, or to provide notice or publication of any changes to the Business Plan which may be adopted in the future. The Business Plan calls for the Reorganized Debtor to change the focus of its sales, from sales to small independents to sales to major and large independents. Debtor intends to concentrate sales efforts to its existing world wide customer base. Additionally, Debtor will diversify into other international markets as they open. Engineered Thermo Systems, Inc. will bring to the business of the Debtor and Reorganized Debtor diversification into refrigeration equipment assembly and construction.

## V. RISK FACTORS

Payments called for under the Plan are subject to a number of material risks, some of which are discussed below. Prior to deciding whether and how to vote on the Plan, each Holder of a Claim or Interest should carefully consider all of the information contained in this Disclosure Statement, including the following discussion of risk factors. These risk factors should not be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### A.    Risk in Financial Projections.

The financial information included in this Disclosure Statement is heavily dependent upon the market conditions for sales of the Reorganized Debtor's products and services for successful implementation of the Business Plan. The financial projections incorporate numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Sort-Rite, industry conditions, assumptions with regard to competitors of Sort-Rite, general business and economic conditions and other matters which may be beyond the control of Sort-Rite. Although Debtor believes that its financial projections are reasonably attainable, some or all of the estimates will vary and variations between the actual financial results and those projected may be material.

### B. The Cyclical Nature of the Shrimp Industry.

Sort-Rite's product sales are dependent, to a certain extent, upon conditions in the world wide shrimp harvest because of weather and environmental changes which cause cyclical problems in production.

### C. The Effect of Competition.

The market for specialty equipment similar to that produced by Sort-Rite is keen and increasing each year. However, the sort-Rite equipment has always been of superior quality and of stainless steel construction. Recent changes in the F.D.A. regulations for

23

**A.    Appointment and Compensation of various Professionals and of Sort-Rite's**

Debtor has filed motions seeking bankruptcy court authorization to retain certain professionals to represent it and assist in the administration of the bankruptcy proceedings. These approved professionals include:

| | |
|---|---|
| Debtor's Attorney: | Ken E. Mackey (including associating attorney Oscar Vela) |
| Debtor's Attorney: | Diane W. Sanders (co-counsel) |
| Debtor's C.P.A.: | George W  Stone |

**B.    Appointment of a Committee of Unsecured Creditors**

On May 30, 2000, Notice was filed of the inability to attract interest of creditors for Appointment of an Unsecured Creditors' Committee by the United States Trustee. No Creditors' Committee has been appointed to date.

## VII. CORPORATE GOVERNANCE

**A.    Board of Directors**

On the Effective Date, in accordance with the Plan, the management, control and operation of the Reorganized Debtor will become the general responsibility of the Board of Directors of Reorganized Debtor. Debtor anticipates that its current directors will be dismissed and the directors of Reorganized Sort-Rite will be elected by Engineered Thermo Systems, Inc. and that Mr. William Capt will serve as Chairman of Reorganized Sort-Rite's Board of Directors. On or before the Confirmation Hearing, the Debtor will file with the Clerk of the Bankruptcy Court a Notice of Appointment of New Board Members. Directors will be entitled to reimbursement of out of pocket expenses in connection with travel and attendance at meeting of the Board of Directors.

**B. Post-Confirmation Management**

**(1).    Management.**
As of the date of this Disclosure Statement, the management of Reorganized Sort-Rite shall be Mr. William Capt, President, Mr. George Daily, plant manager and business manager in Harlingen, Texas, and Shirley Metzger, sales manager. Debtor anticipates that the Executive Management of the Debtor, pursuant to the Management Agreement approved by the Court, immediately before the Effective Date will serve as the initial Executive Management of the Reorganized Debtor on and after the Effective Date.

**(2).    Cancellation of Existing Shareholder Interests**

25

All existing interests of Debtor, including issued and outstanding stock, securities and warrants, will be automatically cancelled on the Effective Date.

### (3).    Amendment of Debtor's Articles of Incorporation and Bylaws

The Plan provides that the Articles of Incorporation and Bylaws of the Debtor will be amended and restated as of the Effective date to effectuate the provision of the Plan, without any further action of the Holders of the New Shareholder Interests or the Debtor's existing Board of Directors, the Debtor in Possession or Reorganized Debtor. The amended agreements will generally call for the first annual meeting of the shareholders of Reorganized Debtor to be held on a date in 2001 selected by the Reorganized Debtor's Board of Directors. Subsequent meetings of the shareholder of Reorganized Debtor will be held at least once annually each year thereafter.

## VIII. LEGAL PROCEEDINGS

### A. Sort-Rite's pending litigation

The Debtor has concluded its litigation with JBS Packing Co., Inc. to recover on a 1999 prepetition invoice for repairs to equipment.  After a trial on the merits, the Court awarded the Debtor $57,206.38.

The Debtor is also in litigation with Coastal Banc, ssb over its Proof of Claim and its entitlement to secured status in the chapter 11 case   The Debtor has filed Objection to the Coastal Banc, ssb Proof of Claim and has instituted an adversary proceeding against Coastal Banc, ssb to determine the validity and extent of its liens.

The Debtor has objected to the Proofs of Claim of the State of Florida and of Buitron Enterprises, Inc. as priority claims and expects both to become Class 7 unsecured claims.  The Debtor has objected to the second Proof of Claim of Coastal Banc, ssb, because it was filed after the Court imposed bar date.

The Debtor was also involved in defending motions to lift stay from Coastal Bank ssb and from FCLT.  The Court refused to lift the stay for either creditor and awarded adequate protection payments of $2,500.00 per month for FCLT and $750.00 per month for Coastal Banc, ssb.

The Exim Bank had filed a Motion to Dismiss the chapter 11 case which was tried on November 8, 2000.  The Court denied the Motion to Dismiss.

## IX. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND LIQUIDATION ANALYSIS

Implementation of the Plan may result in federal income tax consequences to holders of Claims, Existing Shareholders' Interests, and to the Debtor. Tax consequences

to an Entity holding a Claim or Existing Shareholders' Interest may depend on the particular circumstances or facts regarding the Claim or the Entity holding the Claim or Existing Shareholders Interest. CLAIMANTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR, THEREFORE, AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAW.

This discussion is a summary of certain federal income tax consequences expected to result from the consummation of the Plan. The discussion is based upon the Tax Code, Treasury regulations promulgated thereunder, judicial authorities and administrative rulings and practices now in effect. There can be no assurance that the Internal Revenue Service ("IRS") will not take a contrary view, and no ruling from the IRS has been or will be sought by the Debtor or Reorganized Debtor.

### A.    Tax Consequences to the Debtor.

The Debtor does not expect to incur any substantial tax liability as a result of implementation of the Plan. The Tax Code generally provides that taxpayers that realize a "cancellation of indebtedness" must include the amount of canceled indebtedness in gross income to the extent that the indebtedness canceled exceeds any consideration given for such cancellation. The Tax Code further provides that where a taxpayer is in a Chapter 11 case and the cancellation of indebtedness is pursuant to a plan approved by the bankruptcy court, such cancellation of indebtedness will not be included in gross income, but the taxpayer must generally reduce tax attributes in a specified order. The Debtor does not expect to realize a material amount of cancellation of indebtedness ("COD") income as a result of the Plan. With certain exceptions, to the extent that any creditor receives from the Debtor a distribution under the Plan in an amount less than such creditor's Claim, the Debtor will realize COD income. Because the Debtor is in bankruptcy, it will not be required to include COD income in taxable income, but may be required to reduce certain of tax attributes, including tax basis of assets, by the amount of the COD income.

### B.    Tax Consequences to Holders of Claims.

Generally, the Holder of an Allowed Claim will recognize a gain or loss on the exchange of his Allowed Claim for the consideration received by the Holder under the Plan. The amount of realized gain will be equal to the difference between (a) the sum of the amount of any Cash, and the fair market value of other consideration received and (b) the adjusted basis of the Allowed Claim exchanged therefor. (The adjusted basis would generally be equal to the amount paid on the Allowed Claim, increased by any amounts previously accrued as original issue or market discount, and reduced to the extent that a bad debt deduction has been claimed for federal income tax purposes with respect to the allowed Claim.) However, whether such realized gain or loss will be recognized for federal income tax purposes will depend in part upon whether such exchange qualifies as a "recapitalization" as defined in the Tax Code. The character of a gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder, whether the claim has been held for more than

27

one year, whether the claim was purchased at a discount, and whether and to what extent the Holder had previously claimed a bad debt deduction.

**C.     Tax Consequences to Holder of Interests.**

The Holders whose Shareholders Interests are canceled pursuant to the Plan should be entitled to recognize a loss in an amount equal to their tax basis in the Shareholder Interests that are cancelled. Such loss should generally be a long-term capital loss if the Shareholder Interest had been held for more than one year.

## X. ALTERNATIVES TO THE PLAN

**A.     Failure of Confirmation.**     If the Plan is not confirmed, the Debtor's bankruptcy case may be converted to a case under Chapter 7 of the Bankruptcy Code. Then, a trustee would be appointed to liquidate the Assets for distribution to the Claimants according to the priorities of the Bankruptcy Code. The Debtor reasonably believes that less would be realized from the liquidation of its Assets than from the preservation of the going concern value of those Assets. The best value of the Sort-Rite assets is not the liquidation value. The appraised value constitutes an estimate of what a willing buyer might pay a willing seller under normal market conditions. According to the Debtor's bankruptcy schedules and internal appraisals, the value of Sort-Rite's assets is approximately $1,147,000.00, as of April 10, 2000. The amount distributed to unsecured creditors depends upon the net estate available after all assets of the Debtor have been reduced to cash. Generally, a liquidation or forced sale yields a much lower amount, than an orderly sale of assets. The cash realized from liquidation of Debtor's assets would be distributed first to secured creditors. Under Chapter 7, a secured creditor whose claim is fully secured would be entitled to full payment, including interest from the proceeds of the sale of its collateral. A secured creditor whose collateral is insufficient to pay its secured claim in full will be entitled to assert an unsecured claim for its deficiency and share with unsecured creditors. Thereafter, any remaining funds would be distributed in accordance with the priorities set forth in Section 507 of the Bankruptcy Code. Claims entitled to priority under the Bankruptcy Code would be paid in full before any distribution to general unsecured creditors. In case of liquidation, sales proceeds are not likely to be sufficient to pay any more than selling costs, attorneys' fees, and a portion of the secured indebtedness due taxing authorities, including the I.R.S., and Coastal Bank ssb. The Debtor believes that liquidation under Chapter 7 would result in a substantial diminution of the value of the estate because of the additional administrative expenses involved in the appointment of a trustee, attorneys, accountants and other professionals to assist such trustee, and additional expenses and claims, some of which would be entitled to priority that would arise by reason of the liquidation, and from the cessation of any business of the Debtor and failure to realize the greater going concern value of the Debtor's assets. **The Debtor believes that if this case is converted to a case under Chapter 7 of the Bankruptcy Code, FCLT Loans, L.P., Coastal Bank, ssb, the I.R.S. and the county-school-city tax lien holders will more than likely foreclose their liens and security interests in Debtor's assets, and after distributions to secured creditors and administrative and priority expense claimants, the Unsecured**

**Creditors and Existing Shareholder Interests will receive nothing.** As a result, the Debtor believes that all Creditors will receive more under the Plan than they would receive in the event of a Chapter 7 liquidation. A liquidation analysis is attached as **Exhibit "6."**

        **B.**    **Creditor Plans.**       If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate an alternative plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtor's business or the liquidation of the Debtor's assets. Debtor believes that the Plan enables the Debtor to successfully and expeditiously emerge from Chapter 11, preserve the business, allow creditors to realize the highest recovery and preserve the jobs of the Debtor's employees. In a liquidation under Chapter 11 of the Bankruptcy Code, the assets of the Debtor would be sold over a period of time in connection with the terms of the alternative plan and a trustee need not be appointed. Accordingly, creditors may receive a greater recovery than in a Chapter 7 liquidation. Although a Chapter 11 liquidation is preferable to a Chapter 7 liquidation, the Debtor believes that a liquidation under Chapter 11 will likely result in payment of the claim of CoastalBank ssb., taxing authorities, and all administrative and priority claims and little or nothing to unsecured creditors, and is a less attractive alternative to creditors than reorganization under the Plan.

## XI. VOTING PROCEDURES

        To be confirmed by the Bankruptcy Court, the Plan must be accepted by each Class of Claims and Existing Shareholders' Interests whose rights are impaired by the provisions of the Plan. Generally, a Claim that will not be paid in full is considered "Impaired." Under the Bankruptcy Code, a Class of Claims or Interests is deemed to have accepted the Plan if the Plan is accepted by Claimants or Interest holders in such a Class holding at least two-thirds in amount and more than one-half in number of the Allowed Claims or Interests of such Class that in each case have actually voted on the Plan.

        **A. Ballots and Voting Deadline**

        Ballots are to be used for voting on the Plan. Completed Ballots should be sent to:

BALLOTS MUST BE RECEIVED ON OR BEFORE 5:00 P.M., HARLINGEN, TEXAS TIME, ON _____, 2000 (THE "BALLOT DATE") AT THE ADDRESS INDICATED ON THE BALLOT. ANY BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM OR INTEREST THAT DOES NOT SHOW AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN. NOTE: FAXED BALLOTS OR BALLOTS WITHOUT AN ORIGINAL SIGNATURE WILL NOT BE COUNTED.

        **A Ballot, Exhibit "2", has been prepared for Claimants.**

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE DEBTOR AT THE FOLLOWING ADDRESS AND TELEPHONE NUMBER:

> KEN E. MACKEY
> Attorney at Law
> P. O. Box 429
> San Ygnacio, Texas 78067
> 956-712-3451

You may be contacted by representatives of the Debtor with regard to your vote of the Plan. Votes cast by holders of Claims and Interests will be irrevocable once received by the Debtor, unless the Bankruptcy Court, after application, notice and hearing, permits a change of vote. If any ballot received by the Debtor is not discernible as to the Class of the Claim or Interest or the name of the holder thereof, such ballot will be disregarded and not counted.

## B. Claims and Existing Shareholders' Interests Entitled to Vote

Classes 2, 3, 4, 5, and 7 are Impaired under the terms of the Plan. Therefore, the holders of Claims and Existing Shareholders' Interests in Classes 2, 3, 4, 5, and 7 are entitled to and will be solicited to vote on the Plan. Claims and Interests in Classes 8 and 9 are not being solicited to vote. Under 11 U.S.C. 1126(g), such claimants and equity holders are deemed to have rejected the Plan because they will not retain or receive any property on account of their pre-petition claim or interest. Classes 1 and 6 Claimants are not impaired under the Plan and therefore, are not entitled to and will not be solicited to vote on the Plan, pursuant to the provisions of 11 U.S.C. 1126(f).

## XII. CONFIRMATION OF THE PLAN

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor discloses specified information concerning payments made or promised to insiders and that the Plan comply with the applicable provisions of Chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also imposes requirements that, given an Impaired Class, at least one Class of Impaired Claims has accepted the Plan, that confirmation of the Plan is not likely to be followed by the need for further financial reorganization and that the Plan be fair and equitable with respect to each Class of Claims or Interests Impaired under the Plan. The Bankruptcy Court may confirm the Plan only if it finds that all of the requirements enumerated in Section 1129(a) of the Bankruptcy Code have been met. The Debtor believes that the requirements for confirmation have been satisfied.

### A.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court hold the Confirmation Hearing upon appropriate notice to all creditors. Section 1128(b)

30

provides that any party in interest may object to confirmation of the Plan. By Order of the Bankruptcy Court dated _____, 2000, the Confirmation Hearing has been scheduled for _____, 2000, ____a.m., at the United States Bankruptcy Court, 3rd Floor, 600 E. Harrison, Brownsville, Texas. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice to creditors or parties in interest except an announcement made at the Confirmation Hearing or any adjournment of it. Any objection to confirmation must be written and filed with the Bankruptcy Court with proof of service and served upon the following parties on or before _____, 2000:

| | |
|---|---|
| KEN E. MACKEY | Sort-Rite International, Inc. |
| Attorney at Law | P. O. Box 1805 |
| P. O. Box 429 | Harlingen, Texas 78551 |
| San Ygnacio, Texas 78067 | |
| 956-712-3451 | |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan. If the Bankruptcy Court determines that such requirements have been satisfied, an order will be entered confirming the Plan. The requirements of Section 1129 are as follows: (9 The Plan complies with the applicable provisions of the Bankruptcy Code. Code. (ii) The Debtor has complied with the applicable provisions of the Bankruptcy by law. (iii) The Plan has been proposed in good faith and is not by any means forbidden (iv) The Debtor will pay for services or for costs and expenses in, or in connection with, the Reorganization Case, or in connection with the Plan and incident to the reorganization Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable. (VI The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an Affiliate of the Debtor participating in the Plan with the Debtor, or a successor to the Debtor under the Plan. The appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that the Debtor will employ or retain, and the nature of any compensation for such insider. (vi) With respect to each Class of Impaired Claims or Interests, either each holder of a Claim or Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest, property of a value, as of the Distribution Date under the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code.

31

(vii) Each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan. (viii) Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims (other than Priority Tax Claims) will be paid in full on the Distribution Date and that Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Distribution Date, equal to the allowed amount of such Claim. (ix) If at least one Impaired Class exists, at least one Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class. (4 Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the  Plan, unless such liquidation or reorganization is proposed in the Plan. The Debtor believes that the Plan (i) satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (ii) complies with or will comply with all of the requirements of Chapter 11, and (iii) was proposed in good faith. The Debtor further believes that holders of all Claims and Interests under the Plan may ultimately receive payments under the Plan having present value as of the Distribution Date in amounts not less than the amounts likely to be received by holders of such Claims if the Debtor was liquidated in a case under Chapter 7 of the Bankruptcy Code.

## C.    Cramdown

If any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" within the meaning of the Bankruptcy Code. A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its Claims or equity Interests. "Fair and equitable" has different meanings for secured and unsecured claims. With respect to a secured Claim, "fair and equitable" means either (i) the Impaired secured creditor retains its liens to the extent of its Allowed Claim and receives deferred Cash payments at least equal to the allowed amount of its Claim with a present value as of the Distribution Date at least equal to the value of such creditor's interest in the property securing its liens; or (ii) property subject to the lien of the Impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) or (iii) herein; or (iii) the Impaired secured creditor realizes the "indubitable equivalent" of its Claim under the Plan. With respect to an Unsecured Claim, "fair and equitable" means either: (i) each Impaired unsecured creditor receives or retains property of a value equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan. In the event one or more Classes of Impaired Claims or Interests rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims or Interests.

32

### D.     Feasibility

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed the Reorganized Debtor's ability to meet its obligations under the Plan. As part of this analysis, the Debtor has prepared projections of the Reorganized Debtor's financial performance for six years. These projections, and the assumptions on which they are based, are included in the information annexed hereto as Exhibit "5". Based upon such projections, the Debtor believes that the Reorganized Debtor will be able to make all payments required pursuant to the Plan and, therefore, that confirmation will not likely be followed by liquidation or the need for further reorganization. The Debtor further believes that Reorganized Debtor will be able to repay or refinance any and all secured indebtedness under the Plan at or prior to the maturity of such indebtedness. The projections included as Exhibit "5" include the following: *Pro Forma Balance Sheet of Reorganized Sort-Rite as of 12-31-2000 TO 2004; *Projected financial information. Debtor has prepared its financial projections based upon certain assumptions which it believes to be reasonable under the circumstances. Those assumptions considered to be significant are described in the financial projections. The projections have not been examined or compiled by independent accountants. The Debtor makes no representation as to the accuracy of the projections or the Reorganized Debtor's ability to achieve the projected results. The assumptions on which the projections are based are subject to uncertainties, discussed in Section V governing Risk Factors. The actual results achieved throughout the period covered in the projections may vary from the projected results and the variations may be material. Monthly debt service for obligations incurred pursuant to the Plan are estimated by the Debtor to be as follows: (a) FCLT secured claim of $2,000.00 for the first year; (b) Coastal Bank ssb possible secured claim of 1,200 00; (c) payment of approximately $1,700.00 per month to unsecured creditors. Debtor anticipates that it will have sufficient cash on the Effective Date to pay Convenience Claims, estimated to be in the amount of $810.00; Administrative Claims estimated to be no more than $45,000.00 (including attorneys' fees), and priority tax claims of approximately $17,096.00.

## XIII. MISCELLANEOUS PLAN PROVISIONS

### A.     Conditions Precedent to Effectiveness of the Plan.

The Plan will not become effective unless and until the following conditions will have been satisfied or waived by the Debtor and Engineered Thermo Systems, Inc. or other Qualified Bidder:  (a) the Confirmation Order, in form and substance reasonably acceptable to the Debtor  and the Engineered Thermo Systems, Inc. or the successful Qualified Bidder, will have been signed by the judge presiding over the Chapter 11 case and become a final non-appealable order, and there will not be a stay or injunction in effect with respect thereto and the order shall provide, among other things for approval of issuance of new equity to the Engineered Thermo Systems, Inc. or other Qualified Bidder and approval of the Amended Bylaws and Amended Articles of Incorporation of Sort-

Rite; (b) the Debtor will have received all authorizations, consents approvals, letter, opinions or documents determined by Engineered Thermo Systems, Inc. or other Qualified Bidder to be necessary to implement the Plan, (c) Debtor receives the Cash Consideration.

### B.     Effect of Failure of Conditions.

In the event that one or more of the conditions specified in Section 7.6 of the Plan have not occurred by the Effective Date, and upon notification submitted by the Debtor to the Bankruptcy Court, (a) the Confirmation Order will be vacated; (b) no distributions under the Plan will be made; (c) the Debtor and Interest Holders will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; (d) the Debtor's obligations with respect to the Claims and Existing Shareholder Interests will remain unchanged and nothing contained herein will constitute or be deemed a waiver or lease of any Claim or Interest by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor, and (e) the Releases set forth in the Plan will be deemed void.

### C.     Exculpation.

The Debtor, Reorganized Debtor, Creditors' Committee, if any, and any of their respective members, officers, directors, employees, advisors or agents, will have nor incur any liability to any Holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor, Reorganized Debtor, Creditors' Committee, if any, and each of their respective members, officers directors, employees, advisors and agents, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided however, that nothing contained in this Section will exculpate, satisfy, discharge or release any avoidance claims against present or former officers, directors or employees of the Debtor in their capacities other than as present or former officers, directors or employees.

### D.     Payment of Statutory Fees.

All fees payable pursuant to Section 1930 of title 28 of the United States Code will be paid until the Court enters a Final Decree or the case is converted or dismissed.

### E.     Payment of Post-Confirmation Fees and Expenses.

From and after the Confirmation Date, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the Debtor and Reorganized Debtor will pay the reasonable fees and expenses of professional persons thereafter incurred by the Debtor and Reorganized Debtor, including, without limitation,

34

those fees and expenses incurred in connection with the implementation and consummation of the Plan.

**F.     Exemption from Transfer Taxes.**

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, of equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any agreement or assignment executed in connection with any of the transactions contemplated under the Plan will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

**G.     Binding Effect.**

On the Effective Date, according to Section 1141 of the Bankruptcy Code, the provisions of this Plan will bind the Debtor, Reorganized Debtor, any entity acquiring Assets under the Plan, and any holder of a Claim or an Existing Shareholders' Interest, whether or not the Claim or Existing Shareholders' Interest is Impaired under the Plan and whether or not the holder of the Claim or Existing Shareholders' Interest has accepted the Plan.

**H.     Extension of Payment Dates.**

If any Distribution date falls due on any day that is not a Business Day, then such payment date will be extended to the next Business Day.

**I.     Confirmation by Non-Acceptance Method.**

The Debtor requests confirmation of the Plan pursuant to Bankruptcy Code Section 1129(b) with respect to any Impaired Class that does not vote to accept the Plan.

**J.     Vesting.**

As of the Confirmation Date, the Reorganized Debtor. will be vested with all Assets, free and clear of all Claims, liens, security interests, assignments, encumbrances, charges, and other interests of the Claimants (except those Claimants whose Claims have been modified and restructured and whose liens survive as provided in the Plan); and except where the Bankruptcy Court has retained jurisdiction regarding any specified aspect of the activities of the Debtor, the Reorganized Debtor may operate Assets free of any restrictions imposed by the Bankruptcy Code and in all respects as if there were no pending bankruptcy case under any chapter or provision of the Bankruptcy Code.

**K.     Withdrawal of Plan.**

The Plan may be withdrawn or revoked before the entry of the Confirmation Order at the sole and absolute discretion of the Debtor.

**L.    Enforceability.**

Should any provision of the Plan be determined to be unenforceable for any reason, such determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

**M.    Plan Supplement.**

Forms of the documents relating to the Amended Sort-Rite Articles of Incorporation, the Amended Sort-Rite Bylaws, the Employment Agreement will be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court no later than the hearing established by the Bankruptcy Court to consider the adequacy of the Disclosure Statement.

**N.    Pre-petition Lawsuits.**

On the Effective Date, all pre-petition lawsuits, litigation, administrative actions or other proceedings, judicial or administrative, in any forum whatsoever, state or federal, shall be dismissed as to the Debtor. Such dismissal shall be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan.

**0 .    Subordination of Penalty and Shareholder Claims.**

The tiling of this Plan and  its submission to the Holders of Penalty and Shareholder Claims shall constitute an action seeking to subordinate all such Claims pursuant to Section 510 of the Bankruptcy Code. The Confirmation Order, except as provided herein, shall constitute an order subordinating such Claims to all other Claims pursuant to Section 510 of the Bankruptcy Code.

**P.    Severability.**

Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or transaction, the Debtor may modify the Plan in Accordance with Article XIV of the Plan so that such provision shall not be applicable to the Holder of any Claim. Such a determination of unenforceability shall not (1) limit or affect the enforceability and operative effect of any other provision of the Plan or (2) require the resolicitation of any acceptance or rejection of the Plan.

**Q.    Creditor Defaults.**

Any act or omission by a creditor in contravention of a provision within this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Debtor or Reorganized Debtor may seek to hold the defaulting party in contempt of the

36

Confirmation Order. If such creditor is found to be in default under the Plan, such party shall pay the reasonable attorneys' fees and costs of the Debtor or Reorganized Debtor in pursuing such matter.

### R.   Allocation of Plan Distributions between Principal and Interest.

Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

## XIV. CONCLUSION

The Debtor believes that confirmation and implementation of the plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to Holders of Claims and Interests. In addition, other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. Reorganization will ensure the continued operation of the Debtor and maintain the employment of the Debtor's workforce. **THE DEBTOR URGES HOLDERS OF CLAIMS AND INTERESTS TO VOTE IN FAVOR OF THE PLAN.**

Respectfully submitted this 14 day of November, 2000.

SORT-RITE INTERNATIONAL, INC.
Debtor and Debtor in Possession

By: _Shirley Metzger_

Shirley Metzger, Its
President

DEBTOR'S ATTORNEY:

KEN E. MACKEY
P. O. Box 429
San Ygnacio, Texas 78067
956-712-3451

30

CERTIFICATE OF SEVICE

A copy of the attached Second Amended Disclosure Statement has been served upon the following by first class U. S. Mail, postage prepaid, on November 14, 2000, addressed as indicated:

Debtor:

George Daily, General Manager
Sort-Rite International, Inc.
P O. Box 1805
Harlingen, TX 78551

Shirley Metzger, President
Sort-Rite International, Inc.
P.O. Box 1805
Harlingen, TX 78551

U. S. Trustee:

Assistant U. S. Trustee
1107 Wilson Plaza West
606 North Carancahua Street
Corpus Christi, TX 78476

Request for Notice and Service:

Andrew K. Rozell
323 East Jackson
Harlingen, TX 78550

Nancy L. Masso
Assistant U. S. Attorney
600 E. Harrison St., #201
Brownsville, TX 78520

Scott Walsh
4900 N. 10th St., Bldg. B
P. O. Box 1416
McAllen, Texas 78505

Lori Gruver Robertson
LINEBARGER HEARD GOGGAN BLAIR
GRAHAM PEÑA & SAMPSON, LLP
1949 South I.H. 35 (78741)
P. O. Box 17428
Austin, TX 78760

Sam H. Hall
Attorney at Law
P. O. Box 80095
Austin, Texas 78708

Richard O. Habermann
Attorney at Law
308 North 15th Street
McAllen, Texas 78501

Rudy de la Garza
Attorney at Law
315 East First Street
Brownsville, TX 78520

Diane Sanders
Attorney at Law
One Shoreline Plaza
800 N. Shoreline Blvd., Suite 320S
Corpus Christi, TX 78401

George W. Stone
George W. Stone, P.C.
122 W. Ocean Blvd.
Los Fresnos, TX 78566

Respectfully submitted,

KEN E. MACKEY
Attorney for Sort-Rite International, Inc.

38

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | NO. 00-21094-B-11 |
| | § | |
| SORT-RITE INTERNATIONAL, INC. | § | CHAPTER 11 |
| TAX I.D. No.: 74-1982167 | § | |
| DEBTOR | § | |
| | § | |

## SECOND AMENDED
## PLAN OF REORGANIZATION
## FILED BY THE DEBTOR

## ARTICLE I
## INTRODUCTION

SORT-RITE INTERNATIONAL, INC., the Debtor and Debtor-in-Possession in this Bankruptcy Case, proposes this Second Amended Plan of Reorganization (the Plan or the Plan or Reorganization), which includes the first and second amendments. **ALL CREDITORS AND SHAREHOLDERS ARE ENCOURAGED TO CONSULT THE DISCLOSURE STATEMENT PREPARED BY SORT-RITE INTERNATIONAL, INC., AS APPROVED BY THE BANKRUPTCY COURT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. NO OTHER SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.**

## ARTICLE II
## DEFINITIONS

Whenever from the context it appears appropriate, each term stated in either the singular or the plural will include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, the feminine and the neuter. Unless the context requires otherwise, the following words and phrases will have the meanings set forth below when used in initially-capitalized form in this Plan:

**Administrative Expense** means (a) any cost or expense of administration of the Chapter 11 Case (including, without limitation, Professional Charges of the Chapter 11 Professionals) allowed under Section 503(b) and 507(a)(1) of the Bankruptcy Code, and (b) any fees or charges assessed against the Debtor's estate under title 28, United States Code, Section 1930; (c) any indebtedness or obligations incurred or assumed by the Debtor-in-Possession in connection with the conduct of its

1

PFM - 'I'

business, (d) any actual and necessary costs and expenses of operating the business of the Debtor; or (e) post-petition loans made to the Debtor, after Court approval.

**Administrative Expense Bar Date** means the date established by the Bankruptcy Court or the Plan as the last date for filing requests for allowance of Administrative Expenses, other than costs or expenses in the ordinary course of operation of the Debtor.

**Affiliate** has the meaning set forth as defined in Section 101(2) of the Bankruptcy Code.

**Allowed** means, with respect to Claims and Existing Shareholder' Interests, (a) any Claim against, or Interest in, the Debtor, proof of which is timely filed or by order of the Bankruptcy Court is not or will not be required to be filed, (b) any Claim or Existing Shareholders' Interest that has been or is hereafter listed in the schedules of liabilities filed by the Debtor, as liquidated in amount and not disputed or contingent or (c) any Claim or Existing Shareholder Interest allowed pursuant to this Plan and, in each such case in (a) and (b) above, which either (i) no objection to allowance has been interposed within the applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (ii) such objection is so interposed and the Claim or Existing Shareholders' Interest will have been allowed by a Final Order (but only to the extent so allowed).

**Asset** means all property of the Debtor as defined in Section 541(a) of the Bankruptcy Code.

**Ballot** means with respect to any class of Claims or Existing Shareholder Interests that are Impaired and entitled to vote under Article VI and 8.1 of this Plan, the form being distributed to holders of Claims or Existing Shareholder's Interests in such Class to be used for showing acceptance or rejection of this Plan, concerning the solicitation of acceptances or rejections of this Plan by the Debtor. The Ballot is attached to the Disclosure Statement as Exhibit "2".

**Bankruptcy Code** means Title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas, Brownsville Division.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended, promulgated under Section 2075 of title 28 of the United States Code and the Local Rules of the Bankruptcy Court, as applicable from time to time during the Bankruptcy Case.

**Bar Date** means August 14, 2000, the date fixed by a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 3003(c)(3), by which all Entities asserting Claims against the Debtor (other than Administrative Expense, Priority Claims, or Rejection Claims) were required to file proofs of claim or be forever barred from asserting such claims against the Debtor or its property and from voting on this Plan and/or sharing in any distribution thereunder.

2

**Business Day** means any day other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

**Cash** means cash, cash equivalents, and readily marketable securities or instruments, including but not limited to, bank deposits, certified or cashiers' checks, timed certificates of deposit issued by any bank, commercial paper, and readily marketable direct obligations of the United States of America or agencies or instrumentalities thereof.

**Causes of Action** mean all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

**Chapter 11 Professionals** means the professionals retained by the Debtor or the Committee of Unsecured Creditors, if any, wherever they are referred to collectively in the Plan, the retention of which has been approved by the Bankruptcy Court and includes attorneys and accountants.

**Claim** means (a) any right to (i) payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (ii) an equitable remedy for breach of performance if such breach causes a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. When used with respect to any litigation, the term "**Claim**" will also include any claim that has been or could be asserted in any litigation. Notwithstanding anything to the contrary set forth in this Plan, for purposes of this Plan, the term "Claim" will have the broadest possible meaning permitted by applicable law.

**Claimant** means the holder of any Claim.

**Closing Date** means ten (10) days after the Confirmation Order becomes a Final Order that has not been stayed by any Court of competent jurisdiction.

**Collateral** means any property or interest in property of the estate of the Debtor subject to a lien or security interest that secures the payment or performance of a Claim, which lien or security interest is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code, applicable state law, or Order of the Bankruptcy Court.

**Confirmation Date** means the date on which the Confirmation Order is entered on the docket maintained by the Clerk of the Bankruptcy Court with respect to the Bankruptcy Case.

**Confirmation Hearing** means the date or dates on which the Bankruptcy Court considers whether to confirm this Plan.

3

**Confirmation Order** means the Final Order of the Bankruptcy Court confirming this Plan.

**Creditors' Committee** means the Official Committee of Unsecured Creditors in the Bankruptcy Case appointed pursuant to Section 1102(a) of the Bankruptcy Code, if any, as the same may be reconstituted from time to time.

**Debtor** means Sort-Rite International, Inc., a Texas corporation.

**Disclosure Statement** means the Debtor's Disclosure Statement, as the same may be amended and modified from time to time (currently the Second Amended Disclosure Statement), distributed to holders of Claims and Existing Shareholder Interests according to Section 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3018.

**Disputed** means, with respect to Claims, any Claim that is not Allowed after filing of a Proof of Claim in the case.

**Disputed Claims Reserve** means the reserve established for Disputed Claims according to Article 8.2 of this Plan.

**Distributions** means distributions to the various classes of Claims and Existing Shareholders' Interests as provided in this Plan.

**Effective Date** means the date which is ten (10) days after entry of the Confirmation Order. The Effective Date may be extended to the day on which the conditions specified in Section 7.6 of the Plan have been satisfied or waived, which date shall be not later than 30 days after the Confirmation Order is entered.

**Entity** means any individual, corporation, limited or general partnership, limited liability company, joint venture, association, joint stock company, estate, entity, trust, trustee, United States trustee, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof.

**Existing Shareholders** means the Debtor's current shareholders: Shirley Metzger,

**Existing Shareholders' Interests** means all equity interests in the Debtor, including the interests of the Existing Shareholders. The Existing Shareholders' Interests are classified as Class 8 Interests. The treatment afforded Class 8 Interests is set forth in Section 5.8 of the Plan.

**Filing Date** means April 10, 2000, which is the date on which the voluntary case under Chapter 11 of the Bankruptcy Code was commenced by the Debtor.

**Final Order** means an order, ruling or judgment of the Bankruptcy Court or other court of competent jurisdiction that may hear appeals from the Bankruptcy Court (i) which is not stayed, (ii) the time to appeal, seek reconsideration or rehearing or to seek review by petition for **certiorari**

4

**Pro Rata** means regarding Claims, the ratio of the amount of an Allowed Claim in a particular Class to the aggregate amount of Allowed Claims in such Class.

**Qualified Offer** means an offer which complies with all provisions as stated in Section 7.2 of this Plan.

**Qualified Bidder** means a bidder making a Qualified Offer.

**Quarter** means the period beginning on the Initial Distribution Date and ending on the next June 30, September 30, December 31, and March 31 and each three month period thereafter.

**Record Date** means the day that is the Confirmation Date.

**Rejection Claim** means any Claim arising out of the rejection of a lease or executory contract pursuant to Section 365 of the Bankruptcy Code. Allowed Rejection Claims are classified as Unsecured Claims and treated in Class 7.

**Reorganization Case** means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on the Filing Date.

**Reorganized Debtor** means the Debtor after the Effective Date or any successor thereto by merger, consolidation or otherwise.

**Schedules** means the Schedules of Assets and Liabilities, the List of Holders of Interests, and the Statement of Financial Affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto through the Confirmation Date.

**Secured Claim** means any Claim, to the extent reflected in the Schedules or a timely filed proof of claim as being secured and timely perfected, which is secured by a timely perfected lien or security agreement on the Collateral, to the extent of the value of the Estate's interest in such Collateral, as determined as of the date before the Confirmation Date in accordance with 11 U.S.C. 506.

**Shareholders' Claims** means the Claims of the Existing Shareholders, including, but not limited to, damages, quarterly tax distributions, expenses, claims for rejection damages or cure amounts, if any, and any amounts whatsoever in connection with, associated with or arising, directly or indirectly, from or in any way related to the purchase and sale or recession of a purchase or sale of equity interests in the Debtor, owed to any existing or past shareholder, but exclude claims for indemnity The Shareholders' Claims are classified as Class 9 Claims. The treatment afforded Class 9 is set forth in Section 5.9 of the Plan.

**Unsecured Claim** means any Claim against the Debtor (other than an Administrative Expense, Priority Claim, Priority Tax Claim, Secured Claim(s), Existing Shareholders' Claims or an Existing Shareholders' Interest).

6

# ARTICLE III
## TREATMENT OF ADMINISTRATIVE EXPENSE
## AND PRIORITY TAX CLAIMS

3 1 *(a) Administrative Expense*. Except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment, the Reorganized Debtor shall provide to each holder of an Allowed Administrative Expense (a) Cash in an amount equal to such Allowed Administrative Expense on the latest of (i) the Effective Date, (ii) the date such Administrative Expense becomes an Allowed Administrative Expense or (iii) the date such Allowed Administrative Expense is due in accordance with the terms and conditions of the particular transactions or governing documents or (b) such other treatment as the Debtors and such holders shall have agreed upon in writing, provided however, that Allowed Administrative Expenses (other than Claims under Section 330 of the Bankruptcy Code) representing obligations incurred in the ordinary course of business of or assumed by the Debtor in Possession shall be paid in full and performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

3.2 Professional Compensation and Reimbursement.  All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3), 503 (b)(4) or 503(b)(5) of the Bankruptcy Code (a) will file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by the date that is 60 days after the Confirmation Date or such other date was may be ordered by the Bankruptcy Court and (b) if granted, such award by the Bankruptcy Court, will be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) ten days after the date the Administrative Expense becomes an Allowed Administrative Expense, or (ii) on such other terms as may be mutually agreed upon between the Holder of an Allowed Administrative Expense and the Debtor in Possession or, on and after the Effective Date, the Reorganized Debtor.   The Allowed Administrative Expenses of Chapter 11 Professionals for Professional Charges will be paid from the Cash available on the Effective Date.

3.3 Priority Tax Claims.  Except to the Extent that the holder of an Allowed Priority Tax Claim agrees to a different treatment, the Reorganized Debtor shall pay to each holder of an allowed Priority Tax Claim, at the sole option of the Reorganized Debtor, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) equal annual cash payments in arrears in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to eight (8.0%0 percent, over a period through the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim, with the first such payment being made on the Initial Distribution Date, or upon such other terms determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such

Allowed Priority Tax Claim, with all such payments attributable first to payment of the principal balance due on trust fund taxes.

# ARTICLE IV
# CLASSIFICATION OF CLAIMS
# AND EXISTING SHAREHOLDERS' INTERESTS

Claims and Existing Shareholders' Interests are divided into the following Classes under the Plan:

4.1    **Class 1: Other Priority Claim.**  Class 1 consists of Other Priority Claims not included in paragraph 3.3 above for priority tax claims.

4.2    **Class 2: FCLT Secured Claim.**  Class 2 consists of the Allowed FCLT Secured Claim.

4.3    **Class 3: Coastal Bank, ssb, Secured Claim.**  Class 3 consists of the Allowed Secured Claim of Coastal Bank, ssb, San Benito, Texas, which is subject to objections of the Debtor.  If the claim of Coastal Bank does not become an Allowed Secured Claim, then it shall become a Class 7 unsecured claim in an amount as approved by the Court.

4.4    **Class 4: Allowed Secured Tax Claims on Debtor's Real Property.**  Class 4 consists of four separate classes as follows:

      4.A.  Class 4.A is the secured tax claim of the City of Harlingen, Texas;
      4.B   Class 4.B is the secured tax claim of Harlingen CISD;
      4.C   Class 4.C is the secured tax claim of Cameron County, Texas; and
      4.D   Class 4.D is the secured tax claim of the Internal Revenue Service.

4.5    **Class 5: Allowed Secured Tax Claims on Debtor's Personal Property.**  Class 5 consists of four separate classes as follows:

      5.A.  Class 5.A is the secured tax claim of the City of Harlingen, Texas;
      5.B   Class 5.B is the secured tax claim of Harlingen CISD;
      5.C   Class 5.C is the secured tax claim of Cameron County, Texas; and
      5.D   Class 5.D is the secured tax claim of the Internal Revenue Service if there is no interest available for Class 4.D to attach.

4.6    **Class 6: Allowed Convenience Claims.**  Class 6 consists of the Allowed Claims of Claimants holding  unsecured claims of less than $500.00.

4.7    **Class 7: Unsecured Claims.**  Class 7 consists of all Unsecured Claims that become Allowed Claims.

8

4.8     **Class 8: Claims of Existing Shareholders.** Class 8 consists of the Claims of Existing Shareholders (but not the Existing Shareholders' Interests).

4.9     **Class 9: Existing Shareholders' Interests.** Class 9   consists of the Existing Shareholders' Interests.

# ARTICLE V
## TREATMENT OF CLAIMS

The following treatment will be accorded to Claims in Class 1 through Class 8   and the Existing Shareholders' Interests in Class 9:

5.1     **Class 1: Other Priority Claims**

   **(a) Treatment.** The Class 1 Claimants, unless different treatment is agreed to by any such claimants, will be paid in full, on or before the later of the  Effective Date or ten (10) days after the date each such Allowed Other Priority Claim becomes an Allowed Other Priority Claim.

   **(b) Impairment.** Class 1 is **Not Impaired** by the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.2     **Class 2: FCLT Secured Claim (Real property collateral).**

   **(a) Treatment.** The Class 2 Claim will be paid over a period of ten (10) years from the Effective Date as follows: (i)  the first twelve monthly (12) payments shall be in an amount of $2,000.00 each, which shall commence on the Initial Distribution Date, and (ii) thereafter, in monthly payments of an amount necessary to fully pay the claim by the end of the ten year  period, together with interest at the rate of eight (8.0%) percent per annum.  The Class 2 Claim will retain its lien, if any, upon confirmation of this Plan.

   **(b) Alternative Treatment.**  In the alternative, upon agreement between the Debtor and FCLT, The Class 2 claim shall receive, on the Effective Date, its collateral, consisting of the Debtor's land and buildings in Harlingen, Cameron County, Texas, in full satisfaction of all its claims.  If the alternative treatment is agreed upon, then in addition thereto, FCLT shall lease back to the Debtor the buildings at 825 W. Jefferson, Harlingen, Cameron County, Texas, for a term of one (1) year commencing on the Effective Date for a monthly lease amount of $2,000.00, payable monthly in advance.

9

**(b) Impairment.** Class 2 is **Impaired unless the alternate treatment above is agreed to by the Debtor and FCLT**. Therefore, the Class 2 Claimant will have the right to vote to accept or reject the Plan.

5.3    **Class 3: Coastal Bank, ssb, Secured Claim (Personal property collateral).**

**(a) Treatment.**    The Class 3 Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter, at the sole option of the Debtor, except to the extent that a Holder of the Allowed Secured Claim agrees to a different treatment, and if the Coastal Bank ssb claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which shall be sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 3 Claim. The Class 3 Claim will retain its lien, if any, upon confirmation of this Plan.

 **(b) Impairment.** Class 3 is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.4    **Class 4:  Secured Tax Claims on Debtor's Real Property.**

5.4.A   **Class 4.A. Secured Tax Claim of City of Harlingen:**

**(a) Treatment**. The Class 4.A Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the City of Harlingen claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which shall be sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 4.A Claim. The Class 4.A Claim will retain its lien, if any, upon confirmation of this Plan.

 **(b) Impairment.** Class 4.A is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.4.B   **Class 4.B. Secured Tax Claim of the Harlingen CISD.**

10

(a) **Treatment**. The Class 4.B Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Harlingen CISD claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 4.B Claim. The Class 4.B Claim will retain its lien, if any, upon confirmation of this Plan.

(b) **Impairment**. Class 4.B is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

**5.4.C.    Class 4.C, Secured Tax Claim of Cameron County, Texas.**

(a) **Treatment**. The Class 4.C Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Cameron County claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 4.C Claim. The Class 4.C Claim will retain its lien, if any, upon confirmation of this Plan.

(b) **Impairment**. Class 4.C is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

**5.4.D    Class 4.D, Secured Tax Claim of the Internal Revenue Service.**

(a) **Treatment**. The Class 4.D Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Internal Revenue Service claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over ten (10) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of

11

eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 4.D Claim. The Class 4.D Claim will retain its lien, if any, upon confirmation of this Plan.

(b) **Impairment.** Class 4.D is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.5     **Class 5: Secured Tax Claims on Debtor's Personal Property.**

5.5.A     **Class 5.A. Secured Tax Claim of City of Harlingen:**

(a) **Treatment.** The Class 5.A Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the City of Harlingen claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over five (5) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the five (5) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 5.A Claim. The Class 5.A Claim will retain its lien, if any, upon confirmation of this Plan.

(b) **Impairment.** Class 5.A is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

5.5.B     **Class 5.B. Secured Tax Claim of the Harlingen CISD.**

(a) **Treatment.** The Class 5.B Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Harlingen CISD claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over five (5) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the five (5) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the ten year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 5.B Claim. The Class 5.B Claim will retain its lien, if any, upon confirmation of this Plan.

(b) **Impairment.** Class 5.B is **Impaired** by the Plan, and is therefore entitled to vote on the Plan.

12

**5.5.C.  Class 5.C. Secured Tax Claim of Cameron County, Texas.**

(a) Treatment. The Class 5.C Claimant will receive, no later than the Initial Distribution Date, or as soon as practical thereafter at the sole option of the Debtor, except to the extent that a Holder of an Allowed Secured Claim agrees to a different treatment, and if the Cameron County claim is in fact determined by the Debtor or the Court to be secured, the balance due on the claim over five (5) years at a monthly rate of an amount which is sufficient to fully pay the claim by the end of the ten (10) year period, which includes interest on the secured claim at the rate of eight (8.0%) percent per annum, until paid, or if there is a balance due at the end of the five (5) year period, then a final payment is to be paid by the Debtor of the entire then due balance of the Allowed Class 5.C Claim. The Class 5.C Claim will retain its lien, if any, upon confirmation of this Plan.

(b) Impairment. Class 5.C is Impaired by the Plan, and is therefore entitled to vote on the Plan.

**5.5.D.  Class 5.D. Secured Tax Claim of the Internal Revenue Service.**

(a) Treatment. The Class 5.D Claimant, if any, shall receive the same treatment accorded the Class 4.D Claimant over a ten (10) year period. This Class is a contingent class awaiting the I.R.S. decision or Order of the Court concerning the priority of claims on the Debtor's interest, if any, in its real property.

(b) Impairment. Class 5.D is Impaired by the Plan, and is therefore entitled to vote on the Plan.

**5.6    Class 6: Convenience Claims.**

(a) Treatment. Class 6 Claimants will be receive, unless less favorable treatment is otherwise agreed, payment in full, without interest, no later than the Effective Date, Cash in an amount equal to 100% of each such Holder's Allowed Convenience Claim not to exceed $500.00

(b) Election. Any Creditor who chooses to be treated as a Class 6 Creditor must (i) waive all portions of its Claim in excess of $500.00 and (ii) notify Debtor in writing of its election to be treated as a Class 6 Creditor by designating such election on a validly and timely submitted Ballot for accepting or rejecting this Plan. Electing Creditors in this Class shall not have a Class 7 Claim for the amount of their Claims

13

in excess of $500.00.

(c) Impairment. Class 6 is **Not Impaired**. Therefore, the Class 6 Claimants will not have the right to vote to accept or reject the Plan.

5.7    **Class 7: Unsecured Claims**.

(a) Treatment. In full settlement, satisfaction and discharge of their respective Allowed Unsecured Claims, Class 7 Claimants will receive Cash paid over a period of five (5) years in equal quarterly installments, the first such payment being due and payable on the Initial Distribution Date, in an amount equal to fifteen (15%) per cent of their Allowed Unsecured Claim.

(b) Impairment. Class 7 Claims are **Impaired**, and are therefore entitled to vote on the Plan.

5.8    **Class 8: Claims of Shareholders**.

(a) Treatment. Class 8 Existing Shareholders' Claims shall be deemed subordinate, under the provisions of 11 U.S.C. 510, to the Claimants in Class 1 through 7 above. If and to the extent the Bankruptcy Court concludes the Plan cannot be confirmed with subordination of the Class 8 Existing Shareholders' Claims, then the Class 8 Existing Shareholders' Claims shall be treated as Class 8 General Unsecured Claims.

(b) Impairment. Class 8 Existing Shareholders' Claims are **Impaired**. Therefore the Holders of Class 8 Existing Shareholders Claims are entitled to vote to accept or reject the Plan.

5 9    **Class 9: Existing Shareholder's Interests**

(a) Treatment. Class 9 Existing Shareholder's Interests shall be cancelled on the Effective Date, and Holders of such Existing Shareholder's Interests shall not be entitled to, and shall not receive or retain any property or interest in property of the estate on account of such Existing Shareholder's Interest. On and after the Effective Date, the Debtor and Reorganized Debtor will have no obligations or liabilities to the Holders of Allowed Existing Shareholder's Interests and such Holders will have no rights against Debtor or Reorganized Debtor for any amount due on or right created by the Existing Shareholder's Interest.

(b) Impairment. Class 9 Existing Shareholders' Interests are **Impaired** and receive or retain nothing on account of the interests under the Plan.

14

# ARTICLE VI
## IMPAIRMENT OF CLASSES

Classes 1 and 6 are not Impaired under the Plan. Classes 2, 3, 4, 5, 7, 8, and 9 are Impaired under the Plan.

# ARTICLE VII
## IMPLEMENTATION, CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTOR

7.1    **General.** Subject to Section 7.2, on or before the Effective Date, the **Successful Bidder** will pay the Cash Consideration to the Debtor in consideration for the issuance of 100,000 shares of the new common stock to be issued to **Successful Bidder** on the Effective Date or to the Qualified Bidder, if it is the successful bidder will pay such Cash Consideration for the issuance of the New Shareholder. Upon the Effective Date, the Debtor's Existing Shareholder's Interests shall be cancelled and erased. On the Effective Date, without any further act or action under applicable law, regulation, order, or rule, in exchange for payment of the Cash Consideration by the **Successful Bidder** or other Qualified Bidder to the Debtor, the Reorganized Debtor shall be authorized to issue to **Successful Bidder** or other Qualified Bidder the New Shareholder Interests. On the Effective Date, the amended *Sort-Rite* Articles of Incorporation and Amended *Sort-Rite* Bylaws will be adopted substantially in the forms attached.

7.2    **Competing Offers.**

Any competing offers for the New Shareholder Interests shall be governed by the Bidding Procedures approved by Order of the United States Bankruptcy Court.

7.3    **Management of the Reorganized Debtor.**   On and after the Effective Date, the operation of Reorganized Debtor shall become the responsibility of its Board of Directors and management.

(a) **Meeting of Reorganized Sort-Rite Stockholders.** In accordance with the Amended Sort-Rite Articles of Incorporation and Amended Sort-Rite Bylaws, as the same may be amended from time to time, the first annual meeting of the stockholders of the Reorganized Debtor will be held on a date prior to April 10, 2001, as selected by the Board of Directors of the Reorganized Debtor.

(b) **Board of Directors.** On the Effective Date, the management, control and operation of the Reorganized Debtor will become the general responsibility of the Board of Directors of Reorganized Sort-Rite. The **Successful Bidder** shall appoint one person to serve as the chairman of the meeting of the reorganized Sort-Rite Board of directors, which shall be held on the Effective Date or as soon thereafter as possible, and at such organizational meeting such agent shall nominate at least three (3) directors to serve on the Reorganized Sort-Rite Board of Directors, including

15

himself or herself, if desired.   In order for a Qualified Offer by a Qualified Bidder, in the event it is the highest acceptable offer, to be accepted, the names of the new Board of Directors proposed by the Qualified Bidder that it intends to nominate and serve as the Reorganized Debtors Board of Directions must be submitted to the Debtor, and the Plan will be immaterially modified accordingly.

(c) **Executive Management**.  On and after the Effective Date, the Executive Management of the Debtor will serve as the Executive Management of Reorganized Debtor.  After the Effective Date, the Reorganized Debtor will retain Mr. William Capt as President.

(d) **Amended Bylaws and Articles of Incorporation**.  The Amended Sort-Rite Bylaws and Amended Sort-Rite Articles of Incorporation will be amended and restated as of the Effective Date to effectuate the provisions of the Plan, without any further action by the Debtor, Reorganized Debtor, Existing Shareholder Interests or the Debtor's existing Board of Directors.

(e) **Issuance of New Shareholder Interests**.  The issuance of the New Shareholder Interests by the Reorganized Debtor is hereby authorized without further act or action under applicable law, regulation, order, or rule.

7.4    **Implementation**.  The Debtor and Reorganized Debtor will be authorized to take all necessary steps and perform all necessary acts to consummate the terms and conditions of this Plan.  The Bankruptcy court may direct the Debtor and any other necessary party to execute or deliver or to join the execution or delivery of any instrument required to effect the Plan, and to perform any other act necessary to consummate the Plan.

7.5    **Termination of the Creditors' Committee**.  On the date by which both (a) the Effective Date has occurred and (b) the Confirmation Order has become a Final Order, the Creditors' Committee, if any, shall cease to exist, and its members and employees or agents (including without limitation, attorneys, financial advisors, accountants and other professionals) will be discharged from any further authority, duties, responsibilities, and obligations relating to, arising from, or in connection with their services to the Creditors' Committee

7.6    **Conditions Precedent to Effectiveness of the Plan**.  The Plan will not become effective unless and until the following conditions will have been satisfied or waived by the Debtor and **Successful Bidder** or other Qualified Bidder:

(a) the Confirmation Order, in form and substance reasonably acceptable to the Debtor and the **Successful Bidder**, or other Qualified Bidder, will have been signed by the judge presiding over the Chapter 11 case, and there will not be a stay or injunction in effect with respect thereto and the order shall provide, among other things, for approval of issuance of new equity either to the **Successful Bidder** or other Qualified Bidder and approval of the Amended Bylaws and Amended Articles of Incorporation of Sort-Rite;

16

(b) the Debtor will have received all authorizations, consents, approvals, letter, opinions or documents determined by **Successful Bidder** or other Qualified Bidder to be necessary to implement the Plan,

(c) receipt by the Debtor of the Cash Consideration.

7.7    **Effect of Failure of Conditions**.  In the event that one or more of the conditions specified in Section 7.6 of the Plan have not occurred by the Effective Date, and upon notification submitted by the Debtor to the Bankruptcy Court, (a) the Confirmation Order will be vacated; (b) no distributions under the Plan will be made; (c) the Debtor and Interest Holders will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; (d) the Debtor's obligations with respect to the Claims and Existing Shareholder Interests will remain unchanged and nothing contained herein will constitute or be deemed a waiver or release of any Claim or Interest by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor, and (e) the Releases set forth in the Plan will be deemed void.

# ARTICLE VIII
## PROVISIONS REGARDING VOTING, DISTRIBUTIONS AND DISPUTED CLAIMS RESERVE

8.1    **Voting of Claims and Interests**.  Each Holder of an Allowed Claim or Interest in an impaired Class will be entitled to vote separately to accept or to reject the Plan.

8 2    **Disputed Claims Reserve**.  No later than ten (10) days from the Effective Date, or as soon after that as practicable, Debtor or Reorganized Debtor will establish the Disputed Claims Reserve.

(a) **Distributions**.  No later than ten (10) days from the Initial Distribution Date, or as soon after as practicable, Reorganized Debtor will make Distributions from the Disputed Claims Reserve, as, when and if Disputed Claims become Allowed Claims, from the Disputed Claims Reserve Fund, to the holders of Allowed Claims of the amount of Cash that such Claimants are entitled to under this Plan on account of their Allowed Claim.

(b) **Investment of Disputed Claims Reserve**.  Reorganized Debtor, or its appointed Agent, will be permitted to invest all or part of the Cash held in the Disputed Claims Reserve within the restrictions contained in Section 345 of the Bankruptcy Code.

8.3    **Distributions Under the Plan**.  All distributions under the Plan will be made by the Reorganized Debtor to the Holder of each Allowed Claim at the address of such Holder as listed on the Schedules as of the Effective Date.

(a) Any payment of Cash made by the Reorganized Debtor pursuant to the Plan will be made by check drawn on a domestic bank or branch bank situated within the state of Texas.

17

(b) Any payment or distribution required to be made under the plan on a day other than a Business Day will be made on the next succeeding Business Day.

(c) No payment of Cash less than twenty-five dollars will be made by the Reorganized Debtor to any Holder of a Claim unless a request therefore is made in writing to the Reorganized Debtor.

8.4    **Distribution of Unclaimed Property**.  Any distribution of Cash under the Plan that is unclaimed after ninety (90) days after the distribution shall be transferred to the Reorganized Debtor, and the Holder of such Claims shall cease to be entitled to such unclaimed Cash. All right, title and interest in such unclaimed Cash shall vest in the Reorganized Debtor.

8.5    **Payments in Complete Satisfaction**.    The payments, distributions and other treatments provided in respect to each Allowed Claim under this Plan shall be in complete satisfaction, discharge and release of all such Allowed Claims.

8.6    **Distributions to Holders as of the Record Date**.   As of the close of business on the Record Date, the claims register (for Claims) and the stock transfer ledgers (for Existing Shareholder Interests) will be closed and there will be no further changes in the record Holders of any Claims or Interests. The Debtor or Reorganized Debtor will have no obligation to recognize any transfer of any Claims or Interests occurring after the Record Date and, instead, will be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan) with only those record Holders stated on the claims register (for Claims) and transfer ledgers (for Interests) as of the close of business of the Record Date.

8.7    **Cancellation and Surrender of Existing Interests and Agreements**.

(a) On the Effective Date,  share certificates, warrants and other instruments evidencing any Claim or Interest will be deemed canceled without further act or action under any applicable agreement, law , regulation, order or rule and the obligations of the Debtor and Reorganized Debtor under the agreements, certificates, warrants or other instruments governing such  Claim or Interest, as the case may be.

(b) Each Holder of a share certificate, warrant or other instrument evidencing a claim or Interest will surrender such promissory note, share certificate, warrant or instrument to the Reorganized Debtor, unless such requirement is waived by the Reorganized Debtor.  No distribution of property hereunder will be made to or on behalf of any such Holders unless and until such promissory note, share certificate, warrant or instrument is received by the Reorganized Debtor, or the unavailability of such note, share certificate or instrument is established to the reasonable satisfaction of the Reorganized Debtor, or the Reorganized Debtor waives such requirement.

18

# ARTICLE IX
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1    **Executory Contracts and Unexpired Leases**.

A.    Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor entered into before the Filing Date, including without limitation any indemnification obligation, will be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (i) which has been rejected pursuant to a motion for authority to reject that the Debtor may have filed and an order of the Bankruptcy Court entered before the Confirmation Date, or (ii) which is the subject of a motion for authority to reject that has been filed and served before the Confirmation Date to be filed on or prior to the hearing on Confirmation. The Debtor reserves the right to assume or reject executory contracts between the date hereof and the Confirmation Date.

B.    Debtor rejects, as of the Effective Date, any and all employee-related agreements and policies, including any employment agreement, management agreement or stock option provided to any employee in connection with an employment agreement or other agreement which existed prior to Filing, including but not limited to any and all related employment and severance practices and policies, and all related compensation and benefit plans, policies and programs of the Debtor applicable to its officers and employees, including insurance plans, health care plans, severance benefit plans, disability and other insurance plans provided thereunder.

C.    Debtor rejects, as of the Effective Date, to the extent it is or may be found by the Court to be a pre-petition executory contract, the Plan of Reorganization filed on August 12, 1999, and the Order Confirming Debtor's Amended Plan of Reorganization entered on March 15, 1994, in Case No. 92-21053-B-11, in the U. S. Bankruptcy Court for the Southern District of Texas, Brownsville Division.

9.2    **Approval of Assumption or Rejection of Leases and Contracts**. Entry of the Confirmation Order shall constitute (i) the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 9.1 of the Plan and (ii) approval, pursuant to Section 365(a) of the Bankruptcy Code, and (iii) the disallowance of all Claims, except as provided in Section 9.4, arising from contracts and leases assumed prior to or as of the Effective Date.

9.3    **Rejection Claims Bar Date**. Any Rejection Claim must be filed with the Bankruptcy Court and served upon the Debtor or Reorganized Debtor by, the earlier of, 30 days after (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, or (ii) ten (10) days after the Confirmation Date. Any such Claim that is not filed with the Bankruptcy Court within the time provided above will be deemed discharged and not entitled to participate in Distributions under the Plan. Unless otherwise ordered by the Court, all Claims arising from the

19

rejection of executory contracts and unexpired leases will be treated under Sections 5.4 or 5.5 of the Plan, depending upon the amount of the Claim provided, that the Holder of any such Claim may elect to be treated in Section 5.4 of the Plan.

9.4    **Cure of Defaults**. Except as otherwise agreed between the parties, Reorganized Debtor will cure all undisputed defaults existing under and pursuant to any executory contracts or unexpired leases assumed pursuant to the Plan or any motion for authority to assume that is pending and served before the Confirmation Date no later than ten (10) days from the Initial Distribution Date, or as soon thereafter as is practicable. All disputed defaults that are required to be cured will be cured within 30 days of the entry of a Final Order determining the amount, if any, of the Debtor's or the Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

9.5    **Indemnification Obligations**. For purposes of the Plan, the obligations of the Debtor and Reorganized Debtor to defend, indemnify, reimburse or limit the liability of its present and any former directors, officers, or employees that were directors, officers or employees, respectively, before, on or after the Commencement Date against any claims or obligations pursuant to the Debtor's certificates of incorporation or bylaws, applicable state law or specific agreement, or any combination of the foregoing, will survive confirmation of the Plan, remain unaffected thereby, and not be discharged irrespective of whether indemnification , defense, reimbursement or limitation is owed in connection with an event occurring before, on, or after the Commencement Date. The Reorganized Debtor reserves the right to contest or otherwise defend any such asserted or alleged indemnity Claim.

# ARTICLE X
# VESTING OF PROPERTY AND DISCHARGE

10.1    **Revesting to Reorganized Debtor**. On the Effective Date, the property of the Estate of Debtor shall revest in the Reorganized Debtor, except as otherwise provided in the Plan.

10.2    **Operation by Reorganized Debtor**. From and after the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire and dispose of property free of any restrictions imposed under the Bankruptcy Code.

10.3    **Free and Clear of Liens**. As of the Effective Date, except as otherwise expressly provided in the Plan, all property of the Debtor and the Reorganized Debtor will be free and clear of all liens, Claims and Existing Shareholder's Interests.

10.4    **Discharge**.

(a) Except as otherwise specifically provided by this Plan, the confirmation of this Plan shall discharge and release the Debtor, Debtor in Possession, and Reorganized Debtor, its successors and assigns and their respective assets and properties from any debt, charge, liability, encumbrances, security interest, Claim, Existing Shareholders' Interest or other cause of action of any kind, nature

20

or description (including, but not limited to, any claim of successor liability) that arose before the Confirmation Date, and any debt of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of claim is filed or is deemed filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim has voted on this Plan (including, without limitation, any liabilities arising under environmental laws in respect of the Debtor or any of the Debtor's successors or assigns or their respective assets or properties or any such partnership which result, in whole or in part, from any condition, event, occurrence or happening prior to the Confirmation Date, whether or not known or unknown, discovered or undiscovered, asserted or unasserted, latent or patent, and regardless of whether any Claim was, is or could have been asserted for such liability), and upon such discharge and release, no such liabilities shall continue to be obligations of the Debtor, Reorganized Debtor, or their successors or its assets or properties, whether under the doctrine of successor liability or otherwise.

(b)   Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by this Plan, the rights that are provided in this Plan and the treatment of all Claims will be in exchange for and will be in complete satisfaction, discharge and release of (i) all Claims and Causes of Action against, liabilities of, liens on, charges, encumbrances, security interests, obligations of and Existing Shareholders' Interests of any nature whatsoever, against the Debtor , Debtor in Possession and Reorganized Debtor or the direct or indirect assets and properties of the Debtor or Reorganized Debtor, whether known or unknown, and (ii) all Causes of Action, whether known or unknown, either directly or derivatively through the Debtor, or the successors and assigns of the Debtor based on the same subject matter as any Claim, Existing Shareholder's Interest, in each case, regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on this Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on this Plan.

10.5   All injunctions, liens or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on or  immediately before the Confirmation Date will remain in full force and effect until the Effective Date.

10.6   **Injunction**. Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, all entities who have held, hold or may hold Claims against or Interests in the Debtor, are permanently enjoined, on and after the Effective date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or  Interest, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor or Reorganized Debtor for or on account of any such Claim or Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtor or Reorganized Debtor for or against the Debtor or Reorganized Debtor for or on account of any such Claim or Interest, and (d) asserting any right of set off, subrogation or recoupment of any kind against any obligation due from the Debtor or Reorganized Debtor for or against the property

21

or interests in property of the Debtor on account of any such Claim or Interest. Such injunction will extend to successor of the Debtor and Reorganized Debtor, and their respective properties and interests in property.

    10.7 **Release of environmental Claims.** All claims for environmental damage or indemnity existing on the Confirmation Date against the Debtor or which may be asserted under any local, state, or federal law or regulation against the Debtor by any entity as of the Confirmation Date, are released as of the Confirmation Date.

# ARTICLE XI
## RESERVATION OF CLAIMS

    11.1 Except as otherwise provided in the Plan, all Claims and Causes of Action in favor of the Debtor, including, without limitation, all claims under Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, will become assets of the Reorganized Debtor and are reserved and may be prosecuted after the Confirmation Date by the Reorganized Debtor, or its authorized Agent. To the extent necessary, the Reorganized Debtor, or its authorized Agent, shall be deemed a representative of the estate under Section 1123(b) of the Bankruptcy Code. On and after the Effective Date, the Reorganized Debtor will have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such Causes of Action without approval of the Bankruptcy Court.

# ARTICLE XII
## OBJECTIONS TO CLAIMS

    12.1 **Objections to Claims.** Reorganized Debtor, or its authorized Agent, will have full right, power and authority to investigate and if necessary, object to any Claim on or within sixty days (60) of the Effective Date, unless the Bankruptcy Court extends such time on notice for cause shown. The Reorganized Debtor shall litigate to judgment, settle or withdraw objections to contested claims.

# ARTICLE XIII
## DEFAULT UNDER THE PLAN

    Any holder of an Allowed Claim may notify the Debtor or Reorganized Debtor in writing of a default under the Plan. In the event such written notice of a default is transmitted to the Debtor or Reorganized Debtor, the Debtor, Reorganized Debtor or any party in interest will have thirty (30) days from receipt of the notice to cure the alleged default. Absent cure, the aggrieved party may seek relief from the Bankruptcy Court.

22

## ARTICLE XIV
## MODIFICATION OF THE PLAN

The Debtor reserves its right, according to the Bankruptcy Code, to amend or modify the Plan before the Confirmation Date. After the Confirmation Date, the Debtor may, upon order of the Bankruptcy Court, and according to Section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intentions of the Plan.

A Claimant that has accepted or rejected the Plan will be deemed to have either accepted or rejected, as the case may be, any modifications to the Plan, even if they are made after the solicitation of votes of acceptance or rejection of the Plan, unless the Bankruptcy Court orders that such Claimant may change its previous vote within a time established by the Bankruptcy Court for such changes to be made.

## ARTICLE XV
## RETENTION OF JURISDICTION

The Bankruptcy Court will retain exclusive jurisdiction of all matters arising out of the Bankruptcy Case and the Plan as long as necessary for the purposes of Sections 105(a), 1127, 1142(b) and 1144 of the Bankruptcy Code and for, inter alia, the following purposes:

(a)     to recover all Assets of the Debtor, wherever located;

(b)     to decide any objections to the allowance, disallowance or subordination of Claims or a controversy as to the classification of Claims;

(c)     to decide and fix (i) all Administrative Claims, (ii) Claims arising from the rejection of any executory contracts or unexpired leases, (iii) Liens on any property or any proceeds thereof, and (iv) any other fee and expense authorized to be paid or reimbursed under the Bankruptcy Code;

(d)     to liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any disputed, contingent or unliquidated Claims;

(e)     to adjudicate any matters as may be provided for in the Confirmation Order;

(f)     to effectuate payments under and enforce the provisions of the Plan;

(g)     to hear and determine any pending applications, adversary proceedings or contested matter including all controversies, suits and disputes that may arise in connection with the

23

interpretation or enforcement of the Plan, and matters concerning state, local and federal taxes according to Sections 346, 505 and 1146 of the Bankruptcy Code;

(h)    to amend or to correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(i)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated;

(j)    to consider any modification of the Plan pursuant to Section 1127 of the Bankruptcy Code or modification of the Plan after substantial consummation, as such terms is defined in Section 1101(2) of the Bankruptcy Code;

(k)    to determine any causes of action as specified in Section 11.1;

(l)    to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code; and

(m)    to enter a final decree closing the Bankruptcy Case.

## ARTICLE XVI
## GENERAL PROVISIONS

16.1    **Notices**.  Except as otherwise specified, all notices and requests will be given by any written means, including but not limited to, telex, telecopy, telegram, first class mail, express mail or similar overnight delivery service and hand delivered letters, and any such notice or request will be deemed to have been given when received.  Notices will be delivered as follows:

To the Debtor or Reorganized Debtor:

        Sort-Rite International, Inc.
        P. O. Box 1805
        Harlingen, Texas 78550
        956-423-2427

        and

        KEN E. MACKEY
        Attorney at Law
        P. O. Box 429
        San Ygnacio, Texas 78067
        956-712-3451

To the Office of the U.S. Trustee, Southern District of Texas:

24

Office of the United States Trustee
Assistant U. S. Trustee
1107 Wilson Plaza West
606 North Carancahua Street
Corpus Christi, Texas 78476

16.2    **Extension of Payment Dates**.  If any Distribution date falls due on any day that is not a Business Day, then such payment date will be extended to the next Business Day.

16.3    **Confirmation by Non-Acceptance Method**.  The Debtor requests , confirmation of the Plan pursuant to Bankruptcy Code Section 1129(b) with respect to any Impaired Class that does not vote to accept the Plan.

16.4    **Vesting**.  As of the Closing Date, the Reorganized Debtor will be vested with all Assets, free and clear of all Claims, liens, security interests, assignments, encumbrances, charges, and other interests of the Claimants (except those Claimants whose Claims have been modified and restructured and survive as provided in the Plan); and except where the Bankruptcy Court has retained jurisdiction regarding any specified aspect of the activities of the Debtor, the Reorganized Debtor may operate Assets  free of any restrictions imposed by the Bankruptcy Code and in all respects as if there were no pending bankruptcy case under any chapter or provision of the Bankruptcy Code.

16.5    **Withdrawal of Plan**.  The Plan may be withdrawn or revoked before the entry of the Confirmation Order at the sole and absolute discretion of the Debtor.

16.6    **Payment of Statutory Fees**.  All fees payable pursuant to Section 1930 of title 28 of the United States Code will be paid until the Court enters a final decree or the case is converted or dismissed.

16.7    **Payment of Post-Confirmation Fees and Expenses**.  From and after the Confirmation Date, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the Debtor and Reorganized Debtor will pay the reasonable fees and expenses of professional persons thereafter incurred by the Debtor and Reorganized Debtor, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

16.8    **Exculpation**.  The Debtor, Reorganized Debtor, Creditors' Committee, and any of their respective members, officers, directors, employees, advisors or agents, will have nor incur any liability to any Holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor, Reorganized Debtor,

25

Creditors' Committee, and each of their respective members, officers directors, employees, advisors and agents, will be entitled to rely upon the advise of counsel with respect to their duties and responsibilities under the Plan; provided however, that nothing contained in this Section will exculpate, satisfy, discharge or release any avoidance claims against present or former officers, directors or employees of the Debtor in their capacities other than as present or former officers, directors or employees.

16.9    **Headings**.  The headings used in the Plan are inserted for convenience only and constitute neither part of the Plan nor in any manner affect the provisions or interpretations of the Plan

16.10    **Enforceability**.  Should any provision of the Plan be determined to be unenforceable for any reason, such determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

16.11    **Exemption from Transfer Taxes**.  Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, of equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any agreement or assignment executed in connection with any of the transactions contemplated under the Plan will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

16.12    **Binding Effect**.  On the Effective Date, according to Section 1141 of the Bankruptcy Code, the provisions of this Plan will bind the Debtor, Reorganized Debtor, any entity acquiring Assets under the Plan, and any holder of a Claim or an Existing Shareholders' Interest, whether or not the Claim or Existing Shareholders' Interest is Impaired under the Plan and whether or not the holder of the Claim or Existing Shareholders' Interest has accepted the Plan.

16.13    **Plan Supplement**.  Forms of the documents relating to the Amended Sort-Rite Articles of Incorporation, the Amended Sort-Rite Bylaws, the Employment Agreement, if any, will be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court no later than the hearing established by the Bankruptcy Court to consider the adequacy of the Disclosure Statement.

16.14    **Pre-petition Lawsuits**.  On the Effective Date, all pre-petition lawsuits, litigation, administrative actions or other proceedings, judicial or administrative, shall be dismissed as to the Debtor.  Such dismissal shall be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan.

16.15    **Subordination of Penalty and Shareholder Claims**.  The filing of this Plan and its submission to the Holders of Penalty and Shareholder Claims shall constitute an action seeking to subordinate all such Claims pursuant to Section 510 of the Bankruptcy Code. The Confirmation

26

Order, except as provided herein, shall constitute an order subordinating such Claims to all other Claims pursuant to Section 510 of the Bankruptcy Code.

16.16  **Severability**.  Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or transaction, the Debtor may modify the Plan in Accordance with Article XIV of the Plan so that such provision shall not be applicable to the Holder of any Claim.  Such a determination of unenforceability shall not (1) limit or affect the enforceability and operative effect of any other provision of the Plan or (2) require the resolicitation of any acceptance or rejection of the Plan.

16.18  **Creditor Defaults**.  Any act or omission by a creditor in contravention of a provision within this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Debtor or Reorganized Debtor may seek to hold the defaulting party in contempt of the Confirmation Order.  If such creditor is found to be in default under the Plan, such party shall pay the reasonable attorneys' fees and costs of the Debtor or Reorganized Debtor in pursuing such matter.

16.19  **Allocation of Plan Distributions between Principal and Interest**.  Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

Respectfully submitted this ⁄⁄ day of November, 2000.

SORT-RITE INTERNATIONAL, INC.
Debtor and Debtor in Possession

By _____
Shirley Metzger, Its
President

DEBTOR'S ATTORNEY

KEN E. MACKEY
P. O. Box 429
San Ygnacio, Texas 78067
956-712-3451

20

## FORM 1. VOLUNTARY PETITION

| United States Bankruptcy Court For the | VOLUNTARY |
|---|---|
| **Southern    District of Texas, Brownsville Division** | **PETITION** RECEIVED |

| IN RE (Name of debtor - if individual, enter Last, First, Middle) | NAME OF JOINT DEBTOR (Spouse) (Last, First, Middle) |
|---|---|
| SORT-RITE INTERNATIONAL, Inc. | none |

MAY 14 1992

*Insolvency Section*

| ALL OTHER NAMES, INCLUDING TRADE NAMES, USED BY THE DEBTOR IN THE LAST 6 YEARS | ALL OTHER NAMES, INCLUDING TRADE NAMES, USED BY THE JOINT DEBTOR IN THE LAST 6 YEARS |
|---|---|

**92-21053-3-11**

| SOCIAL SECURITY NO.AND/OR EMPLOYER'S TAX ID NO. | SOCIAL SECURITY NO.AND/OR EMPLOYER'S TAX ID NO. |
|---|---|
| SSN:    TIN: 74-1982167 | SSN:    TIN: |
| ADDRESS OF DEBTOR (Street, City, State and Zip Code) | ADDRESS OF JOINT DEBTOR (Street, City, State, and Zip Code) |
| 825 W. Jefferson    , Harlingen, Texas 78551 | 825 W. Jefferson    , Harlingen, Texas 78551 |
| NAME OF COUNTY: Cameron | NAME OF COUNTY: Cameron |
| MAILING ADDRESS OF DEBTOR (if different from street address) | MAILING ADDRESS OF JOINT DEBTOR (if different from st. address) |
| P.O. Box 1805    , Harlingen, Tx 78551 | |

| LOCATION OF PRINCIPAL ASSETS OF BUSINESS | VENUE (Check one box) |
|---|---|
| 825 W. Jefferson<br>Harlingen, Tx. 78551 | [X] Debtor has been domiciled or has had a residence principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district<br>[ ] There is a bankruptcy case concerning the debtor's affiliate, general partner, or partnership pleading in this district. |

### INFORMATION REGARDING DEBTOR (Check applicable boxes)

| TYPE OF DEBTOR | CHAPTER OF SECTION OF BANKRUPTCY CODE UNDER WHICH THE PETITION IS FILED (Check one box) |
|---|---|
| [ ] Individual     [ ] Corporation Publicly Held | [ ] Chapter 7    [X] Chapter 11    [ ] Chapter 13 |
| [ ] Joint (Husband and Wife)  [X] Corporation Not Publicly Held | [ ] Chapter 9    [ ] Chapter 12    [ ] Section 304 |
| [ ] Partnership    [ ] Municipality | |
| [ ] Other_____ | FILING FEE (Check one box) |
| | [X] Filing fee attached |
| **NATURE OF DEBT** | [ ] Filing fee to be paid in installments. |
| [ ] Non-Business/Consumer  [X] Business-Complete A & B below | NAME AND ADDRESS OF LAW FIRM OR ATTORNEY |
| | Denis A. Downey |
| **A. TYPE OF BUSINESS (Check one box)** | 1185 F.M. 802, Suite 3 |
| [ ] Farming    [ ] Transportation  [ ] Commodity Broker | Brownsville, Texas 78521 |
| [ ] Professional   [X] Manufacturing/  [ ] Construction | Telephone: 512/544-0561   ID: #1186 |
| [ ] Retail/Wholesale  Mining   [ ] Real Estate | NAME(S) OF ATTORNEY(S) DESIGNATED TO REPRESENT DEBTOR |
| [ ] Railroad   [ ] Stockbroker  [ ] Other Business | Denis A. Downey |
| **B. BRIEFLY DESCRIBE NATURE OF BUSINESS** | [ ] Debtor is not represented by an attorney |
| Shrimp Processing Equipment | |

### STATISTICAL/ADMINISTRATIVE INFORMATION (U.S.C. SEC. 604) (Estimates only)

| [X] Debtor estimates that funds will be available for distribution to creditors. | This space for court use only |
|---|---|
| [ ] Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

**ESTIMATED NUMBER OF CREDITORS**

| 1-15 | 16-49 | 50-99 | 100-999 | 200-999 | 1000-over |
|---|---|---|---|---|---|
| | [X] | | | | |

**ESTIMATED ASSETS (In thousands of dollars)**

| Under 50 | 50-99 | 100-499 | 500-999 | 1000-9999 | 10,000-99,000 | 100,000-over |
|---|---|---|---|---|---|---|
| | | | | | | [X] |

*filed 5-5-92*

**ESTIMATED LIABILITIES (In thousands of dollars)**

| Under 50 | 50-99 | 100-499 | 500-999 | 1000-9999 | 10,000-99,000 | 100,000-over |
|---|---|---|---|---|---|---|
| | | | | | | [X] |

**ESTIMATED NUMBER OF EMPLOYEES (Chapter 11 & 12 only)**

| 0 | 1-19 | 20-99 | 100-999 | 1000-over |
|---|---|---|---|---|
| | | [X] | | |

**ESTIMATED NUMBER OF EQUITY SHAREHOLDERS (Chapter 11 & 12 only)**

| 0 | 1-19 | 20-99 | 100-999 | 500-over |
|---|---|---|---|---|
| | [X] | | | |

PFM-'J'

000306

## FILING OF PLAN

r Chapter 9, 11, 12, and 13 cases only. Check Appropriate Box.

| | A copy of the debtor's proposed plan dated None is attached. | |X| Debtor intends to file a plan within the time allowed by statute, rule of order of the court. |

### PRIOR BANKRUPTCY CASE FILED WITHIN LAST 6 YEARS (If more than one attach additional sheet)

| Location Where Filed | Case Number | Date |
|---|---|---|
| | | |

### PENDING BANKRUPTCY CASE FILED BY ANY SPOUSE, PARTNER, OR AFFILIATE OF THE DEBTOR (If more than one, attach additional sheets)

| Name of Debtor | Case Number | Date |
|---|---|---|
| Relationship | District | Judge |

### REQUEST FOR RELIEF

Debtor requests relief in accordance with chapter of title 11 United States Code specified in this petition.

### SIGNATURES

ATTORNEY

X _Dennis A. Dunn_

Signature

Date _May 5/92_

| INDIVIDUAL JOINT DEBTOR(S) | CORPORATE OR PARTNERSHIP DEBTOR |
|---|---|
| I declare under penalty of perjury that the information in this petition is true and correct. | I declare under penalty of perjury that the information provided in this petition is true and correct and that the filing of this petition on behalf of the debtor has been authorized. |
| X _____ | X _Michael A. Hosny_ |
| Signature of Debtor | Signature of Authorized Individual |
| | _Michael Hosny CEO_ |
| _____ | Print or Type Name of Authorized Individual |
| Date | |
| X _____ | X _____ |
| Signature of Joint Debtor | Title of Individual Authorized by Debtor to File this Petition |
| | _May 5/92_ |
| _____ | |
| Date | Date |

### EXHIBIT "A" (To be completed if debtor is a corporation, requesting relief under Chapter 11.)

| | Exhibit "A" is attached and made a part of this petition.

### TO BE COMPLETED BY INDIVIDUAL CHAPTER 7 DEBTOR WITH PRIMARILY CONSUMER DEBTS (See P.L. 96-353 Sec. 322)

I am aware that I may proceed under chapter 7, 11, or 12, or 13 of title 11, United States Code, understand the relief available under such chapter, and choose to proceed under chapter 7 of such title.

If I am represented by an attorney Exhibit B has been completed.

X _____         _____
Signature of Debtor                              Date


_____                              _____
Signature of Joint Debtor                        Date

### EXHIBIT "B" (To be completed by attorney for individual chapter 7 debtor(s) with primarily consumer debts.

*, the attorney for the debtor(s) named in the foregoing petition, declare that I have informed the debtor(s) that (he, she, or they) may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter.


_____                              _____
Signature of Attorney                            Date

000307

ED STATES BANKRUPTCY COURT FOR THE Southern
RICT OF Texas, Brownsville Division                    Case Number 92-21053-B-11
------------------------------------------------
re: SORT-RITE INTERNATIONAL, Inc.            } Schedule B - SCHEDULE OF
       n/a                                   }
                                             }      PERSONAL PROPERTY
btor's Employer's Tax Id. Number :   74-1982167  }
------------------------------------------------

None of the following claims is contingent, unliquidated or disputed unless
                          otherwise stated.
------------------------------------------------------------------------------------

ept as directed below, list all personal property of the debtor of whatever kind.  If the debtor has no property in one or more
gories, write "None" in the appropriate position below the category.

the property is being held for the debtor by someone else, state that person's name and address.

et is defined as :  Current Market Value of Debtor's Interest in Property Without Deducting any  Secured Claim or Exemption.
------------------------------------------------------------------------------------

Cash on hand.

scription of Prop.      : overdraft                    Market :$      3290.65

) Checking, savings or other financial accounts, certificates of deposit, or
ares in banks, savings and loan, thrift, building and loan, and homestead
   iations, or credit unions, brokerage houses, or cooperatives.

*None*

Security deposits with public utilities, telephone companies, landlords, and
hers.

cription of Prop.      :                               Market :$      2140.04

) Household goods and furnishings, including audio, video and computer
ipment.

*None*

Books, pictures and other art objects, antiques, stamp, coin, record, tape
mpact disk, and other collections or collectibles.

*one*

) Wearing apparel.

*one*

Furs and jewelry.


                    Page 1   (Continued following page)

RE: SORT-RITE INTERNATIONAL, Inc.                    Case Number: 92-21053-B-11

Schedule B - 7 : Personal Property (continued)

None

8) Firearms and sports, photographic, and other hobby equipment.

None

9) Interest in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each.

Description of Prop.      : Jefferson Pilot Life Insurance   Market :$      3913.68
Street Address           : P.O. Box 65000
City, State, Zip Code    : Greensboro, N.C.

10) Annuities. Itemize and name each issuer.

None

11) Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize.

None

12) Stock and interests in incorporated and unincorporated business. Itemize.

Description of Prop.      : FSC: Sort-Rite Foreign Sales    Market :$      1000.00
Description (continued)  : Guardian Bldg. 2nd Floor
Street Address           : Havensight St.
City, State, Zip Code    : St. Thomas, US Virgin Islands

13) Interests in partnerships or joint ventures. Itemize.

None

14) Government and corporate bonds and other negotiable and non-negotiable instruments.

None

15) Accounts Receivable.

Description of Prop.      : See Exhibit "A"                 Market :$      93825.08

16) Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars.

Page 2   (Continued following page)

RE: SORT-RITE INTERNATIONAL, Inc. _____    Case Number: 92-21053-B-11 ___

:hedule B - 16 : Personal Property (continued)


⁻None

.7) Other liquidated debts owing debtor including tax refunds. Give particulars.

  scription of Prop.    : Carryback of FYE 4/30/92 NOL    Market :$    71084.00

.8) Equitable or future interests, life estates, and rights or powers
  ercisable for the benefit of the debtor other than those listed in
  hedule of Real Property.

⁻scription of Prop.    :    Market :$    0.00

.9) Contingent and non-contingent interests in estate of a decedent, death
  .nefit plan, life insurance policy, or trust.

 escription of Prop.    : Keyman Life Insurance Policy    Market :$    1500000.00
 escription (continued) : in Shirley Metzger Name for the
 scription (continued) : benefit of SBB&T,Export-Import
 reet Address    : Bank & First City Texas, N.A

⁻    Other contingent and unliquidated claims of every nature including tax
  .unds, counterclaims of the debtor, and rights to setoff claims. Give
  ;stimated value if each.

  None

!1) Patents, copyrights, and other intellectual property. Give particulars.

  None

⁻:) Licenses, franchises, and other general intangibles. Give particulars.

  None

 I) Automobiles, trucks, trailers, and other vehicles.

 escription of Prop.    :    Market :$    9500.00

 I) Boats, motors, and accessories.

⁻None

 25) Aircraft and accessories.

  None


Page 3   (Continued following page)

## RE: SORT-RITE INTERNATIONAL, Inc.          Case Number: 92-21053-B-11

) Office equipment, furnishing, and supplies.

*scription of Prop.    :*                          *Market :$     53012.00*

) Machinery, fixtures, equipment and supplies used in business.

*~scription of Prop.    :*                          *Market :$    257000.00*

8) Inventory.

*scription of Prop.    :*                          *Market :$    650000.00*

9) Animals.

*None*

~) Crops - growing or harvested. Give particulars.

*None*

) Farming equipment and implements.

*None*

, Farm supplies, chemicals, and feed.

*~None*

3) Other personal property of any kind not already listed. Itemize.

*None*

                                                    ----------------
*otal: Schedule B : Personal Property :*       $      2644765.45
                                                    ================



# 00-21094-B 11

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS

**Voluntary Petition**

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Sort-Rite International Inc.** | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>**NONE** |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names):<br><br>NONE | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Soc. Sec./Tax I.D. No. (if more than one, state all):<br>74-1982167 | Soc. Sec./Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>825 West Jefferson Avenue<br>Harlingen, Texas 78550 | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business: Cameron | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>P.O. Box 1805<br>Harlingen, Texas 78551 | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

### Information Regarding the Debtor

**Venue**

X   Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

    There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| Type of Debtor (Check all that apply | Chapter or Section of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box) |
|---|---|
| Individual(s)     X Corporation<br>Partnership     Railroad<br>Stockbroker     Commodity Broker<br>Other_____ | Chapter 7    X Chapter 11    Chapter 13<br>Chapter 9     Chapter 12<br>Sec. 304 - Case ancillary to foreign proceeding |
| **Nature of Debts**<br>· Consumer/ Non-Business    X Business | **Filing Fee** |
| **Chapter 11 Small Business:**<br>NO<br>Debtor is a small business as defined in 11 U.S.C. § 101<br>Debtor is and elects to be considered a small business under<br>11 U.S.C.§ 1121 | X Full Filing Fee attached<br>· Filining fee to be paid in installments (Applicable to indvidual<br>Only) Must attach signed application for the court's<br>consideration certifying that the debtor is unable to pay fee<br>except in Installments. Rule 1006(b). See Official Form No. 3. |

**Statistical/Administrative Information (Estimates only)**          THIS SPACE IS FOR COURT USE ONLY

X Debtor estimates that funds will be available for distribution to unsecured creditors

   Debtor estimates that, after any exempt property is excluded and administrative expenses paid,
· there will be no funds available for distribution to unsecured creditors.

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | | | X | | | |

| Estimated Assets | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0<br>$50,000 | $50,001<br>$100,000 | $100,001<br>$500,000 | $500,001<br>$1 Million | $1,000,001<br>$10 Million | $10,000,001<br>$50 Million | $50,000,001<br>$100 Million | More than<br>$100 Million |
| | | | X | | | | |

| Estimated Debts | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0<br>$50,000 | $50,001<br>$100,000 | $100,001<br>$500,000 | $500,001<br>$1 Million | $1,000,00<br>$10 Million | $10,000,001<br>$50 Million | $50,000,001<br>$100 Million | More than<br>$100 Million |
| | | | | X | | | |

PKM - 'K'

**Voluntary Petition**
*(This page must be completed and filed in every case)*

Name of Debtor
Sort-Rite International Inc.

| Prior Bankruptcy Case Filed by any Spouse, Partner or Affiliate Within Last 6 Year | | |
|---|---|---|
| Location | Case Number | Date Filed |
| Where Filed:      NONE | | |

| Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor | | |
|---|---|---|
| Name of Debtor      NONE | Case Number | Date filed |
| District | Relationship | Judge |

### Signatures

**Signature of Debtor (Corporation/Partnership)**

I declare under the penalty of perjury that the information in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter 11, United States Code, specified in this petition.

X _____
      Shirley Metzger, President/CEO

3/29/2000
Date

**Signature of Attorney**

X _____
      Ken E. Mackey

Ken E. Mackey
1800 Victoria Street
Suite 2
Laredo, Texas 78040
(956) 712-3451

4-10-2000
Date                              , 2000.

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

In re:  Sort Rite International Inc.,
        Debtor

Case No. _____

## SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

**Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."

| Type of Property | None | Description and Location of Property | Current Market Value of Debtor's Interest in Property, With-Out Deducting any Secured Claim or Exemption. |
|---|---|---|---|
| 1. Cash on hand. | | Debtor's place of business | $ 150.00 |
| 2. Checking, savings or other finan-cial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and home-stead associations, or credit unions, brokerage houses, or cooperatives. | | Checking Account 011001931 First National Bank 1010 S Expressway 83 Harlingen, Texas 78550 | $1,126.90 |
| 3. Security deposits with public util-ities, telephone companies, land-lords, and others. | X | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | X | | |
| 5. Books; pictures and other art record, tape, compact disc, and other collections or collectibles. | X | | |
| 6. Wearing apparel. | X | | |
| 7. Furs and jewelry. | X | | |
| 8. Firearms and sports, photographic, and other hobby equipment. | X | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | |

In re:  Sort Rite International Inc.,                    Case No. _____
        Debtor

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet 1 )

| Type of Property | None | Description and Location of Property | Current Market Value of Debtor's Interest in Property, With-Out Decucting any Secured Claim or Exemption. |
|---|---|---|---|
| 10. Annuities. Itemize and name each issuer. | X | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | X | | |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | |
| 14. Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | |
| 15. Accounts receivable. | | Work in progress | $ 63,542.00 |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | |
| 19. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | |
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | X | | |
| 22. Licenses, franchises, and other general intangibles. Give particulars | X | | |

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION
 3                    Case No. B-01-142
 4
 5
     JEFFERSON-PILOT LIFE          )
 6   INSURANCE COMPANY,            )
                                   )
 7              Plaintiff,         )
                                   )
 8         vs.                     )
                                   )
 9   SORT-RITE INTERNATIONAL,      )
     ET AL.,                       )
10                                 )     COPY
                Defendants.        )
11
12
13
14
                         DEPOSITION
15
                             OF
16
               CARL D. SEMMLER, J.D.
17
18
19
20
                 Greensboro, North Carolina
21                    May 3, 2002
                      1:16 p.m.
22
23
24                    PFM-'L'
25   Court Reporter:  Cindy A. Fletcher
```

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.          B-01-142
Carl D. Semmler, J.D.                                                              5/3/2002

Page 2

|   | TABLE OF CONTENTS | |
|---|---|---|
| 1 | | |
| 2 | | PAGE |
| 3 | EXHIBIT INDEX | 3 |
| 4 | APPEARANCES | 5 |
| 5 | STIPULATIONS | 6 |
| 6 | EXAMINATION | |
| 7 | By Ms. Singleton | 7 |
| 8 | By Mr. Boswell | 86 |
| 9 | CERTIFICATE OF WITNESS | 96 |
| 10 | CERTIFICATE OF REPORTER | 97 |
| 11 | ERRATA SHEET | 98 |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | Reporter's Note: This transcript contains quoted | |
| 24 | material. Such material is reproduced as read or | |
| 25 | quoted by the speaker. | |

Page 4

|   | EXHIBIT INDEX (CONTINUING) | |
|---|---|---|
| 1 | | |
| 2 | | PAGE |
| 3 | Number 14   3/28/02 Letter From Carl D. | |
| 4 | Semmler to Constance Y. | |
| 5 | Singleton With Attachments | 93 |
| 6 | Number 15   3/15/02 Letter From Carl D. | |
| 7 | Semmler to Chris Boswell | 93 |
| 8 | Number 16   3/15/02 Letter From Carl D. | |
| 9 | Semmler to Constance Y. | |
| 10 | Singleton With Attachments | 93 |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 3

|   | EXHIBIT INDEX | |
|---|---|---|
| 1 | | |
| 2 | | PAGE |
| 3 | Number 5   3/15/02 Affidavit of Carl D. | |
| 4 | Semmler | 10 |
| 5 | Number 6   Draft Affidavit | 11 |
| 6 | Number 7   3/12/02 Facsimile Transmittal | |
| 7 | Sheet From Hilda at Chris | |
| 8 | Boswell's to Carl D. Semmler | |
| 9 | With Attached Draft Affidavit | 13 |
| 10 | Number 8   1/18/88 Letter From Susan | |
| 11 | Westbrook to Mack Scott | 17 |
| 12 | Number 9   5/11/01 Letter From Carl D. | |
| 13 | Semmler to Jane Akin Brasch, | |
| 14 | Lynn Frizzelle, Ken E. Mackey, | |
| 15 | William Mays, and Constance Y. | |
| 16 | Singleton With Attachment | 23 |
| 17 | Number 10   5/6/92 File Copy; Bates-stamped | |
| 18 | P 03837 With Attachment | 25 |
| 19 | Number 11   1/4/88 Policyowner's Service | |
| 20 | Transmittal | 51 |
| 21 | Number 12   8/16/95 Change of Beneficiary | |
| 22 | Form | 82 |
| 23 | Number 13   Rev. 2/94 Tri-copy Form BJ-6625 | |
| 24 | Jefferson-Pilot Change of | |
| 25 | Beneficiary | 85 |

Page 5

|   | APPEARANCES |
|---|---|
| 1 | |
| 2 | APPEARING ON BEHALF OF THE PLAINTIFF JEFFERSON-PILOT |
| 3 | LIFE INSURANCE COMPANY: |
| 4 | Carl D. Semmler, J.D. |
| 5 | Assistant Vice President and |
| 6 | Associate Counsel |
| 7 | Jefferson-Pilot Life Insurance Company |
| 8 | 101 North Greene Street |
| 9 | Post Office Box 21008 (27420) |
| 10 | Greensboro, North Carolina  27401 |
| 11 | Telephone:  (336) 691-3369 |
| 12 | APPEARING ON BEHALF OF THE DEFENDANTS LETICIA PINO, |
| 13 | KATHERINE METZGER AND DEBRA METZGER FINCH: |
| 14 | Constance Y. Singleton, Esq. |
| 15 | Attorney at Law |
| 16 | 215 Bayland Avenue |
| 17 | Houston, Texas  77009 |
| 18 | Telephone:  (281) 687-0100 |
| 19 | APPEARING ON BEHALF OF THE DEFENDANT SORT-RITE |
| 20 | INTERNATIONAL, INC.: |
| 21 | Stapleton, Curtis & Boswell, by |
| 22 | Chris Boswell, Esq. |
| 23 | 515 East Harrison Street, Suite A |
| 24 | Harlingen, Texas  78551 |
| 25 | Telephone:  (956) 428-9191 |

2 (Pages 2 to 5)

B-01-14
5/3/200

**Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.**
**Carl D. Semmler, J.D.**

B-01-142
5/3/2002

Page 4

93

93

93

## Page 6

```
 1          STIPULATIONS
 2      It is hereby stipulated and agreed between the
 3  parties to this action, through their respective
 4  counsel of record, as follows:
 5      1.  The deposition of CARL D. SEMMLER, J.D.,
 6  may be taken on Friday, May 3, 2002, beginning
 7  at 1:16 p.m., in the offices of Jefferson-Pilot Life
 8  Insurance Company; 101 North Greene Street;
 9  Greensboro, North Carolina, before Cindy A. Fletcher,
10  Court Reporter and Notary Public.
11      2.  Said deposition shall be taken in
12  accordance with the Federal Rules of Civil Procedure.
13      3.  The sealed original of this deposition
14  will be mailed first-class postage or hand delivered
15  to Constance Y. Singleton, Esq.; Attorney at Law; 215
16  Bayland Avenue; Houston, Texas, 77009; and notice of
17  filing is hereby waived.
18      4.  The reading and signing of the deposition
19  are not waived.
20          **********
21
22
23
24
25
```

## Page 8

```
 1  interpleader action in Brownsville, Texas, that is
 2  the suit that we're taking this deposition on today?
 3      A.  Yes.
 4      Q.  Okay.  How long have you worked for
 5  Jefferson-Pilot?
 6      A.  In September it will be 15 years.
 7      Q.  Okay.  And, during that entire period,
 8  did you work for them as an attorney?
 9      A.  Yes.
10      Q.  When did you first become familiar with
11  what I'm going to refer to as the "Shirley Metzger
12  file"?
13      A.  I don't remember the date.  It was
14  referred to me by our claims department.
15      Q.  Okay.  That would have been before the
16  interpleader was filed?
17      A.  Yes.
18      Q.  But it would have been sometime after
19  Shirley Metzger died?
20      A.  That's right.
21      Q.  Okay.  When did you first meet Chris
22  Boswell?
23      A.  This morning.
24      Q.  Okay.  And you've talked to him on the
25  phone--
```

Page 5

ON-PILOT

A PINO,
I:

TE

## Page 7

```
 1  Thereupon:
 2          CARL D. SEMMLER, J.D.
 3  being first duly sworn in the above cause, was
 4  examined and testified under oath as follows:
 5          EXAMINATION BY MS. SINGLETON
 6      Q.  Sir, could you state your name for the
 7  record.
 8      A.  Carl Douglas Semmler.
 9      Q.  And what is your occupation, sir?
10      A.  I am assistant vice president and
11  associate counsel for Jefferson-Pilot Life Insurance
12  Company.
13      Q.  Okay.  And you're an attorney licensed to
14  practice law in North Carolina?
15      A.  Yes.
16      Q.  Okay.  My name is Constance Singleton,
17  and I am the attorney that represents Leticia Pino,
18  Katherine Metzger, and Debra Finch.  We have never
19  met before today, have we, sir?
20      A.  No.
21      Q.  But I've talked to you several times on
22  the telephone?
23      A.  Yes.
24      Q.  And you were involved in legal matters on
25  behalf of Jefferson-Pilot relating to the
```

## Page 9

```
 1      A.  Yes.
 2      Q.  --like you've talked to me?
 3      A.  Yes.
 4      Q.  Okay.  I'm going to hand you what will be
 5  marked Exhibit--
 6          MS. SINGLETON:  Off the record a second.
 7          (Discussion off the record.)
 8      Q.  (By Ms. Singleton)  I'm going to hand you
 9  what we will mark, as soon as the copies come back,
10  as Exhibit 5, so that it will agree with the first
11  four exhibits of Kettenring's deposition--
12      A.  Okay.
13      Q.  --and ask you if you recognize this
14  document?
15      A.  Yes.
16      Q.  Okay.  And can you tell the Court what
17  that is.
18      A.  This is an affidavit that I signed and
19  provided to Mr. Boswell.
20      Q.  Okay.  And this was--what's the date on
21  that?
22      A.  March 15th, 2002.
23      Q.  Okay.  Now, initially, Jefferson-Pilot
24  filed the interpleader, I want to say, somewhere in
25  the summer of 2001--I think August of 2001.  At that
```

3 (Pages 6 to 9)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

Page 10

1  time you were on the file, correct?
2       A.  I'm not sure that I know what you're
3  asking by "on the file."
4       Q.  Were you involved in the matters relating
5  to the Shirley Metzger file, which then became the
6  interpleader which was filed in Brownsville, Texas,
7  as B-01-142? Were you involved in that file back in
8  August 2001?
9       A.  Yes.
10      Q.  Okay.  And I believe that--
11          (Brief interruption.)
12          THE WITNESS:  These are the originals,
13  and here's a copy.
14          MS. SINGLETON:  Okay.  Great.  Okay.
15  Let's go ahead and mark this.
16          (Exhibit Number 5 is marked.)
17      Q.  (By Ms. Singleton) Okay.  We've received
18  the copies now, so I'm going to hand you what we've
19  identified as Exhibit 5.  And it's the affidavit, and
20  it also has, I believe, three attached pages on the
21  back that are exhibits.
22      A.  Yes.
23      Q.  Okay.  Did you, in fact, prepare that
24  affidavit?
25      A.  I--I amended it from a draft that

Page 11

1  Mr. Boswell originally drafted.
2          MS. SINGLETON:  Okay.  And, so, let's go
3  ahead and mark Exhibit 6.
4          (Exhibit Number 6 is marked.)
5       Q.  (By Ms. Singleton)  And when you say that
6  you amended it from an earlier draft, are you
7  referring to what we've just had marked as Exhibit 6?
8       A.  No.  I don't think this is the original
9  draft.
10      Q.  Okay.  Could you find the original draft
11  for us.
12      A.  Maybe.  I mean, I can look.  I don't
13  remember whether I kept the original draft or not,
14  but I can look.
15      Q.  Okay.
16          (Brief pause.)
17      A.  This is an earlier draft.  I'm not sure I
18  can tell you whether that's the first draft or not.
19      Q.  Okay.  You've produced for us another
20  document--an additional document, which is a draft of
21  a--an affidavit that has markups that were made by
22  someone.  And it's your testimony that this is also
23  another draft?
24      A.  That's an earlier draft than Exhibit 6.
25      Q.  Okay.  Can I take a look at Exhibit 6

Page 12

1  just a second.
2          (Brief pause.)
3       Q.  Okay.  It's true, is it not, sir, that
4  you and I had conversations around--contemporaneous
5  with these affidavits and drafts being generated, and
6  I had asked for a copy of whatever affidavit you were
7  going to be signing on behalf of Mr. Boswell?
8       A.  Yes.
9       Q.  And it was your response to me that you
10  could not give me a copy of that affidavit?
11      A.  I believe I suggested that you ask
12  Mr. Boswell for a copy of it.
13      Q.  Okay.  I did request a copy, but did not
14  receive one from you?
15      A.  I believe that's right.
16      Q.  Okay.  And it's true, is it not, sir,
17  that I first received a copy from--at least from what
18  you know of this affidavit, today, just prior to the
19  starting of this deposition?
20      A.  That's what you've told me.
21      Q.  Okay.  And, in fact, we retired so that I
22  could review it before I deposed you on it?
23      A.  Yes.
24      Q.  Okay.  Your affidavit addresses basically
25  matters relating to the change-of-beneficiary form;

Page 13

1  is that correct?
2       A.  Yes.
3       Q.  You state in here both on the first--
4  May we mark this.  Can we mark this also.  I think
5  we've already marked that one.
6       A.  What is that?
7       Q.  The other one.
8       A.  Exhibit 5?  This is the signed one.
9       Q.  Okay.  We have Exhibit 6, Exhibit 5.
10          MR. BOSWELL:  May I see Exhibit 5.
11      Q.  (By Ms. Singleton)  This one.  Can we
12  mark this as Exhibit 7.
13      A.  Okay.  Yes.  I'd like to have a copy of
14  it, if you're going to take my original.
15      Q.  Okay.  Or we can mark a copy, if you want
16  to keep this.
17      A.  Yeah.  Why don't we do that.
18          (Exhibit Number 7 is marked.)
19      Q.  I believe that--sir, that in all three of
20  these drafts, it starts--they start out on--or on the
21  two drafts and the final one, which--I'm jumping--it
22  starts out on paragraph 4, saying, "I have internally
23  investigated the Change of Beneficiary Form used
24  in 1995 in connection with policy number JP4038973
25  (the Metzger Policy)."  Do you see that, sir?

4 (Pages 10 to 13)

B-01-1
5/3/20

**Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.**
**Carl D. Semmler, J.D.**

B-01-142
5/3/2002

Page 12

**Page 14**

A. Yes.
Q. Can you tell us, What did you do to internally investigate that?
A. I reviewed the documents, and I discussed with our client-services department how that document listed and how we would have handled it administratively.
Q. Okay. And who did you speak with, sir?
A. I believe I spoke with Mack Scott.
Q. Okay. Now, he's been around here a long time, right?
A. Quite awhile.
Q. In fact, isn't he the person who signed off on the decision to waive the corporate beneficiary--I mean, the corporate--the second corporate signature in the Export-Import Bank assignment?
A. No. I don't think so. I can look at it again, but I believe there was another name on there.
Q. Okay. Who was the name you remember?
A. I think it was David Leland.
Q. Okay. Didn't that entry say "Permitted--permit the single designation per David Leland," and it was signed an M-something--it was illegible to me--and then Scott?

**Page 16**

1  Q. Oh. Okay. It was my conclusion from the
2  entry that was on the document we're having made as
3  Exhibit 8 that David Leland had made the decision
4  that, with regard to the 1988 assignment to the bank,
5  that they would not require a second corporate
6  signature for Sort-Rite. Is that a correct
7  conclusion from the entry on that document that's
8  going to be identified as Exhibit 8?
9  A. I think that's right. It's not clear
10 from the memo whether he--whether they meant for that
11 to apply going forward or whether they meant it for
12 that single document.
13 Q. Okay. Is there anyone at Jefferson-Pilot
14 who would know what the customary standards of
15 practice are for Jefferson-Pilot with regard to how
16 many signatures are going to be required to speak on
17 behalf of a corporation?
18 A. Yes. There are people who know that.
19 Q. Who would those people be?
20 A. Well, I'm one of them.
21 Q. Okay. And who else?
22 A. Well, there are other attorneys in the
23 legal department here, and some of the people in
24 client services who deal with those signatures have a
25 general idea.

Page 13

**Page 15**

1  A. I think there is a--there is--maybe we
2  should look at it, but there's a handwritten note
3  that I think came from David Leland.
4  Q. Oh. Okay. Yes.
5  MS. SINGLETON: If we can go off the
6  record.
7  (Brief pause.)
8  MS. SINGLETON: We're going to need to
9  have this as an exhibit in this deposition.
10 THE WITNESS: Okay.
11 MS. SINGLETON: This sheet.
12 THE WITNESS: Okay. Can I just--
13 MS. SINGLETON: Sure.
14 THE WITNESS: --have a copy of that made.
15 (Recess: 1:35 p.m. to 1:38 p.m.)
16 Q. (By Ms. Singleton) Is David Leland still
17 around? Is he still an employee of Jefferson-Pilot?
18 A. No.
19 Q. Okay. It was my conclusion from the
20 document we were just discussion, which I guess we
21 should now have marked as 8--Exhibit 8. Do you have
22 it there?
23 A. She's making a copy of it.
24 Q. Oh.
25 A. It will be here in just a minute.

**Page 17**

1  Q. Okay. Okay. Is it routine for
2  Jefferson-Pilot to have a change-of-beneficiary form
3  like the one that's attached to your affidavit, which
4  I believe is Exhibit 5--is it standard for
5  Jefferson-Pilot to have a beneficiary form reviewed
6  to see if it has the required signatures?
7  A. It's not uncommon to have one reviewed if
8  client services has a question about it.
9  (Brief interruption.)
10 THE WITNESS: Thank you.
11 (Exhibit Number 8 is marked.)
12 Q. (By Ms. Singleton) Okay. Is there
13 anything in the Jefferson-Pilot file that indicates
14 that a question arose at the time the 1995
15 beneficiary-designation form was executed?
16 A. Any question?
17 Q. Yes. Was it scrutinized, or was there
18 anything that Jefferson-Pilot didn't have about that
19 document when they received it that generated any
20 paper?
21 A. Not that I can tell from the file.
22 Q. Okay. Is there--if that had been the
23 case, would it be customary for it to be in the file?
24 A. If it had been reviewed to the legal
25 department, for instance, there ought to be

5 (Pages 14 to 17)

Page 18

1 documentation of that.
2     Q. Okay. Now, when you look--you're looking
3 now at the second--I guess the third page of the
4 Exhibit 5, which is the-- What is that? It's called
5 "Exhibit 'A-1'" or something?
6     A. Yes.
7     Q. And that's the change-of-beneficiary form
8 which was executed by Shirley Metzger?
9     A. Yes.
10    Q. In fact, it's executed by Shirley Metzger
11 as president of Sort-Rite, is it not?
12    A. One of the signatures is as president of
13 Sort-Rite, yes.
14    Q. Okay. And when you say "one," you are
15 referring to what other one?
16    A. She--she signed this form twice in sort
17 of the middle of the page. She signed, and beside
18 her name is--it says, "SHIRLEY METZGER, PRESIDENT."
19    Q. Okay. Now, that's only--in the middle of
20 the page, there's only one signature?
21    A. Yes.
22    Q. Okay. And the next signature is where?
23    A. At the bottom of the page, and that--
24    Q. Okay. Okay. And--but my question to
25 you, sir, was in--with respect to this

Page 19

1 change-of-beneficiary form, when she executed back
2 in 1995, she executed it in her corporate capacity,
3 did she not?
4     MR. BOSWELL: Objection to form. Asked
5 and answered.
6     A. Well, she signed it twice, and one of the
7 signatures was in her corporate capacity.
8     Q. (By Ms. Singleton) Okay. With respect
9 to the name change in the middle and the person who
10 is requesting that the above instructions be given
11 and applied to the policy, the signature borne
12 there--it says, "SORT-RITE INTERNATIONAL, INC., By
13 SHIRLEY METZGER, PRESIDENT," does it not, sir?
14    MR. BOSWELL: Objection. Misstates the
15 facts.
16    A. This--this line (indicating) is normally
17 not signed by the policy owner. This is the line is
18 where Jefferson-Pilot endorses the form. In this
19 case, Ms. Metzger signed on that line as president of
20 Sort-Rite International, and she also signed at the
21 bottom, which is normally where the policy owner
22 executes the document, and she signed there as an
23 individual.
24    Q. (By Ms. Singleton) Okay. So would it be
25 your understanding that these sorts of documents are

Page 20

1 routinely signed outside of a Jefferson-Pilot office?
2     A. Usually, I'd say yes.
3     Q. So they're not signed in the office?
4     A. In the home office?
5     Q. Yeah. In some office. They're signed by
6 the policy owner in, you know, wherever they might
7 be, you know, in their own personal home, library, or
8 in a bus station or wherever they might be?
9     A. They're signed different ways. They
10 could go to an agency office and sign one, or the
11 agent might bring one out and have you sign it. Or
12 it might be mailed to you, and you sign it in your
13 home or office or wherever you happen to be.
14    Q. Okay. So you're saying--I guess it's
15 your testimony that--with respect to this
16 beneficiary-designation form, that there is a lack of
17 clarity as to in which capacity she is signing?
18    A. She signed it in two capacities, so it's
19 certainly possible to argue about which way she
20 intended it to be.
21    Q. Okay. And is--does Jefferson-Pilot have
22 a different beneficiary-designation-change form for a
23 corporation than one that would normally be executed
24 by an individual?
25    A. No.

Page 21

1     Q. So it's only got one form at any given
2 time? I mean, I know--
3     A. I think that's right.
4     Q. Does it have a different form for a
5 split-dollar endorsement than it has for
6 nonsplit-dollar endorsement policies?
7     A. Not that I'm aware of.
8     Q. Okay. So the document that we're looking
9 at, that is the attachment to your affidavit and
10 about which your affidavit speaks, that document is,
11 at least for that time period in 1995--would have
12 been the form that you would use, whether you were an
13 individual or whether you were a corporation and
14 whether you were dealing with a split-dollar
15 endorsement or another type of endorsement or no
16 endorsement?
17    A. As far as I know, we use a single form.
18    Q. Okay. Now, when you first saw this
19 change-of-beneficiary form, what--was it your
20 conclusion that the insured was attempting to change
21 the beneficiary on the corporate side or the
22 beneficiary on the individual side?
23    A. Are you asking for my personal opinion?
24    Q. What was your conclusion as a--yeah, as
25 the lawyer who was working on a file that contained

6 (Pages 18 to 21)

B-01-1
5/3/20

**Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.**
**Carl D. Semmler, J.D.**

B-01-142
5/3/2002

---

**Page 22**

this piece of paper?
1   A.  I think I looked at that as an individual
2   designation.
3      Q.  Okay.  Okay.  And now did we get copies
4   of this stuff?  Did we have--remember we were going
5   to--?  I've separated out the sides that I wanted to
6   make sure went in as exhibits.
7      A.  You've got copies of all those.
8      Q.  I have personal copies in my file at the
9   time.
10     A.  No.  I made copies today of the ones you
11  pulled out and said you wanted to make exhibits.
12     Q.  Oh.  Okay.  Great.
13     A.  Did you not get those?  They were clipped
14  together.
15     MR. BOSWELL:  She got--you got them.  You
16  got a set.  He brought three sets in here.  I've got
17  one--
18     MS. SINGLETON:  There we go.
19     MR. BOSWELL:  --you've got one, and
20  there's one on the table to be used as exhibits.
21     Q.  (By Ms. Singleton)  Okay.  These are to
22  be used as exhibits?
23     A.  I think those are my originals, and I'd
24  just as soon you use the copies, if you don't mind.

**Page 23**

1      Q.  Okay.  Great.
2      MS. SINGLETON:  Okay.  We can go off the
3   record a second.
4      (Discussion off the record.)
5      (Exhibit Number 9 is marked.)
6      Q.  (By Ms. Singleton)  Sir, I'm going to
7   show you what we've now marked as Exhibit 9--
8      A.  Okay.
9      Q.  --and ask you to tell the Court what that
10  is.
11     A.  This is a letter that I wrote on
12  11th, 2001, to the parties I was aware of who
13  were interested in the proceeds of this policy.
14     Q.  Okay.  So that would have been shortly
15  the death of Shirley Metzger, before the
16  interpleader was filed, and at a time when you just
17  knew there were several claims?
18     A.  Yes.
19     Q.  Okay.  I'd like to have you look at your
20  paragraph 1, page 2 of that.  If you would read into
21  the record that fourth paragraph right there
22  (indicating) on page 2.
23     A.  "Finally, we received a change of
24  beneficiary form dated August 16th [sic], 1995, from
25  Mr. Metzger.  This document named Leticia Elizalde de

**Page 24**

1   Pino"--sorry about the pronunciation--"friend of the
2   insured, as the primary beneficiary.  The contingent
3   beneficiary was Deborah [sic] Ann Metzger, Daughter,
4   and the second contingent beneficiary was Katherine
5   Lee Metzger, Daughter.  That form was signed by
6   Shirley Metzger as President of Sort-Rite
7   International, Incorporated.  A copy of this form is
8   enclosed."
9      Q.  Okay.  Now, at the time you wrote this
10  letter--what I'm getting from that paragraph is that
11  that beneficiary designation was done in Shirley
12  Metzger's corporate capacity, which is different from
13  what you're saying now.
14     A.  I think the question you asked me was
15  what--how did I consider that the change was made.
16  And the documents in the file are all very
17  inconsistent as to how she signed things.  And I
18  think I and Jefferson-Pilot treated the beneficiary
19  change as an individual change.
20     MS. SINGLETON:  Okay.  I need to have
21  three more pages from the file copied, if you don't
22  mind.  I don't--I'm not aware of others that I need.
23  I think those--?
24     THE WITNESS:  Okay.
25     (Brief pause.)

**Page 25**

1      MS. SINGLETON:  This is 10?
2      (Exhibit Number 10 is marked.)
3      Q.  (By Ms. Singleton)  Okay.  Sir, I'm going
4   to hand you what we've marked as Exhibit 10, which is
5   three pages with three different dates that are
6   documents from Jefferson-Pilot that were apparently
7   generated to indicate the status of the policy at the
8   time.
9      My first question is, Do you have any
10  idea why documents of this type would not be in your
11  file?
12     A.  No, I don't know why.
13     Q.  And the other curious thing that I have
14  for you is, if you'll look at the second page, where
15  it says "JP-25" down here (indicating)--
16     A.  Yes.
17     Q.  --the reason it says "JP-25" is because
18  this document was received from your counsel down in
19  Brownsville as the Jefferson-Pilot file.  Do you know
20  how it would happen that Edward Mann's office would
21  be producing this, among about 40 pages of paper, to
22  the parties in the case and it not appear in your
23  file?
24     A.  He shouldn't have--
25     MR. BOSWELL:  I'll object to that as

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

Page 26

1 assuming facts not in evidence.
2        THE WITNESS: Yeah. Yeah.
3     A. I sent him a copy of the file, and I
4 assume that's what he produced to you.
5     Q. (By Ms. Singleton) Well, now, when you
6 say you sent him a copy of the file, you didn't send
7 him a copy of what we received here today? You're
8 not saying that, are you?
9     A. No. I don't remember whether I sent him
10 the whole file or just the relevant documents. He--
11 he wasn't concerned for purposes of the interpleader
12 with all the underwriting and so on, and so it's
13 likely that I didn't send a complete copy of the
14 file.
15     Q. Okay. I mean, I realize this isn't in
16 evidence, but if he got his paper from you, you
17 should be well aware that all he says he--or all he
18 had--what he says he had is about 40 pages.
19     A. Well, then, obviously, I didn't send him
20 the whole file. For purposes of the interpleader, it
21 wouldn't have been necessary for him to have the
22 complete file.
23     Q. Right. But, in any event, you don't know
24 why this document does not appear in the file that
25 you have produced for us here today?

Page 27

1        MR. BOSWELL: Are you looking at--?
2     A. If it's not in there, I don't know why
3 it's not.
4     Q. (By Ms. Singleton) Okay. Now, with
5 respect to the first page of what we've identified as
6 Exhibit 10, will you first provide for the Court with
7 a date--
8        MR. BOSWELL: It's in there. July
9 the 6th, 1996.
10        MS. SINGLETON: Uh-huh.
11        MR. BOSWELL: It's in there. It's in his
12 file.
13        MS. SINGLETON: Well, it sure is. I
14 stand corrected. It is in here.
15     Q. (By Ms. Singleton) Okay. My apologies.
16        Okay. If you'll look at page--the first
17 page of Exhibit 10--
18     A. Okay.
19     Q. --at the top, it says, "May 6, 1992."
20 And the reason I'm addressing your attention to this
21 is because, under the beneficiary designation, it
22 says "PAYABLE AS PROVIDED IN RIDER." Do you see
23 that?
24     A. Yes.
25     Q. And this was the '92--this was a '92

Page 28

1 document before the change of beneficiary
2 designation.
3        On the next page of Exhibit 10, dated
4 July 6 of '96, would you please read what is under
5 the beneficiary category, according to
6 Jefferson-Pilot at that time.
7     A. You're going to make me pronounce this
8 name again. "LETICIA ELIZALDE DE PINO, FRIEND, IF
9 LIVING, OTHERWISE DEBRA ANN METZGER, DAUGHTER, IF
10 LIVING, OTHERWISE KATHERINE LEE METZGER, DAUGHTER."
11     Q. Okay. And, in fact, that is the same
12 language that appears in the 1995 change of
13 beneficiary?
14     A. Yes.
15     Q. And, in fact, it does not say that
16 Sort-Rite is the beneficiary on this sheet?
17     A. No.
18     Q. And, then, again, on the third page--this
19 is a later version--a later-yet version of it,
20 September the 5th of year 2000. And under
21 beneficiary designation, it again recites Leticia
22 Pino, Katherine Metzger, and Debra Finch, and does
23 not recite Sort-Rite?
24     A. That's right.
25     Q. My first question regarding this is,

Page 29

1 Doesn't this indicate that Jefferson-Pilot treated
2 that beneficiary designation as exactly what it says
3 it is, which is a cancellation of all previous
4 beneficiary designations?
5     A. I think what Jefferson-Pilot did was--
6 Yes. Yes. That's right. But I think we're going to
7 distinguish between whether it's a beneficiary
8 designation for Ms. Metzger, individually, or for
9 Sort-Rite, the corporation.
10        On the original rider, I believe, there--
11 I'll have to look again, but there was a place,
12 anyway, for Ms. Metzger to name a beneficiary. When
13 she changed the beneficiary--or when the form came
14 in 1995, Jefferson-Pilot considered that to be a
15 change of her individual beneficiary designation,
16 which is what's reflected on this exhibit.
17     Q. Okay. In any event, this document does
18 not apprise anyone that Sort-Rite is considered to be
19 a beneficiary in any fashion? By "this document," I
20 mean the documents, specifically pages 2 and 3 of
21 Exhibit 10.
22     A. That's right. Sort-Rite is not reflected
23 on this document--well, except as the policy owner.
24     Q. And, with respect to the first page of
25 Exhibit 10, at least you're put on notice that you're

8 (Pages 26 to 29)

B-01
5/3/
Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.
B-01-142
5/3/2002

**Page 30**

going to have to look to another document if you want to ascertain who the beneficiaries are, when it says, "PAYABLE AS PROVIDED IN RIDER"?

A. Yes.

Q. Okay. Now, I have some questions about not necessarily--I probably do have some questions about the language--for the language in the affidavit, but the questions I would like to address now concern the position--Jefferson-Pilot's position with regard to the effect of the failure to have a second corporate officer execute the change-of-beneficiary form.

A. Okay.

Q. It is true, is it not, that, when the 1995 form was received, it was accepted by Jefferson-Pilot?

A. Yes.

Q. Okay. Did Jefferson-Pilot send Shirley Metzger or Sort-Rite any paper which addressed a concern about the ambiguity of the change-of-beneficiary form?

A. Not that I can tell from the file.

Q. Okay. Is there anything, any written communication, anything that shows up on a computer, anything that shows up on secretaries' notes or in

**Page 31**

memos or wherever you might keep that stuff that indicates that anyone ever addressed a potential ambiguity with regard to the change-of-beneficiary form executed in '95?

A. No. There's no record of that.

Q. Okay. Is it your position that the reason it, in Jefferson-Pilot's view, is the reason Jefferson-Pilot takes that view because it didn't have a second corporate signature?

A. No. I think there was--there were several reasons why we treated it the way we did.

Q. Okay. And when you say "why we treated it," you didn't treat it at all, apparently, until after her death; is that correct?

A. Well, actually, during the claims process, we didn't take a position. It wasn't necessary, because we had competing claims, and there were a number of other problems with the policy. It wasn't necessary for us to evaluate the beneficiary designation in order to determine that we needed to interplead.

Q. Okay. And why are you making that--why did you later decide it was necessary to make that analysis?

**Page 32**

1   A. Well, we didn't--what the affidavit says
2  is that, for purposes of the change, in our
3  client-services department, this is how we would have
4  treated it. And I think that's reflected on
5  Exhibit 10. That shows how we designated the
6  beneficiary.
7   Q. In 10? What are you talking about?
8   A. Exhibit 10 is the--are the printouts that
9  you--
10  Q. Right.
11  A. --that showed the policy status. And, as
12 you pointed out, we showed the beneficiary as being
13 the three individuals who were named.
14  Q. Right.
15  A. And that's because client services
16 accepted the beneficiary change as an individual
17 beneficiary change.
18  Q. Well, okay. Wait a minute. Why is
19 that--? Okay. Let's look at Exhibit 10 again.
20 Exhibit--it's true, is it not, sir, that we don't
21 know what client services did with respect--what
22 position they took on the change of beneficiary
23 designation? Had they decided that that was a
24 corporate designation change, this would have showed
25 up exactly the same.

**Page 33**

1   A. Well, this is what I said, that I
2  contacted client services and asked them how they
3  would treat that and how they did treat it. And the
4  answer was that they treated it as an individual
5  change.
6   Q. Okay. And who at client services told
7  you that?
8   A. Mack Scott.
9   Q. And the reason that he did it is why?
10  A. The primary reason was that--that we've
11 never had a corporation name a beneficiary, and so
12 they accepted the form as an individual designation.
13  Q. Okay. Well, sir, you're certainly aware,
14 as a lawyer, that insurance contracts determine the
15 language of the contract?
16  A. You're certainly free to disagree with
17 our interpretation. I'm only telling you how we
18 treated it here.
19  Q. Okay. And in the--
20   MS. SINGLETON: Let's go off the record
21 for a second.
22   (Brief pause.)
23   Q. (By Ms. Singleton)  I guess I'm having a
24 problem--I'm having several problems, but one of them
25 is, I would like to hear how you reconcile your

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.     B-01-142
Carl D. Semmler, J.D.     5/3/2002

---

Page 34

1  statement in the May 11th letter--May 11th, 2001,
2  letter, which is Exhibit 9, on the second page where
3  you say, "That form was signed by Shirley Metzger as
4  President of Sort-Rite International, Inc.," with
5  your--with your affidavit statement found, probably,
6  in all of them, but, in Exhibit 6, Ms. Metzger signed
7  the bottom of the change-of-beneficiary form in her
8  individual capacity.
9     A.  It looks as if, when I wrote the May 11th
10  letter, that I overlooked the second signature and
11  only addressed the first one. But, also, this
12  May 11th letter, part of what I was trying to do was
13  to point out some of the inconsistences in the
14  documents that we had, and those involved the way
15  that she signed--Ms. Metzger signed the relevant
16  documents.
17     Sometimes she signed individually, and
18  sometimes she signed as president of the company, and
19  not always consistently or appropriately, from our
20  point of view.
21     Q.  Okay.  But I want to stop you before you
22  go further.  I definitely want to go back into this.
23  I would like you to take time--and we can go off the
24  record--but I want you to find me every piece of
25  paper that you're talking about when you say she

---

Page 35

1  signed inconsistently.
2     I believe we are only talking about
3  the 1995 change-of-beneficiary form.  However, if you
4  have other reasons, find them.
5     A.  Well, I think the letter talks about all
6  the documents that we had, which included the two
7  assignments, the beneficiary designation.
8     If I recall correctly, one of the
9  assignments was made by Ms. Metzger as president of
10  Sort-Rite International.  One of the assignments was
11  made by her individually.
12     Q.  Why would that have been inconsistent?
13     A.  From our point of view, some documents
14  are signed one way, and some are signed another.  We
15  don't know whether she intended to sign them the way
16  she did, or, knowing that she held both--you know,
17  had two hats, didn't sign them right.  We couldn't
18  look at the documents and tell what her intent was on
19  a particular document.
20     Q.  Okay.  If you're talking about the two
21  assignments, we can certainly talk about that, and I
22  definitely have questions for you about those two
23  assignments.
24     But, if you would please go through your
25  file and find exactly what you're referring to.  You

---

Page 36

1  don't have to pull out the two assignments, because I
2  understand--I know what documents you're referencing.
3  So, we've got the two assignments, and we've got the
4  change-of-beneficiary form.  Anything else?
5     A.  No.  I think those were the ones I had in
6  mind.
7     Q.  Okay.  Well, sir, you certainly
8  understood that what Jefferson-Pilot had sold to
9  Sort-Rite was a split-dollar-endorsement policy?
10     A.  Yes.
11     Q.  And it appears that what that meant to
12  Jefferson-Pilot was that, out of a
13  one-and-a-half-million-dollar policy, they were
14  really split it into two parts:  the million-dollar
15  part where the intended employer--the intended
16  beneficiary at the time of death, at the time the
17  policy was opened up--was begun as of the effective
18  date is recited be--it's intended that Sort-Rite will
19  be the ultimate recipient of that million dollars;
20  and then there is another part that is intended to be
21  individually reserved for the beneficiaries as
22  designated by Shirley Metzger.
23     I mean, Jefferson-Pilot knew those facts,
24  right?
25     A.  Yes.

---

Page 37

1     Q.  Now, Jefferson-Pilot actually wrote the
2  language that's contained in this policy; isn't that
3  true?
4     A.  In the policy, yes.
5     Q.  And the part to the policy that says that
6  Jefferson-Pilot--I mean, that the employer has the
7  right to change the beneficiary, that's
8  Jefferson-Pilot's language, isn't it?
9     A.  Yes.
10     Q.  So Jefferson-Pilot's folks ought to well
11  be aware that the policy language itself says the
12  employer can change the beneficiary designation.
13     A.  I wouldn't dispute that.  I'm only
14  telling you that, in our experience, it has never
15  happened.
16     Q.  Okay.  But the language of the policy
17  provides for it?
18     A.  Yes.
19     Q.  Now, because--and I guess the people that
20  were working on this file on behalf of
21  Jefferson-Pilot at some point back in '87 and '88
22  became aware that Shirley Metzger, the individual who
23  was insured, was also the president of the company?
24     A.  Yes, we knew that.
25     Q.  And that she was also a major shareholder

---

10 (Pages 34 to 37)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

Page 38

1  of the company?
2      A.  I don't know.
3      Q.  Okay.  This isn't the only split-dollar
4  endorsement that Jefferson-Pilot's ever done, is it,
5  sir?
6      A.  No.
7      Q.  And, in fact, the reason that they've got
8  language and that they've prepared seven and eight
9  pages of policy language is because that's one of the
10  things they sell?  They sell split-dollar
11  endorsements?
12      A.  Yes.
13      Q.  And the people they sell them to are
14  usually people who are major shareholders of
15  closely-held corporations?
16      A.  In the typical case, that's correct.
17      Q.  So it wouldn't have been at all unusual
18  for the individual to also be--the individual who's
19  insured and the individual who's getting that smaller
20  part of the split-dollar endorsement to also be the
21  individual who's going to sign for the corporation on
22  the big side?  That wouldn't be unusual, would it?
23      A.  I don't know.
24      Q.  Okay.  Well, back in 1987 and '88, as you
25  referenced, there were two assignments--two

Page 39

1  assignments that were recorded with Jefferson-Pilot?
2      A.  Right.
3      Q.  And one of them was to bank--was to one
4  bank, and it was executed by Shirley Metzger in her
5  individual capacity; is that correct?
6      A.  Yes.
7      Q.  And the other one was written to another
8  bank, and it was executed by Shirley Metzger in her
9  corporate capacity?
10      A.  Yes.
11      Q.  So are you saying that those were
12  transactions that confused Jefferson-Pilot?
13      A.  At the time of the claim, we were unable
14  to tell who was entitled to how much of the proceeds.
15      Q.  No.  No.  I'm talking about the
16  assignments.  We're going back now to '87 and '88.
17      A.  Right.
18      Q.  There aren't any proceeds, unless you
19  want to call the proceeds the money Jefferson-Pilot's
20  getting every month.
21      A.  No.  That's not proceeds.
22      Q.  There aren't any proceeds.  We've got a
23  life-insurance policy that a corporation is paying
24  money on every month in order to keep in force.  And,
25  just as soon as that policy is opened up and right

Page 40

1  behind it come two assignments to Jefferson-Pilot.
2  Is it unusual for Jefferson-Pilot to receive
3  assignments on these large insurance policies?
4      A.  I don't know about the large ones.  We do
5  get assignments on policies.
6      Q.  Wouldn't it be your experience, as a
7  lawyer who's worked for Jefferson-Pilot for 15 years,
8  that one of the primary reasons these big policies
9  are taken out is because some bank that's getting
10  ready to loan somebody a lot of money is requiring
11  it?
12      A.  That does happen, yes.
13      Q.  And in those instances, they want some
14  sort of written memorialization of their right to the
15  proceeds in the event the insured dies?
16      A.  Yes.
17      Q.  And one form that that could come in is
18  in the form of an assignment?
19      A.  Yes.
20      Q.  Somewhere in your affidavit, I think you
21  referenced--or in one of the letters, you reference
22  the fact that Shirley Metzger had signed in both her
23  individual and corporate capacity on an assignment.
24  Can you look and see if you can find which assignment
25  you're talking about, and I will try to find the

Page 41

1  exact language while you do that.
2          (Discussion off the record.)
3          MS. SINGLETON:  Yeah.  We're off the
4  record.
5          (Recess:  2:40 p.m. to 2:48 p.m.)
6      Q.  (By Ms. Singleton)  Mr. Semmler, I want
7  to refer your attention to your May 8th [sic], 2001,
8  letter, which is Exhibit 9 and on the second page,
9  the last two sentences of the third paragraph, where
10  you're  talking about one of the assignments.
11      A.  Okay.
12      Q.  And could you read for us what those last
13  two sentences say.
14      A.  "A second assignment was received in July
15  of 1988 in favor of the Export-Import Bank of the
16  United States.  This assignment was signed by Shirley
17  Metzger and by Shirley Metzger, President of
18  Sort-Rite International, Incorporated.  A copy of
19  this assignment is also enclosed."
20      Q.  Okay.  And could you look at that
21  assignment for me and tell me where those signatures
22  are.
23      A.  This (indicating) is what I was looking
24  at.
25      Q.  Okay.  And what does that say to you?

11 (Pages 38 to 41)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

Page 42

1    A. It says "Shirley Metzger," and then it
2  says "Sort-Rite International, Incorporated, Shirley
3  Metzger, President."
4    Q. Okay. And it's your interpretation that
5  this is signing in both her individual and corporate
6  capacities?
7    A. I read that as two different signatures.
8    Q. I see. Okay.
9      Okay. Is that one of the instances where
10  you say she signed inconsistently?
11    A. From our point of view, it wasn't clear
12  how she intended to sign that.
13    Q. Okay. Did--? Well, wait a minute.
14  Okay. Now, back in 1988, when this document was
15  executed and sent to Jefferson-Pilot, you were not--
16  your consultation was not requested at that point,
17  with regard to--you didn't know about this
18  assignment? You weren't part of that process?
19    A. I don't remember. The file doesn't
20  reflect it.
21    Q. Okay. But isn't it true, sir, that what
22  the file does reflect is that Jefferson-Pilot treated
23  this as a corporate assignment, signed by Shirley
24  Metzger in her corporate capacity, and that they sent
25  back correspondence saying they wanted a second

Page 43

1  signature?
2    A. I'd have to look and see whether the
3  correspondence was--which assignment it was for.
4    Q. That was our Exhibit 8, was it? Yes.
5      MS. SINGLETON: You can go off the record
6  a second.
7      (Brief pause.)
8    Q. (By Ms. Singleton) Mr. Semmler, I've
9  asked you to look at Exhibit 8, which is dated
10  January 18, 1988.
11    A. Yes.
12    Q. And what is January--what does that
13  Exhibit 8 purport to do? What's it saying there?
14    A. Exhibit 8 is a memo to Mack Scott from
15  Susan Westbrook. It concerns a--an assignment form
16  for Ms. Metzger's policies.
17    Q. Okay. And they're discussing a corporate
18  signature?
19    A. There is a notation--a handwritten
20  notation that says it's "OK to accept this one
21  signature."
22    Q. Okay. And they're referring in this
23  Exhibit 8 to this page 2, section IV, of the policy.
24  That's of the policy itself?
25    A. Well, it looks like it's referring to the

Page 44

1  split-dollar endorsement.
2    Q. Okay. Can we find that and see what
3  they're talking about in there.
4    A. I'm thinking about where that is. It may
5  be part of this (indicating), page 2.
6      MS. SINGLETON: If we can go off the
7  record.
8      (Discussion off the record.)
9    Q. (By Ms. Singleton) Part of the problem
10  is that it references a page 2, section IV, and yet,
11  when we find section IV under the endorsement, it
12  isn't on a page 2.
13    A. Okay. No. It looks like it's on the
14  third page of the endorsement.
15    Q. Okay. So what is it that you believe
16  they're referring to here when they say, "Also
17  attached is a copy of the split dollar endorsement we
18  use. Please refer to page 2, section IV"?
19    A. Well, page--section IV is a listing of
20  the rights of the employer and the co-owner and the
21  employer and co-owner jointly under the split-dollar
22  agreement.
23      MS. SINGLETON: Okay. Please, let's go
24  off the record a second.
25      (Discussion off the record.)

Page 45

1    Q. (By Ms. Singleton) Sir, we've gone off
2  the record for a moment so that we could retrieve the
3  actual part of the file that tells us what this
4  page 2, section IV, is.
5      And, within your file, there is that page
6  with certain matters underscored in yellow. And I'm
7  going to ask you, if you would, to read into the
8  record what that section IV--what the yellow part
9  that's under--that's yellow-highlighted is--what it
10  says.
11    A. Well, the title of the section is
12  "Ownership Rights." It says, "Unless otherwise
13  stated herein, the employer acting alone may exercise
14  the following rights," colon. And then the first one
15  is highlighted. It says, "The right to borrow
16  against, pledge, or assign the policy, however, in an
17  amount not to exceed the net premiums."
18      And then there's two other lines
19  highlighted. One is, "Unless otherwise stated
20  herein, the co-owner acting alone may exercise the
21  following rights."
22      And number 3 under that section is,
23  "Exercise the right to transfer, assign, or pledge
24  the co-owners' interest in the policy."
25    Q. Okay. Now, let's look again at

12 (Pages 42 to 45)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

Page 46

1  Exhibit 8, and Exhibit 8 is actually a very short
2  document that's--if I may read it into the record for
3  some simplicity's sake here. "As per our telephone
4  conversation earlier today, I am returning to you the
5  assignment for the above policy.
6     "Also attached is a copy of the split
7  dollar endorsement we use. Please refer to page 2,
8  section IV.
9     "I appreciate your help in this matter
10 and in the future, we will refer to the endorsement
11 when submitting the assignment to home office."
12    Now, this is from who? This is from
13 Susan Westbrook. Where is she? I mean, she's in
14 Greensboro; is that right?
15    A. It's on Greensboro letterhead. It looks
16 like an agent code.
17    Q. Okay. Is it possible that this letter
18 really doesn't even--that it does not concern the
19 second corporate signature at all?
20    A. I don't think you can tell from the--from
21 the memo exactly whether they were talking about a
22 corporate transaction or an individual one.
23    Q. Okay. And, if we are to look at what is
24 underscored and what they reference in this memo,
25 it's, "Unless otherwise stated herein, the employer

Page 47

1  acting alone may exercise the following rights: The
2  right to borrow against, pledge, or assign the
3  policy, however, in an amount not to exceed the net
4  premiums."
5     Now, how much would the net premiums have
6  been on the policy back in 1988?
7     A. I don't know.
8     Q. Well, don't you arrive at net premiums by
9  taking how much money was paid on the premium that
10 month and subtracting out some cost and then giving
11 it a 4-percent edge every--periodically?
12    A. Your question was, How much would there
13 have been? And I don't know.
14    Q. Okay. Well, if the initial--this is six
15 months after the policy was in force?
16    A. Yes.
17    Q. So, if the policy premiums, which we know
18 were approximately a thousand a month--they
19 were $1,004 a month, and we know that it was this
20 universal, blah-blah-blah policy that
21 Mr. Kettenring described for us that provided that a
22 certain amount, but not all, of that 1,000 a month
23 would be set aside, then whatever the net premiums
24 are, they could not have exceeded any--they couldn't
25 have exceeded the amount that had been paid in

Page 48

1  premiums up to that point, could it?
2     A. The net premiums could not exceed the
3  total premiums, no.
4     Q. Exactly. So, between December of 1987
5  and--in fact, what's the date of that letter--January
6  of 1988, can we not safely say that the net premiums
7  couldn't have been even $2,000?
8     A. I think we've got a record of that. I
9  think it was not much. I think that's right.
10    Q. Okay. So, meanwhile, we had got--one
11 month after the policy was generated, we have this
12 January 18 letter that says--actually, does it say,
13 "I'm returning the assignment to you"?
14    A. Yes, it does say that.
15    Q. And it says, "Also attached is a copy of
16 the split dollar endorsement." That underlines the
17 fact the amount that can be assigned by the
18 corporation cannot accept--exceed net premiums?
19    A. Yes.
20    Q. And then it also underlines that, unless
21 otherwise stated, the co-owner acting alone can
22 assign or transfer or pledge the co-owners' entire
23 interest, right?
24    A. Yes.
25    Q. And those are the only three things that

Page 49

1  are underlined when they reference here in this
2  little six-line letter, page 2, section IV?
3     A. Yes.
4     Q. Okay. So, then, in response to this--so
5  now we're starting to get--we've got an assignment
6  from Export-Import Bank, where they want to take an
7  assignment for whatever they can get--I mean, it
8  doesn't have a finite--it doesn't have a number in
9  it. It's not an assignment that says, "We have an
10 assignment on $500,000 of this policy." And you
11 understand that? It's a blank assignment.
12    A. Okay.
13    Q. Then six months later, we have, "OK to
14 accept this one signature on split-dollar assignment
15 per David Leland." Do you have any idea what he's
16 talking about?
17    A. I'd be guessing. I was not part of this
18 transaction.
19    Q. Okay. So, I guess that, if we're
20 guessing, it's possible that somebody out there--
21 maybe David Leland, maybe Mack Scott, maybe somebody
22 else, maybe Susan Westbrook or whatever her name is,
23 that they entertained a lot of questions about the
24 assignment and the language of the split-endorsement
25 policy?

13 (Pages 46 to 49)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.      B-01-142
Carl D. Semmler, J.D.      5/3/2002

Page 50

1    MR. BOSWELL: Objection to form.
2    A.  Somebody apparently had a question about
3  the signature on the form, and that looks like that's
4  what was being addressed with the notation.
5    Q.  (By Ms. Singleton) Okay.  The notation
6  you're discussing is a notation that appears on
7  Exhibit 8?
8    A.  That's right.
9    Q.  And you'll agree with me, will you not,
10  sir, that the notation does not seem to respond to
11  the inquiry that is generated by the letter?
12    A.  That's right.
13    Q.  The letter doesn't say anything about a
14  signature?
15    A.  No.
16    Q.  And the letter references page 2,
17  section IV, and that doesn't talk about a signature
18  either?
19    A.  No.
20    Q.  Okay.  But at some point, we know that
21  within the bulwark of Jefferson-Pilot, there came a
22  time when they were asking questions about the
23  signatures that were required when Sort-Rite made an
24  assignment in its corporate capacity?
25    A.  Apparently so, yes.

Page 51

1    Q.  Yes.  And there are other pieces of
2  paper, besides the handwritten notations on
3  Exhibit 8, which make us believe this.  Will you
4  agree with me?
5    A.  Other documents?
6    Q.  Yeah.  There's a letter that says, "I'm
7  returning this assignment to you."  We need to find
8  it.
9    A.  That's Exhibit 8.
10    Q.  No.  I believe--
11    MS. SINGLETON:  We can go off the record.
12  here.
13    (Discussion off the record.)
14    (Recess:  2:40 p.m. to 2:48 p.m.)
15    (Exhibit Number 11 is marked.)
16    Q.  (By Ms. Singleton)  Mr. Semmler, I now
17  address your attention to Exhibit 11, which is part
18  of the files that you produced today.  That is a
19  one-page, policy-service transmittal, dated
20  January 4, 1988.
21    And it states--there's a Darlene Sechrest
22  that states that "We are returning the submitted
23  assignment form.  This policy is owned by the Insured
24  and Sort Rite International Inc.  The form must be
25  completed by two officers of the company and we must

Page 52

1  be given their titles."
2    Now, the first conclusion I would draw
3  from that is that, with respect to the second
4  assignment--the assignment that is attached to the
5  back of your May 11th letter, which, I believe, is
6  Exhibit--
7    A.  Exhibit 9.
8    Q.  --Exhibit 9, that they're discussing that
9  assignment that eventually went to Export-Import
10  Bank.
11    A.  It doesn't say that on this--on
12  Exhibit 11, but, based on the dates, that's probably
13  right.
14    Q.  Plus, the other--the only other
15  assignment that was recorded by Jefferson-Pilot was
16  Shirley Metzger individually in favor of San Benito?
17    A.  Yes.  That's right.
18    Q.  So they would not have been referring to
19  that one?
20    A.  No.
21    Q.  Okay.  So the first question I have for
22  you, sir, is, After looking at Exhibit 11, it seems
23  clear that with regard to the assignment that it
24  addresses, that the people who are handling that
25  assignment certainly considered it to be an

Page 53

1  assignment from the corporation?
2    A.  Yes, or at least partially from the
3  corporation.
4    Q.  Okay.  And they were going to require two
5  signatures?
6    A.  Yes.
7    Q.  And is there any paper that
8  Jefferson-Pilot has that reflects what their ultimate
9  decision was with regard to this?
10    A.  Well, Exhibit 8 has the handwritten
11  notation that says, "OK to accept this one signature
12  on split-dollar assignment per David Leland."
13    Q.  Okay.  Now, when they say--when he says
14  "one signature," he's referring to Shirley Metzger's
15  one signature?
16    A.  I assume so, since that's the only
17  signature on the form.
18    Q.  Okay.  Is there anything in the
19  Jefferson-Pilot paperwork which would reflect whether
20  a decision was made by Jefferson-Pilot, as reflected
21  in Exhibit 8, that with regard to Sort-Rite's
22  matters, they would only require the signature of
23  Shirley Metzger?
24    A.  You mean, except for this--on documents
25  other than this assignment?

14 (Pages 50 to 53)

Reported by: Cindy A. Fletcher
Accurate Reporting  (336) 373-0985

Page 54

1    Q.  Well--
2    A.  I'm not sure I understand what you're
3  asking.
4    Q.  --I'm saying we know that with respect to
5  this assignment--we know from what happened that, in
6  fact, they did not require two signatures?
7    A.  Right.
8    Q.  And, for the purpose of the Export-Import
9  Bank assignment, they obviously addressed the matter.
10  It wasn't that it slipped through the cracks,
11  correct?
12    A.  Yes.
13    Q.  They recognized that the assignment to
14  Export-Import Bank was one purporting to assign the
15  corporation's interest, and yet it had only one
16  signature.  This matter was--
17    A.  For the corporation, right.  Yes.
18    Q.  --was--came to the attention of the
19  corporate intelligence, for lack of a better word--
20    A.  Thank you.
21    Q.  --and they addressed it, and it's
22  partially addressed in Exhibit 8.
23    A.  Yes.
24    Q.  And then we know that, ultimately, they
25  agreed to accept the assignment in favor of

Page 55

1  Export-Import Bank with only one signature, true?
2    A.  True.
3    Q.  And Jefferson-Pilot recorded among its
4  book--recorded as an official event within the life
5  of the transactions of this life-insurance policy
6  that there was a corporate assignment in favor of
7  Export-Import Bank, recognized by Jefferson-Pilot,
8  and that assignment, although against the
9  corporation, had only one signature, true?
10    A.  True.
11    Q.  And this was done, even though their
12  page 2, paragraph [sic] IV of the split-dollar
13  endorsement says that the corporation can only assign
14  an amount that does not exceed its net premiums?
15    A.  Well, here is where I would have
16  interpreted that to have two signatures, and I guess
17  you can--can be disagreement over whether
18  their--Ms. Metzger is assigning on behalf of herself
19  individually and the corporation, in which case if
20  you go back to the split-dollar language, then, you
21  know, they're assigned their proportionate shares.
22    Q.  Well, we do know that there was another
23  assignment and that that assignment was executed by
24  Shirley Metzger individually.  We know that--
25    A.  Yes.

Page 56

1    Q.  --correct?
2    A.  Yes.
3    Q.  And one would think that, if this
4  assignment were meant to address Shirley Metzger
5  individually, there would have been some supporting
6  documentation in the Jefferson-Pilot file?
7        MR. BOSWELL:  Objection to form.  Calls
8  for speculation, no foundation.
9    A.  I apologize.  I've kind of lost track of
10  the question you asked.
11    Q.  (By Ms. Singleton)  Let me rephrase it.
12    A.  Okay.
13    Q.  If Jefferson-Pilot had considered this
14  assignment to be both against Shirley Metzger's
15  individual part of the policy and against the
16  corporate side of the policy, would it not have been
17  a routine matter to have made that clear in the file
18  in some fashion?
19    A.  I don't know.
20    Q.  Okay.  In fact, there's nothing in the
21  file that states that was what Jefferson-Pilot
22  interpreted that assignment to be leaning, is there?
23    A.  No.  I think I said that's the way I read
24  it.
25    Q.  Okay.  But Jefferson-Pilot--there's not a

Page 57

1  piece of paper that we can find that says, "With
2  regard to the Export-Import Bank assignment, that
3  assignment reaches both sides of the
4  split-endorsement policy"?
5    A.  There's nothing in the file that says
6  that.
7    Q.  Okay.  Now, is there anything that--do
8  you have any explanation for why Jefferson-Pilot only
9  required one corporate signature on that assignment?
10    A.  I can't tell from the documentation what
11  the reasoning was.
12    Q.  Okay.  What is your knowledge of what is
13  required in the state of Texas with respect to
14  signatures of corporate officers to bind the
15  corporation?
16    A.  I believe Texas is one of the states that
17  permits an individual to serve in more than one
18  corporate capacity or to serve as more than one
19  officer in the corporation.  And there are
20  corporations that only have one individual as an
21  officer for that reason.
22    Q.  Okay.  Is it routine for Jefferson-Pilot
23  to require corporations to give them a list of their
24  officers?
25    A.  No.

15 (Pages 54 to 57)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

**Page 58**

1  Q. Okay. Who provides the
2  change-of-beneficiary form like the one signed by
3  Shirley Metzger in 1995--who provides those to the
4  customer?
5  A. It depends. Sometimes the agent will
6  take one out or provide it. More often, we get a
7  request in the home office, and it's mailed out.
8  Q. Okay. Okay. Are there ever any
9  instructions that go out with it?
10  A. Well, the instructions are printed on the
11  back.
12  Q. Okay. And when you say "on the back,"
13  you're talking, I guess, about that four-page carbon
14  that Mr. Boswell provided to you?
15  A. Yes.
16  Q. Okay. And when you're saying "on the
17  back," you don't mean on the back of the individual
18  sheet that you receive from the customer?
19  A. No. It's a multipage form, and on the
20  back of the last page, there are some printed
21  instructions.
22  Q. Okay. And you're referring to, under the
23  instructions--? I'll hand you the copy that I got
24  from Mr. Boswell. Under "Instructions"--would you
25  read first the introductory paragraph into the

**Page 59**

1  record.
2  A. "Almost all beneficiary changes can be
3  requested by using this form and following the
4  examples below. However, if there is any question
5  concerning the completion of the request or if a
6  beneficiary designation is desired which cannot be
7  requested on this form, contact your local
8  Jefferson-Pilot representative or Agency which
9  services your policy."
10  Q. Okay. And then would you read number 2.
11  A. Number 2. "If the policy is corporate
12  owned, the form must be signed and dated by two
13  officials with their titles shown."
14  Q. Okay. Now, I want to draw your attention
15  now to the affidavit, which is Exhibit 5. Okay. And
16  I want to ask you about the last half of paragraph 5.
17  A. Okay.
18  Q. And that--the part I'm going to ask you
19  about, I'll read into the record here, so we'll know
20  what it says. "A copy of the instructions on the
21  reverse of the Change of beneficiary form is attached
22  as Exhibit A-2. Those instructions reflect
23  Jefferson-Pilot's usual requirements regarding a
24  Change of Beneficiary to a corporate owned policy.
25  Our records reflect that both at the time of Shirley

**Page 60**

1  Metzger's death and in 1995, Sort Rite International
2  was co-owner of the Metzger Policy with Shirley
3  Metzger. The Change of Beneficiary form signed by
4  Shirley Metzger in 1995 does not bear the signature
5  of two officers of the corporation."
6  When we look at the change-of-beneficiary
7  form, which is attached to that exhibit, we've
8  already discussed the fact that it bears two
9  signatures?
10  A. Yes.
11  Q. It bears Shirley Metzger's signature
12  twice in two different locations?
13  A. Yes.
14  Q. But you will admit, will you not, sir,
15  that, with regard to the first one, it is clear--it
16  certainly appears clear to the indifferent reader
17  that there is--there are blanks that are to be filled
18  in regarding a change-of-beneficiary form. There is
19  then some admonishments to the one signing, and then
20  there is a space for the signature, and it's a long
21  line. And then underneath that line on the form
22  itself, it says, "By," and then just the last things
23  on that part of the form says, "This acknowledgement
24  should be attached to the policy after it is received
25  back from Home Office."

**Page 61**

1  It was my understanding from your earlier
2  testimony that Jefferson-Pilot intended this line to
3  be one which was filled in by itself--by
4  Jefferson-Pilot, and not by the person who wanted the
5  change made.
6  A. Yes. That's right.
7  Q. But, in fact, sir, there's nothing on
8  this form that indicates that, is there?
9  A. Not on this form, no. Well, not on
10  this--not on the copy that you're showing me now, no.
11  Q. And did--the language just underneath the
12  place for this signature, I guess you could say--if
13  you knew that Jefferson-Pilot were to be signing
14  above, I guess you could say that this was an
15  instruction--an internal instruction to
16  Jefferson-Pilot.
17  But you will admit with me, will you not,
18  sir, that it could also be an instruction that could
19  be addressed to the one seeking the change, the
20  customer?
21  MR. BOSWELL: Objection to form. Vague
22  and argumentative.
23  A. I suppose someone could read it that way.
24  Q. (By Ms. Singleton) Okay. Okay. Now, we
25  know that somebody typed in most of this form. It

16 (Pages 58 to 61)

Reported by: Cindy A. Fletcher
Accurate Reporting  (336) 373-0985

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

**Page 62**

1 wasn't handwritten in. And we've got typed in
2 "SORT-RITE INTERNATIONAL, INC.," and then Shirley
3 Metzger's name beside it, and under it, "By SHIRLEY
4 METZGER, PRESIDENT."
5     If this were not the correct form or not
6 the correct place for her signature, would it not
7 have been a standard matter for Jefferson-Pilot to
8 have returned it to her and said "You need to sign
9 here, down at the bottom, not here"?
10    A. I don't think so. I think they saw that
11 it was signed and accepted it because it had the
12 signature.
13    Q. Okay. But you're saying that, in fact--
14 what you're saying to us today is that when they
15 accepted the signature, they accepted it for the
16 individual side of the policy and not for the
17 corporate side?
18    A. I think the assumption that was made in
19 client services was that she intended it as an
20 individual designation.
21    Q. Well, sir, doesn't this signature at the
22 bottom--it simply says, "Policy"--what does it say?
23 "Policy Owner"?
24    A. Policy owner.
25    Q. So, if you were to be exacting and

**Page 63**

1 consistent with Jefferson-Pilot's language, the
2 actual policy owner, according to Jefferson-Pilot, is
3 Sort-Rite International?
4    A. Well, actually, there are two--there are
5 co-owners on the-- You have an owner and a co-owner.
6    Q. My question to you, sir, though, is,
7 Doesn't Jefferson-Pilot call the owner the
8 corporation and call Shirley Metzger the co-owner?
9    A. Well, actually, I think the split-dollar
10 endorsement refers to Sort-Rite as "employer."
11    Q. So, is it Jefferson-Pilot's position that
12 Sort-Rite is not the owner of the policy?
13    A. No. We're just talking about the
14 definitions in the rider. If you're trying to
15 coordinate the language of this change-of-beneficiary
16 form with the split-endorsement, I don't think that
17 the two were written together, exactly.
18    Q. Okay. But down at the bottom of where--
19 the place where you say is the only place that the
20 one seeking the change-in-beneficiary form should
21 sign on this change-of-beneficiary-designation
22 form--? Is that called something else within
23 Jefferson-Pilot, incidently?
24    A. No.
25    Q. Do you guys have it as called "Form

**Page 64**

1 whatever" or--?
2    A. Well, we refer to it as "the
3 change-of-beneficiary form."
4    Q. Okay. On the change-of-beneficiary form,
5 it's my understanding from what you're saying that
6 the only place you should see the signature of the
7 one who is seeking this change is at the very bottom
8 of the page.
9    A. Well, the form is designed for the policy
10 owner to sign it at the bottom. I think it does
11 happen that people sign other places. And; if we
12 have what we consider a valid signature, we usually
13 accept it.
14    Q. Okay. Well, then clearly in this case,
15 given what you've said here, you have an ambiguity--
16 or should have an ambiguity within Jefferson-Pilot's
17 reviewing apparatus as to which capacity Shirley
18 Metzger executed her change of beneficiary as?
19    A. I would agree that reasonable people
20 could look at that and disagree about what the
21 signatures mean.
22    Q. Now, in fact, this letter didn't come
23 fully hatched from the head of Zeus to
24 Jefferson-Pilot. There was a cover letter attached
25 to this?

**Page 65**

1    A. I don't know.
2    Q. Can you find that for us.
3       (Witness reviews documents.)
4    A. Are you looking for a letter that sent it
5 out or a letter--?
6    Q. Yeah. A cover letter. It's actually a
7 cover letter on Sort-Rite stationery executed by
8 Shirley Metzger as president of Sort-Rite.
9    A. Okay. Because I don't remember seeing
10 that, but I'll see if I can find it.
11       (Witness continues to review documents.)
12       (Discussion off the record.)
13    A. I'm not able to find the transmittal
14 letter that you're referring to.
15    Q. Okay. In your affidavit, we just
16 discussed the fact that, under paragraph 5, the last
17 sentence, you state that "The Change of Beneficiary
18 form signed by Shirley Metzger in 1995 does not bear
19 the signature of two officers of the corporation."
20       Is it your position that the reason that
21 this is treated as an individual--or the reason you
22 think it should have been treated as a--an individual
23 beneficiary change is because there was not a
24 companion corporate signature?
25    A. No. I don't think that really was the

17 (Pages 62 to 65)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.    B-01-142
Carl D. Semmler, J.D.    5/3/2002

Page 66

1 reasoning. The statement in the affidavit is just a
2 statement of fact, that there are not two corporate
3 signatures.
4      Q.  Okay. But, nonetheless, you admit that
5 Jefferson-Pilot did accept this as a change of
6 beneficiary?
7      A.  Yes.
8      Q.  And they--I guess they record those
9 matters?
10     A.  Yes. It's recorded.
11     Q.  Okay. Can you tell us what that means
12 when you say that you record--like they record the
13 assignments, and they record the change of
14 beneficiaries. What does that mean?
15     A.  Two things are supposed to happen. The
16 actual paper, change-of-beneficiary form, is made a
17 part of the policy file. And then the beneficiary
18 designation is supposed to be entered onto our
19 computer-administrative system. In cases of
20 discrepancy, we rely on the paper.
21     Q.  Okay. And, in this case, was the
22 change-of-beneficiary information entered in the
23 system?
24     A.  It looks like it was, because the
25 documents in Exhibit 10 that you referred to before,

Page 67

1 which are generated by the system, show the
2 beneficiary change.
3      Q.  Okay. But we cannot discern from that
4 document whether--we cannot answer the questions
5 we're asking here by looking at Exhibit 10?
6      A.  No. That's right.
7      Q.  Okay. Now, in any event, because this
8 was recorded--this change of beneficiary was recorded
9 with Jefferson-Pilot, then, can we conclude that in
10 the event that two corporate signatures were required
11 and this did include and this was a corporate change
12 that Jefferson-Pilot chose to waive that requirement,
13 just as it had with respect to the 1988 assignment?
14     A.  If client services had accepted this form
15 as a corporate change, then, yes, they accepted it
16 with one signature.
17     Q.  Okay. Is there any way--are there any
18 documents among the papers of Jefferson-Pilot which
19 would clarify how client services treated this change
20 of beneficiary?
21     A.  No.
22     Q.  Okay. Is there any individual available
23 to enlighten us with regard to that?
24     A.  Well, I've--I think I previously
25 testified about my conversation with Mack Scott as to

Page 68

1 explain how client services treated this change.
2      Q.  With respect to how Mack Scott's--I mean,
3 was Mack Scott aware of this stuff in 1995?
4      A.  Mack Scott was not aware of this
5 particular change. What I discussed with him was,
6 hypothetically, how a beneficiary change like this
7 would have been handled.
8      Q.  Okay. You would agree with me, would you
9 not, sir, that in the event that Jefferson-Pilot had
10 looked at this change-of-beneficiary form and said,
11 "Gee, we've got something here that looks like an
12 effort to make a change on the corporate side, and
13 yet, we've got this signature that we know is the one
14 that really should be controlling down here
15 (indicating). We need to get this clarified,"
16 wouldn't they have done that if they had entertained
17 the fact that there was a problem?
18         MR. BOSWELL:  Objection to form.
19 Leading.
20     A.  I can only tell you what they--what
21 client services has said they would do with this.
22 And they have indicated that they would have treated
23 this as an individual change.
24     Q.  (By Ms. Singleton)  Well, if they had
25 done that, would they not also have sent a letter to

Page 69

1 the client, saying, "You appear to be signing in your
2 corporate capacity one place and in an individual
3 capacity in another place, and you need to be clear"?
4      A.  If you're asking me, would they have, I'm
5 not sure they would have done that. If you're asking
6 me, should they have, that's a different question.
7 You can--you can second-guess what we did.
8      Q.  Well, I guess the question that I'm
9 asking is, If Jefferson-Pilot had in fact gone
10 through some internal agony, for lack of a better
11 word, with regard to what was intended on the part of
12 the policyholder--
13     A.  Right.
14     Q.  --would it not have been a routine matter
15 to make inquiry to find that out?
16         MR. BOSWELL:  Objection to form.
17     A.  I believe that's right. I think if there
18 had been a concern about what was intended here, that
19 there would have been some follow-up.
20     Q.  (By Ms. Singleton)  Okay. Okay. Now,
21 with respect to the language of the split-dollar
22 endorsement itself, who prepares--? My first
23 question is, Who is it within Jefferson-Pilot that
24 prepares that language?
25     A.  We have a separate department, what's

18 (Pages 66 to 69)

Reported by: Cindy A. Fletcher
Accurate Reporting  (336) 373-0985

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

Page 74

1  Jefferson-Pilot's experience that corporate Employers
2  do not designate an individual beneficiary, even
3  though the Split Dollar Endorsement permits it."
4       Why did you put that in there?
5       A.  That's my--I mean, that's part of the
6  explanation as to why we treated the beneficiary
7  change as an individual change, rather than a
8  corporate change, because it's been our experience
9  that corporate employers do not designate a
10  beneficiary.
11      Q.  Well, okay.
12           MR. BOSWELL:  Objection.  Sidebar.
13           MS. SINGLETON:  I'm sorry.  I take back
14  the "okay."
15      Q.  (By Ms. Singleton)  Okay.  In the last
16  sentence of your affidavit, you say, "For these
17  reasons, Jefferson-Pilot treated the 1995 Change of
18  Beneficiary form received in connection with
19  Metzger Policy only as a change of the beneficiary to
20  Ms. Metzger's Co-Owner's portion of the policy."
21       Okay.  Will you produce for me any and
22  all paper which shows that Jefferson-Pilot treated
23  that change-of-beneficiary form as only reaching
24  Ms. Metzger's co-owner's portion of the policy?
25      A.  There's no paper that says that.

Page 75

1       Q.  Okay.  So how do you conclude that
2  Jefferson-Pilot did so treat it that way?
3       A.  That's based on my conversation with the
4  client services people who accepted the beneficiary
5  change and endorsed it.
6       Q.  Okay.  And those are people that were not
7  aware of the change at the time?  Those were people
8  who don't have paper in this file relating to
9  this 1995 change-of-beneficiary form?
10      A.  Yes.  That's right.
11      Q.  Okay.  I mean, it's my understanding--I
12  just want to make it clear that Mack Scott was not
13  involved in this 1995 change-of-beneficiary form.
14      A.  I don't know.  I'm not aware that he was.
15      Q.  Okay.  And you had a conversation with
16  him about this, did you not?
17      A.  Yes, I did have a conversation with
18  him about this kind of change and how it would be
19  treated.  I did not sit down with him and show him
20  the file and go through it.
21      Q.  He knew that you were preparing this
22  affidavit?
23      A.  I don't recall whether I told him that or
24  not.
25      Q.  Okay.  So your conversation with him was

Page 76

1  so generic that it didn't even get into the
2  particulars of Shirley Metzger's case at all?
3       A.  I think we talked about it
4  hypothetically, a situation where there was a
5  split-dollar agreement; the insured was a president
6  of the employer.  And I think we talked about the
7  facts in that way and how would that be treated with
8  a--
9       Actually, I should change what I'm
10  saying.  I apologize.  I did actually go to see Mack,
11  and I think I took him a copy of the beneficiary
12  change, so he did actually see it.
13      Q.  Okay.  And he didn't tell you, "Oh.  I
14  remember this when it happened"?
15      A.  No.
16      Q.  Okay.  What--did he tell you anything
17  regarding this particular change-of-beneficiary form
18  that would indicate to you that he had been involved
19  in the facts of this designation change when they
20  occurred in 1995?
21      A.  No.
22      Q.  Are the people in client services aware
23  of the language of the split-dollar endorsement
24  policies?
25      A.  I would say, in general, they are not

Page 77

1  very familiar with the language.
2       Q.  Okay.  So they don't know, just like you
3  didn't know, that there was a right on part of the
4  employer to make a designation change of the
5  beneficiary?
6       A.  I think that's probably right.
7       Q.  Well, that would certainly influence a
8  decision on how to characterize an ambiguous
9  change-of-beneficiary form, wouldn't it?
10      A.  That would give people reason to dispute
11  how it ought to be interpreted, certainly.
12      Q.  Well, I mean, not only that, but I'm
13  saying, within client services, to them, there is no
14  dispute, if, in fact, it's impossible for her to be
15  signing in her corporate capacity.
16      A.  That's right.  I think--I think client
17  services felt that only the individual could name a
18  beneficiary.
19      Q.  Okay.  So that would explain, then, why
20  they didn't send her a letter saying, "How do you
21  want to do this?" because, in their opinion, there
22  was only one way to do it, and she had done it wrong?
23      A.  I think they had accepted her signature
24  as an individual and treated it that way, and there
25  wouldn't--unless--because--

20 (Pages 74 to 77)

Page 78

1    Q.  I'm sorry.
2    A.  Well, I don't think they considered that
3  there was an ambiguity here, which would be a reason
4  not to follow up on it.
5    Q.  Okay.  Okay.  Now, with respect to your
6  Exhibit--your affidavit, which is Exhibit 5, the last
7  page, which, I think, is called attachment A-2, it's
8  your testimony that you didn't--that is not a part of
9  the Jefferson-Pilot file that you've produced for us
10 today?
11   A.  I don't think it's in there.
12   Q.  And the actual copy that you got that's
13 attached there as Exhibit A-2, you got from
14 Mr. Boswell?
15   A.  I believe that's right.
16   Q.  It originated with him and not with your
17 office?
18   A.  Yes.  That's the way I recall it.
19   Q.  You don't have any knowledge as--you
20 certainly don't have any knowledge as to whether
21 Ms. Metzger ever received a copy of that
22 attachment A-2, do you?
23   A.  Ms. Metzger?
24   Q.  Sure.
25   A.  I'm not sure I follow.  Received a copy

Page 79

1  of it?
2    Q.  Or you don't have any knowledge that
3  allows you to testify that she read that document at
4  the time that she executed her 1995
5  change-of-beneficiary form?
6    A.  I don't know what she read.
7    Q.  And you don't even know whether that
8  piece of paper was attached to the
9  change-of-beneficiary form that she received?
10   A.  The form that we send out has a page like
11 this (indicating) on the back of it.  Whether it was
12 this exact one, I can't say for sure, but she should
13 have been sent a form that had this language on the
14 back.
15   Q.  Okay.  But it's not your testimony that
16 you know that she did have that?  Let me explain.
17 Let me ask it a different way.
18   A.  Okay.
19   Q.  I'm not trying to be difficult here.  But
20 in your affidavit, under paragraph 5, you say--
21 somewhere in the middle of the paragraph, and I'll
22 quote, "A copy of the instructions on the reverse of
23 the Change of Beneficiary form is attached as Exhibit
24 A-2."
25   A.  Yes.

Page 80

1    Q.  Could not the indifferent third party,
2  like a judge, understand you to mean that if you were
3  simply to flip over the very page that she had to
4  sign, you would find the instructions, so that the
5  fact that she executed this page, the
6  change-of-beneficiary form, requires, by necessity,
7  that she at least have access to the reverse?
8    A.  The affidavit does not explain how the
9  form is put together and the fact that it is a
10 multipage form.
11   Q.  Okay.  So, with respect to the copy of
12 the instructions on the reverse, you don't mean that
13 it's--that if you pick up the original of the
14 change-of-beneficiary form and it--and you turned
15 over that very page and it was still in its original
16 condition, that you would find the instructions on
17 the back?
18   A.  No.
19   Q.  Okay.  And, in fact, what we've got,
20 because we have a copy of one here, is, we've got
21 something that you might call an old-fashioned
22 carbon, something that's kind of pretty soon not even
23 going to be around, except in a museum, where you've
24 got the original, and then you've got a thin carbon,
25 and then you have another copy--a slightly-changed

Page 81

1  version of the original--well, something that may
2  actually be a second copy of the original, and then
3  another carbon and then yet a third copy of the
4  original, and on the back of that third one, we have
5  the instructions?
6    A.  That's right.
7    Q.  Okay.  So the instructions--I'm assuming
8  the instructions actually come--strike out the
9  assuming part--the instructions are actually on the
10 copy that is designated by this tri-part form as the
11 agency office copy?
12   A.  Yes.
13   Q.  And the first copy appears, because it's
14 shorter than the other two, and it does not have
15 language at the bottom that's of interest only to
16 Jefferson-Pilot, we can assume that it is the first
17 copy that probably is the one that the--the one
18 seeking the change will execute and keep for himself
19 or herself?
20   A.  I'm not sure exactly how that works,
21 whether they send in the whole form and we return the
22 first page or whether they simply keep it and send in
23 the last pages.  I don't know that.
24       MS. SINGLETON:  Okay.  I want to have
25 this marked.

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

**Page 82**

1  THE WITNESS: Is that the original?
2  MS. SINGLETON: It's her original.
3  THE WITNESS: Oh. Okay. I'm sorry.
4  MS. SINGLETON: I mean, it was among her
5  papers. It's her document.
6  THE WITNESS: That's fine.
7  MS. SINGLETON: This is Exhibit what?
8  THE COURT REPORTER: Twelve.
9  MS. SINGLETON: Twelve?
10  MR. BOSWELL: Where did that come from?
11  MS. SINGLETON: Shirley Metzger's--
12  Let's see.
13      Let's go off the record a second.
14      (Discussion off the record.)
15      (Exhibit Number 12 is marked.)
16  Q.  (By Ms. Singleton) Okay. Mr. Semmler,
17  we just marked for identification Exhibit 12, and
18  that is a copy of the--or that's actually--yeah,
19  that's a copy for, for lack of a better word, I'm
20  going to say the original of the 1995
21  change-of-beneficiary form.
22      And what I've represented to you here
23  today as I gave it to you, and we had it copied, is
24  that this came from the personal papers and effects
25  of Shirley Metzger, and it appears--you can tell from

**Page 83**

1  the perforations, I'm handing you the actual original
2  now. What we've marked as a copy. But you can there
3  are perforations at the top, and the signatures are
4  original, and it bears the stamp of Jefferson-Pilot
5  or a Jefferson-Pilot agent/representative.
6      And so it was my--you were telling us
7  that, because of that stamp, we knew what about how
8  this had processed through?
9  A.  Well, the fact that it's stamped and
10  dated shows that this part of the form came into
11  Jefferson-Pilot and was received in the home office.
12  Q.  Okay. And the reason I wanted to place
13  this as an exhibit is because this is the first page
14  of that four-part form that we were just discussing,
15  and this page is not the page that has the signature
16  of the policyholder at the bottom, correct?
17  A.  Yes.
18  Q.  So the sheet of paper that the one
19  seeking the change sends in and receives back has
20  only the signature that relates in this case to
21  Shirley Metzger as president of Sort-Rite?
22      MR. BOSWELL: Objection to form. Assumes
23  facts not in evidence.
24  A.  Yes.
25  Q.  (By Ms. Singleton) Okay. And, maybe I

**Page 84**

1  didn't word that right, so I'm going to try and
2  reword it.
3  A.  Okay.
4  Q.  When we look at this page, this is the
5  first page of what we can now confidently say is a
6  four-page form; is that right?
7  A.  Is it four or three?
8  Q.  Let me see. There's a first page, and
9  this page is shorter.
10  A.  Yes.
11  Q.  Then there's a carbon. Then there's a
12  second page--
13      MR. BOSWELL: Look, just attach that.
14  I'll agree to let you attach that as an exhibit--
15      MS. SINGLETON: Okay.
16      MR. BOSWELL: --provided that, if you
17  receive the original of the deposition back, that you
18  not--you know, that it remain intact and available
19  for trial in the event that we are unable to find a
20  duplicate-original blank change-of-beneficiary form.
21      MS. SINGLETON: Okay.
22      THE WITNESS: I'll see if I can-- If we
23  still have those, then I'll send each of you one.
24      MS. SINGLETON: Okay. Would you mind
25  also sending us the form they use now.

**Page 85**

1      THE WITNESS: Okay.
2      (Exhibit Number 13 is marked.)
3  Q.  (By Ms. Singleton) Okay. Mr. Boswell
4  has been kind enough to allow us to attach to this
5  deposition as Exhibit 13 the actual form, which is
6  identical to the form that was used in this case by
7  Shirley Metzger to change the beneficiary in 1995.
8      The page that I provided to you as
9  Exhibit 13--12--
10  A.  Twelve.
11  Q.  --12 is a page that bears the original
12  signature of Shirley Metzger as president of
13  Sort-Rite International. But this very first page
14  does not provide the--does not provide a space for
15  the signature of the policy owner, which we were
16  discussing before as the second signature; isn't that
17  correct?
18      MR. BOSWELL: Objection. The document
19  speaks for itself.
20  Q.  (By Ms. Singleton) Isn't that correct?
21  A.  Yes.
22  Q.  Okay. Now, where does that second
23  signature show up? What page is it attached to?
24  A.  It's what I would call the second page of
25  the form, the one that--well, how would you

22 (Pages 82 to 85)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

Page 86

1  distinguish it? It's the--it's the second white
2  sheet after the first piece of carbon paper.
3      Q.  Okay.  And it has pink boxes where the
4  signature and the date go?
5      A.  Yes.
6      Q.  And, then, on the third and last page
7  that--what is underneath that lower part and making
8  that third page longer is something that's related to
9  Jefferson-Pilot's own housekeeping matters?
10     A.  I'm not sure how that works, but it is--
11 they don't match.  I don't know what that box is for.
12     Q.  Okay.  What it says, though, is that the
13 change of beneficiary has been recorded?
14     A.  Yes.
15     Q.  And that was done in this case?
16     A.  Yes.
17     MS. SINGLETON: Okay.  Let's go off the
18 record a second.
19     (Discussion off the record.)
20     MS. SINGLETON: I'm going to pass the
21 witness now, with the right to reserve for just a few
22 questions, which I may not even have.
23     EXAMINATION BY MR. BOSWELL
24     Q.  Okay.  Mr. Semmler, my name is Chris
25 Boswell.  I represent Sort-Rite International, Inc.,

Page 87

1  in connection with the interpleader suit that
2  Jefferson-Pilot originally filed, and you understand
3  that, correct?
4      A.  Yes.
5      Q.  And you know--you and I have spoken on
6  the telephone in the past, just as you have spoken on
7  the phone with Ms. Singleton; is that right?
8      A.  Yes.
9      Q.  You may have spoken with other lawyers on
10 the telephone representing other parties to this
11 case; is that right?
12     A.  Yes.
13     Q.  Okay.  Attached as Exhibit 5 or marked as
14 Exhibit 5 is an affidavit which you signed and
15 executed.  And my question is, Is Exhibit 5 your true
16 and authorized statement made on behalf of
17 Jefferson-Pilot Life with respect to certain facts
18 related to this case?
19     A.  Yes.
20     Q.  Now, some questions have been raised by
21 Ms. Singleton today regarding the conclusion by
22 client services that the change-of-beneficiary form
23 was a change of beneficiary to the individual, that
24 being Shirley Metzger's portion of the split-dollar
25 endorsement policy.

Page 88

1      And, in that regard, because client
2  services did consider it as a change to the
3  individual's portion of the policy, it would not,
4  then, have even considered the issue of whether two
5  corporate officers needed to sign in order to
6  authorize a change for the corporation's beneficiary?
7      A.  Yes.  That's right.
8      Q.  Okay.  The general rule of the--and
9  policy of Jefferson-Pilot, however, is to require two
10 corporate-officer signatures with their titles in
11 order to effect a change to any--to the beneficiary
12 of the--of a corporation's portion of a policy?
13     A.  Yes.  In general, we require two
14 corporate signatures in order for a corporation to
15 make policy changes.
16     Q.  And, while an exception may be made from
17 time to time, that would generally be on a
18 case-by-case basis.  Does that make sense?
19     A.  Yes.
20     Q.  Okay.  Now, in looking at the
21 change-of-beneficiary form--and I'm not sure what
22 exhibit that has been marked.
23     A.  I don't have all the exhibits anymore.
24     MS. SINGLETON: Okay.  I'm going to put
25 this one back.

Page 89

1      Q.  (By Mr. Boswell) Well, let's look at the
2  exhibit to your affidavit.  Let's look at your
3  exhibit in the affidavit.  It would be Exhibit A-1,
4  actually.
5      A.  Okay.
6      Q.  And that exhibit indicates that the new
7  beneficiaries are to be Leticia de Pino, and then
8  alternative beneficiaries are Debra Metzger and
9  Katherine Lee Metzger, and it bears designations,
10 such as friend of the insured and daughter, correct?
11     A.  Yes.
12     Q.  All right.  That would be at least
13 somewhat inconsistent or peculiar, to identify a
14 beneficiary of the corporation's portion of the
15 policy as the--as a friend or as a relation, because
16 obviously, a corporation can't have a daughter,
17 correct?
18     A.  In my opinion, it would not seem to fit.
19     Q.  All right.  And, so, the manner in which
20 she has designated the beneficiaries would be more
21 consistent with a change to the individual's portion
22 of the policy, rather than to the corporation's
23 portion of the policy.  Do you agree?
24     A.  I agree with that.
25     Q.  Also contained in your file is a

23 (Pages 86 to 89)

Reported by: Cindy A. Fletcher
Accurate Reporting  (336) 373-0985

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

**Page 90**

1  life-insurance standard confirmation inquiry dated
2  April 30th, 1996. Are you familiar with those?
3      A. No.
4      Q. Have you ever--does that appear to be an
5  inquiry from the owner of the policy or--? It's an
6  inquiry from Sort-Rite International, Inc., to the
7  corporation to confirm the existence of the policy.
8  Do you agree with that?
9      MS. SINGLETON: I'm going to object to
10  him answering questions about that, if that's not a
11  document that's used by Jefferson-Pilot.
12      A. Verification? There are some boxes
13  checked or X'ed out at the bottom of the form. It
14  looks like they're asking for some policy
15  information.
16      Q. (By Mr. Boswell) Okay. And, at the
17  bottom of the page, do you see a signature--
18      A. Yes.
19      Q. --which is a signature of an employee of
20  Jefferson-Pilot?
21      A. It looks like it's signed by Fonda James.
22  I don't know who that is.
23      Q. Okay.
24      MS. SINGLETON: Can I see that.
25      Q. (By Mr. Boswell) If we leave a space in

**Page 91**

1  the deposition, would you--when you get a chance to
2  read the deposition, would you confirm whether or not
3  she is an employee of Jefferson-Pilot.
4      A. You want to know if she's currently an
5  employee? I could tell you whether she's currently
6  an employee.
7      Q. But you wouldn't--if she had been an
8  employee in 1996 and is no longer employed, we may
9  not know that.
10      A. I couldn't tell you that now. I might be
11  able to find out.
12      Q. All right. Well, we'll leave a space, if
13  you're agreeable to that, and you can either write,
14  "I don't--was unable to determine," or "Yes, Fonda
15  James was an employee."
16      A. I can tell you if she's currently an
17  employee.
18      (Witness reviews document.)
19      A. And she's not.
20      Q. Okay. Okay. After having looked at this
21  any longer--any more, does that--do you have any--
22  have you--do you recall ever having had any
23  experience in reviewing a form like that, or have you
24  seen a form like that? It's just a standard
25  accounting--accountant's form to confirm information,

**Page 92**

1  usually for business.
2      A. All right. I don't recognize the form,
3  but we do commonly get inquiries from policy owners
4  to confirm policy status.
5      Q. Okay. And, in fact, a document titled
6  "Life Insurance Standard Confirmation Form," dated
7  April 30th, 1996, appearing to bear the signature of
8  Shirley Metzger on behalf of Sort-Rite International,
9  Inc., is contained in your file; is that right?
10      A. Yes.
11      Q. Okay. And the form signed by Shirley
12  Metzger on April 30th, 1996, after the change in
13  beneficiary indicates that Sort-Rite International,
14  Inc., is still a beneficiary of the life-insurance
15  policy in question?
16      A. Sort-Rite is shown on the form as a
17  beneficiary as shown on policies.
18      Q. Okay.
19      MS. SINGLETON: Can I see that, sir.
20      (Witness complies with request.)
21      MS. SINGLETON: Okay.
22      Q. (By Mr. Boswell) Now, we have agreed
23  that you will make a copy of your file, which is the
24  claims file and the policy file?
25      A. Yes. The claims file contains the policy

**Page 93**

1  file. So I'll make a copy of the entire file and
2  provide a copy to both you and Ms. Singleton.
3      Q. All right. To each of us?
4      A. To each of you.
5      Q. And Ms. Singleton and I have agreed to
6  stipulate that we will regard the copies that you
7  forward to us as the corporate business records of
8  Jefferson-Pilot.
9      MR. BOSWELL: Is that our agreement?
10      MS. SINGLETON: Yes. Those are the
11  business records.
12      MR. BOSWELL: Okay. Would you mark
13  these.
14      (Exhibit Numbers 14 through 16 are
15  marked.)
16      Q. (By Mr. Boswell) I'm just going to mark
17  these as Exhibits 14, 15, and 16, and ask you if
18  these are copies of letters that you wrote to me and
19  Constance Singleton?
20      (Witness reviews documents.)
21      A. Okay. Yes, they are.
22      Q. Okay. The--that original form, which we
23  have now marked--
24      MR. BOSWELL: Where is that?
25      MS. SINGLETON: Somewhere in the

24 (Pages 90 to 93)

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.     B-01-142
Carl D. Semmler, J.D.     5/3/2002

Page 94

1  exhibits.
2      Q.  (By Mr. Boswell)  Ms. Singleton has
3  talked a little bit about it and described it, and so
4  I don't feel the need to redescribe it.  But this
5  comes as one--although this one's coming apart, this
6  is designed to come as one document?
7      A.  Yes.  It's a single form with--
8      Q.  Multiple--
9      A.  --pages that are designed to tear off.
10     Q.  Multiple parts?
11     A.  Right.
12     Q.  Okay.  And, even on the first page here,
13  it says, "See the"--there is a statement in big, bold
14  letters at the bottom of the page--of the first page
15  of the multipart form that says, "See instructions on
16  Reverse Side of Last Page," correct?
17     A.  Yes.
18     Q.  Similarly, on the second and third pages,
19  that same instruction is given, to review the
20  instructions on the reverse?
21     A.  Yes.
22     Q.  All right.  In a perfect world, the back
23  side of the second page in the multipart form is
24  where the party who wants to change their beneficiary
25  should actually sign?

Page 95

1      A.  There is a space there.  That's a little
2  ambiguous.  Most people do sign on the front.  We do
3  get them in on the back.  We will accept them either
4  way.
5      MR. BOSWELL:  Okay.  I'll pass the
6  witness.
7      MS. SINGLETON:  I don't have any
8  questions.
9      (Deposition concludes at 4:08 p.m.)
10     - - - - - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1          CERTIFICATE OF WITNESS
2
3      I, CARL D. SEMMLER, J.D., hereby certify
4  that I have read the foregoing transcript of my
5  deposition, taken pursuant to the applicable Rules of
6  Civil Procedure, and that the foregoing transcript is
7  in conformity with my testimony given at that time
8  (with the exception of any corrections made by me and
9  reflected on the errata sheets attached hereto and
10  signed by me).
11
12
13      Carl D. Semmler, J.D.
14
15  Subscribed and sworn to before me, the undersigned
16  notary public, commissioned in the State of
17       and County of          , on this the
18       day of          2002.
19
20
21      Notary Public
22      My Commission expires:
23
24
25  Court Reporter:  Cindy A. Fletcher

Page 97

1          CERTIFICATE OF REPORTER
2
3      I, CINDY A. FLETCHER, Court Reporter and
4  a Notary Public, duly appointed and qualified in and
5  for the State of North Carolina at large, do hereby
6  certify:
7          That CARL D. SEMMLER, J.D., was by me
8  duly sworn to testify concerning the matters in
9  controversy in this case and was thereupon examined;
10         That said examination was reported by me
11  and the foregoing transcript is a true record of the
12  testimony given by the witness to the best of my
13  knowledge and belief;
14         That I am neither related to nor employed
15  by any of the parties or counsel employed by the
16  parties hereto, nor interested directly or indirectly
17  in the matter in controversy.
18         IN WITNESS WHEREOF, I have hereunto set
19  my hand and affixed my official seal this 6 day of
20  May 2002.
21
22
23
24      Cindy A. Fletcher, Notary Public
25      My Commission Expires:  03/11/2003

25 (Pages 94 to 97)

Reported by: Cindy A. Fletcher
Accurate Reporting  (336) 373-0985

Jefferson-Pilot Life Insurance Company vs. Sort-Rite International, et al.
Carl D. Semmler, J.D.

B-01-142
5/3/2002

Page 98

```
 1              ERRATA SHEET
 2    I wish to make the following changes for the
 3    following reasons:
 4    PAGE   LINE
 5              Change:
 6              Reason:
 7              Change:
 8              Reason:
 9              Change:
10              Reason:
11              Change:
12              Reason:
13              Change:
14              Reason:
15              Change:
16              Reason:
17              Change:
18              Reason:
19              Change:
20              Reason:
21              Change:
22              Reason:
23
24
25              (Signature of Deponent)
```

26 (Page 98)



**JEFFERSON PILOT**
FINANCIAL

Carl D. Semmler,
JD, FLMI
*Assistant Vice President
and Associate Counsel*

Jefferson Pilot Financial
PO Box 21008
Greensboro, NC 27420

bus: 336 691 3369
fax: 336 691 3258
email: carl.semmler@
jpfinancial,com

May 11, 2001

Jane Akin Brasch
Brasch & Taylor, LLP
806 Morgan
Suite J
Harlingen, Texas 78550

Lynn Frizzelle
Sr. Vice President
Coastal Bank, ssb
P. O. Drawer 2468
Harlingen, Texas 78551

Ken E. Mackey
Attorney at Law
724 South Alamo Street
Suite 1
San Antonio, Texas 78205

William Mays
Office of the General Counsel
Export-Import Bank of the United States
811 Vermont Avenue, NW
Washington, DC 20571

Constance Y. Singleton
Attorney at Law
215 Bayland Avenue
Houston, Texas 77009

Re:   Shirley Jean Metzger;  Policy No. JP4038973

Dear Mesdames and Messrs:

I have been asked to contact each of you concerning the proceeds due under the
above referenced policy. Jefferson-Pilot has heard from each of you in connection with
this policy and it is clear that there is disagreement as to the proper recipient(s) of the
policy proceeds. For that reason, Jefferson-Pilot will not make payment of the proceeds
at this time, or until some resolution can be reached about their proper payment.

PFM-`N´

Ex-Im Bank-1726

For your information, I am enclosing documentation from our file concerning the history of beneficiary designations and assignments on this policy. Hopefully, this will be of use to you in evaluating the claims of your respective clients.

On the original application for this policy, the beneficiary designation was stated as "See Split Dollar Endorsement." A copy of that Split Dollar Endorsement for Universal Life Policy is enclosed. As you can see, it shows Sort-Rite International, Inc. as the Employer and Shirley Jean Metzger as the Co-Owner. The Co-Beneficiaries were "Deborah Ann Metzger, Daughter, Katherine Lee Metzger, Daughter, and Frances E. Merrick, Mother of Insured, share and share alike, survivor or survivors." Shirley Metzger signed this form both as Applicant/Co-Owner and on behalf of the Employer.

In December of 1987, Jefferson-Pilot received an assignment in favor of San Benito Bank & Trust Company. This assignment was executed by Shirley Metzger. A copy of that document is enclosed. A second assignment was received in July of 1988 in favor of the Export-Import Bank of the United States. This assignment was signed by Shirley Metzger and by Shirley Metzger, President of the Sort-Rite International, Inc. A copy of this assignment is also enclosed.

Finally, we received a change of beneficiary form dated August 16, 1995, from Ms. Metzger. This document named Leticia Elizalde de Pino-friend of the insured, as the primary beneficiary. The contingent beneficiary was Deborah Ann Metzger, Daughter, and the second contingent beneficiary was Katherine Lee Metzger, Daughter. That form was signed by Shirley Metzger as President of Sort-Rite International, Inc. A copy of this form is enclosed.

Jefferson-Pilot has been contacted by each of you concerning this policy and a number of questions have been raised about the proper payment of the proceeds. It is my understanding that Sort-Rite International, Inc., is involved in bankruptcy proceedings. Ms. Singleton, on behalf of Leticia de Pino, has suggested that the August 1995 change of beneficiary, executed on behalf of Sort-Rite International, extinguished their claim to any benefits. Mr. Mackey, on behalf of the company, has questioned the validity of the assignments. There have also questions raised about the effect of the different signatures on our documents and whether they bind Sort-Rite International or Ms. Metzger individually, or both.

As a result, Jefferson-Pilot now finds itself the recipient of conflicting claims. We admit that the policy proceeds are due and payable, but if we pay them incorrectly, we run the risk of being sued by one or more of the interested parties. The solution for us is to file an action in interpleader by paying the proceeds into the Court, naming all of you as defendants and asking the Court to determine the proper recipients. If it becomes necessary for us to do that, we will ask the Court to reimburse us for costs and attorney's fees out of the policy proceeds. In addition, each of you will incur the costs associated with defending your claims against each other before the Court. Given the size of this policy, we would seriously consider this action in Federal Court. The interpleader rules

are clear that we are entitled to take this action regardless of our opinion of the relative merit of your respective claims.

Before we take that action, we would like to offer you an opportunity to resolve this matter between yourselves. If you can agree on a mutually acceptable division of the proceeds and can provide Jefferson-Pilot with the appropriate releases and indemnifications, we will be happy to pay the proceeds according to your agreement. Please advise me whether you want to pursue such an agreement. We are willing to hold the proceeds while you negotiate a settlement, but unless all of you agree to work toward such an agreement, Jefferson-Pilot will proceed with an action in interpleader.

I would ask that Ms. Brasch advise me whether the insured's estate has any claim to these proceeds. If not, I will not include her in future correspondence. Also, I would appreciate it if Ms. Frizzelle would provide documentation to show that Coastal Bank, ssb is the successor in interest to San Benito Bank & Trust Company.

Jefferson-Pilot will anticipate hearing from each of you within the next 20 days. — May 31 If we do not, or if you indicate that you prefer not to work out a mutual agreement, we will then proceed by filing our action in interpleader.

We appreciate your prompt attention to this matter and look forward to hearing from each of you.

Very truly yours,

Carl D. Semmler

CDS/m

Enclosures

Cc:    Katie Pulaski - 5310
       Rosie Hernandez - 78124